## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF IOWA

|  |  |  |
|---|---|---|
| IOWA ASSOCIATION OF BUSINESS AND INDUSTRY, *et al.*, | ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | No. 4:25-cv-00211 (SHL) (WPK) |
| v. | ) ) | |
| DOUG OMMEN, in his official capacity as Insurance Commissioner of Iowa, | ) ) ) ) | |
| *Defendants*. | ) ) | |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Ryan G. Koopmans
KOOPMANS LAW GROUP, LLC
500 East Court Ave., Suite 420
Des Moines, IA  50309
Telephone:  (515) 978-1140
Email:  ryan@koopmansgroup.com

Anthony F. Shelley (*pro hac vice* application forthcoming)
Joanne Roskey (*pro hac vice* application forthcoming)
DeMario M. Carswell (*pro hac vice* application forthcoming)
MILLER & CHEVALIER CHARTERED
900 Sixteenth St., NW
Washington, DC  20006
Telephone:  (202) 626-5800
Email:  ashelley@milchev.com

*Counsel for Plaintiffs Iowa Association of Business and Industry, Iowa Bankers Benefit Plan, Iowa Laborers District Council Health and Welfare Fund, Des Moines Orthopaedic Surgeons PC, and Iowa Spring Manufacturing & Sales Company*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

    A.    SF 383's Enactment, Purpose, and Financial Effect ...............................2

    B.    SF 383's Provisions .................................................................................6

    C.    This Lawsuit..............................................................................................9

ARGUMENT .......................................................................................................11

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...................12

    A.    Plaintiffs Are Likely to Succeed on the Merits of Their ERISA-
          Preemption Claim ...................................................................................12

          1.    ERISA Preempts State Laws that Dictate Plan Design,
               Interfere with Central Matters of Plan Administration, or
               Have Acute Economic Effects on Plans ....................................12

          2.    SF 383 Is Preempted as to Self-Funded ERISA Plans...............17

          3.    SF 383 Is Also Preempted as Applied to Insured ERISA
               Plans and Plans Otherwise Subject to State Insurance
               Regulations ................................................................................25

    B.    Plaintiffs Are Likely to Succeed on the Merits of Their First
          Amendment Claim...................................................................................27

II.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ...........................31

III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST
      FAVOR GRANTING PRELIMINARY RELIEF ...........................................35

CONCLUSION....................................................................................................39

CERTIFICATE OF SERVICE ......................................................................... *Post*

## INTRODUCTION

In this lawsuit, Plaintiffs challenge Senate File 383 ("SF 383"), a sweeping and just-enacted Iowa law that purports to regulate pharmacy benefit managers ("PBMs"), but in reality targets health benefit plans and those who sponsor, administer, and participate in them. Although framed as PBM regulation, SF 383 intrudes deeply into the design and administration of employer-sponsored plans – an area Congress reserved for exclusive federal regulation under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*

Plaintiffs are a coalition of ERISA-plan sponsors and ERISA plans themselves whose prescription drug benefits are administered in part by PBMs. SF 383 dictates how these plans must structure their pharmacy networks, which providers must be included, what benefits must be paid, how cost-sharing must be calculated, and what can and cannot be communicated to covered individuals. It compels plan sponsors to include specific contractual terms in their PBM agreements, alters how PBMs are compensated, and imposes detailed reporting, notice, and enforcement mechanisms, all under the threat of new legal penalties.

These mandates come at great financial expense: Plaintiffs and industry analysts estimate that SF 383's provisions will, in the aggregate, cost affected parties more than $300 million annually, with individual health benefit plans incurring $121 per covered person annually; and covered individuals additionally paying $48 annually from their own pockets. And the chief beneficiary of SF 383 is none of the parties it regulates; instead, Iowa lawmakers professed their aim to be to bolster independent, mostly rural, retail pharmacies deemed endangered under the current prescription-drug delivery system (though a big beneficiary is a not-even-rural independent pharmacy with more than 240 locations in multiple states, *see infra* p. 6). To make matters worse, SF 383 – being enacted so late in the legislative session and signed less than three

weeks before its provisions go into effect on July 1, 2025 – leaves no time for anyone to prepare for its severe logistical dislocations and increased costs.

Earlier this week, just a little more than a week after the Governor signed SF 383 into law, Plaintiffs filed this action seeking declaratory and injunctive relief on two grounds: (1) that ERISA preempts SF 383; and (2) that the law violates the First Amendment by restricting and compelling commercial speech.

Plaintiffs now move for a temporary restraining order ("TRO") and a preliminary injunction immediately halting SF 383's operation and enforcement.  Plaintiffs' counsel conferred with Defendant's counsel in an effort to obtain an agreement that Iowa would not commence enforcement of the law on July 1, in order potentially to avoid the Court needing to consider emergency relief.  Defendant, however, would not agree to non-enforcement, leaving Plaintiffs no choice but to seek preliminary relief from the Court to take effect on or before July 1, or as soon as practicable for the Court thereafter.

To put an emphasis on the absurdity of this law:  without judicial intervention, come July 1, it will be illegal for Iowa businesses to tell their employees how to save money on prescriptions – by, for example, using a national chain pharmacy that does not charge a (new) $10.68 dispensing fee.  That is not just bad policy; it is unconstitutional and preempted by federal law.  The only question is how much of SF 383, if any, will survive.  Because the legal flaws are so clear, and the immediate harm irreparable, the Court should enjoin the law in full before July 1, preserving the status quo and allowing the parties and Court to address these serious ERISA and constitutional questions through fuller briefing.

## BACKGROUND

### A.    SF 383's Enactment, Purpose, and Financial Effect

The Governor signed SF 383 into law on June 11, 2025.  *See* Ex. 1 to Compl. (ECF No.

1-1) (official statutory text).  It goes into effect on July 1, 2025.  *See* SF 383 § 9.  In essence, the legislature gave regulated parties twenty days to adjust to and implement SF 383.  Defendant has issued no implementing regulations, and yesterday placed on the Iowa Insurance Division's website the first guidance regarding SF 383.  *See* Iowa Ins. Div., *Pharmacy Benefit Managers (PBMs)*, https://iid.iowa.gov/regulated-entities/insurance-related/service-providers/pbm.

SF 383 constitutes a comprehensive re-write of the Chapter of the Iowa Code governing PBMs, which is Title XIII, subtitle 1, Chapter 510B [hereinafter "Chapter 510B"].  PBMs are companies that act as "intermediaries" between health benefit plans, health insurers, drug manufacturers, pharmacies, and covered individuals who require prescription drugs.  *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 83 (2020).  PBMs are often contracted to administer and manage prescription drug benefits offered through health benefit plans, and PBM services include, among other things, processing claims and payments for covered prescription drugs, managing drug formularies and drug costs, and establishing and maintaining pharmacy networks through which individuals in health benefit plans can access covered prescription drugs at lower cost.  *See Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183, 1188 (10th Cir. 2023), *pet. for cert. filed*, No. 23-1213 (May 10, 2024).

As of the time of SF 383's enactment, Chapter 510B's provisions were limited in scope. Not taking into account SF 383, Chapter 510B requires a PBM doing business in Iowa to obtain a certificate as a third-party administrator ("TPA") under Title XIII, subtitle 1, Chapter 510 and to comply with the requirements on TPAs under that chapter.  In addition, Chapter 510B imposes on PBMs – and only PBMs, not health benefit plans – certain other standards and requirements, including good-faith conduct and conflict of interest standards when dealing with health benefit plans; prohibitions on retaliation against pharmacies for exercising rights under Chapter 510B;

authorizations for the substitution of generic drugs for a prescribed drug; authorizations for

PBMs to contact individuals seeking to fill prescriptions; and requirements that PBMs publish

cost lists to pharmacies.  The Eighth Circuit invalidated amendments enacted in 2014 to Chapter

510B, as preempted by ERISA.  *See, e.g.*, *Pharm. Care Mgmt. Ass'n v. Gerhart*, 852 F.3d 722,

730-32 (8th Cir. 2017).

SF 383 greatly expands Iowa's regulation of PBMs and, importantly, adds extensive new

restrictions and prohibitions directly on health benefit plans, health carriers, and third-party

payors who provide prescription drug benefits to covered persons within Iowa.  Chapter 510B,

whose definitions govern SF 383, defines "Pharmacy benefits manager" as "a person who,

pursuant to a contract or other relationship with a third-party payor, either directly or through an

intermediary, manages a prescription drug benefit provided by the third-party payor."  Iowa

Code § 510B.1.15.  "Prescription drug benefit" means "a health benefit plan providing for third-

party payment or prepayment for prescription drugs."  *Id.* § 510B.1.19.  "Third-party payor" is

defined as "any entity other than a covered person or a health care provider that is responsible for

any amount of reimbursement for a prescription drug benefit" and expressly includes "health

carriers and other entities that provide a plan of health insurance or health care benefits."  *Id.* §

510B.1.22.  "Covered person" means "a policyholder, subscriber, or other person participating in

a health benefit plan that has a prescription drug benefit managed by a pharmacy benefits

manager."  *Id.* § 510B.1.4.  "Health benefit plan" means "a policy, contract, certificate, or

agreement offered or issued by a third-party payor to provide, deliver, arrange for, pay for, or

reimburse any of the costs of health care services."  *Id.* § 510B.1.6.  "Health carrier"  means "an

entity subject to the insurance laws and regulations of this state, or subject to the jurisdiction of

the commissioner, including an insurance company offering sickness and accident plans, a health

4

maintenance organization, a nonprofit health service corporation, or a plan established pursuant to chapter 509A for public employees." *Id.* § 510B.1.9.

