IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| IOWA ASSOCIATION OF BUSINESS AND INDUSTRY, IOWA BANKERS BENEFIT PLAN, IOWA LABORERS DISTRICT COUNCIL HEALTH AND WELFARE FUND, DES MOINES ORTHOPAEDIC SURGEONS PC, and IOWA SPRING MANUFACTURING & SALES COMPANY, | **No. 4:25-cv-00211-RGE-WPK** |
| Plaintiffs, | **ORDER GRANTING PLAINTIFFS' MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER** |
| v. | |
| DOUG OMMEN, in his official capacity as Insurance Commissioner of Iowa, | |
| Defendant. | |

## I.    INTRODUCTION

Plaintiffs sue Defendant Iowa Insurance Commissioner Doug Ommen in his official capacity seeking to enjoin enforcement of amendments to Title XII, subtitle 1, Chapter 510B of the Iowa Code contained in Senate File 383 ("SF 383") and entitled, "An Act Relating to Pharmacy Benefits Managers, Pharmacies, Prescription Drugs, and Pharmacy Services Administrative Organizations, and Including Applicability Provisions." Iowa Governor Kim Reynolds signed SF 383 into law on June 11, 2025, and it is scheduled to become enforceable at midnight on July 1, 2025. Plaintiffs argue the Employee Retirement Income Security Act of 1974 ("ERISA") expressly preempts several provisions of SF 383. Plaintiffs also argue several provisions of SF 383 violate the First Amendment to the United States Constitution by impermissibly restricting or compelling commercial speech. Plaintiffs seek declaratory relief and a permanent injunction against enforcement of the entirety of SF 383.

Plaintiffs presently move for a fourteen-day ex parte restraining order temporarily preventing the Commissioner from enforcing SF 383. Plaintiffs also ask the court to schedule a hearing for inter partes consideration of preliminary injunctive relief pending resolution of this case. Finally, Plaintiffs ask the Court to establish a briefing schedule for such hearing.

After considering Plaintiffs' pleadings and supporting materials, and applying the factors from *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc), under the standard applicable to the restraint of duly promulgated state laws as set forth in *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731–32 (8th Cir. 2008) (en banc), the Court grants Plaintiffs' motion for a fourteen-day ex parte temporary restraining order for the reasons set forth below. The Court also schedules briefing deadlines and a preliminary injunction hearing.

## II.    BACKGROUND

### A.    Factual and Statutory Background

The Court draws the following facts from Plaintiffs' complaint, motion for a temporary restraining order and preliminary injunction, supporting declarations, and supporting brief. Compl., ECF No. 1; Pls.' Mot. TRO, ECF No. 6; Pls.' Ex. 1 Supp. Mot. TRO, Bartle Decl., ECF No. 6-1; Pls.' Ex. 2 Supp. Mot. TRO, Veenstra Decl., ECF No. 6-2; Pls.' Ex. 3 Supp. Mot. TRO, Karow Decl., ECF No. 6-3; Pls.' Br. Supp. TRO and Prelim. Inj., ECF No. 16. As a general rule, "the findings of fact and conclusions of law made by a court granting a [temporary restraining order] are not binding at [later stages such as a preliminary injunction proceedings or a] trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

#### 1.    Plaintiffs

Plaintiff Iowa Association of Business and Industry is an advocacy group representing more than 600 members who collectively employ more than 300,000 people. ECF No. 1 ¶ 8. "The

Association" advocates for its members generally as to legislative and litigation matters and actively pursued efforts to resist or amend SF 383 prior to its passage. *Id.* Its "members, almost universally, sponsor for their employees ERISA-covered health benefits plans, both self-funded and insured, and many contract with [Pharmacy Benefit Managers, ("PBMs")] or for PBM services to assist in their ERISA plans' administration." *Id.*

Plaintiff Iowa Bankers Benefit Plan is a "tax-exempt Voluntary Employee Beneficiary Association under Internal Revenue Code § 501(c)(9), is a Multiple Employer Welfare Arrangement . . . under ERISA, [and] provide[s] . . . health and related benefits to . . . banks' employees and their dependents." *Id.* ¶ 9. The "Bankers Plan" "covers more than 9,300 employees and, with dependents, approximately 20,000 total lives." *Id.*

"Plaintiff Iowa Laborers District Council Health and Welfare Fund . . . is a self-funded Taft Hartley welfare benefit plan governed by ERISA." ECF No. 1 ¶ 10. The "Laborers Fund" "covers more than 2,200 active participants and 505 retirees and, with dependents, a total of 5,700 lives, the majority of whom live in Iowa." *Id.*

Plaintiff Des Moines Orthopaedic Surgeons PC is a privately owned medical practice with several Iowa locations. *Id.* ¶ 11. It provides health benefits for "approximately 150 employees and, with dependents, approximately 400 total lives." *Id.*

Plaintiff Iowa Spring Manufacturing & Sales Company is an Iowa Corporation that manufactures agricultural and garage-door springs. *Id.* ¶ 12. "['Iowa Spring'] provides health benefits to its employees through a fully insured plan underwritten and administered by Wellmark, which includes PBM services through Wellmark's contract with CVS Caremark." *Id.* "Iowa Spring's health benefit plan covers approximately 175 employees and, with dependents,

approximately 300 covered lives, the majority of whom are located in Iowa."[1] *Id.*

