**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| IOWA ASSOCIATION OF BUSINESS AND INDUSTRY, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DOUG OMMEN, in his official capacity as Insurance Commissioner of Iowa, <br><br> *Defendant*. | Case No. 4:25-cv-211-SMR-WPK <br><br><br> **DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

    I.    Pharmacy Benefits Managers' Outsized Influence. ............................................. 2

    II.   Iowa Enacts Senate File 383 to Protect Iowans' Healthcare. ............................... 6

    III.  A Group of Third-Party Payors Sue to Enjoin SF383 In Its Entirety. ................. 8

LEGAL STANDARD ........................................................................................................ 8

ARGUMENT .................................................................................................................... 9

    I.    Plaintiffs Are Not Likely To Succeed On The Merits. ......................................... 9

        A.  Plaintiffs lack standing to challenge laws regulating PBMs. ........................ 9

        B.  Plaintiffs lack a cause of action to challenge laws regulating PBMs. .......................... 11

        C.  Plaintiffs seek facial relief yet fail to establish that SF383 does not constitutionally apply to non-ERISA plans. .......................................................... 12

        D.  ERISA does not preempt SF383 in all its applications. ............................... 16

        E.  Plaintiffs' First Amendment Claim Fails under *NetChoice*. ....................... 38

    II.   The Other Factors Weigh Against Plaintiffs' Requested Relief. ........................ 44

    III.  Rule 65(c) Injunction Bond. ............................................................................. 45

CONCLUSION ................................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800-411 Pain Referral Serv. LLC v. Otto*,
   744 F.3d 1045 (8th Cir. 2014) .................................................. 41, 42
*Abbott v. Perez*,
   585 U.S. 579 (2018) ............................................................... 45
*Aetna Health Inc. v. Davila*,
   542 U.S. 200 (2004) ............................................................... 34
*Ark. Times LP v. Waldrip as Tr. of Univ. of Ark. Bd. of Trs.*,
   37 F.4th 1386 (8th Cir. 2022) .................................................. 45
*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ............................................................... 11
*Bribriesco-Ledger v. Klipsch*,
   957 N.W.2d 646 (Iowa 2021) .................................................. 29, 43
*Brockett v. Spokane Arcades, Inc.*,
   472 U.S. 491 (1985) ............................................................... 16, 44
*California Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*,
   519 U.S. 316 (1997) ............................................................... 16, 17, 18
*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
   447 U.S. 557 (1980) ............................................................... 43
*Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*,
   474 F.3d 463 (7th Cir. 2007) .................................................. 14
*CIGNA Healthplan of La., Inc. v. Louisiana ex rel. Ieyoub*,
   82 F.3d 642 (5th Cir. 1996) .................................................... 29
*Dept. of Educ. v. Brown*,
   600 U.S. 551 (2023) ............................................................... 9, 10
*DeVillier v. Texas*,
   601 U.S. 285 (2024) ............................................................... 11
*Egelhoff v. Egelhoff*,
   532 U.S. 141 (2001) ............................................................... 19
*Ex parte Young*,
   209 U.S. 123 (1908) ............................................................... 12
*FMC Corp. v. Holliday*,
   498 U.S. 52 (1990) ................................................................ 37
*Fort Halifax Packing Co. v. Coyne*,
   482 U.S. 1 (1987) .................................................................. 17, 19
*Furlow v. Belmar*,
   52 F.4th 393 (8th Cir. 2022) .................................................. 9, 13
*GLBT Youth in Iowa Sch. Task Force v. Reynolds*,
   114 F.4th 660 (8th Cir. 2024) ................................. 2, 9, 38, 39, 40
*Gobeille v. Liberty Mut. Ins. Co.*,
   577 U.S. 312 (2016) ............................................... 16, 17, 33, 36
*Gonzales v. Oregon*,
   546 U.S. 243 (2006) ............................................................... 27

Gunn v. Minton,
 568 U.S. 251 (2013) ...........................................................11
H&R Block, Inc. v. Block, Inc.,
 58 F.4th 939 (8th Cir. 2023) ............................................ 8
Hodak v. City of St. Peters,
 535 F.3d 899 (8th Cir. 2008) .....................................10, 11
Howard Jarvis Taxpayers Ass'n v. Cal. Secure Choice Ret. Sav. Program,
 997 F.3d 848 (9th Cir. 2021) ......................................... 36
Kentucky Ass'n of Health Plans v. Miller,
 538 U.S. 329 (2003) .......................................... 36, 37, 38
Ky. Ass'n of Health Plans, Inc. v. Nichols,
 227 F.3d 352 (6th Cir. 2000) ......................................... 30
Lujan v. Defenders of Wildlife,
 504 U.S. 555 (1992) .................................................... 9
Merrill Lynch, Pierce, Fenner & Smith v. Ware,
 414 U.S. 117 (1973) ................................................... 13
Metro. Life. Ins. Co. v. Massachusetts,
 471 U.S. 724 (1985) ................................................... 19
Moody v. NetChoice, LLC,
 603 U.S. 707 (2024) ............................................. passim
N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,
 514 U.S. 645 (1995) ............................................. passim
NetChoice, LLC v. Paxton,
 121 F.4th 494 (5th Cir. 2024) ...................................... 40
Ng v. Bd. of Regents of Univ. of Minn.,
 64 F.4th 992 (8th Cir. 2023) ........................................ 44
Novus Franchising, Inc. v. Dawson,
 725 F.3d 885 (8th Cir. 2013) ........................................ 44
PCMA v. Gerhart,
 852 F.3d 722 (8th Cir. 2017) ........................................ 33
PCMA v. Mulready,
 78 F.4th 1183 (10th Cir. 2023) .................................. passim
PCMA v. Rowe,
 429 F.3d 294 (1st Cir. 2005) .................... 4, 14, 35, 41, 42
Pharm. Rsch. & Mfrs. of Am. v. Stolfi,
 724 F. Supp. 3d 1174 (D. Or. 2024) .............................. 39
Planned Parenthood Minn., N.D., S.D. v. Rounds,
 530 F.3d 724 (8th Cir. 2008) ..................................... 9, 44
Powers v. Ohio,
 499 U.S. 400 (1991) ................................................... 10
Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.,
 154 F.3d 812 (8th Cir. 1998) ........................................ 29
Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.,
 413 F.3d 897 (8th Cir. 2005) ....................... 12, 13, 15, 37
Religious Sisters of Mercy v. Becerra,
 55 F.4th 583 (8th Cir. 2022) ........................................ 10

*Rutledge v. PCMA*,
  592 U.S. 80 (2020) ..................................................................... *passim*
*Shaw v. Delta Air Lines, Inc.*,
  463 U.S. 85 (1983) ............................................................................ 19
*Singer v. City of Orange City*,
  15 N.W.3d 70 (Iowa 2024) .............................................................. 9
*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ......................................................................... 9
*State v. Blyth*,
  226 N.W.2d 250 (Iowa 1975) ........................................................ 15
*Trump v. CASA, Inc.*,
  2025 WL 1773631 (June 27, 2025) ........................................... 12, 13
*Turtle Mountain Band of Chippewa Indians v. Howe*,
  137 F.4th 710 (8th Cir. 2025) ......................................................... 11
*United States v. Hansen*,
  599 U.S. 762 (2023) ........................................................................ 12
*United States v. Sineneng-Smith*,
  590 U.S. 371 (2020) ........................................................................ 14
*Veix v. Sixth Ward Bldg. & Loan Ass'n*,
  310 U.S. 32 (1940) .............................................................. 6, 27, 45
*PCMA v. Wehbi*,
  18 F.4th 956 (8th Cir. 2021) ..................................................... *passim*
*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .............................................................................. 8
*Zanders v. Swanson*,
  573 F.3d 591 (8th Cir. 2009) ......................................................... 10
*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985) ........................................................................ 41

## Statutes

29 U.S.C. § 1001 .................................................................................. 16
29 U.S.C. § 1003 .................................................................................. 13
29 U.S.C. § 1144 ..................................................................... 16, 17, 36
Iowa Code § 4.4 ............................................................................. 9, 45
Iowa Code § 4.12 ...................................................................... 15, 16, 44
Iowa Code § 510B.1 ............................................................. 7, 8, 13, 37
Iowa Code § 510B.4 .......................................................... 26, 28, 43
Iowa Code § 510B.4B ............ 7, 8, 23, 24, 27, 28, 29, 33, 34, 41, 43, 44
Iowa Code § 510B.8 ...................................................................... 22, 23
Iowa Code § 510B.8B ....................................................... 7, 8, 10, 22, 32
Iowa Code § 510B.8D ....................................................................... 7, 23
Iowa Code § 510B.8E .......................................................................... 33

## Rules

Fed. R. Civ. P. 65(c) .......................................................................... 45

**Regulations**

Iowa Admin. Code 653–23.1(19)..................................................................................... 27

# INTRODUCTION

Many pharmacy benefit managers ("PBMs")—and subsequently their affiliated health benefit plans—leverage outsized market power to impose coercive cost and network restrictions on Iowa retail pharmacies. That wreaks havoc across Iowa, leaving many Iowans in pharmacy deserts, and leaving all with skyrocketing costs.

Iowa's Legislature spent years crafting and debating various solutions to try to help ensure that everyone has access to the healthcare that they need. *See* Senate File 383, Dkt. 1-1. SF383 seeks to minimize PBMs' harmful practices and to increase transparency in the system. SF383 restricts PBMs' and third-party payors' ability to engage in misleading conduct. That will reduce harm to community pharmacies and protect Iowans' access to healthcare, thus ensuring better choice, care, costs, and—crucially—health outcomes.

Just two business days before SF383's effective date, Plaintiffs sought to facially enjoin Defendant's enforcement of the whole law. But even they acknowledge that many parts of the law are constitutional. Under binding Supreme Court precedent, if even one application of the law is constitutional that defeats a facial challenge. If Plaintiffs believe that some applications of the law are illegal, as applied to them, then they should bring those narrow, fact-intensive challenges. But the challenges they bring here must fail at this stage because they have sought much broader relief. On the preliminary (and expedited) record presented here, Plaintiffs fail to carry their burden of establishing a likelihood of success as to both facial and (not-pleaded) as-applied relief.

Before even getting to the merits, Plaintiffs' threshold flaw jumps off the page: they seek to enjoin enforcement of the entire law, yet most of the law does not even apply to them. Most of SF383 applies to PBMs. But no Plaintiff is a PBM. At the threshold, those overbroad parts of Plaintiffs' requested relief fail.

On the merits, Plaintiffs' ERISA preemption challenge fails. SF383 bears no impermissible relation to ERISA plans. ERISA is "primarily concerned with pre-empting laws that require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits," "by binding plan administrators to specific rules for determining beneficiary status," or

1

by creating such acute economic effects that ERISA plans are "forced" to "adopt a certain scheme of substantive coverage." *Rutledge v. PCMA*, 592 U.S. 80, 86–87 (2020) (cleaned up).

SF383 does none of that. It does not force plans into any choice about the who or what of a plan's coverage. Plans may offer any terms they desire; SF383 merely requires they allow all pharmacies equal opportunity to accept those terms and participate in the plan's network. ERISA has nothing to say about the things that SF383 requires. And SF383 meanwhile applies irrespective of the nature or character of any plan. It has nothing to do with ERISA. Indeed, many parts of the law are materially similar to state laws upheld by the Supreme Court and Eighth Circuit.

Plaintiffs' First Amendment challenge similarly fails at the outset. Plaintiffs challenge only three sections of the law under the First Amendment, yet they seek to enjoin it all. Even skipping that flaw, their claim fails because they do not carry their heavy burden. Courts must first "perform the necessary inquiry set forth in *NetChoice*." *GLBT Youth in Iowa Sch. Task Force v. Reynolds*, 114 F.4th 660, 670 (8th Cir. 2024). But Plaintiffs fail to carry their legal and factual burden at all three steps of the *NetChoice* analysis for all three parts of the law they challenge under the First Amendment. Plaintiffs bear the heavy burden; that "is the price of [their] decision to challenge the law[] as a whole." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024). They are not entitled to any relief, especially at this preliminary-injunction stage.

## BACKGROUND

### I.    Pharmacy Benefits Managers' Outsized Influence.

"Pharmacy benefit managers (PBMs) are a little-known but important part of the process by which many Americans get their prescription drugs." *Rutledge*, 592 U.S. at 83. Before reaching a patient, prescription drugs flow through a complex system of intermediaries with different interests, stakeholders, and incentives. And PBMs are the intermediaries between drug manufacturers, pharmacies, and employer-sponsored health plans.

Many health benefit plans found it most efficient to contract with PBMs and delegate the administration of the plan's prescription drug benefits to the PBM. So beginning around the 1960s and 1970s, PBMs initially played only a claims-processing role—checking to make sure that a

patient had coverage, that the drug was covered, and calculating the copay. *See* Minority Staff of the U.S. Senate Committee on Finance, *A Tangled Web: An Examination of the Drug Supply and Payment Chains* (June 2018), at 26, tinyurl.com/yx4y33ke.

But PBMs' role began to expand in the 1980s as rising drug costs led employers to look for ways to find more savings. Janet Brierton, Conn. Office of Legislative Research, *OLR Research Report: Pharmacy Benefit Managers* (Dec. 24, 2003), tinyurl.com/rw2mvl7. And by 2023, PBMs administered prescription-drug benefits for approximately 270 million people across the country. *PCMA v. Mulready*, 78 F.4th 1183, 1188 (10th Cir. 2023).