Under these definitions, private employers (and those acting on their behalf) that offer health benefits to their employees and the employees' dependents are third-party payors within Chapter 510B's, and thus SF 383's, scope, and their coverage for their employees and the employees' dependents constitutes a health benefit plan for covered persons within Chapter 510B's, and thus SF 383's, scope. Insurers underwriting and administering private employers' coverage for their employees and the employees' dependents are health carriers within Chapter 510B's, and thus SF 383's, scope. And PBMs assisting the provision of private employers' coverage for their employees and the employees' dependents are pharmacy benefits managers within Chapter 510B's, and thus SF 383's, scope.

The legislature made the object of SF 383 well-known during the legislative process, emphasizing that the bill sought to provide money to local independent pharmacies, particularly in rural areas.[1] But the new law does more than provide funds to rural pharmacies; instead, it refashions the relationships among, and shifts costs and responsibility to, health benefit plans, third-party payors, PBMs, and covered persons in Iowa who use prescription drugs.

---

[1] *E.g.*, *Senate Video SF 383: by Klemish from Winneshiek*, Iowa Legislature, at 04:47:25–04:47:43, https://www.legis.iowa.gov/dashboard?view=video&chamber=S&clip=s2025042—8040306830—&dt=2025-04-28&offset=2030&bill=SF%20383&status=i&ga=91 (Apr. 28, 2025); *id.* at 04:48:18 - 04:49:12; *House Video SF 383: by Lundgren from Dubuque*, Iowa Legislature, 05:44:13–5:45:22, https://www.legis.iowa.gov/dashboard?view=video&chamber=H&clip=h20250512051355834&dt=2025-05-12&offset=1429&bill=SF%20383&status=r; Gigi Wood, *Businesses Split on PBM Bill Sent to Governor*, BUS. REC. (May 23, 2025), https://www.businessrecord—.com/businesses-split-on-pbm-bill-sent-to-governor/; Stephen Gruber-Miller, *Iowa lawmakers target prescription drug prices, pharmacy reimbursements with "PBM" bills*, Des Moines Reg. (Feb. 6, 2025), https://www.desmoinesregister.com—/story/news/politics/2025/02/06/iowa-legislature-targets-pharmacy-benefit-managers-with-pbm-bills-aimed-to-help-costs/78244622007/; *see also* Governor's Signing Statement (Ex. 1 to Compl.).

Industry analyses of SF 383 estimate that, in the aggregate, the cost for health benefit plans and covered persons will increase annually by tens of millions of dollars – perhaps by as much as $340 million annually.  *See* Jason Clayworth, *Iowa Groups Urge Reynolds to Veto Pharmacy Reform Bill, Axios Des Moines* (May 14, 2025), https://www.axios.com/local/des-moines/2025/05/14/iowa-pharmacy-benefit-manager-reform-pbm [hereinafter "Clayworth, Axios Article"].  Plaintiffs' economic analyses show that, annually, for each of them, their costs to provide prescription drugs to their employees will rise by $120.51 per covered person under SF 383's provisions; and their employees' out-of-pocket charges will increase by $48.18 per year. Declaration of Bradley W. Bartle ¶ 22 (Ex. 1 to Mot. for TRO & Prelim. Inj.) (ECF No. 6-1) [hereinafter "Bartle Decl."].  Further, the industry analyses suggest that the main beneficiary of the law may not be rural, struggling independent pharmacies, but a large corporate retail pharmacy with more than 240 locations, many in urban areas, in several states (though not the twenty states necessary for it to constitute a chain that would not receive the financial benefits associated with SF 383, *see infra* p. 9 n.3).  *See* Clayworth, Axios Article (noting that "Hy-Vee, Iowa's largest pharmacy retailer, is projected to receive an additional $66 million annually under the bill").

### B.    SF 383's Provisions

The complaint in this case lays out in full detail the provisions of SF 383, and to whom each is directed (noting the entity to which each particular provision is aimed with **bold** text). *See* Compl. ¶ 24 (pp. 9-14) (ECF No. 1); *id.* ¶¶ 25, 26.  In brief, SF 383 contains the following provisions relevant to this litigation, listed in the order they appear in SF 383 and with similar **bold** notation as to whom the provision is directed:

6

- A prohibition on discrimination by **PBMs**, **health carriers**, **health benefit plans**, and **third-party payors** in their dealings with pharmacies.  SF 383 § 1 (new Iowa Code § 510B.1.4.).

- A limitation on **PBMs** guiding **covered persons** to preferred pharmacies within a **health benefit plan**'s network.  SF 383 § 3 (new Iowa Code § 510B.4B.1.a.).

- An any-willing-provider provision applicable to **PBMs** for participation in a **covered person**'s **health benefit plan**.  SF 383 (new Iowa Code § 510B.4B.1.b.).

- A pharmacy-accreditation standard that **PBMs** must use for determining participation in a **third-party payor**'s network.  SF 383 (new Iowa Code § 510B.4B.1.c.).

- A restriction on **PBMs** from characterizing a drug as a "specialty drug"[2] so that they may not "[u]nreasonably" prevent wide access for a **covered person** to the drug within a **health carrier**'s network.  SF 383 § 3 (new Iowa Code § 510B.4B.1.d.).

- A prohibition on **PBMs** requiring **covered persons** exclusively to use mail-order pharmacies.  SF 383 § 3 (new Iowa Code § 510B.4B.1.e.).

- A prohibition on **PBMs** from imposing cost-sharing obligations or other conditions on a **covered person**'s use of a pharmacy that differ from cost-sharing obligations or other conditions for mail-order pharmacies.  SF 383 § 3 (new Iowa Code § 510B.4B.1.f.).

---

[2] SF 383 defines "Specialty drug" as "a drug used to treat chronic and complex, or rare medical conditions and that requires special handling or administration, provider care coordination, or patient education that cannot be provided by a nonspecialty pharmacy or pharmacist."  SF 383 (new Iowa Code § 510B.1.21B.).

- An any-willing-provider provision applicable to **third-party payors**, including a written notice requirement for the **third-party payor** to advise pharmacies of the opportunity to join the network.  SF 383 § 3 (new Iowa Code §  510B.4B.2.a.).

- A notice requirement for **third-party payors** to inform **covered persons** about in-network pharmacies.  SF 383 § 3 (new Iowa Code § 510B.4B.2.b.).

- An enforcement provision for a **covered person** or pharmacy injured by a violation of SF 383 § 3 to seek injunctive relief.  SF 383 § 3 (new Iowa Code § 510B.4.).

- A requirement that a **PBM** have cost-sharing equivalence for a **covered person** at all pharmacies.  SF 383 § 4 (new Iowa Code § 510B.8.3.).

- A requirement that **PBMs** pass through to **health carriers** and to an "**employee benefit plan sponsor** as permitted by the federal Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*" 100% of all rebates the **PBM** receives.  SF 383 § 4 (new Iowa Code § 510B.8.4.).

- A requirement that **PBMs** compute cost-sharing by referencing any amount contributed on behalf of the **covered person**, such as manufacturers' coupon assistance.  SF 383 § 4 (new Iowa Code § 510B.8.5.).

- A similar requirement that **PBMs** provide credit to the **covered person** toward a **health benefit plan**'s deductible, irrespective of the source of funds utilized by the covered person.  SF 383 § 4 (new Iowa Code § 510b.8.6.).

- A standard for computing a **covered person**'s cost-sharing in high-deductible health benefit plans.  SF 383 § 4 (new Iowa Code §  510b.8.7.).

- A requirement that **PBMs** utilize a reimbursement rate for all pharmacies that is no lower than the rate at which the **PBM** reimburses its affiliated pharmacies.  SF 383 § 5 (amended Iowa Code § 510B.8B.1.).

- A requirement that **PBMs** reimburse retail pharmacies[3] at the published national average acquisition cost or, alternatively, the wholesale acquisition cost, as of the date the drug is administered or dispensed.   SF 383 § 5 (amended Iowa Code § 510B.8B.2.).

- A requirement that **PBMs** pay a dispensing fee to retail pharmacies of $10.68 per prescription.  SF 383 § 5 (amended Iowa Code § 510B.8B.3.).

- Quarterly reporting requirements for **PBMs** to file reports to the Iowa Insurance Division on drug reimbursements.  SF 383 § 5 (amended Iowa Code § 510B.8B.4.a., .b., .d.).

- A requirement that all contracts between **PBMs** and a **third-party payor** amended or adjusted after July 1, 2025 for plan year 2026 include pass-through pricing.[4]  SF 383 § 6 (new Iowa Code § 510B.8D.1.).

- A requirement that SF 383's contractual mandates for **PBM** / **third-party payor** contracts (such as pass-through pricing) shall supersede contrary provisions in any

---

[3] Under SF 383, "'Retail pharmacy' means a pharmacy that is not a pharmacy chain or a publicly traded entity, and that does not exclusively provide mail order dispensing of prescription drugs." SF 383 § 1 (new Iowa Code § 510B.1.21A.).  "'Pharmacy chain' means an entity that has twenty or more pharmacies under common ownership or control located in at least twenty or more states." *Id.* (new Iowa Code § 510B.1.16A.).

[4] SF 383 defines "'Pass-through pricing" as "a model of prescription drug pricing in which payments made by a third-party payor to a pharmacy benefits manager for prescription drugs are equivalent to the payments the pharmacy benefits manager makes to the dispensing pharmacy or dispensing health care provider for the prescription drugs, including any professional dispensing fee." SF 383 § 1 (new Iowa Code § 510B.1.11B.).

contract adjusted or amended after July 1, 2025 for the 2026 plan year.  SF 383 § 6 (new Iowa Code § 510B.8D.2.).

- An enforcement provision requiring **PBMs** to provide a process for a pharmacy to appeal "any matter."  SF 383 § 7 (new Iowa Code § 510B.8E.1.-.3.).