## 2.    ERISA preemption

Except for churches and the government, employers sponsoring health benefit plans are governed by ERISA, which contains a broad express preemption provision. *See* 29 U.S.C. § 1144(a); *see also, e.g., Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183, 1188–89 (10th Cir. 2023) (describing generally the players in the pharmaceutical benefits field and their relative roles). Pharmacies, however, are regulated by state law, and, as addressed in detail below, courts are developing tests to identify the boundaries at which state laws addressing retail or wholesale pharmaceutical industry may coexist with ERISA. *See, e.g., Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 91–92 (2020) (holding an Arkansas pharmacy price-control statute not preempted); *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 967–970 (8th Cir. 2021) (holding several North Dakota pharmacy-related statutory provisions not preempted, including express disclosure or anti-gag-order provisions). Moreover, plans may be self-funded or fully insured, and ERISA contains a limited preemption savings clause for some state insurance regulations not expressly contrary to the requirements of ERISA. *See* 29 U.S.C. § 1144(b)(2)(A).

Sponsors amend their plans and contracts with providers often (usually for annual plan periods), and sponsors frequently contract with PBMs to administer pharmacy benefits and obtain advantageous pricing. *See, e.g.,* ECF No. 6-2 ¶¶ 25–33. Through PBMs, sponsors and their insureds gain access to negotiated networks of pharmacies. *Id.* ¶ 31. And through these networks, built and contracted by the PBMs, sponsors gain access not only to special pricing, but potentially other features, like waivers of copayments for their insureds. ECF No. 6-3 ¶¶ 10–13.

---

[1] Without the benefit of adversarial briefing on the issues, at this stage of the proceedings, the Court concludes Plaintiffs have standing, personal and subject-matter jurisdiction exist, and venue is proper.

### 3.    Senate File 383

Senate File 383 reflects an attempt by the State of Iowa to preserve rural community healthcare systems by protecting local rural retail pharmacies from exclusion by PBMs and to incentivize the use of local pharmacies to level the playing field with large chain or mail-order pharmacies operating within PBMs' networks. *See* Governor Reynold's Transmittal Letter, ECF No. 1-1; *see also*, ECF No. 1 ¶ 3.[2] The provisions of SF 383 attempt to accomplish these goals by imposing requirements, restrictions, or transaction fees on several categories of persons and entities expressly defined within the Iowa Code, including "pharmacy benefit managers," Iowa Code § 510B.1.15 ("a person who, pursuant to a contract or other relationship with a third-party payor, either directly or through an intermediary, manages a prescription drug benefit provided by the third-party payor"); "third-party payors," *id.* § 510B.1.22 ("any entity other than a covered person or a health care provider that is responsible for any amount of reimbursement for a prescription drug benefit. . . . includ[ing] health carriers and other entities that provide a plan of health insurance or health care benefits [but not including certain government affiliated entities]"); "covered persons," *id.* § 510B.1.4 ("a policyholder, subscriber, or other person participating in a health benefit plan that has a prescription drug benefit managed by a pharmacy benefits manager"); "health benefit plans," *id.* § 510B.1.6 ("a policy, contract, certificate, or agreement offered or issued by a third-party payor to provide, deliver, arrange for, pay for, or reimburse any of the costs

---

[2] Plaintiffs note, however, that SF 383 treats a large interstate retail grocery and pharmacy store, Hy-Vee, as a protected local pharmacy. ECF No. 6 at 2. The Court's summary is not intended as an endorsement of Plaintiffs' commentary nor the accuracy of Plaintiffs labels for the distinctions they set forth. The new law speaks for itself and the record at this stage of proceedings does not contain sufficient information as to which entities fall within SF 383's definitions. *See* Iowa Code § 510B.1.16A ("'*Pharmacy Chain*' means an entity that has twenty or more pharmacies under common ownership or control located in at least twenty or more states."); *id.* § 510B.1.21A ("'*Retail Pharmacy*' means a pharmacy that is not a pharmacy chain or a publicly traded entity, and that does not exclusively provide mail order dispensing of prescription drugs.").

of health care services"); "health carriers," *id.* § 510B.1.9 ("an entity subject to the insurance laws and regulations of this state, or subject to the jurisdiction of the commissioner, including an insurance company offering sickness and accident plans, a health maintenance organization, a nonprofit health service corporation, or a plan established pursuant to chapter 509A for public employees" [but not including certain government affiliated entities]); and "prescription drug benefits," *id.* § 510B.1.19 ("a health benefit plan providing for third-party payment or prepayment for prescription drugs"). *See* ECF No. 1 ¶¶ 3, 5, 21–30.[3]

As examples of requirements, restrictions, or transaction fees, Iowa Code § 510B.8B.3 requires PBM's to "reimburse the retail pharmacy or pharmacist a professional dispensing fee in the amount of ten dollars and sixty-eight cents." *See* Note 2 *supra* (definition of retail pharmacy). Iowa Code § 510B.4B.1.a prohibits the disclosure of truthful information to covered persons regarding the comparative reimbursement rates as between pharmacies and mail-order pharmacies. And Iowa Code § 510B.1.4 bars health plans and many other entities from discriminating against pharmacies or pharmacists regarding many aspects of benefit provision, including through "referral[s]."