Today, PBMs are not just claims processors—they are intermediaries between all facets of the prescription drug market, developing drug formularies, contracting with pharmacies, negotiating prices, discounts, and rebates with drug manufacturers, and a whole lot more. *See generally* Wiese Decl. (Dkt. 24-2). In that expanded role, PBMs first negotiate volume discounts with drug manufacturers, including accepting rebates from manufacturers, in return for PBMs placing that manufacturer's drug on the PBMs' drug formulary (the list of drugs covered in the PBM's network). *See, e.g.*, Hartig Decl. ¶¶ 12–18 (Dkt. 24-5).

Next, PBMs contract with pharmacies to create the PBM's own network of preferred pharmacies. Third, PBMs then contract with health benefit plans to administer their prescription drug benefits, bringing to the negotiating table the PBM's curated pharmacy network. Finally, PBMs act as claims processors: "When a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription, the pharmacy checks with a PBM to determine that person's coverage and copayment information." *Rutledge*, 592 U.S. at 84. The PBM reimburses the pharmacy for the prescription, less the beneficiary's cost-sharing amount. Then the plan reimburses the PBM. *Id.*

But reimbursements are not just money in, money out for the PBM. "A PBM's reimbursement from a plan often differs from and exceeds a PBM's reimbursement to a pharmacy. That difference generates a profit for PBMs." *Id.* This process, called spread pricing, is a byproduct of PBMs' position as intermediary. In addition to pocketing the profitable spread, PBMs often

pocket much of the rebates negotiated with the drug manufacturer. *PCMA v. Rowe*, 429 F.3d 294, 298 (1st Cir. 2005). And sometimes PBMs even use their leverage to pressure manufacturers to market higher-priced drugs. Amici Brief of National Community Pharmacists Association, et al., *PCMA v. Mulready*, 2022 WL 14849173, at \*13–\*14 (10th Cir. 2023).

PBMs have captured such an outsized role in the process that they can reimburse many pharmacies below cost. Wiese Decl. ¶¶ 12–18; Knoer Decl. ¶ 5 (Dkt. 24-6); Pilkington Decl. ¶ 5 (Dkt. 24-7); Hartig Decl. ¶¶ 8, 9, 13, 20, 23; Wegmann Decl. ¶ 6 (Dkt. 24-8). Many PBMs own and operate pharmacies of their own and leverage that market power to deploy coercive network restrictions to force consumers to obtain prescriptions from PBM-affiliated pharmacies, regardless of whether that is to consumers' benefit. *Id.* PBMs offer affiliated pharmacies more favorable terms, while often dropping their reimbursement rate for unaffiliated pharmacies below the pharmacy's cost of acquiring and dispensing the drug. *Id.* A 2018 article explained that while the PBM operated by CVS reimburses a CVS pharmacy $400.65 for a fentanyl patch and $5.86 for Ibuprofen, it reimburses unaffiliated pharmacies $75.74 for the patch and $1.39 for the Ibuprofen. Linette Lopez, *What CVS is Doing to Mom-and-Pop Pharmacies in the U.S. Will Make Your Blood Boil,* Business Insider (Mar. 30, 2018), tinyurl.com/vqph452. And as one Iowa pharmacist testified to Congress, these losses are neither inconsequential nor rare. Testimony of Randy McDonough, U.S. Senate Comm. on the Judiciary (May 13, 2025), perma.cc/4WZK-CQSG.

As PBMs self-deal, unaffiliated pharmacies of all types suffer, especially independent, rural pharmacies. *See* Wiese Decl. ¶¶ 19–22. "The more prescriptions [they] fill, the more money [they] lose." Stephen Gruber-Miller, *Saving pharmacies or raising drug costs? Iowa Gov. Kim Reynolds signs law regulating PBMs*, DSM Register, (June 12, 2025), perma.cc/WGR3-LH6G.

Those coercive tactics cause pharmacy deserts in many Iowa communities. Wegmann Decl. ¶ 6; Fuller Decl. ¶¶ 5, 6, 12 (Dkt. 24-4). "Local pharmacies, especially in rural areas, are vital to community health and local hospitals but are being driven out by opaque, one-sided contracts—evidenced by the closure of 34 rural pharmacies in Iowa last year." Dkt. 1-1 at 2; Hartig Decl. ¶ 23. And more than 150 Iowa pharmacies have closed in the last decade. *See* Robin Opsahl,

*Bill regulating pharmacy benefit managers passes Iowa Senate*, Iowa Capital Dispatch (Apr. 28, 2025), tinyurl.com/4y679x3u. These opaque, coercive practices delay or disrupt access to much-needed drugs, and often deny continuity of care, especially care that had been integrated with local providers. Brooks Decl. ¶¶ 7–9 (Dkt. 24-3); Knoer Decl. ¶ 5; Wegmann Decl. ¶¶ 6, 7. And that harms Iowans' health outcomes. Knoer Decl. ¶ 5; Hartig Decl. ¶ 18. One Iowa pharmacy is unable to fill any prescriptions for employees of the second-largest employer in the community (Tyson Fresh Meats) because those employees are forced to use a chain pharmacy, which has caused the pharmacist to see "several patients struggle to receive their medications due to transportation issues getting to these pharmacies." Pilkington Decl. ¶ 6.

Yet because of PBMs' outsized power, many pharmacies have no choice but to deal with PBMs. Fuller Decl. ¶¶ 6, 7, 10; Wiese Decl. ¶¶ 9, 12, 15. And if a pharmacy declines to fill a prescription at a loss, they face termination from the PBM's network; this leaves many pharmacies with a stark choice: either close, or stop carrying critical, needed medications. Fuller Decl. ¶ 10.

"Over time, consolidation has led to three major PBMs controlling 80% of the market and a close affiliation with both insurers and pharmacies." Dkt. 1-1 at 2. "This vertical integration gives them outsized power," "often resulting in unaffordable drug costs, difficult choices for families, and reimbursement below pharmacy acquisition cost." *Id.*

Though PBMs argue they lower drug prices by negotiating volume discounts and by increasing efficiencies in plan administration, non-transparent PBMs in fact contribute to the trend of increased drug prices. Hartig Decl. ¶¶ 13–16; Wiese Decl. ¶¶ 6, 24–30, 38–43. That much is clear by comparing plan sponsors' savings after they moved to a transparent PBM that uses pass-through pricing from a traditional PBM. Wiese Decl. ¶¶ 41, 42 (highlighting $35,000 monthly savings for one plan sponsor as to just one specialty drug, and triple rebate savings for another).

"PBM[s] actually win[] when list price go up." Alex M. Azar II, U.S. Secretary of Health & Human Services, *Fixing Healthcare: Driving Value Through Smart Purchasing and Policy* (May 16, 2018), tinyurl.com/kwmyhve3. Secretary Azar provided a helpful anecdote to show this patient-harming practice in action:

> Imagine you take a $1,000 drug. The PBM working for your insurance plan negotiates a 30 percent rebate, $300, which gets sent back to your employer, minus a percentage cut for the PBM. Now imagine the list price goes up to $1,500-now the rebate would be $450, allowing the PBM to keep the added $150, while the patient pays significantly more in cost-sharing.

*Id.* PBMs' nontransparent rebate structure skews incentives to increase drug costs—even though the PBMs can claim ever higher rebate "savings." All the while, PBMs reimburse at a markup rate that bears "no necessary relation to pharmacies' acquisition costs." Wiese Decl. ¶¶ 14, 17 (three largest PBMs reimburse their affiliate pharmacies at 1,000% or greater markup 22% of the time).

That greatly harms consumers' pocketbooks. And Iowa's too. *See*, *e.g.*, Iowa DHHS, *Iowa Medicaid Update* (Jan. 2025) hhs.iowa.gov/media/15349/download (Iowa's budget for Medicaid is $9b); Williams, et al, *Recent Trends in Medicaid Outpatient Prescription Drugs and Spending*, KFF (Oct. 11, 2024) perma.cc/Y42C-CE4B (prescription drugs account for about 6% of Medicaid spending). Worse, it harms Iowa's "vital interest[]" in its residents' "health," "safety," and "economic needs." *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38–39 (1940).

## II.     Iowa Enacts Senate File 383 to Protect Iowans' Healthcare.

Across the nation, PBMs' practices have raised concerns about conflicts of interest and other harmful-to-consumers practices. PBMs "exercise undue market power against manufacturers and against the health plans and beneficiaries they are supposed to be representing, thus generating outsized profits for themselves." White House, *Annual Report of the Council of Economic Advisers*, at 313 (Feb. 2018), perma.cc/5CUP-H2V4. And as forty-five States said: "PBM business practices have caused widespread harm," so States have passed an "array of measures" to regulate PBMs and "protect access to affordable prescription drugs." Amici Brief for California et al., *Rutledge v. PCMA*, 2020 WL 1372774, *5, *14 (2020).

Most States have used their traditional consumer-protection role and police power to protect the health and safety of their citizens by enacting laws restricting PBMs ability to harm consumers' pocketbooks and access to healthcare. And after a yearslong legislative debate, Iowa joined these States in enacting a law aimed at "bringing greater accountability to the role of

Pharmacy Benefit Managers (PBMs)." Dkt. 1-1 at 2. Senate File 383 "target[s] PBM practices that harm both patients and independent pharmacies." Dkt. 1-1 at 2. And it "amplifies the rural healthcare bill" Iowa enacted this year, working "toward a fairer, more transparent, and accessible healthcare system for all." Dkt. 1-1 at 2. Plaintiffs claim SF383 will increase costs in Iowa, but that has not proven true in other States after they enacted similar laws, which have seen no increase in premium growth rates, and is hotly contested by others in the industry who believe SF383 will assist in reducing drug and plan premium prices. *See, e.g.*, Wiese Decl. ¶¶ 23, 31–33.

Though described in more detail below, here is an overview of how SF383 furthers its ends.

SF383 protects consumer choice and access to healthcare by ensuring fair reimbursement for all pharmacies, not just those affiliated with a PBM. Iowa Code § 510B.8B(1).[1] *E.g.*, Brooks Decl. ¶¶ 7-10. SF383 limits PBMs' ability to apply more favorable cost and reimbursement strategies to affiliated or favored pharmacies, like cost-sharing rates, fees, and other financial penalties or incentives. Iowa Code §§ 510B.4B(1)(*a*), (*f*). It establishes rules for how those cost-sharing regulations affect someone's deductible or total contribution. *Id.* §§ 510B.8(5)–(7). It requires PBMs to reimburse pharmacies at least at the national average drug acquisition cost. *Id.* § 510B.8B(2). And it sets a floor for the reimbursement rate for retail pharmacies, as defined by the law, by requiring a $10.68 dispensing fee. *Id.* §§ 510B.8B(3), 510B.1(21A). It also requires PBMs to use "pass through" pricing, where all rebates received from drug manufacturers are passed onto the plan sponsors and not pocketed by the PBMs. *Id.* §§ 510B.8D(1)–(2).

SF383 seeks to minimize PBMs' conflicts of interest. So it limits PBMs', and in smaller part third-party payors' (as defined, Iowa Code § 510B.1(22)), ability to unfairly steer business to their own affiliated pharmacies. The law prohibits them from discriminating against one pharmacy over another "with respect to participation, referral, or reimbursement of a covered service. *Id.* § 510B.4(4). They may set network-participation terms as they see fit, but SF383 requires those terms be applied equally to any willing pharmacy. *Id.* §§ 510B.4B(1)(*b*), (2)(*a*).

---

[1] All citations to Iowa Code ch. 510B are to the version effective from July 1, 2025.

Separately, PBMs may not "promot[e] one participating pharmacy over another" or "compar[e] the reimbursement rates of a pharmacy against mail order pharmacy reimbursement rates" if a pharmacy has "agreed to participate" in the plan. *Id.* § 510B.4B(1)(*a*). Nor may they impose accreditation requirements on pharmacies beyond what the state requires. *Id.* § 510B.4B(1)(*c*). These restrictions do not apply to third-party payors.

And SF383 aims to increase transparency in the system. A third-party payor may restrict access to its network, but if it does so it must make sure all pharmacies in the plan's geographic coverage area are notified of the plan's decided terms of participation. *Id.* §§ 510B.4B(2)(*a*)–(*b*). And they must inform their beneficiaries who has chosen to participate in their pharmacy network. *Id.* As for PBMs, they must issue a quarterly report documenting when they have reimbursed 10% above or below the national average acquisition cost. *Id.* §§ 510B.8B(4)(*a*), (*b*), (*d*).

Lastly, SF383 gives pharmacies the right to appeal PBM decisions, and covered persons and pharmacies the right to enforce some of SF383's duties. *Id.* §§ 510B.8E(1)–(3), 510B.4B(4).

SF383 passed both chambers on May 12, then the Governor signed it into law on June 11. Dkt. 1 at 2. The law took effect on July 1.