### C.      This Lawsuit

Plaintiffs filed this action on June 23, 2025.  Plaintiffs are:  (1) the Iowa Association of Business and Industry ("ABI"), which is Iowa's largest business association, comprising hundreds of Iowa employers that sponsor ERISA-governed health benefit plans, both self-funded and insured, for their employees and their dependents[5] that include prescription drug coverage managed by a PBM, *see* Compl. ¶ 8; (2) Iowa Bankers Benefit Plan ("IBBP"), which is a multiple employer welfare arrangement ("MEWA") under ERISA that includes prescription drug coverage managed by a PBM, *see id.* ¶ 9; (3) Laborers District Council Health and Welfare Fund, which is a self-funded Taft-Hartley welfare benefit plan governed by ERISA that includes prescription drug coverage managed by a PBM, *see id.* ¶ 10; (4) Des Moines Orthopaedic Surgeons PC, which sponsors a self-funded ERISA-governed health benefit plan for its employees and their dependents that includes prescription drug coverage managed by a PBM, *see id.* ¶ 11; and (5) Iowa Spring Manufacturing & Sales Company, which sponsors an insured ERISA-governed health benefit plan for its employees and their dependents that includes prescription drug coverage managed by a PBM.  *See id.* ¶ 12.  The Iowa Insurance

---

[5] Under ERISA, employees and their dependents covered under an ERISA plan are generally referred to as "participants" and "beneficiaries," respectively.  A "'participant' means any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan," and a "'beneficiary' means a person designated by a participant . . . who is or may become eligible for a benefit [under an ERISA plan]."  29 U.S.C. § 1002(7)-(8).

Commissioner, sued in his official capacity, is the state official responsible for enforcement of SF 383. Under ERISA, ERISA plans can sue and be sued. *See* 29 U.S.C. § 1132(d)(1).[6]

SF 383 applies to ERISA plans because an ERISA-plan sponsor is a "Third-party payor" under SF 383, an ERISA plan is a "Health benefit plan" under SF 383, ERISA-plan participants and beneficiaries are "Covered person[s]" under SF 383, and a PBM providing services to an ERISA plan is a "Pharmacy benefits manager" under SF 383. *See supra* pp. 4-5.

Plaintiffs' complaint raises two claims. The first is that ERISA preempts a myriad of SF 383's provisions. *See* Compl. ¶¶ 53-63. The second (*see id.* ¶¶ 64-79) is that various provisions of SF 383 violate the First Amendment. For relief, Plaintiffs request that the Court preliminarily and permanently enjoin enforcement of SF 383 in its entirety and that the Court declare SF 383 preempted by ERISA and in violation of the First Amendment. *Id.* at 37-38.

Plaintiffs now move for a TRO and a preliminary injunction. With the TRO, they seek a temporary stay of SF 383's enforcement (for 14 days) to commence on or before the statute's effective date of July 1, 2025, or as soon thereafter as practicable for the Court to enter a TRO. A TRO would maintain the status quo and, respectfully, allow the Court to consider the serious issues raised by Plaintiffs' request for preliminary relief in a more deliberate manner, upon briefing and argument by the parties, as the Court deems appropriate.

## **ARGUMENT**

Under the four-part standard for TROs and preliminary injunctions,

[a] party seeking to preliminarily enjoin the implementation of a state statute must show [1] that it is likely to succeed on the merits, [2] that there is a threat of

---

[6] ERISA defines "welfare plan" to include health benefit plans. A "welfare plan," is, in relevant part, "any plan, fund, or program which has heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing its participants and their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, [or] disability."  29 U.S.C. § 1002(1).

irreparable harm to the movant if the injunction is not granted, [3] that the balance of harms favors the movant, and [4] that the injunction is in the public interest.

*Ass'n for Accessible Meds. v. Ellison*, No. 24-1019, --- F.4th ---, 2025 U.S. App. LEXIS 14434, *3 (8th Cir. June 12, 2025) (preliminary injunction); *accord Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (TRO).  Of those factors, "'likelihood of success on the merits is most significant.'"  *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 517 (8th Cir. 2024) (quoting *S & M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992)).

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs raise two counts in their complaint, one based on ERISA preemption and the other under the First Amendment.  Plaintiffs are likely to succeed on the merits on both.

### A.   Plaintiffs Are Likely to Succeed on the Merits of Their ERISA-Preemption Claim

#### 1.   *ERISA Preempts State Laws that Dictate Plan Design, Interfere with Central Matters of Plan Administration, or Have Acute Economic Effects on Plans*

ERISA-preemption analysis starts with ERISA's express preemption provision.  It states that "the provisions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" governed by ERISA.  29 U.S.C. § 1144(a). With that provision, which is "clearly expansive," *Egelhoff v. Egelhoff*, 532 U.S. 141, 146 (2001) (internal quotation marks and citation omitted), Congress indicated its "'intent to establish the regulation of employee welfare benefit plans 'as exclusively a federal concern.'"  *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 321 (2016) (quoting *Alessi v. Raybestos-Manhattan, Inc.*, 451 U. S. 504, 523 (1981)).

ERISA was enacted to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures.  In pursuit of that goal, Congress sought "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law," thereby "minimiz[ing] the administrative and financial burden of complying with conflicting directives" and ensuring that plans

do not have to tailor substantive benefits to the particularities of multiple jurisdictions.

*Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020) (quoting *Gobeille*, 577 U.S. at 320-21, and *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990)).

In turn, giving further content to the "relate to" language in the preemption provision's text, the Supreme Court has explained that a "'state law relates to an ERISA plan if it has a connection with or reference to such a plan.'" *Id.* (quoting *Egelhoff*, 532 U.S. at 147). Of those two rubrics, the "reference to" prong is narrower. "A law refers to ERISA if it acts exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation." *Id.* at 88 (internal quotation marks and citation omitted). "In *Rutledge*, the Supreme Court clarified that the existence of ERISA plans is essential to a law's operation only if the law cannot apply to a non-ERISA plan." *Pharm. Care Mgmt. Ass'n v. Wehbi* ("*Wehbi*"), 18 F.4th 956, 969 (8th Cir. 2021).

But the "connection with" standard, in contrast, encompasses a diversity of situations in which state laws impermissibly "relate to" ERISA plans. A state law has a "connection with" ERISA plans when it "require[s] providers [*i.e.*, ERISA-plan sponsors] to structure benefit plans in particular ways, such as by requiring payment of specific benefits, or binding plan administrators to specific rules for determining beneficiary status." *Rutledge*, 592 U.S. at 86-87 (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983)). A state law also has a "connection with" ERISA plans if it "'governs . . . a central matter of plan administration,'" such as reporting recordkeeping, disclosures, or fiduciary obligations, all of which are specifically addressed within ERISA; in such situations, keeping to ERISA's standards ensures "'nationally uniform plan administration.'" *Gobeille*, 577 U.S. at 320 (quoting *Egelhoff*, 532 U.S. at 148). Likewise, a state law has a "connection with" ERISA plans if it has "'acute, albeit indirect, economic

13

effects'" so as to "'force an ERISA plan to adopt a certain scheme of substantive coverage or

effectively restrict its choice of insurers.'"  *Id.* (quoting *N.Y. State Conf. of Blue Cross & Blue*

*Shield Plans v. Travelers Ins. Co.* ("*Travelers*"), 514 U.S. 645, 668 (1995)).  Additionally, a state

law will have a "connection with" an ERISA plan if it sets forth an "alternative enforcement

mechanism" to the remedies ERISA provides in 29 U.S.C. § 1132(a).  *Travelers*, 514 U.S. at

658.[7]  On the other hand, a state law that has an "'indirect economic influence'" and "merely

increase[s] costs" for an ERISA plan lacks a sufficient "connection with" ERISA plans to

warrant preemption.  *Rutledge*, 592 U.S. at 87 (quoting *Travelers*, 514 U.S. at 659).

 Aside from its main "relate to" provision, ERISA contains a savings clause for a state law

that "regulates insurance." 29 U.S.C. § 1144(b)(2)(A).  However, it provides only "narrow"

respite from ERISA's preemption provision.  *Shaw*, 463 U.S. at 100.  A state insurance

regulation under ERISA is not whatever the state includes in its insurance code.  Rather, a state

law regulates insurance for ERISA purposes only where the state law is:  (a) "specifically

directed toward entities engaged in insurance," and (b) "substantially affect[s] the risk pooling

arrangement between the insurer and the insured."  *Kentucky Ass'n of Health Plans v. Miller*,

538 U.S. 329, 342 (2003).  Plus, a "deemer" clause right after the savings clause provides that an

ERISA plan itself cannot "be deemed an insurance company or other insurer . . . or to be

engaged in the business of insurance" to come within the scope of a saved state insurance

regulation.  29 U.S.C. § 1144(b)(2)(B).  The consequence of the savings and deemer clauses is

that "self-funded employee benefits plans" enjoy the full breadth of ERISA's preemption

provision; "employee benefit plans that are insured are subject to indirect state regulation . . .

---

[7] Separately, ERISA's enforcement scheme, 29 U.S.C. § 1132(a), of its own power, preempts state-law
remedies that would operate against ERISA plans.  *See Aetna Health Inc. v. Davila*, 542 U.S. at 200, 217
(2004); *Ingersoll-Rand*, 498 U.S. at 142.

insofar as [state insurance regulations] apply to the plan's insurer." *FMC Corp. v. Holliday*, 498 U.S. 52, 61 (1990). Still further, a saved state insurance law can still be preempted, if it conflicts with a substantive ERISA provision. *See, e.g.*, *Aetna Health Inc.*, 542 U.S. at 217 (ERISA's enforcement provision preempts state insurance remedies).[8]

In a series of decisions (some referenced already above), the Supreme Court, the Eighth Circuit, and another Court of Appeals have applied ERISA's general preemption principles in the context of state laws purporting to regulate PBMs, sometimes finding preemption, sometimes not: (1) *Rutledge*, 592 U.S. at 86-91 (Arkansas PBM law not preempted by ERISA); (2) *Wehbi*, 18 F.4th at 968-69 (North Dakota PBM law not preempted by ERISA); (3) *Pharmaceutical Care Management Ass'n v. Gerhart* ("*Gerhart*"), 852 F.3d 722, 730-31 (8th Cir. 2017) (earlier amendments to Iowa Code § 510B.8. preempted by ERISA);[9] and *Pharmaceutical Care Management Ass'n v. Mulready* ("*Mulready*"), 78 F.4th 1183, 1193-1205 (10th Cir. 2023), *pet. for cert. filed*, No. 23-1213 (May 10, 2024) (Oklahoma PBM law preempted by ERISA).