### 4.    Plaintiffs' contentions

Plaintiffs argue these and several other requirements, restrictions, or transaction fee provisions of SF 383 directed at plans themselves or at one or more of these classes of entities are unenforceable due to ERISA preemption or First Amendment violations. ECF No. 1 ¶¶ 53–63 (ERISA preemption); *id.* ¶¶ 64–79; ECF No. 16 at 17–20; *see also, e.g.*, Iowa Code §§ 510B.4B.1.b., 510B.4B.2.a. ("any-willing-provider" restrictions imposing requirements on

---

[3] Unless noted otherwise, references to Iowa Code Chapter 510B are references to code language added, amended, or left unchanged by SF 383, that is, language Iowa's lawmakers designated as becoming enforceable, or remaining in force, on July 1, 2025.

how PBMs and plans construct pharmacy networks). In addition to presenting discrete challenges to several provisions, Plaintiffs argue a severability provision, Iowa Code § 510B.8, cannot save SF 383 because the unenforceable provisions are too extensive and integral to the operation of SF 383 as a whole to workably permit partial enforcement. ECF No. 1 ¶¶ 62, 78.

Finally, Plaintiffs present declarations describing the consequences to various firms, employees, and insureds if injunctive relief is denied. Bradley W. Bartle, Chief Actuary and Vice President for Wellmark, Inc., doing business in Iowa as Wellmark Blue Cross and Blue Shield of Iowa, explains his company's role in Iowa's healthcare system and presents a series of actuarial analyses conducted to assess the impact of SF 383. ECF No. 6-1. Bartle used 2024 drug-claim data from his company, which insures approximately 800,000 Iowans, to estimate the cost of several individual sections of SF 383 to plans and insureds. *Id.* ¶¶ 10, 12. Taken together, he concludes the SF 383 sections he analyzed

> will increase total costs for benefit plans per year for Wellmark insured and/or administered self-funded plans by as much as $96.8 million (and for each plan, an average Enrollee per year increase in cost of as much as $120.5), and separately, an increase of as much as $38.7 million per year of additional costs to be paid by Enrollees covered by Wellmark insured and/or administered plans (and an average per Enrollee per year increase in cost of as much as $48.18).

*Id.* ¶ 22.

Plaintiffs also submit the declaration of Kirk Veenstra, the Senior Benefits Manager at Pella Corporation, an Iowa manufacturer of doors and windows and member of The Association. ECF No. 6-2 ¶¶ 2, 5, 8. Pella Corporation provides health benefits for employees and their dependents through a self-funded plan that provides coverage for prescription drugs. *Id.* ¶¶ 8–13. Pella Corporation is responsible for plan design, contracting with CaremarkPCS Health LLC for PBM services to administer and manage prescription drug benefits. *Id.* ¶¶ 12, 23. Pella Corporation's plan operates on a calendar-year basis with plan benefit offerings and service-

provider contracts running for a calendar year. *Id.* ¶¶ 25–26. Pella Corporation reviews and amends contracts and benefit offerings annually, with months-long negotiation periods preceding plan amendment. *Id.* ¶ 27. Pella Corporation's plan costs upwards of $60,000,000 annually and insures approximately 15,000 people, half of whom live in Iowa. *Id.* ¶¶ 17–19. Pella Corporation anticipates that enforcement of SF 383 will force it to "make structural changes to its Plan design" mid-year and mid-contract in addition to increasing costs for covered persons and for Pella itself. *Id.* ¶¶ 33, 35. Further, Pella Corporation will be negotiating future contracts under a cloud of uncertainty and will be banned from referring its own insureds to pharmacies that waive point-of-sale charges, including insureds with specialty-drug needs who may not be able to obtain their drugs affordably without referral. *Id.* ¶¶ 32–40.

Finally, Plaintiffs submit a declaration from Paul Karow, Vice President and Chief Pharmacy Officer at Wellmark, Inc., doing business in Iowa as Wellmark Blue Cross Blue Shield of Iowa. ECF No. 6-3 ¶ 2. Karow describes a specialty drug program Wellmark operates through its PBM vendor, CVS Caremark. *Id.* ¶¶ 10–13. Through the program, regular co-pays for insureds are waived; enactment of SF 383 will prohibit continuation of the program. *Id.* Karow provides examples with five specialty drugs showing an immediate price increase for insureds ranging from $100 to $4,380 per prescription if SF 383 goes into effect. *Id.*

The Court presents additional facts as necessary below.

## B.    Procedural Background

Governor Reynolds signed SF 383 on June 11, 2025, nineteen days before it was to become enforceable. Plaintiffs filed the present action twelve days later on June 23, and filed their motion for a temporary restraining order on June 26. ECF Nos. 1, 6. The Commissioner has waived service. ECF No. 3. Plaintiffs' attorney has consulted with the Commissioner and represents the Commissioner does not agree to voluntarily stay enforcement of SF 383 and opposes a temporary

restraining order. ECF No. 6 at 3. The Commissioner filed a motion for a desired briefing schedule, advocating to, in effect, eliminate the possibility of injunctive relief before enactment, and asserting skeletal arguments contesting the merits of Plaintiffs' motions for preliminary relief. ECF No. 8. Plaintiffs resisted. ECF No. 9. The Court entered a text order declining to allow briefing beyond the time for the law's enactment. ECF No. 15. Accordingly, the matter before the Court is deemed an ex parte request for a temporary restraining order, and the Court analyzes it as such, although the Court does consider the merits arguments suggested in the Commissioner's motion for a scheduling order.

## III.    LEGAL STANDARD

### A.    Temporary Restraining Orders

Courts in this circuit apply the well-established *Dataphase* factors when considering motions for preliminary injunctions and motions for temporary restraining orders. *Sports Design & Dev., Inc. v. Schoneboom*, 871 F. Supp. 1158, 1162–63 (N.D. Iowa 1995) (citing *S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir.1989)). A movant is entitled to such relief when "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.