### III.    A Group of Third-Party Payors Sue to Enjoin SF383 In Its Entirety.

Plaintiffs—an Iowa business representative organization, two ERISA plans, and two ERISA-plan sponsors—sued on June 23, but they did not move for any preliminary injunctive relief until June 26. Dkts. 1, 6. Despite challenging only some of SF383's new requirements, Plaintiffs request facial relief, seeking to enjoin enforcement of SF383's "in its entirety." Dkt. 1 at 37; Br. 2. This Court issued a temporary restraining order on June 30, enjoining Defendant's enforcement of the law against only the named Plaintiffs. Dkt. 17. The law took effect July 1 and has been enforceable since against non-parties. *Id.* at 25.

### LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). Plaintiffs bear the burden. *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 946 (8th Cir. 2023) (detailing PI factors). Because

Plaintiffs seek to enjoin enforcement of a state statute, they must satisfy the more rigorous threshold requirement that they are "likely to prevail on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008) (en banc). The "more rigorous standard" is intended to ensure that "a state's presumptively reasonable democratic processes" are not thwarted without "an appropriately deferential analysis." *Id.* at 733.

When interpreting Iowa statutes, courts apply Iowa's codified rules of construction. *See GLBT Youth*, 114 F.4th at 670–671 (applying Iowa Code ch. 4). "In enacting a statute, it is presumed that [c]ompliance with the Constitutions of the state and of the United States is intended" and that the "[p]ublic interest is favored over any private interest. Iowa Code § 4.4(1), (5). And Iowa's laws are severable. *id.* § 4.12.

## ARGUMENT

## I.     Plaintiffs Are Not Likely To Succeed On The Merits.

To succeed on a facial challenge, plaintiffs must show there is no "circumstance" where a statute can be constitutionally applied. *Furlow v. Belmar*, 52 F.4th 393, 400 (8th Cir. 2022). Facial challenges are disfavored, because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Singer v. City of Orange City*, 15 N.W.3d 70, 77 (Iowa 2024) (quotation marks omitted). If the Court determines the law can be constitutionally applied to any set of facts, then the challenge fails. *See NetChoice*, 603 U.S. at 723 ("[F]acial challenges [are] hard to win.").

### A.     Plaintiffs lack standing to challenge laws regulating PBMs.

Federal courts have limited jurisdiction, so they first determine whether a plaintiff has Article III standing. *See Dept. of Educ. v. Brown*, 600 U.S. 551, 560 (2023); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). At this stage, standing is assessed based on the complaint's allegations. *GLBT Youth*, 114 F.4th at 667.

To establish a cognizable injury-in-fact, Plaintiffs must establish that they "suffered 'an invasion of a legally protected interest,'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Or they must plead "facts that affirmatively and plausibly

9

suggest that they are indeed subject to a credible threat of prosecution under the statute." *Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009). And organizations pleading organizational standing must similarly plead that at least one of its named members has suffered injury-in-fact. *See Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 & n.12 (8th Cir. 2022).

No Plaintiff can establish standing to challenge SF383's PBM regulations, so this Court need not proceed to the merits on those claims. *Brown*, 600 U.S. at 560–561. No Plaintiffs are PBMs. Plaintiffs are two third-party payors and two Iowa businesses, one who sponsors a self-funded ERISA plan and the other an insured ERISA plan. And Plaintiff ABI pleads injury on behalf of its members, many of whom are employers and plan sponsors. Dkt. 1 ¶ 8; Dkt 19.

But most of SF383 imposes duties on and is enforceable only against PBMs. Of the 24 SF383 sections detailed in Plaintiffs' complaint, at least 16 regulate only PBMs and are not enforceable against these Plaintiffs at all. *See, e.g.*, Br. 6–10 (detailing SF383's new regulations and highlighting in bold "the entity to which each particular provision is aimed"); Br. 25–26 (SF383 is more than "minimally concerned with PBMs").

Though Plaintiffs allege that they each contract with PBM services, no Plaintiff is a PBM. Because Plaintiffs are only PBM customers, and not PBMs, there can be no actual or threatened enforcement of the PBM-focused sections of SF383 against Plaintiffs. For example, amended Iowa Code section 510B.8B(3) says: "a pharmacy benefits manager shall reimburse the retail pharmacy or pharmacist a professional dispensing fee." That imposes no obligation on any Plaintiff. And the law does not allow Defendant to enforce those SF383 sections against these Plaintiffs.

A customer of a PBM—like Plaintiffs—should not be allowed to bring third-party claims on behalf of PBMs. To assert third-party standing, Plaintiffs must have (1) Article III standing in their own right, (2) "a close relation" to the third party, and (3) there must be "some hindrance to the third party's ability to protect" their own interests. *Powers v. Ohio*, 499 U.S. 400, 411 (1991).

"Hindrance" asks about "the likelihood and ability of the third parties . . . to assert their own rights." *Hodak v. City of St. Peters*, 535 F.3d 899, 904 (8th Cir. 2008) (cleaned up). There must be some "practical obstacle (e.g., third party is unidentifiable, lacks sufficient interest, or will

suffer some sanction) [that] prevents or deters the third party from asserting his or her own interest." *Id.* "No practical barriers exist if the third party actually asserts his own rights." *Id.*

Though here PBMs have not challenged SF383, PBMs have shown over time that they face no obstacles in challenging state laws regulating PBMs. They do it all the time. *See, e.g., PCMA v. Wehbi*, 18 F.4th 956 (8th Cir. 2021) (PCMA—the PBMs' trade association—challenging State's PBM law); *Rutledge v. PCMA*, 592 U.S. 80 (2020) (same); *PCMA v. Mulready*, 78 F.4th 1183 (10th Cir. 2023) (same). They just have not done so here. Instead, third-party payors have sued.

PBMs face no practicable obstacles preventing them from challenging SF383. So to the extent Plaintiffs in reply seek to assert third-party standing on behalf of PBMs, that fails too.

**B.      Plaintiffs lack a cause of action to challenge laws regulating PBMs.**

Even if this Court determines Plaintiffs are harmed by laws regulating non-parties sufficient to give Plaintiffs standing here, Plaintiffs lack a cause of action to challenge those laws regulating PBMs for similar reasons.

"Federal courts are courts of limited jurisdiction possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (cleaned up). "Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts;" instead they are "invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024); *cf. Turtle Mountain Band of Chippewa Indians v. Howe*, 137 F.4th 710, 717 (8th Cir. 2025) ("To seek redress through § 1983, a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." (cleaned up)).

Plaintiffs plead a cause of action under the Supremacy Clause. Dkt. 1 at ¶ 15. But that clause does not create a cause of action; it is a "rule of decision." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–325 (2015). It does not "give affected parties a constitutional (and hence congressionally unalterable) right to enforce federal laws against the States." *Id.* So Plaintiffs must instead ground any cause of action in *Ex parte Young* and its concept of an anti-suit

injunction, which allows persons "about to" be subject to state action that would violate federal law to bring injunctive actions to forestall violation of their rights. 209 U.S. 123, 155–156 (1908).

The problem for Plaintiffs is that they are not "about to" be subject to SF383's sections regulating PBMs because those laws do not regulate Plaintiffs and cannot be enforced against Plaintiffs at all. Plaintiffs therefore lack an equitable cause of action against those sections. Indeed, the Supreme Court recently found nonparty relief to be improper. *Trump v. CASA, Inc.*, 2025 WL 1773631, at *14 (June 27, 2025). Because when a federal court grants relief to non-parties, "it improperly intrudes on a coordinate branch of the Government and prevents the Government from enforcing its policies against nonparties." *Id.* (cleaned up).

### C. Plaintiffs seek facial relief yet fail to establish that SF383 does not constitutionally apply to non-ERISA plans.

The strategic litigation choice to bring this suit and the preliminary injunction against enforcement of the whole law creates an insurmountable burden on Plaintiffs. "Litigants mounting a facial challenge to a statute normally must establish that no set of circumstances exists under which the [law] would be valid." *United States v. Hansen*, 599 U.S. 762, 769 (2023) (cleaned up).

Plaintiffs make as-applied-to-ERISA-plans arguments in support of their ERISA preemption claims, yet seek facial relief. Nowhere do Plaintiffs argue that federal law preempts SF383's application to non-ERISA plans. Indeed, Plaintiffs now say they "do not seek to enjoin the statute as to non-ERISA entities." Dkt. 9 at 5. That admission is telling—and, worse for Plaintiffs, it creates a per se bar to facial relief. If the law is not preempted in some of its applications, a facial injunction is improper.

1. Plaintiffs seek injunctive relief against "enforcement of SF 383 in its entirety." Dkt. 1 at 3, 37; Br. 11 ("Plaintiffs request that the Court preliminarily and permanently enjoin enforcement of SF 383 in its entirety."). In other words, they seek a preliminary facial injunction. So it is their burden to show there are no set of facts to which the law could constitutionally apply. They fail.

"Because ERISA does not apply to non-ERISA plans, ERISA could not preempt a statute as applied to those plans." *Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 413 F.3d 897,

913 n.10 (8th Cir. 2005). Any "injunction cover[ing] non-ERISA plans" is improper. *Id.* (dissolving injunction as to non-ERISA plans); *see also Merrill Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117, 127 (1973) (State statutes are preempted "only to the extent necessary to protect the achievement of the aims of the [federal law]." (quotation marks omitted)). *Cf. CASA, Inc.*, 2025 WL 1773631, at *14–15 (preliminary injunction should not grant universal relief to nonparties, but only the relief necessary to provide complete relief to each plaintiff with standing to sue).

SF383 does not apply exclusively to ERISA plans. ERISA regulates private and union employee benefit plans; it does not govern governmental or church plans. 29 U.S.C. §§ 1003(a)-(b). And SF383 generally applies, including to non-ERISA plans like commercial marketplace plans and government-offered or church-offered plans. *See* Iowa Code §§ 510B.1(9), (22) (not excluding non-ERISA commercial marketplace, governmental, or church plans).

SF383's legitimate application to non-ERISA plans therefore cannot be preempted and thus establishes as a matter of law that facial relief here is improper. So even if Plaintiffs are correct that ERISA preempts certain sections of SF383, that preemption can apply—at most—as applied to ERISA plans. Indeed, that is how other plaintiffs have chosen to litigate ERISA preemption claims. *See, e.g.*, *Prudential*, 413 F.3d at 913 n.10; *Mulready*, 78 F.4th at 1200–01 (enjoining only as applied to ERISA plans: "Oklahoma reminds us that the network restrictions also apply to PBM networks for non-ERISA plans. Even so, we are concerned here with the effects on ERISA plans. This is all that ERISA demands. And this cabins our holding: The network restrictions are preempted *as applied to ERISA plans*.").

But Plaintiffs here are clear: they do not want to enjoin Defendants' enforcement of SF383 only as applied to ERISA plans. They "seek preliminary and permanent injunctions halting enforcement of SF 383 *in its entirety*." Dkt. 1 at ¶ 7 (emphasis in original); Br. 2 (asking the Court to "enjoin the law in full"). Because SF383 cannot be preempted as to non-ERISA plans, Plaintiffs cannot establish there is no "circumstance" in which SF383 can be constitutionally applied. *See Furlow*, 52 F.4th at 400. A facial injunction of the law in its entirety is improper.

Plaintiffs did not plead both facial relief and, in the alternative, narrower as-applied relief. They wanted all or nothing. And because SF383 has many legitimate applications, their request for facial relief against SF383 fails.

The decision to litigate as a facial challenge "comes at a cost." *NetChoice*, 603 U.S. at 723. It is not this Court's job to convert Plaintiffs' pleaded relief from facial to as-applied. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). Indeed, catering to Plaintiffs' request would have steep consequences. Plaintiffs' arguments here would negate the need to ever plead as-applied relief—if a plaintiff can plead facial relief, and avoid the fact-intensive as-applied inquiry, yet still receive narrow, as-applied relief, why would they ever go through the trouble of pleading as-applied relief? This Court should reject the request for facial relief.

2. In their resistance to Defendant's request for a briefing schedule, Plaintiffs try to walk back their overbroad, as-pleaded relief. They now phrase their request with a caveat: "the law in its entirety *as applied to Plaintiffs* must be enjoined." Dkt. 9 at 5 (emphasis added). They "do not seek to enjoin the statute as to non-ERISA entities." *Id.* But that is not what they pleaded. Dkt. 1 at 37 (seeking to "Preliminarily and permanently enjoin enforcement of SF 383 in its entirety.").

And recall that Plaintiffs are an Iowa business representative organization, two ERISA plans, and two ERISA-plan sponsors. No Plaintiff is a PBM. Taking Plaintiffs at their word: they now seek relief only as to ERISA plans and ERISA-plan sponsors, not as to non-ERISA entities. And PBMs, who are not ERISA fiduciaries, are not ERISA entities. *See, e.g.*, Dkt. 6-1 ¶ 9; Dkt. 6-3 ¶ 7; *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 473 (7th Cir. 2007) (holding that PBMs are not ERISA fiduciaries); *PCMA v. Rowe*, 429 F.3d 294, 300–301 (1st Cir. 2005) (same). If standing does not eliminate Plaintiffs' facial challenge of SF383's regulations of PBMs, Plaintiffs' recharacterization of their requested relief should.

In all events, Plaintiffs' narrowed request still asks too much of this Court—especially on this timeline and in this preliminary posture. Plaintiffs reason that even if only some of the law's applications as applied to Plaintiffs are preempted, the law is "built on a house of cards" and cannot withstand a narrowed injunction. Dkt. 9 at 3, 5. Plaintiffs reason that a narrower, as-applied-to-

ERISA-plans injunction would be "unworkable and impermissibly legislative," so any success as to ERISA plans requires enforcement of the entire law to be suspended. Dkt. 1 at 30. Not so.