Regardless of their final outcomes on preemption, the decisions agree that a state law, even if addressed just to PBMs, as opposed to ERISA plans directly, cannot "escape preemption on that basis." *Wehbi*, 18 F.4th at 966; *see id.* ("Because PBMs manage benefits on behalf of

---

[8] Plaintiff IBBP is an ERISA-governed MEWA. For it, under another provision in ERISA's preemption regime, "any law of any State which regulates insurance may apply to the extent not inconsistent with ERISA." 29 U.S.C. § 1144(b)(6)(a)(ii).

[9] *Gerhart* remains binding precedent with respect to some of its "connection with" analysis. In *Wehbi*, the Eighth Circuit recognized that the Supreme Court's *Rutledge* decision undercut *Gerhart*'s "reference to" holdings. 18 F.4th at 969. However, *Gerhart* also found preemption of several provisions amending Iowa Code § 510B.8. – the very law at issue here – on the basis of "a prohibited connection with ERISA," 852 F.3d at 730, and *Rutledge* and *Wehbi* – in their holdings finding no ERISA preemption of the state laws there at issue on a "connection with" test – involved state-law measures mostly different than in *Gerhart*. *See infra* pp. 19-20. Where there is Eighth Circuit precedent that "has direct application in a case, [courts in the Circuit] should follow it, even if a later [Supreme Court] decision arguably undermines some of its reasoning." *Bierman v. Dayton*, 900 F.3d 570, 574 (8th Cir. 2018) (citing *Agostini v. Felton*, 521 U.S. 203, 237 (1997)).

plans, a regulation of PBMs 'function[s] as a regulation of an ERISA plan itself.'") (quoting

*Pharm. Care Mgmt. Ass'n v. District of Columbia*, 613 F.3d 179, 188 (D.C. Cir. 2010)); *accord*

*Mulready*, 78 F.4th at 1195-96.  At the same time, because PBMs actually are intermediaries not

expressly mentioned in ERISA, ERISA poses lesser concern for a state law addressed to a

PBM's relations with just pharmacies, which also nowhere are expressly mentioned in ERISA.

*Rutledge*, 592 U.S. at 88-89 ("the Act does not directly regulate health benefit plans at all");

*Wehbi*, 18 F.4th at 968 (finding ERISA did not preempt state requirements "merely authoriz[ing]

pharmacies to do certain things"); *see generally Travitz v. Ne. Dep't ILGWU Health & Welfare

Fund*, 13 F.3d 704, 709-10 (3d Cir. 1994) (a relevant preemption "factor" is whether "the state

law affects relations among the principal ERISA entities – the employer, the plan, the plan

fiduciaries, and the beneficiaries – rather than relations between one of these entities and an

outside party, or between two outside parties with only an incidental effect on the plan").

Finally, two additional points about ERISA preemption bear emphasis at the start.  First,

there now is "no presumption against preemption when applying the express preemption

provision[] in ERISA."  *Wehbi*, 18 F.4th at 967 (citing change in law resulting from *Puerto Rico

v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115 (2016)).  Second, decisions rejecting ERISA

preemption have typically involved "generally applicable laws [that] regulat[e] 'areas where

ERISA has nothing to say.'"  *Egelhoff*, 532 U.S. at 148 (quoting *Cal. Div. of Labor Standards

Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 330 (1997)).  In contrast, if a state seeks

*directly* to regulate employee benefit plans or "an area of core ERISA concern" like "the

payment of benefits," courts "have not hesitated" to find ERISA to preempt the state law.  *Id.* at

147, 148, 151;  *Mackey v. Lanier Collection Agency & Serv.*, 486 U.S. 825, 829 (1988) ("we

have virtually taken it for granted that state laws which are 'specifically designed to affect

employee benefit plans' are pre-empted") (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47-48 (1987), and *Shaw*, 463 U.S. at 98).

### 2. SF 383 Is Preempted as to Self-Funded ERISA Plans

Some of Plaintiffs sponsor self-funded ERISA plans, and many of Plaintiff ABI's members do so as well. For self-funded ERISA plans (as opposed to insured plans), whether SF 383 is preempted turns entirely on whether any of SF 383's provisions "relate to" ERISA plans. At a minimum, Plaintiffs are likely to succeed in establishing that innumerable provisions in SF 383 have "connection with" ERISA plans and, therefore, "relate to" them and are preempted.

a. *Anti-Discrimination Provision.* SF 383's overarching anti-discrimination provision states that a "pharmacy benefits manager, health carrier, health benefit plan, or third-party payor shall not discriminate against a pharmacy or pharmacist with respect to participation, referral, reimbursement of a covered service, or indemnification if a pharmacist is acting within the scope of the pharmacist's license . . . and the pharmacy is operating in compliance with all applicable laws and rules." SF 383 § 1 (new Iowa Code § 510B.1.4.). Notably, like many of SF 383's other provisions, the anti-discrimination provision does not simply regulate PBMs' relationships with pharmacies. It extends the state's regulation to health benefit plans and third-party payors *directly*.[10] Iowa's endeavor to regulate ERISA plans and their sponsors directly puts SF 383 in the most-endangered-species category: the type of legislation that courts have "virtually taken . . . for granted" to be preempted. *See supra* p. 16.

---

[10] Again, in the chart in the complaint (¶ 24) detailing SF 383's various provisions, Plaintiffs highlighted in **bold** the entities to which each provision is facially directed. As the chart indicates, several take aim not just at PBMs, but also at health benefit plans and third-party payors. Further, any provision addressed to a PBM's activities with respect to a "covered person" inevitably entangles an ERISA plan, because "covered person" is defined as any "person participating in a *health benefit plan* that has a prescription drug benefit managed by a pharmacy benefits manager." Iowa Code § 510B.1.4. (emphasis added).

In effect, the anti-discrimination provision prohibits ERISA-plan terms or ERISA administrators from favoring one provider over another.  For instance, ERISA plans may not make special arrangements with particular providers for access to prescription drugs, even "specialty drugs" to "treat chronic and complex or rare medical conditions and that require special handling or administration, [and] provider care coordination."  SF 383 § 1 (new Iowa Code § 510B.1.21B); *see also* SF 383 § 3 (new Iowa Code § 510B.4B.1.d.) (restricting PBMs from designating a drug as a "specialty drug" in order to prevent participants and beneficiaries from obtaining the drug from *any* in-network provider).  Irrespective of the beneficial purpose the state may believe it is furthering, ERISA's preemption provision does not allow Iowa to "prohibit[] employers from structuring their employee benefit plans in a manner that discriminates" against a provider.  *Shaw*, 463 U.S. at 96-97 (finding that ERISA preempted New York's "Human Rights Law and Disability Benefits Law" because it barred "discriminat[ion]" by ERISA plans "on the basis of pregnancy").

> b.      <u>*Limitations on Guidance for Participants and Beneficiaries*</u>.  Another of SF 383's provisions limits PBMs from guiding participants and beneficiaries to a particular pharmacy within an ERISA plan's network, including by "a promotion of one participating pharmacy over another" or even by assisting the participant or beneficiary with a "compari[son of] the reimbursement rates" for the particular pharmacy versus a mail-order pharmacy.  SF 383 § 3 (new Iowa Code § 510B.4B.1.a.).  The anti-discrimination provision contains a similar prohibition on ERISA plans and ERISA-plan sponsors (in addition to PBMs), in that it prohibits "referral[s]" by them of one pharmacy over another.  *Id.* § 1 (new Iowa Code § 510B.1.4.).

These anti-steering mechanisms intrude on central matters of plan administration, which include "fiduciary responsibilit[ies]."  *Shaw*, 463 U.S. at 98.  Under ERISA, a fiduciary has the

18

obligation to act "for the exclusive purpose" of "providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Yet, notwithstanding that it may be in a participant's or beneficiary's and the plan's best financial (or other) interests for the individual to fill a prescription at a particular pharmacy with whom the ERISA plan has preferred terms (or one for which there is lower cost since it is not a retail pharmacy for which a dispensing fee applies), Iowa bars administrators from furthering that outcome, in order to avoid favoritism of one pharmacy over another.

      c.    *Network Restrictions*. SF 383 instructs ERISA plans and PBMs on how they must construct the pharmacy networks that their ERISA-plan participants and beneficiaries may access on preferred terms. In that respect, there are any-willing-pharmacy provisions applicable both to third-party payors and PBMs, respectively. *See* SF 383 § 3 (new Iowa Code §§ 510B.4B.1.b. & 510B.4B.2.a.). Together, these provisions mandate that ERISA plans and PBMs potentially "take all comers" into their pharmacy networks, irrespective of whether they believe a particular pharmacy's entry into the network is in their or their participants' and beneficiaries' best interests.