*Dataphase* articulates four factors the Court considers when determining whether to issue a preliminary injunction or temporary restraining order: 1) the probability the movant will succeed on the merits; 2) the threat of irreparable harm to the movant; 3) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; and 4) the public interest. *Id.* When a plaintiff seeks to enjoin a duly enacted statute reflecting legislative will, the required showing as to a probability of success is a "likelihood of success." *Planned Parenthood*, 530 F.3d at 731–32 . When a plaintiff seeks to restrain governmental action, the public

interest and balancing of harm factors largely merge. *See Eggers v. Evnen*, 48 F.4th 561, 564 (8th Cir. 2022). The Court has broad discretion when ruling on a request for a temporary restraining order. *See Dataphase*, 640 F.2d at 113. Ultimately, the Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplements, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (internal quotation marks and citation omitted).

Federal Rule of Civil Procedure 65(b)(1) allows for ex parte temporary restraining orders where the moving party presents "specific facts in an affidavit or verified complaint [that] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and the moving party's attorney certifies in writing "efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1). The Supreme Court has counseled that ex parte restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). Conclusions reached on a compressed timeframe without full briefing and argument by all parties necessarily are preliminary and non-binding because they fall outside the adversarial process on which our system of justice relies. As such, the Rules narrowly constrain courts' authority. Ex parte temporary restraining orders must expire no later than fourteen days after entry "unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension." Fed. R. Civ. P. 65(b)(2).

### B.    ERISA Preemption

"ERISA pre-empts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' covered by ERISA." *Rutledge*, 592 U.S. at 479 (quoting 29 U.S.C.

§ 1144(a)). "[A] state law relates to an ERISA plan if it has a connection with or reference to such a plan." *Id.* (quoting *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001) (internal quotation marks omitted)). But "not every state law that affects an ERISA plan or causes some disuniformity in plan administration has an impermissible connection with an ERISA plan. . . . especially . . . if a law merely affects costs." *Id.* at 480. Rather, an impermissible connection with ERISA exists where a state law "require[s] providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits or by binding plan administrators to specific rules for determining beneficiary status" *Id.* (citations omitted). An impermissible connection may also exist "if 'acute, albeit indirect, economic effects of the state law force an ERISA plan to adopt a certain scheme of substantive coverage.'" *Id.* (quoting *Gobeille v. Liberty Mutual Ins. Co.*, 577 U.S. 312, 320 (2016) (internal quotation marks omitted)). The Supreme Court has described the test "[a]s a shorthand for these considerations[:] whether a state law governs a central matter of plan administration or interferes with nationally uniform plan administration." *Id.* (citation omitted).

A state law impermissibly "references" ERISA if the applicability of the statute distinguishes between ERISA-secured plans and other plans. *See Rutledge*, 592 U.S. at 481 (a state law did not impermissibly reference ERISA "because it imposed surcharges 'regardless of whether the commercial coverage [was] ultimately secured by an ERISA plan, private purchase, or otherwise.'" (quoting *N.Y. St. Conf. Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995))).

Ultimately, ERISA's preemption provision is broad. Challenged provisions do not escape preemption based merely on the fact that they may regulate PBMs rather than plans directly, and no otherwise generally applicable presumption against preemption applies. *Wehbi*, 18 F.4th at

966–67. Even generally applicable laws are preempted when they meet the "connection-with" or "reference to" standards. *Id.* at 968–69.

### C.    First Amendment Limits on the Restriction of Commercial Speech

Through the Fourteenth Amendment, the First Amendment provides a state "shall make no law. . . abridging the freedom of speech." U.S. Const. amend. I. The Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Centr. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980). But "commercial speech is still protected 'from unwarranted government regulation.'" *1-800-411 Pain Referral Serv. LLC v. Otto*, 744 F.3d 1045, 1054 (8th Cir. 2014) (quoting *Centr. Hudson*, 447 U.S. at 561).

Pursuant to *Central Hudson*, an intermediate level of scrutiny applies to "content- or speaker-based" "commercial speech restrictions." *Id.* at 1055. *Central Hudson*'s four-part test asks:

> (1) whether the commercial speech at issue concerns unlawful activity or is misleading; (2) whether the governmental interest is substantial; (3) whether the challenged regulation directly advances the government's asserted interest; and (4) whether the regulation is no more extensive than necessary to further the government's interest.

*Id.* (quoting *Centr. Hudson*, 477 U.S. at 566). And, "[j]ust as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views or from compelling certain individuals to pay subsidies for speech to which they object." *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001).

## IV.    DISCUSSION

### A.    Likelihood of Success on the Merits

"Success on the merits has been referred to as the most important of the four [*Dataphase*] factors." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). "When

determining the likelihood of [Plaintiffs'] success on the merits, [the Court does] not have to decide whether [Plaintiffs] will ultimately win, [but a]n injunction cannot issue if there is no chance of success on the merits." *Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020) (cleaned up) (citations omitted). Generally,"[plaintiffs] do[] not need to prove a greater than fifty per cent likelihood that [they] will prevail on the merits." *Id.* at 1044–45 (citations omitted). Rather, in a mine-run case, plaintiffs "must . . . show a 'fair chance of prevailing.'" *Id.*at 1045 (quoting *Planned Parenthood*, 530 F.3d at 732). But when a plaintiff seeks to enjoin the enforcement of a duly enacted state law, the required showing of potential success on the merits is higher. In such cases, plaintiffs must demonstrate a likelihood of success and not merely a fair chance of prevailing. *Planned Parenthood*, 530 F.3d at 732.