When PBMs—the typical challenger of state laws regulating PBMs—challenge state laws across the country, they seek relief as-applied to ERISA plans. Sometimes they get it, sometimes they do not. But when injunctive relief is warranted, courts do not upgrade as-applied relief to facial relief based on arguments that narrow relief is "unworkable." *See, e.g.*, *Prudential*, 413 F.3d at 913 n.10; *Mulready*, 78 F.4th at 1201.

Had Plaintiffs pleaded a narrow as-applied injunction, that would closer follow the Legislature's express intent here to preserve as much of the law as possible even if a part is found to be unconstitutional. Beyond Iowa Code section 4.12's codified presumption of severability, the Legislature enacted a severability clause within SF383 too. *See* SF383 § 8 ("The provisions of this division of this Act are severable."). That text shows the Legislature's express intention that if any portion is enjoined, all remaining sections should remain in force. *State v. Blyth*, 226 N.W.2d 250, 262 (Iowa 1975) (unsevered section should "be sustained" to the extent "complete in itself and capable of being executed in accordance with the apparent legislative intent").

The law's purpose would thus be fulfilled despite any narrowed injunction. For example, if Defendant's enforcement of the so-called "anti-discrimination" or "anti-referral" provisions is enjoined, the pass-through pricing requirement is still capable of being executed in full and would ensure that PBMs do not keep for themselves the profitable spread but instead pass savings onto the plan and thus the consumer. Just as network-access rules do not depend on cost-sharing rules.

3. As for Plaintiffs' First Amendment claim, that involves a slightly different inquiry but poses the same procedural problems for Plaintiffs. First Amendment overbreadth is an exception to the typical facial analysis. A court may still facially enjoin enforcement of a law that has constitutional applications, but only if those applications are substantially outweighed by the law's unconstitutional ones. *See NetChoice*, 603 U.S. at 723–726. And even if this Court determines a preliminary, pre-enforcement, facial injunction is warranted as to the First Amendment claim (which is asserted against only three sections, not the entire law), this Court should sever and

preserve all constitutional applications of the law. Asserting First Amendment claims against three sections but calling for relief against the whole law's many sections again fatally defeats the basis for a facial injunction. "[F]acial invalidation of the statute [is] . . . improvident" where a state statute—like both Iowa Code section 4.12 and SF383 itself—imposes a severability requirement. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501, 506 & n.14 (1985). So even in the more lenient overbreadth context, if the Court determines injunctive relief is warranted, it should enjoin Defendant's enforcement of only the law's unconstitutional applications.

### D.     ERISA does not preempt SF383 in all its applications.

ERISA regulates private and union employer-provided benefit plans. 29 U.S.C. § 1001 *et seq.* It "supersede[s] any and all state laws insofar as they may now or hereafter relate to any" ERISA plan. 29 U.S.C. § 1144(a). But that preemption standard is not as sweeping as it may seem on first look. *See Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016) ("[T]he need for workable standards has led the Court to reject uncritical literalism in applying the clause." (quotation marks omitted)). A state law "relate[s] to" an ERISA plan, and thus may be preempted, "if and only if it 'has a connection with or reference to such a plan.'" *Wehbi*, 18 F.4th at 967 (quoting *Rutledge*, 592 U.S. at 86). Plaintiffs bear the burden of proving ERISA preemption. *Id.*

The Supreme Court been careful not to overextend ERISA preemption, declining to find preemption of state laws regulating "areas where ERISA has nothing to say." *California Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 330–331 (1997). And the Court has declined to hold preempted State "laws of general applicability" unless they meaningfully impact ERISA benefits. *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 661 (1995). After all, "the practice of pharmacy is an area traditionally left to state regulation." *Wehbi*, 18 F.4th at 972; *Travelers*, 514 U.S. at 661 ("[G]eneral health care regulation . . . historically has been a matter of local concern.").

Most recently, *Rutledge* held that ERISA did not preempt state law regulating PBM reimbursement rates, because ERISA had nothing to say in that area. 592 U.S. at 88. But in *Gobeille*, the Court preempted a state law that required plans to disclose detailed information that

overlapped with disclosures ERISA already mandated. 577 U.S. at 321–323. Indeed, "since *Travelers* every state law th[e] Court has held pre-empted involved a matter explicitly addressed by ERISA provisions." *Rutledge*, 592 U.S. at 96 (Thomas, J., concurring).

Plaintiffs mostly assert "connection with" preemption. For one section, they argue in passing that the section also impermissibly "refers to" ERISA. Br. 22 n.13. Each claim fails.

> **1.** ***A text-based approach to ERISA preemption establishes that ERISA does not preempt any part of SF383.***

Even though the Supreme Court has "veered from the text" and transformed the ERISA preemption inquiry into a "vague and potentially boundless purposes and objectives preemption clause," it has not gone so far as to embrace anything approaching field preemption when it comes to regulations relating to PBMs. *Rutledge*, 592 U.S. at 92 (Thomas, J., concurring) (cleaned up).

ERISA's plain text offers a two-part preemption test: "(1) do any ERISA provisions govern the same matter as the state law at issue, and (2) does that state law have a meaningful relationship to ERISA plans? Only if the answers to both are in the affirmative does ERISA displace state law." *Id.* (interpreting 29 U.S.C. § 1144). That textual approach is consistent with the "outcomes of [the Court's] recent cases—if not the reasoning." *Id.* at 96; *accord Dillingham*, 519 U.S. at 330–334 (applying similar standard under the "connection with" test).

Applying that textual preemption test here, the answer to question one is "No," so ERISA does not supersede SF383. "That alone should resolve the case." *Rutledge*, 592 U.S. at 94.

ERISA's core concern is plan administration, which includes "determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 9 (1987).

SF383 regulates in areas that ERISA does not—it regulates PBMs' conduct and relationships. And the Supreme Court has said States may—and traditionally have—regulated the quality of services sold to ERISA plans including through "medical-care quality standards"—

without triggering ERISA preemption. *Dillingham*, 519 U.S. at 329; *see also Travelers*, 514 U.S. at 660. The Eighth Circuit has said so too. *See Wehbi*, 18 F.4th 968–969.

And this makes sense. PBMs are not ERISA fiduciaries. And because PBMs are not fiduciaries, and instead are third-party providers, ERISA does not regulate them. Laws regulating PBMs do not intrude on any of ERISA's central concerns.

"ERISA has nothing to say about th[e] activities" SF383 regulates. *Rutledge*, 592 U.S. at 485 n.2 (Thomas, J., concurring).

### 2. SF383 does not have an impermissible "connection with" ERISA plans.

"Connection with" preemption is chiefly concerned with state laws that either overlap with an area where ERISA already regulates or that preordain an ERISA plan's choices about who to cover or what benefits to provide. SF383 does none of that.

A state law has an "impermissible connection with" an ERISA plan "if (1) it governs a central matter of plan administration; (2) it interferes with nationally uniform plan administration; or (3) acute, albeit indirect, economic effects of the law force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers." *Wehbi*, 18 F.4th at 968 (cleaned up). If a state law "bind[s] plan administrators to specific rules for determining beneficiary status" (the who), or "requir[es] payment of specific benefits" (the what), then it may have an impermissible "connection with" ERISA plans. *Rutledge*, 592 U.S. at 87.

But "not every state law that affects an ERISA plan or causes some disuniformity in plan administration has an impermissible connection with an ERISA plan." *Id.* at 87. ERISA does not preempt state laws that "merely affect[] costs" or alter a plan's incentives or "shopping decisions" without forcing the "plan[] to adopt any particular scheme of substantive coverage." *Id* at 87–88.

Courts have instead held that state laws are not "connection with" preempted when they regulate costs and reimbursement, mandate a particular process, or dictate substantive standards for plan appeals. *Id.* at 87–88, 90–91; *Wehbi*, 18 F.4th at 968–969. If the state law does not "require plans to provide any particular benefit to any particular beneficiary in any particular way," then it

is not "connection with" preempted. *Rutledge*, 592 U.S. at 90; *see also Fort Halifax*, 482 U.S. at 13 n.8 (ERISA preempts laws that "attempt to dictate what benefits shall be paid under a plan.").

There could be a point where "an exorbitant tax leaving consumers with a Hobson's choice would be treated as imposing a substantive mandate," *Travelers*, 514 U.S. at 664, or where the law's effect is "so acute that it will effectively dictate plan choices." *Rutledge*, 592 U.S. at 88. But until that point, a State may pass laws that affect ERISA plans without preordaining the who or what of the plan's benefits package. So long as the law leaves determination of the who and the what to the plan, there is no "connection with" preemption.

Finally, where an effect on ERISA plan benefit structure is "attributable to the independent actions of PBMs rather than to the [state] law," there is no basis for preemption. *Wehbi*, 18 F.4th at 969. Because "the responsibility lies first with the PBM," and not the law, such downstream effects may alter incentives or shopping options, but they do not trigger preemption. *Rutledge*, 592 U.S. at 91; *Travelers*, 514 U.S. at 660. In effect, there is a proximate causation element to finding ERISA preemption of laws that regulate PBMs that can be difficult for challengers to meet.

Some examples illustrate the "connection with" standard.

State laws may not dictate who is eligible for coverage under a plan. *Egelhoff v. Egelhoff*, 532 U.S. 141, 147–148 (2001). They may not mandate particular benefits contrary to the terms of an ERISA plan. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983). They may not mandate that particular benefits be covered in a plan. *Metro. Life. Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985). Nor may they compel a plan to disclose or report the kind of detailed "information that overlaps with the information ERISA requires plans to report." *Wehbi*, 18 F.4th at 969.

But courts have declined to preempt state laws that regulate where ERISA has nothing to say or that do not predetermine the who or what of a plan. A state law was not preempted when it imposed unequal surcharges on hospital billing rates, and in turn created an indirect economic influence that would be passed on to consumers and push them to choose a certain plan. *Travelers*, 514 U.S. at 659–660. That law did not force a plan to adopt certain coverage; it simply "affect[ed]

a plan's shopping decisions." *Id.* at 660, 668. If the plan wished, it could still provide uniform benefits, but it would be more expensive to offer that specific benefit in that State. *Id.*

So too with a state law that "require[d] PBMs to reimburse pharmacies for prescription drugs at a rate equal to or higher than the pharmacy's acquisition cost." *Rutledge*, 592 U.S. at 88. That cost regulation did not "dictate plan choices," nor did it even create the same thumb-on-the-scale as the cost regulation in *Travelers*, because the PBM law applied equally across the State. *Id.*

Even state laws that create enforcement mechanisms are not impermissible, because they do not dictate plan structure "nor do they lead to anything more than potential operational inefficiencies." *Id.* at 89, 91. And the same goes for laws that mandate PBMs offer certain appeal processes for pharmacies, including the governing substantive standard, even though that might cause a downstream effect on the price or provision of certain benefits. *Id.* at 90–91. If any downstream denial of certain benefits results, "the responsibility lies first with the PBM for" not following the State's new cost regulation. *Id.* at 91.

A state law that prohibited PBMs from prohibiting pharmacies from offering mail delivery was not impermissible, because it merely authorized pharmacies to act. *Wehbi*, 18 F.4th at 968. So too with a law that prohibited PBMs from prohibiting pharmacies from dispensing any drug allowed under the pharmacy's license, including specialty drugs. *Id* at 966, 968. And with a law limiting the accreditation requirements PBMs may impose on pharmacies as a condition of participation in the PBM's curated network. *Id.* at 968. States may even require PBMs to disclose or report certain basic information about their business when that information is not the "kind of detailed information that ERISA requires plans to report." *Id.* at 968–969.

Though such laws could cause disuniformity in plan administration, and thus affect the scope of the network the PBM may offer to plans, they are not impermissible because they stop short of forcing "payment of specific benefits or binding plan administrators to specific rules for determining beneficiary status." *Id.* (cleaned up). These regulations, the Eighth Circuit said in *Wehbi*, instead amount to "regulation of a noncentral matter of plan administration with *de minimis* economic effects." *Id.* (quotation marks omitted).

Those principles highlight Plaintiffs' pitfalls. SF383 affects cost, reimbursement rates, PBM's pharmacy network curation, and the like. It does not dictate substantive coverage. The plan remains in control of setting the terms of the who and the what of its plans.

And remember, to succeed on their facial challenge of SF383 in its entirety, Plaintiffs must run the table: they must establish that every application of SF383 is preempted. If the Court agrees with Defendant, as to even one section, then it should reject Plaintiffs' request for facial relief.

**i.** *Cost- and reimbursement-related sections*. Cost regulations requiring a particular "pricing methodology" are not preempted so long as their effect is not "so acute that it will effectively dictate plan choices." *Rutledge*, 592 U.S. at 88, 90. Certain challenged SF383 sections prohibit PBMs from imposing different "cost-sharing," "additional fees," or "more costly or restrictive" "payment or conditions relating to purchasing," and others impose cost or reimbursement processes. These sections regulate cost or reimbursement rates and thus, under *Rutledge*, do not have an "impermissible connection" with ERISA plans. They "merely increase costs or alter incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage." *Id.* at 88.