      These are exactly the types of state laws that *Mulready* held ERISA to preempt, because they are "quintessential state laws that mandate benefit structures." 78 F.4th at 1199. "[T]hey impede PBMs from offering plans some of the most fundamental network designs, such as preferred pharmacies, mail-order pharmacies, and specialty pharmacies." *Id.* at 1200. "ERISA preempts these provisions because a pharmacy network's scope (which pharmacies are included)" is a "key benefit design[] for an ERISA plan." *Id.* at 1198. Moreover, consistent with *Mulready*, the Eighth Circuit previously has held that ERISA preempts state any-willing-provider laws. *See Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 413 F.3d 897, 907

(8th Cir. 2005) (holding, "[w]ith regard to self-funded ERISA plans," that ERISA preempts Arkansas' "AWP laws," *i.e.*, any-willing-provider laws).[11]

   d. <u>*Cost-Sharing Requirements*</u>.  A core feature of SF 383 is its limitations on the manner in which ERISA plans may set and calculate cost-sharing for participants and beneficiaries.  The Iowa statute prohibits "copayment or coinsurance variation" depending on the provider utilized (SF 383 § 3 (new Iowa Code § 510B.4B.1.a.) & § 4 (new Iowa Code § 510B.8.3.)); prohibits cost-sharing incentives for the use of mail-order pharmacies (SF 383 § 3 (new Iowa Code § 510B.4B.1.f.)); mandates credit for a participant's or beneficiary's cost-sharing regardless of the payment source, such as a drug manufacturer's coupon rather than the individual's own funds (SF 383 § 4 (new Iowa Code § 510b.8.6., .7.)); and sets cost-sharing rules for high-deductible health benefit plans.  SF 383 § 4 (new Iowa Code § 510B.8.7.).

   Like state-law provisions mandating "a pharmacy network's scope (which pharmacies are included)," state-law measures telling ERISA plans "what cost-sharing arrangements" they must adopt impermissibly dictate plan design.  *Mulready*, 78 F.4th at 1198.  Typically, cost-sharing is delineated in the ERISA plan itself, so that a state's regulation of it "directs or forbids an element of plan structure or benefit design."  *Id.*[12]

---

[11] SF 383 also contains a provision establishing the accreditation criteria for entry into "a third-party payor network."  SF 383 § 3 (new Iowa Code § 510B.4B.1.c.).  *Wehbi* casts some doubt on ERISA's preemption of accreditation requirements, because the one there in issue survived the preemption challenge due to it having only "*de minimis* economic effects."  18 F.4th at 968.  *Wehbi* is distinguishable on this point, however, because the state law there "limit[ed] the accreditation requirements that a PBM may impose on pharmacies as a condition for participation in *its* network."  *Id.* (emphasis added).  Here, the accreditation requirement impacts the third-party payor's network directly, thus immediately affecting the ERISA plan's structure.  There is not an exception to ERISA preemption for "a *de minimis* effect on plan *design*."  *Mulready*, 78 F.4th at 1203 (finding *Wehbi* inapposite) (second emphasis added).

[12] The United States, at the Supreme Court's invitation, filed a brief in *Mulready*, in connection with the Court's consideration of a pending petition for certiorari in its case.  Recommending against certiorari, the United States agreed with the Tenth Circuit that ERISA preempts state-law network-participation (*i.e.*, any-willing-provider) laws and cost-sharing requirements.  Br. of United States at 12-13, 17, *Mulready v.*

e.     *Reporting and Notice Requirements*.  Under SF 383, PBMs must file quarterly reports with the state on a slew of topics associated with their provision of prescription-drug benefits for ERISA (and other) plans.  *See* SF 383 § 5 (new Iowa Code § 510B.8B.4.a., .b.).  Further, ERISA plans and their sponsors (as third-party payors) must send participants and beneficiaries notices advising them of "the names and locations of all pharmacies participating in the health benefit plan as providers of pharmacy services and prescription drugs."  SF 383 § 3 (new Iowa Code § 510B.4B.2.b.).  ERISA plans and their sponsors (as third-party payors) must also "notify, in writing, all pharmacies [of] the opportunity to participate in the health benefit plan."  *Id.* (new Iowa Code § 510B.4B.2.a.).

These are reporting and disclosure requirements beyond anything ERISA mandates.  As noted earlier, "reporting, disclosure, and recordkeeping are central to, and an essential part of, the uniform system of plan administration contemplated by ERISA."  *Gobeille*, 577 U.S. at 323; *see supra* p. 13.   "Differing, or even parallel, regulations from multiple jurisdictions could create wasteful administrative costs and threaten to subject plans to wide-ranging liability.  Pre-emption is necessary to prevent the States from imposing novel, inconsistent, and burdensome reporting requirements on plans."  *Gobeille*, 577 U.S. at 323 (citations omitted).  In addition, the reporting and disclosures that SF 383 requires resemble the earlier Iowa requirements that *Gerhart* found ERISA to preempt, not the *de minimis* elective disclosures (to be provided "upon request") to private parties that *Wehbi*, 18 F.4th at 969, sanctioned.  *See Gerhart*, 852 F.3d at 731 ("Here, Iowa's law compels PBMs as third-party administrators to report to the commissioner and to

_____

*Pharm. Care Mgmt. Ass'n*, No. 23-1213 (U.S.) (filed May 27, 2025), https://www.supremecourt.gov/ DocketPDF/23/23-1213/359728/20250527171343811_23-1213_Mulready.pdf.

network pharmacies their methodology for establishing reimbursement amounts paid to pharmacies for providing certain generic drugs to plan participants.").

        f.      *Plan-PBM Contract Limitations*.  SF 383 establishes mandatory terms for contracts between PBMs and ERISA plans (as third-party payors).  The contracting parties must adopt "pass-through pricing" (SF 383 § 6 (new Iowa Code § 510B.8D.1.)), which "means a model of prescription drug pricing in which payments made by a third-party payor to a [PBM] for prescription drugs are equivalent to the payments the [PBM] makes to the dispensing pharmacy or dispensing health care provider for the prescription drugs, including any professional dispensing fee."  *Id.* § 1 (new Iowa Code § 510B.1.11B.).  Relatedly, SF 383 requires that "one hundred percent of all rebates received by a [PBM] shall be passed through to . . . the employee benefit plan sponsor as permitted by the federal Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.*"  *Id.* § 4 (new Iowa Code § 510B.8.4.).

        These requirements constitute another intrusion by Iowa into central matters of ERISA-plan administration – here, fiduciary obligations.  ERISA regulates contracting with service providers, as a fiduciary function.  Hence, ERISA demands that fiduciaries enter only "reasonable" contracts with service providers, which includes terms for "no more than reasonable compensation."  29 U.S.C. § 1108(b)(2)(A).  Iowa limits the discretion fiduciaries have in contracting with PBMs and prohibits PBMs from being compensated through rebates or pricing mechanisms that "generate[] a profit for PBMs."  *Rutledge*, 592 U.S. at 84 (alluding to "spread" pricing alternative to pass-through pricing).[13]

---

[13] Because its requirements are expressly stated in terms of ERISA plans, SF 383 § 4's terms adding new Iowa Code § 510B.8.4. make a "reference to" ERISA plans, in addition to having a "connection with" ERISA plans by affecting central matters of plan administration.  ERISA plans are essential to the provision's operation because, without ERISA plans, this part of the provision has no effect or application.

g.    _Dispensing Fee_.  SF 383 inaugurates a substantial dispensing fee ($10.68) for all

prescriptions filled at retail pharmacies.  To be sure, this is a cost regulation, which is the sort of

state-law provision that ERISA, under _Rutledge_, usually permits.  _See supra_ p. 14.  But a cost

regulation that causes "acute" financial distress to ERISA plans is an extraordinary cost feature

that ERISA can preempt.  _See supra_ pp. 13-14.  "Acute" means "characterized by sharpness or

severity of sudden onset" or "of rapid onset and relatively short duration."  "Acute," _Merriam-_

_Webster's Dictionary_, https://www.merriam-webster.com/dictionary/acute.

The dispensing fee, when considering SF 383's abrupt onset beginning July 1, 2025,

constitutes an "acute" measure that "will effectively dictate plan choices."  _Rutledge_, 592 U.S. at

88.  ERISA plans – and participants and beneficiaries through their cost-sharing – have no time

to prepare for the sudden and stiff uptick in their prescription-drug costs.  Combined with the

other immense cost increases that SF 383 engenders, _see_ Bartle Decl. ¶¶ 16-22, ERISA plans

necessarily must take any self-help measures ERISA allows in order to contain costs, including

adopting plan amendments to alter benefits, to increase cost-sharing, and to limit the prescription

drugs for which the ERISA plan will pay.  Were the statute not effective essentially _immediately_,

the financial effect might not be acute, and ERISA plans could with deliberation answer the

legislation's financial challenges; however, the Iowa legislature prevented that deliberation with

a harsh and dislocating effective date.

h.    _Enforcement Mechanisms_.  SF 383 contains at least two new enforcement

mechanisms to assist in implementing its other provisions.  SF 383 provides that a "covered

person or pharmacy" may "maintain a cause of action to enjoin the continuation" of a violation

of certain other provisions in the statute (SF 383 § 3 (new Iowa Code § 510B.4.)), including the

any-willing-pharmacy provision applicable to "a third-party payor."  _Id._ (new Iowa Code

§ 510B.4B.2.a.).  Another provision in SF 383 mandates that a PBM provide "a reasonable

process to allow a pharmacy to appeal *any matter*."  *Id.* § 7 (new Iowa Code § 510B.8E.1.-.3.)

(emphasis added).