In light of Iowa's enactment of SF 383, Plaintiffs must demonstrate a likelihood of success pursuant to the heightened standard of *Planned Parenthood* to meet their burden. "The plaintiff need only establish a likelihood of succeeding on the merits of any one of [its] claims." *Richard/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (internal quotation marks and citation omitted).

Based on the allegations contained in the submitted declarations and the Court's preliminary analysis of SF 383 for purposes of considering an ex parte temporary restraining order, the Court holds Plaintiffs have made the necessary showing that provisions of SF 383 are unenforceable as preempted by ERISA and violative of the First Amendment, as set forth below.

### 1.    ERISA preemption

The Court focuses on the challenged provisions of SF 383 codified at Iowa Code § 510B.1.4. Section 510B.1.4 imposes an anti-discrimination provision *directly* upon health benefit plans and third-party payors in addition to pharmacy benefit managers and health carriers. This provision also regulates plans *indirectly* by applying mandates to plans' contracting partners.

It does not, however, "reference" ERISA in that it directly and indirectly regulates ERISA plans and non-ERISA plans alike. The question of preemption, therefore, focuses on the "connection with" test from *Rutledge* and *Wehbi*.

Section 510B1.4.'s anti-discrimination provision as applied to health plans requires plans to treat all licensed and law-abiding pharmacies identically as to "participation, referral, reimbursement of a covered service, or indemnification." Iowa Code § 510B.1.4. The Court concludes as a preliminary matter that this general anti-discrimination provision impermissibly interferes with a "central matter of plan administration," namely plan design and structure and plan sponsors' fiduciary duties towards participants, and "interferes with nationally uniform plan administration." *Wehbi*, 18 F.4th at 968; *see also* ECF No. 6-2 ¶ 33 ("As a result of SF 383 Pella Corporation anticipates needing to make structural changes to its Plan design, because aspects of the Plan's design are incompatible with the requirements of SF 383 including . . . removing benefit-allowance preferences . . . for . . . in-network pharmacies [and] changing cost-share requirements . . . ."). The Court reaches this preliminary conclusion because § 510B1.4. reaches beyond cost controls—which were found not preempted in *Rutledge*—and interferes more meaningfully in plan design, as found impermissible by several courts, as discussed below.

In *Rutledge*, the Supreme Court addressed several provisions of an Arkansas statute directed towards pharmacy benefit managers. 592 U.S. 80, 84–85 (2020). Taken together, the challenged provisions, "[i]n effect . . . require[d] PBMs to reimburse Arkansas pharmacies at a price equal to or higher than that which the pharmacy paid to buy the drug from a wholesaler." *Id.* at 84. The Court focused on the "connection with" prong of the test for ERISA preemption and concluded, based on a characterization of the challenged cost provisions as "nothing more than cost regulation," that no impermissible connection existed. *Id.* at 89.

In reaching this conclusion, the Court rejected arguments that the Arkansas statute's

"enforcement mechanisms . . . directly affect[ed] central matters of plan administration and interfere[d] with nationally uniform plan administration." *Id.* The Court held the enforcement mechanisms—namely, a price floor, an appeal process, and the ability of individual pharmacies to refuse to dispense drugs at a loss—did "not require plan administrators to structure their benefit plans in any particular manner nor [did] they lead to anything more than potential operational inefficiencies." *Id. Rutledge*, therefore, provides an example of permissible state PBM regulation.

Prior to *Rutledge*, the Fifth and Sixth Circuits had held state statutes restricting plan structure intruded impermissibly upon a central matter of plan administration and fell within ERISA's preemption provision. *See CIGNA Healthplan of La., Inc. v. Louisiana ex rel. Ieyoub*, 82 F.3d 642 (5th Cir. 1996) (Louisiana any-willing-provider law preempted and not saved by ERISA saving clause); *Ky. Ass'n of Health Plans Inc. v. Nichols*, 227 F.3d 352 (6th Cir. 2000) (Kentucky any-willing-provider law preempted but saved). After *Rutledge*, the Tenth Circuit reached a similar conclusion, finding several provisions similar to those contained in SF 383 preempted by ERISA. *See Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183, 1198–99 (10th Cir. 2023) (holding state-law geographic access standards, discount prohibitions, and any-willing-provider provisions preempted by ERISA because they "require providers to structure benefit plans in particular ways," and "govern[] a central matter of plan administration" (quoting *Rutledge*, 592 U.S. at 86–87)).

The dividing line between state laws with permissible and impermissible connections to ERISA, however, remains murky. Several cases hold state laws dictating coverage or non-discrimination in the relationship between the plan and covered individuals are preempted. For example, in *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 108–09 (1983), the Supreme Court stated, "We have no difficulty in concluding that the Human Rights Law and Disability Benefits Law 'relate to' employee benefit plans," and "[w]e hold that New York's Human Rights Law is

pre-empted with respect to ERISA benefit plans only insofar as it prohibits practices that are lawful under federal law." *Shaw*, it would seem, was a straight-forward case. There, the challenged state law directly intruded on a particular aspect of plan decision making—benefit determination. *Id.*

In *Mulready*, the Tenth Circuit determined a plan's choice of provider relationships, such as pharmacy selection, are similarly integral to plan structure and administration. *See Mulready*, 78 F.4th at 1198. The court explained:

> Functionally, the network restrictions mandate benefit structures; they at least 'eliminate[ ] the choice of one method of structuring benefits.' The Access Standards dictate which pharmacies must be included in a PBM's network, and . . . the [any-willing-provider] Provision requires that those pharmacies be invited to join the PBM's preferred network. The Discount Prohibition requires that cost-sharing and copayments be the same for all network pharmacies—whether retail or mail-order; standard or preferred. *Each provision either directs or forbids an element of plan structure or benefit design.*

*Id.* (citation omitted) (emphasis added).