Section 510B.8B(2) is squarely governed by *Rutledge*. In *Rutledge*, a state law required PBMs to reimburse pharmacies at a rate at least equal to the pharmacy's acquisition cost, *Id.* at 87–88. Here, SF383 requires PBMs to set a reimbursement rate for retail pharmacies at national average drug acquisition cost or wholesale acquisition cost. There is no principled distinction between that and the law in *Rutledge*. Plaintiffs neither plead that this section is preempted, nor do they press that argument in their motion. Though that is not a square admission that the section is not preempted, Plaintiffs have at least waived any contrary argument. *Rutledge* establishes that section 510B.8B(2) amounts to at least one constitutional application. And because Plaintiffs' chose to litigate a facial challenge, the Court can end its analysis here: section 510B.8B(2) is not preempted, and SF383 thus has at least one legitimate application. A facial injunction is improper.

Other SF383 sections regulate how PBMs may set cost methodologies or reimbursement rates. One prohibits PBMs from setting reimbursement rates for non-affiliate pharmacies less than

what they reimburse affiliates—and Plaintiffs do not address this section in their motion at all. Iowa Code § 510B.8B(1). Another requires PBMs to reimburse retail pharmacies a specified professional dispensing fee, which in effect sets a floor rate that all PBMs must reimburse retail pharmacies. Iowa Code § 510B.8B(3). These are like the rate regulations in *Rutledge*, and less intrusive than the one upheld in *Travelers*, which imposed a surcharge of up to 13% on hospital billing rates for patients covered by certain plans. *Travelers*, 514 U.S. at 650, 662. They might affect cost uniformity, but they do not dictate any plan benefit or beneficiary-status choice. Indeed, in *Rutledge*, the Supreme Court said a state law "establish[ing] a floor for the cost of the benefits that plans choose to provide" was not preempted. 592 U.S. at 90.

Plaintiffs' only argument against the dispensing fee is that it is acute and thus dictates plan choices. Not so. The $10.68 dispensing fee is, presumably, far less than what the 13% surcharge on hospital billing rates would have totaled to in *Travelers*. Indeed, Plaintiffs concede the dispensing fee would not be preempted if only it took effect later. But because it took effect July 1, Plaintiffs reason, it is acute. Br. 23. This is more of a workability or insufficient notice argument, not a preemption argument. "Acute" means a law imposing "an exorbitant tax leaving consumers with a Hobson's choice," *Travelers*, 514 U.S. at 664, one that "effectively dictate[s] plan choices." *Rutledge*, 592 U.S. at 88. Plaintiffs instead argue a novel meaning of "acute." Under Supreme Court precedent, the dispensing fee does not create acute economic effects.

Other sections challenged and upheld in *Rutledge* did not set specific rates, but the Court determined were still "nothing more than cost regulation" because, in part, they mandated PBMs use certain "process" or "substantive standard[s]" which, in turn, might affect cost. *Id.* at 89–90. Such cost-related regulations do not govern plan administration, nor do they dictate the who or what of a plan's benefits—they simply require a certain "pricing methodology for pharmacy benefits." *Id.* at 90.

SF383 regulates the "pricing methodology," "process," or "standard" PBMs may use when determining how to set costs or reimbursement rates. It prohibits PBMs from imposing "different cost-sharing" or "additional fees" based on the pharmacy a person chooses. Iowa Code

§§ 510B.8(3), 510B.4B(1)(*a*). And it similarly prohibits PBMs from placing on a pharmacy "more costly or restrictive" "payment or conditions relating to purchasing" than if the pharmacy services were purchased from a mail-order pharmacy. *Id.* § 510B.4B(1)(*f*). SF383 requires PBMs to use a pass-through pricing standard for rebates it receives, *id.* § 510B.8(4), and requires contracts that apply to prescription drug benefits beginning January 1, 2026, to include a requirement that PBMs "shall use pass-through pricing." *Id.* §§ 510B.8D(1)–(2). And two other sections establish rules for how those cost-sharing regulations affect deductibles or total contribution. *Id.* §§ 510B.8(6)–(7). Subsections 510B.8(5) and 8(7) provide rules applicable only to PBMs. Though Plaintiffs' motion does not address subsections 510B.8(5) or 510B.8D(2).

These regulations, like those in *Rutledge*, require PBMs and administrators to "comply with a particular process" or "pricing methodology" that might require a plan to "recalculate and reprocess how much it" owes. 592 U.S. at 90. And like in *Rutledge*, they are "cost regulation[s] that do[] not bear an impermissible connection with or reference to ERISA." *Id.* at 91. Though they might affect cost or reimbursement, they do not dictate the who or what of a plan's design.

Plaintiffs say these cost-regulations intrude into core matters of ERISA plan administration because they affect fiduciary obligations. Br. 22. But most of these regulations impose requirements on PBMs—and PBMs are not fiduciaries so ERISA does not regulate them. Iowa's cost-regulations requiring PBMs to use certain cost or reimbursements processes therefore do not intrude on anything ERISA has to say.

**ii.** *Accreditation requirements*. Eighth Circuit precedent forecloses Plaintiffs' preemption claim as to SF383's accreditation standards. *Wehbi* rejected a challenge to a North Dakota law similar to Iowa's. 18 F.4th at 965. The court held the accreditation standard did not warrant preemption because, though it might "cause some disuniformity in plan administration," it did "not 'requir[e] payment of specific benefits' or 'bind[] plan administrators to specific rules for determining beneficiary status.'" *Id.* at 968 (quoting *Rutledge*, 592 U.S. at 86–87). At most, it is a "regulation of a noncentral 'matter of plan administration' with *de minimis* economic effects." *Id.*

Iowa's law is materially similar, generally prohibiting all PBMs—not just those that contract with ERISA plans—from imposing on pharmacies "any course of study, accreditation, certification, or credentialing that is inconsistent with, more stringent than, or in addition to state requirements for licensure or certification, and the administrative rules adopted by the board of pharmacy." Iowa Code § 510B.4B(1)(*c*).

In *Wehbi*, the plaintiff PBM trade organization argued the law impermissibly regulated "benefit design" or structure by limiting the range of choices plans could make when choosing which PBM or PBM pharmacy network to contract with. Plaintiffs here make similar arguments. Br. 20 n.11. And just like *Wehbi*, this Court should reject those arguments. Iowa's law does not preordain any benefits provided by an ERISA plan. It engages in a traditional state power: determining who is qualified to dispense prescription drugs. *See Travelers*, 514 U.S. at 661 (ERISA does not preempt "general health care regulation"). Just as Iowa can preclude PBMs from using unlicensed pharmacies, it can limit the ability to further restrict licensing.

Plaintiffs concede that *Wehbi* "casts some doubt" on ERISA preemption here. Br. 20 n.11. So they try to distinguish *Wehbi*, saying the law there limited the accreditation restrictions PBMs could impose, whereas Iowa's law "impacts the third-party payor's network directly." Br. 20 n.11.

Comparing the text of the two States' laws, it is hard to find that distinction. Indeed, Plaintiffs have it backwards. North Dakota's law in *Wehbi* limited what accreditation requirements a "pharmacy benefits manager or third-party payer" could require. 18 F.4th at 965–966. Iowa's law imposes materially similar limitations, but only on a PBM. Iowa Code § 510B.4B(1)(*c*).

Such "laws of general applicability," *Travelers*, 514 U.S. at 661, that operate in "an area traditionally left to state regulation," *Wehbi*, 18 F.4th at 972, have nothing to do with dictating the who or what of plan benefits. By regulating a PBM's curation of its pharmacy network, Iowa's law, like North Dakota's, is not preempted.

**iii.** ***Limitations on how PBMs and third-party payors may restrict pharmacy network access.*** PBMs curate their own pharmacy networks then offer those networks to plans. Plans that decide to contract with a PBM then purchase a PBM's services, which includes access to the

PBM's curated pharmacy network. State laws managing access requirements PBMs may place on their pharmacy networks "do[] not require plans to provide any particular benefit to any particular beneficiary in any particular way." *Rutledge*, 592 U.S. at 90. Indeed, state laws do not force a plan to contract with a PBM at all.

Applying *Rutledge*, the Eighth Circuit recently held that ERISA does not preempt state laws regulating how PBMs may curate their pharmacy networks. *Wehbi*, 18 F.4th at 968–969. The laws at issue there included multiple regulations barring PBMs from discriminating against pharmacies in various ways. For example, the law prohibited PBMs from prohibiting pharmacies from providing relevant information to plan beneficiaries, shipping mail-order drugs as an ancillary service, or charging shipping and handling fees for deliveries. *Id.* at 968.

That state law also regulated PBMs' conflicts of interest. It "prohibit[ed] a PBM from having an ownership interest" in a program or pharmacy, "unless the PBM agrees to not participate in a transaction that benefits the PBM instead of another person owed a fiduciary duty." *Id.* at 969 (cleaned up). The court recognized that the conflicts-of-interest regulation could result in a particular benefit being declined—like a specific drug becoming unavailable to ERISA plans—but reasoned there was no preemption to be had. *Id.* Any benefit unavailability was not a direct result of the new law; " 'the responsibility lies first with the PBM' for refusing to satisfy the condition that would permit the drug to be available." *Id.* (quoting *Rutledge*, 592 U.S. at 91). Though the state law may have an "effect . . . on benefit structure," that effect was "attributable to the independent actions of PBMs rather than to the law." *Id.*

It did not matter to the Eighth Circuit that some of the regulations challenged in *Wehbi* did not directly regulate cost; the court determined that they amounted to regulation of "noncentral matter[s] of plan administration" having no more than "*de minimis* economic effects and impact[s] on the uniformity of plan administration across states." *Id.* (quotation marks omitted). True, the laws might have an "effect . . . on benefit structure." *Id.* But connection-with preemption does not turn on whether a law "reaches beyond cost controls." Dkt. 17 at 14. Instead, the key question, as *Wehbi* emphasized, is whether the challenged state laws "requir[e] payment of specific benefits"

or impose "specific rules for determining beneficiary status." *Wehbi*, 18 F.4th at 968 (quoting *Rutledge*, 592 U.S. at 87). And it did not.

Though *Wehbi* concerned laws regulating PBMs, its reasoning governs similar laws as applied to third-party payors. After all, in reaching its decision in *Wehbi*, the Eighth Circuit made clear that it saw no material distinction between laws regulating PBMs and laws regulating ERISA plans. *Id.* at 966 ("Because PBMs manage benefits on behalf of plans, a regulation of PBMs functions as a regulation of an ERISA plan itself." (cleaned up)). So if a state law regulates pharmacy network curation, whether as applied to PBMs or ERISA plans, and it "does not require plans to provide any particular benefit to any particular beneficiary in any particular way," *Rutledge*, 592 U.S. at 90, there is no basis for ERISA preemption.

SF383 limits the network-access requirements that PBMs, and in smaller part third-party payors, may impose on pharmacies. These sections apply to any plan, regardless of ERISA status. Under *Rutledge* and *Wehbi*, because Iowa's generally applicable laws regulate pharmacy network curation, and do not dictate payment or coverage of "any particular benefit to any particular beneficiary in any particular way," *id.*, there is no basis for preemption.

Like the challenged laws in *Wehbi*, SF383 seeks to allay the conflicts of interest that arise in the triangle formed by PBMs, third-party payors, and pharmacies when they treat different—especially unaffiliated—pharmacies in different ways.

*First*, SF383 imposes an "anti-discrimination" requirement on PBMs, health benefit plans, and third-party payors. It prohibits "discriminat[ing] against a pharmacy or pharmacist with respect to participation, referral, reimbursement of a covered service, or indemnification if a pharmacist is acting within the scope of the pharmacist's license, as permitted under state law, and the pharmacy is operating in compliance with all applicable laws and rules." Iowa Code § 510B.4(4).

Plaintiffs say this restriction regulates particular benefits in a particular way because it "prohibits ERISA-plan terms or ERISA administrators from favoring one provider over another." Br. 18. But Plaintiffs overstate the law's requirements. They are wrong to link it with other sections that apply only to PBMs. Br. 18 (suggesting "ERISA plans" may not do something prohibited

under section 510B.4B(1)(*d*), which applies only to PBMs). And more importantly, they are wrong to extrapolate from a generally applicable non-discrimination requirement that the law requires providing particular benefits to any particular beneficiary in any particular way.

PBMs, health benefit plans, and third-party payors are welcome to "make special arrangements with particular providers for access to prescription drugs, even 'specialty drugs.' " Br. 18. They may set whatever participation terms or restrictions they want. But when it comes to participation, referral, or reimbursement of a covered service, they must give all pharmacies—that comply with applicable state laws, rules, and licenses—an equal opportunity to accept those terms and provide services.

If pharmacy A dispenses a specialty drug, but pharmacy B—despite a similar opportunity to provide specialty drugs as pharmacy A—chooses not to accept the applicable terms and restrictions to dispense that specialty drug, then it is not referral discrimination to refer a beneficiary to pharmacy A for the specialty drug that pharmacy B has chosen not to provide.

But if both pharmacies meet the terms and conditions imposed by the plan to provide the specialty drug, then both should have a chance to be referred and equally reimbursed. And if pharmacy B was not given a similar chance to participate in the network, despite being properly licensed and complying with laws and rules to provide that specialty drug, then that is participation-based discrimination.