Because these enforcement provisions authorize an ERISA participant or beneficiary and

a party nowhere mentioned in ERISA – a pharmacy – to bring causes of action against an ERISA

plan or a PBM administering it, ERISA preempts the provisions.  ERISA preempts alternative

enforcement mechanisms, either because they have "connection with" ERISA plans or due to the

force of ERISA's own enforcement remedies, 29 U.S.C. § 1132(a).  *See supra* p. 14 & n.7.  "Any

state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement

remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is

therefore pre-empted."  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

Nor does *Rutledge*'s acceptance of the appeal remedy in the Arkansas law there at issue

mean SF 383's enforcement remedies survive.  *See Rutledge*, 592 U.S. at 91.  The Arkansas law

required that "PBMs must provide administrative appeal procedures for pharmacies to challenge

[applicable] reimbursement prices that are below the pharmacies' acquisition costs," *id.* at 84,

and the only responsive argument the Supreme Court considered was that "[Arkansas] Act 900's

enforcement mechanisms interfere with nationally uniform administration by creating

operational inefficiencies."  *Id.* at 91 (internal quotation marks and citation omitted).  Here, the

causes of action in SF 383 are much broader, including covered persons as plaintiffs, and

authorize remedies against ERISA plans (as third-party payors) themselves.

*    *    *

In sum, numerous SF 383 provisions have "connection with" ERISA plans because they

dictate the structure and design of ERISA plans, interfere with central matters of plan

administration (including fiduciary obligations and reporting and disclosure requirements), have

acute financial effect, and provide alternative enforcement mechanisms. On these bases,

Plaintiffs are likely to succeed on the merits in showing that ERISA preempts some or all of

them as applied to self-funded ERISA plans.

       3.     *SF 383 Is Also Preempted as Applied to Insured ERISA Plans and Plans Otherwise Subject to State Insurance Regulations*

Some of Plaintiffs sponsor insured ERISA plans or plans otherwise subject to some state

insurance regulation, *see supra* p. 10 & *infra* p. 27, and certain of Plaintiff ABI's members do so

as well. For insured ERISA plans (as opposed to self-funded ones), the same preemption

analysis applies, except that there is an added inquiry into whether any provisions having a

"connection with" ERISA plans (and thus "relat[ing] to" them) come back to life as saved state

insurance regulations. Here, none do. In fact, none of the prior ERISA preemption cases

involving state PBM laws – *Rutledge*, *Wehbi*, *Gerhart*, and *Mulready* – hold that any aspect is a

saved state insurance regulation.

For provisions of SF 383 to qualify as saved state insurance regulations, they must "be

specifically directed toward entities engaged in insurance." *Ky. Ass'n of Health Plans, Inc. v.*

*Miller* ("*Miller*"), 538 U.S. 329, 341-42 (2003). SF 383, however, is, in the first instance, "[a]n

Act relating to pharmacy benefit managers, pharmacies, prescription drugs, and pharmacy

services administrative organizations." SF 383 (preamble). None of those entities is engaged in

insurance or carries any risk. PBMs are administrators, not insurers. True, SF 383 does

encompass and even target within its many provisions (as Plaintiffs have emphasized) health

benefit plans, third-party payors, and health carriers, which do carry risk. But for the law to be a

saved state insurance regulation, the law must be focused on the risk-bearing entities, with only

"minimal application to noninsurers" like PBMs. *Miller*, 538 U.S. at 336 n.1 (internal quotation

marks and citation omitted).  It is not a fair characterization of SF 383 to say it is just minimally concerned with PBMs.

Even if the first requirement were met, a second requirement for a state law to be a saved state insurance regulation is that "the state law must substantially affect the risk pooling arrangement between the insurer and the insured."  *Id.* at 342.  Insofar as SF 383's provisions involve PBMs, "these administrators perform no risk-bearing function"; accordingly, regulating them . . . does not spread risk among policy holders."  *NGS Am., Inc. v. Barnes*, 998 F.2d 296, 299 (5th Cir. 1993) (holding that TPA licensing law was not a saved state insurance regulation). On the other hand, to the extent SF 383 regulates health benefit plans and third-party payors, only third-party payors who are "health carriers" (as defined for SF 383's purposes, *see supra* p. 4) could qualify as insurers, because ERISA's "deemer" clause immunizes ERISA plans themselves from state insurance regulation.  *See supra* p. 14.  And even for health carriers, most of the provisions at issue in SF 383 have nothing to do with spreading risk between the insurer and insured (such as notice and reporting requirements, causes of action,[14] contract terms with PBMs, protecting pharmacies from discrimination, a dispensing fee paid by PBMs to retail pharmacies, limiting commercial speech regarding benefits options, etc.).

The one group of SF 383 provisions that might qualify as substantially affecting risk-pooling between the insurer and the insured is the any-willing-pharmacy and cost-sharing provisions.  *See Miller*, 538 U.S. at 338-39 (holding that any-willing-provider laws substantially affect risk-pooling arrangement).  However, only one of the two any-willing-pharmacy provisions applies to a health carrier as a third-party payor (SF 383 § 3 (new Iowa Code

---

[14] A state insurance remedy also cannot qualify as a saved state insurance regulation, because ERISA's enforcement scheme of its own force preempts state insurance remedies.  *See Aetna Health Inc.*, 542 U.S. at 217.

§ 510B.4B.2.a.)), with the other applying to PBMs (SF 383 § 3 (new Iowa Code
§ 510B.4B.1.b.)).  And some of the cost-sharing provisions are directed to PBMs (*e.g.*, SF 383
§ 3 (new Iowa Code §§ 510B.4B.1.f.), § 4 (new Iowa Code § 510B.8.3., .5.)).  In any event, if
these provisions do substantially affect the risk-pooling arrangement between insurer and
insured, it remains that they are part of a law directed, overall, to PBMs as much as entities
engaged in insurance (failing the first *Miller* prong).

There is still one more wrinkle for Plaintiff IBBP, which is a self-funded MEWA.  *See
supra* p. 10.  As such, it is subject to state insurance regulations (though none of SF 383 so
qualifies, as just noted), with the additional condition that any state insurance regulation applies
only "to the extent not inconsistent with [ERISA]."  29 U.S.C. § 1144(b)(5)(A)(ii).  Of the
provisions in SF 383 possibly constituting measures that affect the risk-pooling arrangement (and
assuming they passed the first part of the *Miller* test too), at least the cost-sharing provisions
would conflict for the time being with any current terms in the "documents and instruments
governing the plan" that call for different cost-sharing and with which ERISA, in its fiduciary
requirements, insists the IBBP's fiduciaries act "in accordance."  *Id.* § 1104(a)(1)(D).

### B.    Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim

Plaintiffs also are likely to succeed on their First Amendment claim.  SF 383
unconstitutionally infringes upon the speech rights of ERISA plans, their sponsors, and PBMs
who assist ERISA plans and their sponsors with administration of prescription-drug benefits.  In
particular, three provisions of SF 383 burden the First Amendment's guarantee that the
government "shall make no law . . . abridging the freedom of speech," U.S. Const. amend. I,
which includes "'both the right to speak freely and the right to refrain from speaking at all.'"
*Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019) (quoting *Janus v. Am. Fed'n*

*of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018)).  They are:  (1) the part of the anti-discrimination provision prohibiting health benefit plans, third-party payors, health carriers, and PBMs from "referral" of certain pharmacies (referenced here as the "anti-referral provision"), SF 383 § 1 (new Iowa Code § 510B.1.4.); (2) the anti-promotion provision in SF 383 § 3 (new Iowa Code § 510B.4B.1.a.) that bars "a promotion of one participating pharmacy over another" that might "affect a covered person's choice"; and (3) the notice requirement in the any-willing-pharmacy provision in SF 383 § 3 (new Iowa Code § 510B.4B.2.a.) applicable to third-party payors that requires them to "notify, in writing, all pharmacies" of the requirements for, and opportunity to participate in, the health benefit plan's network.

Specifically, the anti-referral and anti-promotion provisions bar referrals and promotion, respectively, of particular pharmacies for *any* reason, preventing health benefit plans, third-party payors, and PBMs from speaking freely to covered persons to provide beneficial, accurate information.  The notice requirement requires health benefit plans to reveal commercially sensitive information that they otherwise would not disclose to third parties with which the health benefit plans have no preexisting relationship.  These provisions, by restricting protected commercial speech in one case and compelling it in another, constitute "unwarranted governmental regulation[s]" in violation of the First Amendment.  *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980).

"Commercial speech not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Id.* at 561-62.  In the Eighth Circuit, the "first question to ask" to determine whether a challenged law unconstitutionally impairs commercial speech is whether it is "content- or speaker-based, or both."  *1-800-411-Pain Referral Serv., LLC v. Otto* ("*Otto*"), 744 F.3d 1045, 1054 (8th Cir.

2013) (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563-66 (2011)).  The government

imposes a content- or speaker-based restriction when it "'disfavors speech with a particular

content'" or "'disfavors specific speakers.'"  *Id.* at 1055-56 (internal quotation marks and

citation omitted).  Furthermore, "[m]andating speech that a speaker would not otherwise make

necessarily alters the content of the speech."  *Riley v. Nat'l Fed'n of Blind of N.C., Inc.*, 487 U.S.

781, 795 (1988).

The anti-referral and anti-promotion provisions and the notice requirement are each

content- and speaker-based.  The anti-referral and anti-promotion provisions single out speech

that distinguishes "one participating pharmacy over another" for promotional purposes.  SF 383

§ 3 (new Iowa Code § 510B.4B.1.a.); *cf. Sorrell*, 564 U.S. at 564 (finding provision content-

based when it prohibited use of information for marketing but not for other purposes).  And the

notice requirement is necessarily content-based because it mandates speech regarding

confidential, sensitive information that the third-party payors covered by the provision otherwise

would not make.  The challenged provisions are also speaker-based because they disfavor the

speech of health benefit plans, third-party payors, and PBMs, particularly if they structure their

pharmacy benefits in ways the state does not like.