Importantly, the court in *Mulready* found *Rutledge* did not disturb *Cigna* or *Nichols*. *Id.* at 1199 ("*Rutledge* does not change our conclusion). In *Mulready*, the Tenth Circuit noted the Supreme Court in *Rutledge* had concluded the Arkansas law at issue ultimately amounted to a price control law, rather than a regulation of plan structure. *Id.* ("The unanimous Court held that [the Arkansas] law was a mere cost regulation that did not have an impermissible connection with ERISA plans."). In contrast, the law at issue in *Mulready* carried an impermissible connection to ERISA in that it essentially dictated plan structure. *id.* at 1198 ("However sliced, the network restrictions 'require providers to structure benefit plans in particular ways,' *Rutledge*, 592 U.S. at 86–87, and 'prohibit[ ] employers from structuring their employee benefit plans in a [certain] manner,' *Shaw*, 463 U.S. at 97."). Unlike the permissible state law in *Rutledge*, the Court concludes SF 383 reaches beyond price control and requires sponsors to structure their plans in particular ways. Senate File 383 directly and indirectly controls health plans' relationships with pharmacies,

barring health plans and PBMs alike from exercising distinctions between pharmacies as to "participation, referral, reimbursement of a covered service, or indemnification . . . ." Iowa Code § 510B.1.4. As with the provisions at issue in *Mulready*, § 510B.1.4. "either directs or forbids an element of plan structure or benefit design." 78 F.4th at 1198.

Finally, the Court finds nothing in the Eighth Circuit's application of *Rutledge* in *Wehbi* to call this conclusion into doubt. The North Dakota statute in *Wehbi* "merely authorize[d] pharmacies to do certain things" such as "provide relevant information to a patient," "disclose certain information to the plan sponsor," "mail drugs . . . as an ancillary service," or "charg[e] a shipping . . . fee." 18 F.4th at 968. The Eighth Circuit expressly held the challenged provisions, "constitute[], at most, a *noncentral* 'matter of plan administration' with *de minimis* economic effects and impact on the uniformity of plan administration across states." *Id.* (emphasis added). The *de minimis* nature of the requirements imposed by North Dakota differed from the mere price controls in *Rutledge*, but they did not, directly or indirectly, impinge upon central matters of plan structure. Here, in contrast, it is evident from the text of SF 383 and the declaration of Veenstra that SF 383 imposes structural constraints on plan design that are not *de minimis* and that reach central matters of plan design and administration. *Rutledge*, 592 U.S. at 86–87.

In reaching this preliminary conclusion specifically with reference to Iowa Code § 510B.1.4. and solely for the purpose of temporary preliminary relief, the Court makes no comment as to the presence of an impermissible connection between ERISA and the other challenged provisions of SF 383.

## 2.    First Amendment

Senate File 383 contains several provisions that restrict speech. For purposes of considering the temporary restraining order, the Court focuses on SF 383's provision prohibiting pharmacy benefit managers from "impos[ing] a monetary advantage or penalty that would affect a covered

person's choice" of "pharmacy or pharmacist." Iowa Code § 510B.4B.1. It defines "monetary advantage or penalty" to include "a *promotion* of one participating pharmacy over another, or *comparing* reimbursement rates of a pharmacy against mail order pharmacy reimbursement rates." *Id.* (emphases added). Setting aside for now concerns of vagueness and the interpretive challenges attendant to a prohibition on words or actions that might "affect" a person's "choice," this provision appears likely to fail under *Central Hudson*'s four-part test.

*Central Hudson* applies because this restriction on commercial speech is speaker- and content-directed. *1-800-411 Pain Referral*, 744 F.3d at 1055. The regulated content does not "concern[] unlawful activity [n]or is [it] misleading." *Id.* Rather, SF 383 directly prohibits the disclosure of truthful comparative reimbursement rate information to covered persons.[4] Such information has clear commercial value to consumers. The second and third factors ask "whether the governmental interest is substantial" and "whether the challenged regulation directly advances the government's asserted interest*." Id.* Iowa may well have a substantial interest in promoting and protecting retail pharmacies when coupled with an interest in ensuring pharmacy access to rural areas. *Cf. Birchansky v. Clabaugh*, 421 F. Supp. 3d 658, 678 (S.D. Iowa 2018) ("[P]rotecting or favoring a particular intrastate industry is not an *illegitimate* interest when protection of the industry can be linked to advancement of the public interest or general welfare."). Looking specifically at the methods of protection chosen, however, the Court sees no substantial interest in the suppression of factually accurate reimbursement rate information from covered persons. Instead, the Court sees, at most, a potential *indirect* rather than *direct* advancement of Iowa's

---

[4] In *Wehbi*, the Eighth Circuit found no ERISA preemption for a provision that authorized pharmacies to disclose certain information—effectively an "anti-gag order" provision. 18 F.4th at 968. Here, in contrast and at this preliminary stage, at least some challenged provisions of SF 383 seem to mandate the suppression of information consumers (and sponsors who owe those consumers fiduciary duties under ERISA) would find valuable in making choices as to pharmacy providers.

broader purpose of promoting rural pharmacies in the suppression of truthful comparative pricing information. For this reason, at this stage of the proceedings, the Court preliminarily concludes the speech restrictions in Section 510B.4B.1 are "more extensive than necessary to further the government's interest." *1-800-411 Pain Referral*, 744 F.3d at 1055.