As in *Wehbi*, Iowa may regulate conflicts of interest in this way. Indeed, Iowa has often used its traditional consumer-protection role and police power to regulate similar conflicts of interest. *See, e.g.*, Iowa Admin. Code 653–23.1(19) (prohibiting doctors from "accept[ing] remuneration for referral of a patient"); *see also Veix*, 310 U.S. at 38–39; *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) ("[G]reat latitude under [States'] police powers to legislate as to the protection of the lives, limbs, health.") (quotation marks omitted).

The key here is that nothing in SF383 dictates how any particular benefit is provided. PBMs and third-party payors may set their network restrictions however high or low they want, but they must allow willing pharmacies to participate in their network by accepting those equal terms. And

they must not selectively refer to their favored pharmacies over other participating, compliant pharmacies. If a PBM or third-party payor independently acts to increase the terms of participation, but does so equally as to all pharmacies, then that would not be undue discrimination under section 510B.4(4). And if the anti-discrimination requirement ultimately affects benefit availability or benefit structure, that effect would be the result of a PBM or third-party payor's independent actions—not a result dictated by the law. *See Wehbi*, 18 F.4th at 969. As in *Wehbi*, such a law does not trigger ERISA preemption.

*Second*, SF383 separately limits how only PBMs may curate their pharmacy networks: PBMs may not "impose a monetary advantage or penalty that would affect a covered person's choice." Iowa Code § 510B.4B(1)(*a*). That includes a prohibition on PBMs from "promoti[ng] one participating pharmacy over another" or "comparing the reimbursement rates of a [participating] pharmacy against mail order pharmacy reimbursement rates." *Id.*

There is no "similar prohibition on ERISA plans and ERISA-plan sponsors." Br. 18. The statute's text belies Plaintiffs' contrary assertion. Section 510B.4(4)'s anti-discrimination requirement applies to PBMs and third-party payors. That part of the law prohibits discrimination between pharmacies based, in part, on referral. But section 510B.4B(1)(*a*)'s promotion-and-comparison limitation applies only to PBMs. Because the Legislature, in enacting the promotion-and-comparison limitation, used different language and applied it only to PBMs, it must carry a different meaning than the separate referral-discrimination prohibition.

Plaintiffs fail to make that distinction. They instead argue that both sections improperly intrude on ERISA's role in regulating fiduciary duties. As they see it, both sections limit plan administrators from telling a beneficiary which pharmacy is in their best financial interest. Br. 19. But properly interpreted, only the promotion-and-comparison limitation prohibits any entity from "comparing the reimbursement rates." Iowa Code § 510B.4B(1)(*a*). And that applies only to comparing a pharmacy to a mail order pharmacy. And—crucially—that applies only to PBMs.

Interpreting the separate referral-discrimination section to do the same work as the promotion-and-comparison limitation would render the latter superfluous, contrary to proper rules

of interpretation. *See Bribriesco-Ledger v. Klipsch*, 957 N.W.2d 646, 650–651 (Iowa 2021) (courts "interpret every word and every provision of a statute to give it effect" and avoid making a section "superfluous"). The challenged sections of SF383 do not prohibit third-party payors from doing what Plaintiffs argue is improperly restricted, like comparing reimbursement rates.

And the promotion-and-comparison limitation cannot improperly intrude on ERISA's role in regulating fiduciary duties, because that section applies only to PBMs. And PBMs are not fiduciaries.

**iv. *Any-willing-pharmacy*.** The same result follows from SF383's "any-willing-pharmacy" sections. One prohibits PBMs from denying a pharmacy the right to participate in the PBM's network if the pharmacy agrees to the plan's set terms, requirements, and reimbursement rates. *See* Iowa Code § 510B.4B(1)(*b*). And the other requires third-party payors that both reimburse covered persons and restrict participation in their network to allow all pharmacies in the plan's geographical coverage area to participate in the plan's network under "identical reimbursement terms." Iowa Code § 510B.4B(2)(*a*).

These sections dictate nothing about the terms, requirements, or reimbursement rates a plan may offer. They merely require giving any pharmacy willing to agree to those terms, requirements, or reimbursement rates the opportunity to participate in the network. Any effect these sections may have on benefit structure is the result of the third-party payor's "independent actions"—that is, the third-party payor's setting of the terms, requirements, or reimbursement rates. *Wehbi*, 18 F.4th at 969. As in *Wehbi*, such a law does not trigger ERISA preemption.

The Eighth Circuit has not decided whether an any-willing-pharmacy law like Iowa's has an impermissible "connection with" ERISA. Plaintiffs (at 19) cite a pre-*Rutledge* case from the Eighth Circuit, but not only does that case not consider *Rutledge*'s clarity on ERISA preemption standards, but that case found "reference to" preemption, a claim that Plaintiffs do not assert here. *See Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 154 F.3d 812, 822–826 (8th Cir. 1998). And Plaintiffs wisely do not rely on cases from other circuits that are similarly inapposite because they held laws preempted principally based on "reference to" theory. *See CIGNA Healthplan of*

*La., Inc. v. Louisiana ex rel. Ieyoub*, 82 F.3d 642, 647–648 (5th Cir. 1996); *Ky. Ass'n of Health Plans, Inc. v. Nichols*, 227 F.3d 352, 358–361 (6th Cir. 2000) (holding that State's any-willing-provider law preempted in large part because it treated some ERISA plans differently than non-ERISA plans and thus made impermissible "reference to" ERISA plans; parties then appealed only the savings-clause issue to Supreme Court). Although *Wehbi* did not consider an any-willing-pharmacy requirement, its principles and application of *Rutledge* apply all the same.

Plaintiffs instead ask this Court to apply *Mulready*. Br. 19. But there, the Tenth Circuit applied *Rutledge*'s concept of plan benefits too broadly, or at least more broadly than *Wehbi*. *Mulready* held Oklahoma's any-willing-provider law had an impermissible connection with ERISA plans. 78 F.4th at 1196–98. It characterized Oklahoma's law as a "network restriction[]" limiting the range of available pharmacy networks from which plans could choose. *Id.* at 1198. Because PBMs had to accept any pharmacies that qualified under a plan's terms and conditions, plans effectively lacked the ability to adopt whatever pharmacy networks they happened to prefer. *Id.* at 1196. Reasoning that a pharmacy network's composition is a key aspect of a plan's benefit design, the court concluded the law "require[d] providers to structure benefit plans in particular ways." *Id.* at 1198 (quotation marks omitted). And that impermissibly "eliminate[s] the choice of one method of structuring benefits." *Id.* (quotation marks omitted).

The trouble with that is that it applies *Rutledge*'s language absent its context. The Tenth Circuit focused on the language from *Rutledge* regarding "laws that require providers to structure benefit plans in particular ways." *Id.* at 1194 (quoting *Rutledge*, 592 U.S. at 86–87). Absent *Rutledge*'s context, those words could be interpreted so broadly as to encompass almost any law regulating the activities of PBMs. But under such a broad approach, even regulations like the ones upheld in *Rutledge* could be regarded as a law structuring benefit plans in particular ways.

Indeed, the challengers in *Rutledge* made a similarly overbroad argument, and lost. According to them, parts of Arkansas's law requiring certain appeal procedures and creating enforcement mechanisms would "affect[] plan design by mandating a particular pricing methodology for pharmacy benefits." *Rutledge*, 592 U.S. at 90. The Supreme Court recognized

that argument was too broad. Having already determined that cost regulations did not interfere with central matters of plan administration, the Court explained that the challengers defined the concept of benefit design or structure so broad as to even sweep in cost regulations. *See id.* at 89–91 ("[Challengers'] argument is just a long way of saying that [the law] regulates reimbursement rates."); *cf. id.* at 90 ("Taken to its logical endpoint, PCMA's argument would pre-empt any suits under state law that could affect the price or provision of benefits."). The *Rutledge* challengers—like *Mulready* and now Plaintiffs here—applied too broad an understanding of what types of laws impermissibly govern benefit design or structure. That approach threatens to swallow *Rutledge*'s holding.

Regulating pharmacy network curation might indirectly impact benefits available under the plan. And it might even create "operational inefficiencies." *Id.* at 89. But *Rutledge* does not say such a law is off limits.

And neither does *Wehbi*. In *Wehbi*, North Dakota's challenged law prohibited PBMs from preventing pharmacies from participating in the PBMs' networks for various reasons. 18 F.4th at 968. One way or another, that state law prevented PBMs from freely shaping their pharmacy networks as they pleased. Or, in *Mulready*'s words, it "eliminate[d] the choice of one method of" benefit structure. 78 F.4th at 1198.

This Court cannot apply *Mulready* and *Wehbi* without conflict. Had the Eighth Circuit applied *Mulready*'s reasoning, it would have held North Dakota's law "connection with" preempted. But the Eighth Circuit upheld the law because, like *Rutledge*, it did not force or dictate a plan's who or what. *Mulready* instead says a law is preempted that merely takes one term off the table, even if it leaves the plan a choice. In other words, the Eighth Circuit rejected the capacious understanding of benefit structure embraced in *Mulready* and pressed by Plaintiffs here.

This Court should apply *Wehbi*. SF383's any-willing-pharmacy sections does not limit the terms or conditions that PBMs may impose on its pharmacy network. Nor does it dictate what a third-party payor may require for participation in its plan. If PBMs or third-party payors want to condition entrance into its network or plan on certain criteria, the any-willing-pharmacy section

has nothing to say about that. PBMs or third-party payors are free to set their terms, requirements, or reimbursement rates in such a way as to ensure participating pharmacies sufficiently meet the needs of their plan beneficiaries. All these sections require is that those terms, requirements, and rates be offered to any willing pharmacy, thus preventing arbitrary discrimination against pharmacies otherwise able to meet those criteria.

Iowa's any-willing-pharmacy sections do not dictate the who or what of any particular benefit. They merely require PBMs and third-party payors to give any pharmacy willing to agree to those terms the opportunity to participate. Any effect these sections may later have on benefit availability or structure would be the result of a PBM or third-party payor's "independent actions." *Wehbi*, 18 F.4th at 969. As in *Rutledge* and *Wehbi*, such a law does not trigger ERISA preemption.

**v. *Reporting and notice requirements***. State laws may not compel an ERISA plan to disclose or report the kind of detailed "information that overlaps with the information ERISA requires plans to report to the Secretary of Labor," which included information about claims and plan members. *Wehbi*, 18 F.4th at 969.

But that does not mean any State reporting, notice, or disclosure requirements are preempted. Indeed, applying *Rutledge*, the Eighth Circuit said States could require PBMs to disclose or report basic information about their business when that information is not the "kind of detailed information that ERISA requires plans to report." *Id.* That included requiring both PBMs and third-party payors with an ownership interest in a pharmacy affiliate to, if requested, "disclose to the plan sponsor contracted payer any difference between the amount paid to a pharmacy and the amount charged to the plan sponsor contracted payer." *Id.* at 965.

SF383's report and notice requirements are more like those in *Wehbi* than *Gobeille*. SF383's reporting regulation applies only to PBMs. And like *Wehbi*, which required reporting spread pricing, SF383 requires PBMs to issue a quarterly report to Iowa's Insurance Commissioner of all drugs reimbursed at 10% above or below the national average drug acquisition cost. Iowa Code §§ 510B.8B(4)(*a*), (*b*), (*d*). Plaintiffs' motion does not address subsection (*d*).

Unlike *Gobeille*, which was concerned with disuniformity in a *plan's* ERISA reporting requirements, Iowa's reporting requirement does not apply to plans. Nor does it require the "kind of detailed information" ERISA requires. As Plaintiffs concede, SF383 does not require PBMs to report the same information at all. Br. 21; Dkt. 6 at 2. Nor does it require disclosing any plan information. This section merely requires PBMs to report on their own business and is in line with the State's traditional role in policing conflicts of interest.

SF383 separately imposes a limited notice duty on third-party payors. Iowa Code §§ 510B.4B(2)(*a*)–(*b*). If third-party payors restrict pharmacy access to their network, they must notify all pharmacies in the plan's geographical coverage area of the restrictions and of the ability to participate on equal footing as other pharmacies. And they must let covered persons know which pharmacies participate in the plan.

This section does not overlap with anything ERISA requires from third-party payors. Dkt. 6 at 2. It does not require reporting data relating to the plan's claims or payments. *Gobeille*, 577 U.S. at 321–322. Nor does it relate to disclosing confidential methodologies for reimbursement amounts like in *PCMA v. Gerhart*, to the extent that case is good law anymore. 852 F.3d 722, 731 (8th Cir. 2017), abrogated by *Rutledge*, 592 U.S. 80, 84, 90 n.3. Nor is it burdensome. This is merely a notice requirement related to pharmacy network curation—like the rest of SF383, this section too has nothing to do with the who or what of a plan's benefits package.

**vi.** *Appealing a PBM decision.* A state law prescribing a "procedure" for a pharmacy to appeal a PBM action "does not govern central matters of plan administration." *Rutledge*, 592 U.S. at 90. Even if it might cause a plan to "recalculate and reprocess" claims, the Supreme Court determined it was not preempted. *Id.*

Iowa's law, subsections 510B.8E(1)–(3), requires a PBM to "provide a reasonable process to allow a pharmacy to appeal any matter." And it imposes several procedural requirements. Like the law in *Rutledge*, Iowa's law recognizes that if an appeal is successful, rates and costs may be adjusted. Iowa Code § 510B.8E(3). Like the law in *Rutledge*, Iowa's appeal process and standard is not preempted.