Because SF 383 contains content- and speaker-based infringements on commercial

speech, it is subject to the four-part intermediate scrutiny analysis from *Central Hudson*, which

asks:  "(1) whether the commercial speech at issue concerns unlawful activity or is misleading;

(2) whether the governmental interest is substantial; (3) whether the challenged regulation

directly advances the government's asserted interest; and (4) whether the regulation is no more

extensive than necessary to further the government's interest."  *Otto*, 744 F.3d at 1055 (citing

*Cent. Hudson*, 447 U.S. at 566).  "[I]t is the State's burden to justify its content-based law as

consistent with the First Amendment." *Sorrell*, 564 U.S. at 571-72.  SF 383 fails the *Central Hudson* test at every step.

SF 383 is not directed at speech that is misleading or concerned with unlawful activity.  It is an outright effort to make clear that the state is forcing employers and their employees to subsidize certain pharmacies over others.  The anti-referral and anti-promotion provisions prevent health benefit plans, third-party payors, and PBMs from providing *truthful* information regarding the availability of lower-cost or higher-quality pharmacy offerings, information that covered persons and their health benefit plans value.  For example, Pella Corporation cannot tell its employees that its plan and those employees will save money if they get their prescriptions filled at Walmart instead of an independent pharmacy.  *See* Decl. of Kirk Veenstra ¶¶ 31, 34 (Ex. 2 to Mot. for TRO & Prelim. Inj.) (ECF No. 6-2) [hereinafter "Veenstra Decl."].  Promoting rural pharmacies might be a legitimate government interest, but muzzling employers from speaking the truth is not.[15]

Indeed, as the Supreme Court has made clear, speech restrictions based on "fear that people would make bad decisions [according to the government] if given truthful information" constitute unconstitutional means to achieve the state's ends, which is precisely what Iowa has done through the anti-referral and anti-promotion provisions.  *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002).  As to the notice requirement, there are several non-speech-related means by which the state could have sought to increase pharmacy network access, and "regulating speech must be a last – not first – resort."  *Id.* at 373.

---

[15] It is on this basis that the notice requirement is not governed by the more relaxed standard of review in *Zauderer v. Office of Disciplinary Couns. of Supreme Court of Ohio*, 471 U.S. 626 (1985).  *Zauderer* applies to disclosure requirements "directed at *misleading* commercial speech."  *Otto*, 744 F.3d at 1061. In any event, the notice requirement fails the *Zauderer* "unduly burdensome" inquiry, as it requires uniform disclosure to *all* area pharmacies, regardless of whether any given pharmacy demonstrates interest in participating in a third-party payor's network.

In short, all of the challenged provisions are more extensive than necessary, as the Plaintiffs have shown that SF 383 curtails significant "beneficial speech," *id.* at 376, and compels speech that may not even, in the end, have the impact the state seeks. *Cf. Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 724 F. Supp. 3d 1174, 1201 (D. Or. 2024) (invalidating disclosure requirement on pharmaceutical companies for lack of tailoring and finding the state's assertion that the compelled speech would benefit consumers amounted to "little more than speculation"). Because the speech-related provisions of SF 383 are not narrowly tailored to achieve the state's interests, substantial or not, SF 383 violates the First Amendment.[16]

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY

The second TRO and preliminary injunction factor – irreparable harm to the movants absent an injunction – weighs heavily in favor of granting preliminary relief. "The party seeking a preliminary injunction must show 'that irreparable injury is *likely* in the absence of an injunction,' not merely 'a possibility of irreparable harm.'" *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 893 (8th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) (emphasis in original). In addition, the irreparable harm must be in the future, as past injury alone has been found insufficient. *Id.* Plaintiffs[17] fully meet this burden.

---

[16] Because, combining the ERISA-preemption and First-Amendment claims, Plaintiffs challenge nearly all of the significant provisions of SF 383, there is not practical necessity to determine if what would remain is severable from the illegal parts. However, notwithstanding that SF 383 has a severability provision (*see* SF 383 § 8), and even if the Court were to find only certain of SF 383's provisions unlawful, the Court should not sever the illegal parts from the rest, since the provisions are all intertwined, the remainder cannot workably exist, and determining which parts should live requires intricate legislative work. *See Sisney v. Kaemingk*, 15 F.4th 1181, 1194 (8th Cir. 2021); *ANR Pipeline Co. v. Iowa State Com. Comm'n*, 828 F.2d 465, 473 (8th Cir. 1987).

[17] References to "Plaintiffs" includes ABI's members.

*First*, Plaintiffs will suffer irreparable harm because starting July 1, 2025, they will immediately begin to incur expenditures that they later cannot recoup if the Court, without preliminary relief, later rules in their favor on the merits.  The Bartle Declaration estimates the financial cost from SF 383 for health benefit plans on a per-participant basis to be $121 annually.  *See* Bartle Decl. ¶ 22.  The Bartle Declaration also breaks down the costs of various SF 383 provisions on a per-provision basis, including the any-willing-pharmacy provisions, cost-sharing aspects, its enforcement provisions, and the mandatory dispensing fee that adds more than $10 to *every* prescription filled at a retail pharmacy – each of which goes into effect on July 1.  *See id.* ¶¶ 16-21; *see also* Veenstra Decl. ¶ 30 (noting SF 383 increases Pella's costs by an estimated $1,199,389 per year).

It is well-settled law that "[t]he *threat* of unrecoverable economic loss . . . qualif[ies] as irreparable harm."  *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) (finding that the petitioners demonstrated irreparable harm where their economic losses could not later be recouped in a lawsuit against the government or "merely through their participation in the market") (emphasis added).  Defendant, presumably, will assert qualified immunity to any request for monetary compensation, making – as a legal matter – compensation to Plaintiffs uncertain.  *See Scott v. Baldwin*, 720 F.3d 1034, 1036 (8th Cir. 2013) ("Qualified immunity shields public officials from § 1983 damage actions if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (internal quotation marks and citation omitted); *cf. Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994) (finding irreparable harm where plaintiff "would be unable to recover any damages . . . as [the state agency] has Eleventh Amendment sovereign immunity").  In addition, there is no mechanism under Chapter 510B or SF 383 to recover such costs.  And

irreparable harm is present where, as here, damages would be "difficult, or even impossible" to determine after the fact. *Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp.*, LLC, 953 F.3d 1041, 1046 (8th Cir. 2020); *see Couser v. Shelby Cnty.*, 681 F. Supp. 3d 920, 946-47 (S.D. Iowa 2023) (finding irreparable harm where "significant" economic losses would not be compensable because it would be difficult to quantify damages and, in any event, "Shelby County would not have the ability to pay a monetary judgment because it is a small county with insufficient ability to raise this amount through taxes").

*Second*, Plaintiffs will suffer irreparable harm because, given their likelihood of success on the merits, they face a realistic threat of deprivation of constitutional rights starting on July 1. Courts have long recognized that, in many instances, the loss of constitutional protections constitutes irreparable injury, including loss of First Amendment protections. *See Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) ("It is well-established that '[t]he loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury.' *Elrod v. Burns*, 427 U.S. 347, 373 (1976).") (emphasis added); *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 998 (8th Cir. 2023) ("[T]he denial of a constitutional right is a cognizable injury and an irreparable harm.") (internal quotation marks and citation omitted); *Law v. Gast*, 641 F. Supp. 3d 580, 603 (S.D. Iowa 2022) ("A violation of a constitutional right is an irreparable injury for the purposes of a preliminary injunction motion.") (internal quotation marks and citation omitted).

As to violations of the Supremacy Clause, from which preemption stems, courts have stated that "[i]f a statute is expressly preempted, a finding with regard to likelihood of success fulfills the remaining preliminary injunction requirements." *United States v. Texas*, 719 F. Supp. 3d 640, 695 (W.D. Tex.), *vacated on other grounds*, 144 S. Ct. 797 (2024) (collecting cases)

(internal quotation marks and citation omitted).  Even in circumstances where a court has declined to hold that loss of the protections of federal preemption alone constitutes irreparable injury, they have emphasized that there is "*some* level of significant harm when a state tries to enforce its own [] laws that are likely preempted by federal law." *United States v. State*, 737 F. Supp. 3d 725, 749 (S.D. Iowa 2024); *see also Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 462, 463 (S.D.W. Va. 2024) (stating that "being subjected to fines and being forced to spend resources on compliance with a law ultimately struck down has been sufficient to meet irreparable harm" and "[a]ll of these rather severe consequences flow from the effect of a law that this Court finds likely to be preempted and thus unconstitutional").

*Third*, starting on July 1, Plaintiffs will suffer irreparable harm absent emergency relief because they must begin a variety of plan-design and administration activities, and – in light of them – it would be "impossible to restore the status quo." *Brady v. Nat'l Football League*, 640 F.3d 785, 793 (8th Cir. 2011).  If SF 383 is allowed to go into effect, Plaintiffs must modify their ERISA-covered plans and the benefits they offer to conform to SF 383, modify their ERISA-plan administration procedures to conform to the requirements of SF 383, and begin to modify their contracts with their PBMs in accordance with SF 383 (with those requirements, and only those, going into effect as of the first time *any* adjustment is made to the existing contract or January 1, 2026, whichever is earlier, *see* SF 383 § 6 (new Iowa Code § 510B.8D.1.)).  They will also be required to produce and distribute the mandated and costly notices to pharmacies and ERISA participants and beneficiaries about participation in the health benefit plan's network, as well as new notices *under ERISA* to participants and beneficiaries regarding their ERISA plans' altered prescription drug benefits and provider networks.  They will be compelled to engage in speech

with pharmacies and others because of SF 383's mandates, while also being restricted in how they communicate with the employees who participate in their plans.

None of this can easily be undone.  Health benefit plans that are amended will remain in force until the next amendment cycle.  Contracts with PBMs altered in the meantime will remain in force until amended again.  As one Declarant testifies, companies are currently already in their negotiation cycle for contracting for PBM services for the 2026 plan year.  *See* Veenstra Decl. ¶¶ 42-44.  If the Court does not grant emergency relief, companies necessarily will work SF 383's requirements into their contracts with PBMs, only potentially later to obtain a judgment that absolved them of the obligation to write those contract terms in the manner that they did. Yet, those contracts will be on the books until then amended again, so that Plaintiffs cannot meaningfully obtain the benefit of the judgment they will have received.