### 3. Severability

Plaintiffs seek to have all of SF 383 enjoined notwithstanding SF 383's severability provision. *See* Iowa Code § 510B.8 ("The provisions of this division of this Act are severable pursuant to section 4.12."). Plaintiffs argue "the Court should not sever illegal parts from the rest, since the provisions are all intertwined, the remainder cannot workably exist, and determining which parts should live requires intricate legislative work." ECF No. 16 at 31 n.16 (citing *Sisney v. Kaemingk*, 15 F.4th 1181, 1194 (8th Cir. 2021) and *ANR Pipeline Co. v. Iowa State Com. Comm'n*, 828 F.2d 465, 473 (8th Cir. 1987)). Plaintiffs' non-severability argument, however, is premised at least in part on the assumption that the Court finds the many provisions Plaintiffs challenge all individually unenforceable. *Id.* ("Plaintiffs challenge nearly all of the significant provisions of SF 383.").

The Court does not address all of the challenged provisions and makes no finding, at this preliminary ex parte phase, whether the entirety of SF 383 ultimately rises or falls on the strength and core character of the limited sections addressed herein. The Court has found two provisions unenforceable as a preliminary matter. The Court agrees with Plaintiffs, however, that a severability analysis in the present context involves, essentially, "intricate legislative work," *id.*, that is complex and challenging. *Cf. Sisney*, 15 F.4th at 1194 ("Sometimes a limited solution is not possible because it would entail quintessentially legislative work (in the case of a statute) or executive work (in the case of a regulation) that the Constitution does not empower federal courts to undertake." (internal quotation marks omitted)). Plaintiffs have set forth sufficient argument

and facts to support the conclusion that an expedited and ex parte severability analysis is, in and of itself, unworkable. At this early stage, therefore, and for the fourteen days during which this order will preclude enforcement, the Court refrains from conducting such an analysis. The Court deems the more prudent path forward to be a short preservation of the status quo— governance of PBMs in Iowa pursuant to the preexisting provisions of Iowa Code Chapter 510B. *Cf. Dataphase,* 640 F.2d at 113 ("the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined"). The parties shall be prepared to address the issue of severability in detail through the adversarial process at the preliminary injunction hearing.

### B.    Threat of Irreparable Harm

Plaintiffs' affidavits describe primarily economic hardship, which, in most instances, is not irreparable harm. *See* ECF Nos. 6-1, 6-2; s*ee also Wildhawk Investments, LLC v. Brava I.P., LLC*, 27 F.4th 587, 597 (8th Cir. 2022) ("Economic loss, on its own, is not an irreparable injury so long as the losses can be recovered."(citation omitted)). The Eighth Circuit has held, however, that when the threatened economic harm may not in the future be recovered, economic harm may be considered irreparable harm. *See, e.g., Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm."). And here, if the statute is ultimately deemed unenforceable, there is no possibility of recovery.

Moreover, for the very same reasons the Court finds a preliminary likelihood of success regarding ERISA preemption, the Court finds a threat of irreparable harm beyond unrecoverable economic harm. Interference with plan structure and design interferes with the ability to conduct the ongoing process of review, amendment, and negotiation necessary to maintain plans from year to year. Plaintiffs, their covered employees, pharmacies, and PBMs generally operate within a web of contracts and relationships built over time with annual adjustments to those contracts.

Veenstra's affidavit describes in convincing and credible fashion the process of reviewing, amending, and negotiating changes to the plans and the various vendor or servicer contracts necessary to support and sponsor a plan. ECF No. 6-2. The immediate and consequential disruption to plan structure and the inability to structure future plans is irreparable. As the Court has previously concluded, the statute at issue reaches into the exclusive field of plan design and plan structure choices. The statute also threatens irreparable disruption of plan maintenance and, ultimately, drug provision to covered persons.

Finally, Karow describes immediate price increases to covered persons with particular focus on specialty drugs. ECF No. 6-3 ¶ 10–13. To the extent such dramatic price increases ($4,380 per prescription in one instance) threaten covered persons' ability to access prescribed drugs in a timely fashion, the Court finds a threat of irreparable harm.

### C.    Balance of Hardship and Public Interest

The Court concludes the final two *Dataphase* factors favor issuance of a temporary restraining order. Plaintiffs face irreparable harm outweighing risk of injury to Defendant. The loss of fourteen days' enforcement ability seemingly deprives Defendant of the least valuable window of time for enforcement. If much or all of SF 383 ultimately is found constitutional and not preempted, vigorous and meaningful enforcement will occur when new contracts, networks, and plan structures arise, and when the Commissioner has issued robust guidance, pharmacies are aware of their rights, and plans can understand what is required. Plaintiffs presently labor under existing contracts, billing structures, and pharmacy networks. The public will not be aided by uncertain disruption to drug distribution pathways. In other words, "the temporary nature of the requested relief poses minimal harm to defendants." *Saxena v. Noem*, No. 5:25-cv-05035-KES, 2025 WL 1149498, at *3 (D.S.D. April 18, 2025) (citing *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022) (concluding that "the equities strongly favor an injunction considering the

irreversible impact [on Plaintiffs] compared to the lack of harm an injunction would presently impose [on the United States]")). The Court also concludes "[t]here is substantial public interest in ensuring that governmental agencies abide by federal laws as 'there is generally no public interest in the perpetuation of unlawful [government] action.'" *Id.* (quoting *Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025)). On balance, the relative hardships and public interest justify granting temporary relief.