Plaintiffs do not meaningfully dispute that *Rutledge* establishes there are at least some constitutional applications of SF383's appeal section. Br. 24. They instead argue Iowa's law is "much broader." Even if true, the fact of more applications does not affect the constitutionality of the application shared with the law in *Rutledge*. And any constitutional application defeats Plaintiffs' attempt at a facial injunction.

**vii.** ***Cause of action to enforce violations of SF383 duties.*** State law causes of action that duplicate, supplement, or supplant ERISA's civil enforcement remedies are preempted. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 210–214 (2004). In *Aetna Health*, that meant ERISA preempted a state law that subjected a health plan to liability "if it denied coverage for any treatment not covered by the health care plan that it was administering." 542 U.S. at 213. This was problematic, the Court reasoned, because the plan's terms would "form[] an essential part of [the state law] claim;" liability would follow "only because of [the plan administrator's] administration of ERISA-regulated benefit plans." *Id.* Liability under the state law cause of action cannot "derive[] entirely from the particular rights and obligations established by the benefit plans." *Id.*

But SF383 includes no such section. Subsection 510B.4B(4) instead allows a covered person or pharmacy to "maintain a cause of action to enjoin the continuing of the violation" of "this section," referring to section 510B.4B. And that section, newly created by SF383, includes the cost-related and reimbursement regulations imposed on PBMs, Iowa Code § 510B.4B(1), as well as the any-willing-pharmacy requirements, Iowa Code §§ 510B.4B(1)(*b*), (2)(*a*).

SF383 thus authorizes enforcement of a "legal duty independent of ERISA." *Aetna Health*, 542 U.S. at 214. It provides an enforcement mechanism authorizing covered persons or pharmacies to enjoin noncompliance with a narrow subset of SF383's new requirements. It has nothing to do with any ERISA remedies or ERISA-plan terms. Regardless of the type of plan (ERISA or not), if a PBM or third-party payor complies with plan terms yet fails to comply with section 4B, a covered person or pharmacy would be entitled to enjoin that continuing state law violation.

The cause of action provided to enforce subsection 4B(1)'s requirements imposed on PBMs cannot conflict with ERISA, because ERISA does not regulate PBMs. Allowing a state law cause

of action to enforce state law duties against PBMs therefore cannot be an end run around ERISA's exclusive remedies. *See Rowe*, 429 F.3d at 305 (holding that ERISA does not preempt state law alternative enforcement mechanism that targets PBMs because PBMs are not ERISA fiduciaries).

Nor does enforcing subsection 4B(2)—the requirements imposed on third-party payors—conflict with ERISA. Indeed, Plaintiffs do not argue that this cause of action overlaps with ERISA's plan administration or that it allows a state law mechanism to enforce an ERISA duty. They instead argue, without explanation, that it is an impermissible alternative enforcement mechanism. Br. 24.

But Iowa's enforcement mechanism is akin to the self-help enforcement mechanism *Rutledge* held was not preempted. The state law there authorized a pharmacy to decline to dispense a drug if the PBM failed to comply with the State's new reimbursement regulations. *Rutledge*, 592 U.S. at 85. Plaintiff's argument there was that such self-help empowered a pharmacy to determine which benefits to provide. *Id.* at 91. The Court disagreed, reasoning that "responsibility lies first with the PBM for offering the pharmacy a below-acquisition reimbursement." *Id.* Because the duty imposed on the PBM was not preempted, allowing a pharmacy to enforce that duty does not create an "impermissible connection" with ERISA. It instead is connected to the permissible state law duty imposed on the PBM.

Iowa's law here does no more than what *Rutledge* allows. Section 4B's underlying duties are permissible. And the cause of action granted to covered persons and pharmacies is connected to enforcing those state law duties, not ERISA. As in *Rutledge*, "the responsibility lies first with the PBM," or third-party payor, for failing to follow those state law duties. *Id.* A cause of action enforcing independent state law duties is not impermissibly connected with ERISA.

### 3. Section 510B.8(4) does not impermissibly "refer to" ERISA plans.

Plaintiffs argue that one phrase in SF383's pass-through-pricing section is preempted because it impermissibly "refers to" ERISA plans. By making that argument in a footnote without any supporting authorities or analysis, Plaintiffs have waived the claim for purposes of preliminary injunctive relief. Br. 22 n.13. *Cf. Mulready*, 78 F.4th at 1204 (perfunctory arguments made in footnote on appeal are waived). But even if preserved, the argument is not likely to succeed.

A law impermissibly "refers to" ERISA if it "acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation." *Gobeille*, 577 U.S. at 319–320 (cleaned up). And that takes more than a law saying the words "Employee Retirement Income Security Act." *See Howard Jarvis Taxpayers Ass'n v. Cal. Secure Choice Ret. Sav. Program*, 997 F.3d 848, 865 (9th Cir. 2021) ("The Supreme Court . . . has never found a statute to be preempted simply because its text included the word ERISA or explicitly mentioned ERISA plans." (quotation marks omitted)). Rather, a state law impermissibly refers to ERISA plans when it singles out ERISA plans for different treatment. *See Wehbi*, 18 F.4th at 969 (reference-to preemption triggered "only if the law cannot apply to a non-ERISA plan").

Though section 510B.8(4) says "ERISA," it "does not act immediately and exclusively upon ERISA plans because it applies to PBMs whether or not they manage an ERISA plan." *Rutledge*, 592 U.S. at 88. If you take that reference to ERISA out of that section, the law does the same thing: it requires all PBMs to use pass-through pricing. Regardless of whether the PBM contracts with an ERISA plan or non-ERISA plan, if the PBM receives a rebate they must pass through 100% of the rebate. ERISA plans are not essential to this section's operation.

### 4. A majority of SF383's applications would be saved from preemption under ERISA's insurance Saving Clause.

Even if any part of SF383 has an impermissible connection with ERISA, that is not the end of the inquiry. ERISA's Saving Clause saves from preemption generally applicable state laws regulating insurance. 29 U.S.C. § 1144(b)(2)(A). To be saved, a state law does not need to "regulate 'insurance companies' or even 'the business of insurance.'" *Kentucky Ass'n of Health Plans v. Miller*, 538 U.S. 329, 336 n.1 (2003). First, "it need only be a 'law . . . which regulates insurance.'" *Id.* Second, it must "substantially affect the risk pooling arrangement between the insurer and the insured." *Id.* at 342.

Many of the challenged SF383 sections can be saved. Though laws applied to self-funded plans might not be saved from preemption because of the "deemer" clause, which limits the scope of the insurance saving clause, that does not mean the law could not be applied to the PBM with

whom the self-funded plan contracts. *Cf. FMC Corp. v. Holliday*, 498 U.S. 52, 61 (1990) (state law can deem insured plan as insurance, but not a self-funded plan). But in this facial-challenge posture, the Court need not go into detailed parsing of plan types. Instead, because there are constitutional applications of each section—at minimum, as applied to insured plans and PBMs— the Court may reject the facial challenge.

SF383 regulates insurance, thus satisfying *Miller*'s first prong. SF383 is codified in Title XIII, subtitle 1, which houses Iowa's insurance laws. And Iowa's Insurance Commissioner (Defendant here) enforces those laws. *See* Iowa Code § 510B.1(2). SF383 is not a law generally applicable outside the insurance sphere too.

Plaintiffs argue SF383 is not "specifically directed toward entities engaged in insurance," like Plaintiffs themselves, because it is more than "minimally concerned with PBMs." Br. 25–26. But in opposing Defendant's briefing-schedule request, Plaintiffs disclaim any relief as to non-ERISA entities. Dkt. 9 at 5. So any part of SF383 against which Plaintiffs now seek injunctive relief is not concerned with PBMs and does, in fact, regulate insurance.

In all events, even the parts of SF383 that regulate PBMs still regulate insurance—PBMs are third-party providers contracting their services to the health insurance industry. That goes for PBMs contracting with any type of plan, whether self-funded or insured. The United States agreed that laws regulating PBMs may be saved from ERISA preemption. *See* Amicus Br. of United States, *PCMA v. Mulready* No. 22-6074, 2023 WL 2990378, *18 (10th Cir.) (Third-party PBMs are "sufficiently engaged in the 'activity of insurance' to come within the insurance savings clause's scope" (quoting *Miller*, 538 U.S. at 336 n.1)).

And PBMs, like insured plans, may be subject to insurance regulation. States may apply their insurance laws to third parties with whom plans contract, "even where that results in indirect regulation of ERISA plans," without triggering ERISA's deemer clause. *Id.* *20–*21 & n.4 (applying *Holliday*, and explaining why *Prudential*, 413 F.3d at 912–913, wrongly applied later Supreme Court precedent). Indeed, it is odd that Plaintiffs argue SF383's PBM regulations dictate

plan design, Br. 12, yet now under the Saving Clause argue there is a weak substantive connection between those laws and insurance. If they are right on preemption, they cannot change tack here.

As to *Miller*'s second prong, much of SF383—including parts that govern PBMs—regulates the size of the risk pool or shifts risk across the risk pool. Consider the any-willing-provider sections and network access cost-sharing requirements. Plaintiffs appear to rightly concede that these satisfy *Miller*'s second prong. Br. 26–27. *Miller* saved an "any willing provider" law: "[b]y expanding the number of providers from whom an insured may receive health services," the law substantially affects "the type of risk pooling arrangements that insurers may offer." *Miller*, 538 U.S. at 338–339. SF383's network access cost-sharing provisions similarly expand the services and number of pharmacies that may dispense benefits. They too regulate insurance, substantially affect the risk pool, and are saved. *See* Amicus Br. of United States, *PCMA v. Mulready* No. 22-6074, 2023 WL 2990378, *17–*22 (10th Cir.) (pharmacy network access standards and cost-sharing requirements, like the any-willing-provider section, even when applied to PBMs, are saved from preemption).

As to Plaintiff IBBP, a self-funded multiple employer welfare arrangement (MEWA), Plaintiffs state that "for the time being" SF383's cost-sharing requirements would conflict with ERISA because some plan documents might include different terms. Br. 27. Plaintiffs thus seem to suggest that were SF383's cost-sharing provisions to take delayed effect as to self-funded MEWAs, to allow time to update plan documents, then those cost-sharing requirements would be saved from preemption. What this means, in this facial-challenge posture, is that Plaintiffs concede those requirements have at least some legitimate applications as to self-funded MEWAs and thus should not be facially enjoined.

### E. Plaintiffs' First Amendment Claim Fails under *NetChoice*.

Plaintiffs assert a facial challenge under the First Amendment against three of SF383's sections. Br. 28. The Supreme Court recently reiterated that, even in the First Amendment context, facial challenges are "hard to win," *NetChoice*, 603 U.S. at 723, and should "only be done as a last resort." *GLBT Youth*, 114 F.4th at 669 (quotation omitted). As did the Eighth Circuit, when it

recently vacated a preliminary injunction because the district court did not first "perform the necessary inquiry set forth in *NetChoice*." *Id.* at 669–670.

As Plaintiffs' authorities admit, "[t]o succeed on a facial challenge under the First Amendment, [plaintiff] must show that a substantial number of [SF383's] applications are unconstitutional, judged in relation to [the law's] plainly legitimate sweep." *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 724 F. Supp. 3d 1174, 1197 (D. Or. 2024) (quotation marks omitted). Determining the number of applications, what a substantial number of those are, and the law's plainly legitimate sweep are all Plaintiffs' burden. Failure to meet that burden means an injunction cannot issue.

Plaintiffs pleaded facial relief. So the only question in this preliminary injunction posture is whether facial relief is appropriate. The Court should not craft a narrower injunction if it believes that some relief other than what Plaintiffs asked for is appropriate. That approach of shooting for the moon and landing in the stars undermines the Eighth Circuit's recent admonitions relating to injunctions' scope. *See*, *e.g.*, *GLBT Youth*, 114 F.4th at 669 ("facial challenges involve a heightened risk of a premature interpretation of a statute based on a barebones record"). If all Plaintiffs must do to receive substantial relief is ask for facial relief, then the district judge has the burden of affirmatively deciding what portions of the law must be enjoined as applied to Plaintiffs, that turns *GLBT Youth* and *NetChoice* upside-down.

There are three steps to analyzing facial-overbreadth challenges. *See id.* (applying *NetChoice*, 603 U.S. at 723–725). The first is to analyze the law's scope. *NetChoice*, 603 U.S. at 724. This can be referred to as establishing the denominator—and for facial relief purposes is a vital step. Here, Plaintiffs contend that the entirety of SF383 should be enjoined based on their First Amendment argument. So the legitimate sweep of the law from this First Amendment challenge must be all potential applications of SF383. The denominator would be different if Plaintiffs only sought to challenge the three parts of the law that they allege violate the First Amendment. But repeatedly they insist that the law cannot be severed. While Defendants disagree, each step of *NetChoice* is *Plaintiffs'* burden. Here, they have chosen the heaviest burden of all: to

set aside as unconstitutional a law with more than twenty operative parts, including a severability clause, based on alleged unconstitutionality of just three sections.

The second *NetChoice* step requires Plaintiff to prove which of the law's applications violate the First Amendment—*i.e.*, they must establish the numerator. *Id.* at 725. Here, Plaintiffs allege three sections of the law violate the First Amendment. Defendant disagrees. At any rate, the clash of whether SF383 must be facially enjoined rests on whether Plaintiffs carried their factual burden of establishing the unconstitutional applications. As will be explained, they do not.

And step three, Plaintiffs' final burden in the *NetChoice* analysis, is to compare the unconstitutional applications to the constitutional ones. *Id.* at 725–726. Only if "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," can enforcement of the law be facially enjoined. *Id.* at 723 (quotation marks omitted); *GLBT Youth*, 114 F.4th 669–670.

The problem is that Plaintiffs do not even attempt *NetChoice*'s analysis—either as to the whole law or as to any challenged section. That is fatal. Plaintiffs bear the heavy burden here; that "is the price of [their] decision to challenge the law[] as a whole." *NetChoice*, 603 U.S. at 744. A facial overbreadth challenge is a "daunting, if not impossible, task," and "likely forces a court to bite off more than it can chew." *Id.* at 744–745, 747 (Barrett, J., concurring). Heavy as it may be, Plaintiffs must nevertheless carry their factual burden of establishing the laws unconstitutional applications and its constitutional ones. *See NetChoice, LLC v. Paxton*, 121 F.4th 494, 500 (5th Cir. 2024) (remanding to district court so plaintiffs could "develop a factual record to support their request for facial injunctive relief").

In support of their First Amendment claim, Plaintiffs home in on a narrow subset of allegedly unconstitutional applications. Br. 30–31. They cite one example detailed in one declaration: one company "cannot tell its employees that its plan and those employees will save money if they get their prescriptions filled at Walmart instead of an independent pharmacy." Br. 30. Beyond that, they fail to carry their factual burden of establishing the law's—or even any section's—full scope of unconstitutional and constitutional applications. Then they summarize that

"all of the challenged provisions are more extensive than necessary." Br. 31. Yet they fail to make a record as to the laws' applications, nor do they allow the Court to do the requisite weighing under *NetChoice* step three. Their showing is not enough. *See NetChoice*, 603 U.S. at 797 (Alito, J., concurring) (Plaintiffs have "merely identified one subset of one platform's content that would be affected by these laws," but that is not enough). Plaintiffs' should not be rewarded with a disfavored facial injunction.

On the merits, Plaintiffs fail to demonstrate they are likely to succeed. Plaintiffs admit that the challenged laws regulate commercial speech. Br. 28.

Plaintiffs challenge the notice section that requires third-party payors to notify pharmacies in their plan's geographical coverage area of their network-participation restrictions and give them the opportunity to accept those restrictions. Iowa Code § 510B.4B(2)(*a*). That requires disclosing "purely factual and uncontroversial information," so it is reviewed under *Zauderer*'s framework, which requires that such laws be "reasonably related to the State's interest in preventing deception of consumers" and not "unduly burde[n]" speech. *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 650–651 (1985); *see id.* ("State's interest in preventing deception of consumers" triggers *Zauderer*'s deferential review); *1-800-411 Pain Referral Serv. LLC v. Otto*, 744 F.3d 1045, 1062 (8th Cir. 2014) (conduct inherently misleading, and subject to deferential *Zauderer* review, where it, in part, fails to inform consumers that the nature of the business was "as a referral service").

In a PBM-related First Amendment challenge, the First Circuit rejected that challenge to a state law requiring PBMs to disclose certain price schemes and conflicts of interest. *Rowe*, 429 F.3d at 309–310. The court reasoned the law involved "routine disclosure of economically significant information designed to forward ordinary regulatory purposes—in this case, protecting covered entities from questionable PBM business practices." *Id.* at 316 (Boudin J. and Dyk, J., jointly concurring and opinion of the court as to First Amendment issue). After all, "[t]here are literally thousands of similar regulations on the books." *Id.*

Iowa's notice requirement similarly passes muster. It is limited to disclosing objective facts that are not controversial. It does not require third-party payors to espouse any viewpoint that the government favors. It requires disclosing information that is valuable to the recipient.

And like the disclosure requirement in *Rowe*, Iowa's "protect[s] covered entities from questionable PBM business practices." *Id.* It furthers Iowa's legitimate and substantial interest in transparency, protecting consumer choice, and limiting PBMs' ability to self-deal in a way that either harms plan beneficiaries or exacerbates PBMs' outsized influence on pharmacy networks.

The law thus reduces harm to community pharmacies and protects access to rural healthcare, thus ensuring better choice, care, cost, and—crucially—health outcomes. *See, e.g.*, Brooks Decl. ¶¶ 7–9; Hartig Decl. ¶¶ 18, 22; Knoer Decl. ¶ 5; Wegmann Decl. ¶ 6 (PBMs' unchecked practices create pharmacy deserts in Iowa). Requiring notice to all pharmacies in a plan's coverage area furthers that interest by allowing willing pharmacies fair opportunity to review proposed restrictions and decide whether to participate in a network they are otherwise excluded from.

Plaintiffs reason the law is unduly burdensome because it requires them to notify all pharmacies, even ones that have not shown an interest in participation. Br. 30 n.15. But under the current opaque regime, excluded pharmacies often do not even know the network-access restrictions imposed, so it is unclear how they should know to show their interest in participating. This law is about leveling the playing field by ensuring equal access to information for pharmacies. And regulating pharmacies and drugs is core State police power. Indeed, Plaintiffs' footnote does not present enough "facts demonstrating the undue burden" the notice requirement has on Plaintiffs. *1-800-411 Pain Referral*, 744 F.3d at 1063.

Plaintiffs also argue the disclosure requirement forces them to "reveal commercially sensitive information" they otherwise would not disclose. Br. 28. But that is a feature, not a bug. Iowa's law is a transparency and information-sharing law intended to demystify the coercive system Plaintiffs seek to protect. Iowa has a substantial interest in promoting consumer choice and transparency and protecting against misleading practices that disrupt care.

And that is why, even under more exacting scrutiny, the notice requirement survives. The law directly advances a substantial governmental interest in a way not more extensive than necessary. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564–566 (1980)). For example, no preexisting regulations require disclosure of the same information.

The other challenged sections also survive scrutiny. As to the "anti-promotion" section, Plaintiffs overstate its applications. That restriction applies only to PBMs. Iowa Code § 510B.4B(1)(*a*). Plaintiffs focus on the law's effect only on employers' ability to communicate "beneficial, accurate information" to their employees. Br. 28, 30. But the statute's text shows that specific concern is misplaced. This section does not apply to employers (plan sponsors). And Plaintiffs fail to develop an argument (nor do they carry their factual burden) as to why this section unconstitutionally restricts PBMs' speech. Again, no Plaintiff alleges that it is a PBM subject to direct regulation by that section. This challenge fails at step one of the *NetChoice* analysis.

Plaintiffs next challenge section 510B.4(4)'s referral restriction, which says PBMs and third-party payors may not "discriminate against a pharmacy or a pharmacist with respect to . . . referral . . . of a covered service." They again fail *NetChoice*'s analysis.

Plaintiffs do not properly analyze the law's scope, nor do they establish its applications. Plaintiffs do not analyze the differences in SF383's usage of "referral" and "promotion." The statute uses the terms in different sections, applying different duties to different actors. *Compare* Iowa Code § 510B.4(4) ("referral"), *with* Iowa Code § 510B.4B(1)(*a*) ("promotion"). They must carry distinct meanings. *Bribriesco-Ledger*, 957 N.W.2d at 650–651.

Plaintiffs' argument is this: "The anti-referral" section prevents Plaintiffs "from providing truthful information regarding the availability of lower-cost or higher-quality pharmacy offerings, information that covered persons and their health benefit plans value." Br. 30. Citing a declaration, they argue "Pella Corporation cannot tell its employees" beneficial information, like where their employees can save money. Br. 30.

But that sounds a lot like what "monetary advantage or penalty" means under the promotion-and-comparison section, which applies only to PBMs and does not apply to third-party

payors at all. *See* Iowa Code § 510B.4B(1)(*a*). And, of course, Pella Corporation is an employer and a third-party payor, under SF383. It is not a PBM. Plaintiffs' hypothetically restricted conduct thus cannot be attributed to the referral-discrimination section. Ultimately, Plaintiffs fail to explain how the challenged sections "muzzl[e] employers" at all. Br. 30.

In all events, these sections—like the notice requirement—further Iowa's substantial interest in limiting "questionable PBM business practices." *Rowe*, 429 F.3d at 316 (Boudin J. and Dyk, J., jointly concurring and opinion of the court as to First Amendment issue). The law restricts PBM and third-party payors' ability to engage in misleading conduct that ultimately has a negative effect on consumer choice, access to healthcare, and transparency. *See, e.g.*, Fuller Decl. ¶ 11.

At a minimum, any unconstitutional overbreadth entitles Plaintiffs to an injunction only as to the unconstitutional applications. "[F]acial invalidation" of the law is particularly improper because Iowa Code mandates severability. *Brockett*, 472 U.S. at 506 & n.14; *see* Iowa Code § 4.12.

## II.     The Other Factors Weigh Against Plaintiffs' Requested Relief.

Because Plaintiffs are not likely to succeed on the merits, the Court need not proceed to the other factors. *See Rounds*, 530 F.3d at 732. But those factors also weigh against an injunction.

Plaintiffs' delay in suing "vitiates much of the force of" any "allegations of irreparable harm." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (cleaned up); *see Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023) (similar). SF383 was enacted after a lengthy and highly publicized legislative process, which Plaintiffs were closely following. *See* Iowa Legislature, *Lobbyist Declarations – SF383* perma.cc/A4ST-8V7A (Iowa ABI lobbyists registered against SF383 in February 2025); Iowa ABI, *Iowa Legislature Passes Costliest Health Care Mandate in State History* (May 12, 2025), perma.cc/SU5D-RYW6. The bill passed both chambers by May 12. Then the Governor signed it into law on June 11. Yet Plaintiffs waited until the evening of June 26—two business days before the law was set to take effect—to seek emergency injunctive relief.

As to the balance of harms, an injunction irreparably harms the State and is not in the public interest. The Supreme Court has long recognized that States have a unique interest in protecting

the health and well-being of their people. *See, e.g.*, *Veix*, 310 U.S. at 38–39. Indeed, Defendant has a unique interest in enforcing SF383, at a minimum to protect Iowans' access to healthcare and to police conflicts of interest. Restricting Iowa from exercising this power risks Iowans' health, *see, e.g.*, Hartig Decl. ¶¶ 18, 22–23; Knoer Decl. ¶ 5; Fuller Decl. ¶ 13; Brooks Decl. ¶¶ 7–9; Wegmann Decl. ¶¶ 6–7, thus outweighing Plaintiffs' alleged harm. So too does the harm to plan sponsors and consumers that will stack up each month the law is enjoined. Wiese Decl. ¶ 41 ($35,000/month savings on one specialty drug after plan sponsor moved to a PBM that uses pass-through pricing).

Enjoining enforcement of a state law "clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). "All doubts" are to be "resolved in favor of constitutionality." *Ark. Times LP v. Waldrip as Tr. of Univ. of Ark. Bd. of Trs.*, 37 F.4th 1386, 1393 (8th Cir. 2022) (cleaned up). That is black letter Iowa law. *See* Iowa Code §§ 4.4(1), (3), (5).

### III.      Rule 65(c) Injunction Bond.

If the Court determines injunctive relief is warranted, Defendant renews his previous request, Dkt. 8 at 4–5, that the Court impose an injunction bond before that order may take effect, as required under Rule 65(c)'s mandatory language. *See* Fed. R. Civ. P. 65(c) (A "court may issue a preliminary injunction . . . *only if* the movant gives security." (emphasis added)). Here, Plaintiffs allege that enforcement of the law could lead to hundreds of millions of dollars in costs—much of which includes fees and penalties. It cannot be the case that facial injunction of a major new regulatory scheme casts such a light burden on the State that it never justifies an injunction bond—such an approach is a *sub silentio* abrogation of Rule 65(c). If the Court finds ABI has standing on behalf of its members, then it should also consider each of ABI's plan-sponsor members as a potential violator when calculating the requisite bond amount.

### CONCLUSION

For these reasons, the Court should deny the motion for injunctive relief.

July 7, 2025                          Respectfully submitted,

                                     BRENNA BIRD
                                     Attorney General of Iowa

                                     ERIC WESSAN
                                     *Solicitor General*

                                     */s/ Patrick C. Valencia*
                                     PATRICK C. VALENCIA
                                     *Deputy Solicitor General*

                                     Iowa Department of Justice
                                     Hoover State Office Building
                                     Des Moines, Iowa 50319
                                     (515) 281-5164 / (515) 281-8770
                                     (515) 281-4209 (fax)
                                     eric.wessan@ag.iowa.gov
                                     patrick.valencia@ag.iowa.gov

                                     ATTORNEYS FOR DEFENDANT

*Original filed electronically.*
*Copy electronically served on all parties of record.*

**PROOF OF SERVICE**
The undersigned certifies that the foregoing instrument was served on counsel for all parties of record by delivery in the following manner on July 7, 2025:

☐ U.S. Mail                 ☐ FAX
☐ Hand Delivery             ☐ Overnight Courier
☐ Federal Express           ☐ Other
☒ CM/ECF

Signature: */s/ Patrick C. Valencia*