*Fourth*, Plaintiffs face the threat of enforcement under ERISA if they do not comply with current ERISA-plan language and, at the same time, the threat of Iowa enforcement if they do not comply with contrary requirements in SF 383.  Complying with SF 383, "administrators must pay benefits to the beneficiaries" as required "by state law."  *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001).  But that "runs counter to ERISA's commands that a plan shall 'specify the basis on which payments are made to and from the plan' [29 U.S.C.] § 1102(b)(4), and that the fiduciary shall administer the plan 'in accordance with the plan documents and instruments governing the plan,' [*id.*] § 1104(a)(1)(D)."  *Egelhoff*, 532 U.S. at 147.  The crisis is the result of SF 383's immediately effective date, which puts administrators seeking to comply with it in the crosshairs in the face of contrary plan terms.[18]

---

[18] One simple example of immediate conflict between the ERISA-plan documents and SF 383 is where the plan differentiates between benefit levels for different network providers (which violates the anti-discrimination provision in SF 383 § 1 (new Iowa Code § 510B.1.4.)), or where the plan prohibits

### III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR GRANTING PRELIMINARY RELIEF

The remaining preliminary injunction factors – the balance of equities and the public interest – further support a TRO and preliminary injunction in this case. "When a plaintiff seeks to restrain governmental action, the public interest and balancing of harm factors largely merge." *Doe #1 v. Noem*, No. 25-cv-00042, U.S. Dist. LEXIS 80459, at *8 (S.D. Iowa Apr. 24, 2025) (citing *Eggers v. Evnen*, 48 F.4th 561, 564 (8th Cir. 2022)). The merged factors support granting preliminary relief "when the benefits of granting the injunction outweigh the specific harms." *Couser v. Shelby Cnty.*, 681 F. Supp. 3d 920, 947 (S.D. Iowa 2023). Here, a TRO and preliminary injunction are in the public interest, as the benefits – vindicating federal law and constitutional rights, preserving the status quo, and preventing harm to covered persons – decidedly outweigh any interests the state may assert on behalf of itself or other third parties, such as retail pharmacies.

This Court and others have consistently concluded that "'there is substantial public interest in ensuring that governmental agencies abide by federal laws.'" *Doe #1*, U.S. Dist. LEXIS 80594, at *8 (quoting *Saxena v. Noem*, No. 25-cv-5035, 2025 U.S. Dist. LEXIS 76318, at *8 (D.S.D. Apr. 18, 2025)); *Couser*, 681 F. Supp. 3d at 948 ("[T]he strongest equity in favor of a preliminary injunction is the full enforcement of *valid* federal and state laws.") (emphasis added). "[I]t is also 'always in the public interest to protect constitutional rights.'" *Ass'n for Accessible Meds. v. Ellison*, No. 24-1019, U.S. App. LEXIS 14434, at *8 (8th Cir. June 12, 2025) (quoting *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020)); *D.M. ex rel. Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (same). As Plaintiffs

---

manufacturers' coupons from being considered part of cost-sharing (which violates SF 383 § 4 (new Iowa Code § 510B.8.5., .6., .7.). *See* Veenstra Decl. ¶¶ 33, 39.

have demonstrated, there is more than a "fair probability that [SF 383] violates the Constitution" because it is preempted by federal law and infringes upon Plaintiffs' First-Amendment rights. *D.M. ex rel. Bao Xiong*, 917 F.3d at 1004 (finding public interest favored granting an injunction). The public interest is served by preventing enforcement of a law likely to be ultimately determined unlawful and unenforceable, as this avoids public confusion and the creation of reliance interests that later must be upended. And if a TRO and preliminary injunction are not issued and the state is permitted to commence enforcement of SF 383, public resources may be expended on unlawful enforcement actions and a compliance apparatus that may be expensive, if not impossible, to fully unwind.

In contrast, the government "lack[s] a meaningful equity in attempting to enforce a patently preempted ordinance." *Couser*, 681 F. Supp. 3d at 948. Any interest the state has in enforcing its laws in general is obviated where the law is "invalid." *Id.*; *accord Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025) (describing governmental interest in enforcing a law as "minimal" given likelihood that the law exceeded agency authority). Even in the unlikely event that SF 383 is not declared unlawful, a temporary delay to enforcement "poses minimal harm" to the state and actually conserves public resources by avoiding compliance obligations, as compared to the irreparable harm to Plaintiffs that will occur in the absence of an injunction. *Doe #1*, U.S. Dist. LEXIS 80549, at *16 (finding that "temporary nature of the requested relief" weighed in favor of finding public interest supported grant of injunction) (internal quotation marks and citation omitted).

Nor would injunctive relief pose meaningful harm to any third parties, such as independent retail pharmacies, that stand to benefit from the enforcement of SF 383, because the law has not been in effect for sufficient time for any party to rely on its dictates. The Eighth

Circuit has found that a "change in . . . *expectations*" of third parties caused by the promulgation of "likely unlawful" mandates constitutes "minimized" harm that cannot overcome a plaintiff's showing of irreparable harm. *Missouri*, 128 F.4th at 997 (emphasis added). In fact, a main beneficiary of SF 383 has many locations and throughout many states, and there is no indication that it is in jeopardy of immediate financial crisis if SF 383's implementation is temporarily delayed. *See supra* p. 6.

On the other hand, covered persons may suffer immense harm by losing valuable coverage if SF 383 is not enjoined, as benefits currently provided become illegal as of July 1, 2025. One potent example is the PrudentRx program, a cost-saving initiative available to plans administered by Wellmark Blue Cross Blue Shield through CVS Caremark. PrudentRx enables members to obtain expensive specialty prescription drugs – typically subject to 30% coinsurance – with zero out-of-pocket cost. *See* Declaration of Paul Karow ¶¶ 11-13 (Ex. 3 to Mot. for TRO & Prelim. Inj.) (ECF No. 6-3) [hereinafter "Karow Decl."]; *see also* Veenstra Decl. ¶ 35. It does so by combining manufacturer copay assistance (with plan contributions when necessary), supported by a companion system called True Accumulations, which ensures that only actual out-of-pocket expenses are credited toward a member's deductible or coinsurance limits.

SF 383's restrictions on how cost-sharing must be calculated and credited, *see* SF 383 § 4 (new Iowa Code §§ 510B.8.5., .6., .7.), prohibit the use of True Accumulations, without which the PrudentRx program becomes inoperable. Karow Decl. ¶ 12; Veenstra Decl. ¶ 35. As a result, beginning July 1, thousands of plan members that require expensive specialty drugs (*e.g.*, the specialty prescription drug for the serious but treatable Hepatitis C can cost over $30,000 for a prescription) will abruptly face substantial out-of-pocket costs. Many may forego essential medications due to confusion or an inability to absorb the unexpected financial burden. For

employers like Pella Corporation, this means not only a sharp increase in plan costs but also immediate disruption in care and a loss of predictability for participants who received little or no advance notice. *See* Veenstra Decl. ¶ 35. Moreover, for the many plans like Pella's, which is uniform across all states in which it operates, SF 383 will force the termination of the PrudentRx program for all participants, not just those residing in Iowa. *See id.*

In that important sense, the public interest favors the issuance of a preliminary injunction because injunctive relief would preserve the status quo. *See Arc of Iowa v. Reynolds*, 566 F. Supp. 3d 921, 930 (S.D. Iowa 2021) ("The primary purpose of issuing a preliminary injunction is to preserve the status quo and prevent irreparable harm until a court can make a final decision on the merits."); *accord Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022). The status quo is preserved by preventing enforcement of SF 383, which stands to transform the regulatory regime applied to health benefit plans, third-party payors, and PBMs in Iowa. Plaintiffs filed their Complaint challenging SF 383 twelve days after the Governor signed it into law and before its provisions go into effect, exercising more than the "reasonable diligence" required to support their request for preliminary relief. *Arc of Iowa*, 566 F. Supp. 3d at 938. Teamed with Plaintiffs' showing of irreparable harm, the benefits to Plaintiffs and the public of preserving the status quo tips the balance of equities heavily in favor of granting the preliminary relief Plaintiffs seek.

## **CONCLUSION**

The Court should grant Plaintiffs' motion for a TRO and preliminary injunction.

June 26, 2025            Respectfully submitted,

*/s/ Ryan G. Koopmans*
Ryan G. Koopmans
KOOPMANS LAW GROUP, LLC
500 East Court Ave., Suite 420
Des Moines, IA  50309
Telephone:  (515) 978-1140
Email:  ryan@koopmansgroup.com

Anthony F. Shelley (*pro hac vice* application forthcoming)
Joanne Roskey (*pro hac vice* application forthcoming)
DeMario M. Carswell (*pro hac vice* application forthcoming)
MILLER & CHEVALIER CHARTERED
900 Sixteenth St., NW
Washington, DC  20006
Telephone:  (202) 626-5800
Email:  ashelley@milchev.com

*Counsel for Plaintiffs Iowa Association of Business and Industry,*
*Iowa Bankers Benefit Plan, Iowa Laborers District Council Health*
*and Welfare Fund, Des Moines Orthopaedic Surgeons PC, and*
*Iowa Spring Manufacturing & Sales Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Eric H. Wessan
Patrick C. Valencia
Iowa Department of Justice
1305 E. Walnut Street
Des Moines, IA 50319
515-823-9117 (E. Wessan)
515-281-8770 (P. Valencia)
Email: eric.wessan@ag.iowa.gov
Email: patrick.valencia@ag.iowa.gov

*Counsel for Defendant*

  */s/ Ryan G. Koopmans*
Ryan G. Koopmans