### D.    Granting Order Without Notice

Rule 65(b)(1) provides a

> court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
> (A) specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
> (B) the movant's attorney certifies in writing any efforts made to give notice and reasons why it should not be required.

Here, Plaintiffs' attorney represents he gave notice of the present motion to Defendant, and, in fact, Defendant's filing as to a preferred briefing schedule demonstrates notice, although they have not had the opportunity to respond fully.

Given the descriptions of harm present in Plaintiffs' declarations, the Court finds the requirements of Rule 65 satisfied. *Cf. Creativision, Inc. v. Martinelli*, No. 4:16-cv-00428-SMR-HCA, 2016 WL 9345208, at *1 (S.D. Iowa July 26, 2016) (discussing requirements of Rule 65(b)(1)).

### E.    Security

Rule 65(c) states the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Eighth Circuit has stated that the bond amount ultimately "rests within

the sound discretion of the trial court." *Stockslager v. Carroll Elec. Co-op. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976). Further, the Court may waive entirely the requirement of bond. *See Richard/Wilkin Joint Powers Auth.*, 826 F.3d at 1043. In particular, where the public interest weighs in favor of restraining unlawful government action and where the restraint causes little hardship to the government a waiver of bond may be appropriate. *See id.* at 1045 (concluding it was "permissible for the district court to waive the bond requirement based on its evaluation of public interest in this specific case").

The Commissioner, in his motion seeking a briefing schedule, urges the Court to impose a bond of $80,000 if the Court issues a temporary restraining order. ECF No. 8 at 4–5. The Commissioner suggests this amount relates to statutory penalties found at Iowa Code § 507B.7.1.a. of $1,000 per unknowing violation (capped at an aggregate of $10,000) and $5,000 per knowing violation (capped at an aggregate of $50,000), as referenced in the complaint. ECF No. 8 at 4–5; ECF No. 1 ¶ 27. The Commissioner suggests a foundation for his $80,000 request, stating, "While Plaintiffs seek a facial injunction, bond of $20,000 per Plaintiff—$10,000 for each Plaintiff's violations plus $10,000 for each non-party PBM with whom each Plaintiff contracts and also presumably will be violating the Statute—is a reasonable and modest request . . . ." ECF No. 8 at 4–5. In making this suggestion, the Commissioner does not treat The Association as 600 separate employers or plan sponsors.

The Court does not find the Commissioner's suggested basis for bond amount compelling in light of the minimal hardship cause by the limited present relief. The Court concludes no bond is required in this matter for the limited, temporary relief being granted through this order. The Court's conclusion in this regard, like all of the Court's conclusions herein, does not foreclose assertion of similar arguments at the preliminary injunction hearing regarding security for 1) any possible preliminary injunction or 2) any possible continuation or extension of the temporary

restraining order.

## V.    CONCLUSION

Based on the allegations contained in the record and after considering the *Dataphase* factors, the Court grants Plaintiffs' motion for a temporary restraining order.

The Court notes Plaintiff The Association asks the Court to make any final order applicable to all of its members. ECF No. 1 ¶ 60.a. n.6. The Association, however, does not name its members, making any immediate temporary relief essentially universal in contravention of the Supreme Court's recent narrowing of district courts' ability to impose injunctive relief beyond that which is necessary to afford relief to named parties. *See Trump v. Casa Inc.*, Nos. 24A884, 24A885, 24A886, 2025 WL 1773631, at *15 (June 27, 2025) (holding injunctions may not be "broader than necessary to provide complete relief to each plaintiff with standing to sue"); *see also id.* at *4 n.2 (recognizing the question of granting relief to unidentified members of a litigant organization but expressly declining to address the question). Accordingly, the Court will require Plaintiffs to provide to the Court and Defendant a list identifying its members not later than twenty-four hours from issuance of this order.

**IT IS ORDERED** that Plaintiffs' Motion for Temporary Restraining Order, ECF No. 6, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Doug Ommen, in his official capacity as Insurance Commissioner of Iowa, may not enforce SF 383 against the named plaintiffs, including the subsequently identified members of The Association, while this temporary restraining order is in effect.

**IT IS FURTHER ORDERED** that Plaintiff Iowa Association of Business and Industry must file a list of its members not later than twenty-four hours after the time this order is filed.

**IT IS FURTHER ORDERED** that this Order does not prevent Defendant Doug

Ommen, in his official capacity as Insurance Commissioner of Iowa, from enforcing SF 383 against non-parties.

**IT IS FURTHER ORDERED** that a hearing on Plaintiffs' Motion for Preliminary Injunction is set for Monday, July 14, 2025, at 10:00 a.m. in Courtroom 410 in the United States Courthouse in Des Moines, Iowa. Defendant shall file a response to Plaintiffs' Motion for Preliminary Injunction by no later than July 7, 2025. If necessary, Plaintiff shall file a reply by no later than July 9, 2025. By no later than 12:00 p.m. on July 10, 2025, the parties shall file exhibit and witness lists and exhibits. The parties shall also each provide the Court with a tabbed, three-ring binder containing copies of all of that party's exhibits by no later than 5:00 p.m. on July 10, 2025. The binder shall be delivered to the trial judge's chambers in Des Moines, Iowa.

**IT IS SO ORDERED**.

Dated this 30th day of June, 2025.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE