# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

IOWA ASSOCIATION OF BUSINESS AND INDUSTRY, IOWA BANKERS BENEFIT PLAN, IOWA LABORERS DISTRICT COUNCIL HEALTH AND WELFARE FUND, DES MOINES ORTHOPAEDIC SURGEONS PC, and IOWA SPRING MANUFACTURING & SALES COMPANY,

*Plaintiffs*,

v.

DOUG OMMEN, in his official capacity as Insurance Commissioner of Iowa,

*Defendant*.

No. 4:25-cv-00211-RGE-WPK

**DECLARATION OF AARON WIESE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1. I am greater than 18 years of age and am competent to make this declaration.

2. I am the current President of Hy-Vee, Inc ("Hy-Vee"). I assumed the position of President in December of 2022, and have a long history with Hy-Vee. I started there as a student employee in 1991 and have since held various leadership roles before becoming President, including Executive Vice President; President, Digital Growth, Co-Chief Operating Officer; and Chief Health Officer. I have also held roles as Operations Manager for Hy-Vee Care, Director of Real Estate Planning, and Director of Health/Wellness Strategic Planning. I have been particularly involved in the company's health and wellness initiatives, including Hy-Vee's pharmacy operations and "Food is Medicine" programs. In my current position as President, I supervise all business activities at Hy-Vee.

1

3. Unless otherwise indicated, all statements in this Declaration are based on my personal knowledge; on information that I acquired in the regular course of performing my business duties; or on information I understand and believe to be accurate.

4. I make this declaration on behalf of Hy-Vee in support of Defendant Doug Ommen's opposition to Plaintiffs' Motion for a Preliminary Injunction, which seeks to enjoin on a preliminary basis Senate File 383—bipartisan legislation that was recently enacted by the Legislature and signed into law by the Governor.

5. Senate File 383 includes comprehensive reforms for pharmacy benefit managers (PBMs). To be clear, PBMs are not health plans. PBMs enter contracts with pharmacies to create networks where beneficiaries can access their prescription medications. PBMs then enter contracts with third-party payors, including private-employer-sponsored prescription drug plans, where the plans' beneficiaries can access their drug benefits.

6. Because of their unique position in the market, PBMs have been able to leverage their market power—the three largest PBMs administer benefits for nearly 80% of all Americans with a prescription-drug benefit—to the detriment of plans, patients, and pharmacies. The abusive practices of PBMs have increased drug prices, lowered patient access to life-saving medications, and led to the shuttering of thousands of pharmacies across the country.

7. Senate File 383 includes a variety of provisions meant to curb the abusive business practices of PBMs. It includes reimbursement provisions to prevent PBMs from using their market power to reimburse pharmacies at less than their cost to acquire medication. It includes provisions on accreditation, specialty pharmacy, and network composition designed to prevent PBMs from arbitrarily excluding pharmacies from their networks and steering patients to PBM-affiliated pharmacies, where PBMs charge plans supra-competitive prices. And it includes transparency

provisions designed to ensure that plans know what they are paying for and to put economic pressure on PBMs to pass savings on to plans and patients.

8. Hy-Vee is uniquely situated to speak to the operation of Senate File 383 because Hy-Vee wears three hats related to the legislation: (1) retail pharmacy, (2) sponsor of a welfare benefit plan subject to regulation under the Employee Retirement Income Security Act of 1974 (ERISA), and (3) owner of its own transparent PBM, Vivid Clear Rx.

### A. Perspective of Retail Pharmacy Provider:

9. Hy-Vee is an employee-owned company that operates grocery stores and 270 pharmacies, including 132 pharmacies in Iowa. For years, our pharmacies have faced increasingly aggressive and opaque PBM practices: unsustainable reimbursement rates, hidden fees, and patient steering to PBM-owned mail-order pharmacies. These practices erode the financial viability of local pharmacies, limit patient access, and compromise continuity of care.

10. Senate File 383 helps level the playing field by requiring fair reimbursement, prohibiting discriminatory network behavior, and giving patients greater freedom to choose their pharmacy—whether it's a local independent pharmacy, a regional chain like Hy-Vee, or otherwise.

11. A July 2024 report by the Federal Trade Commission chronicles how the PBM industry has grown and consolidated rapidly in recent decades. *See* Fed. Trade Comm'n, *Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers*, at 2 (Jan. 2025). Currently, the three largest PBMs—CVS Caremark, Express Scripts, and OptumRx—control more than 80 percent of the market share for prescription drug access and around 180 million prescription drug customers. Additionally, these PBMs are also vertically integrated with health insurance companies, rebate aggregators, and retail, specialty and mail-order

pharmacies, giving them unprecedented power. This has enabled PBMs to lessen competition, disadvantage rivals, and inflate drug costs.

12. PBMs exploit their position to offer supermarket pharmacies take-it-or-leave-it contracts. The pharmacy must either accept the PBM's mandated contract terms (including, among other things, allowing the PBM to set prices for certain drugs unilaterally) or give up the ability to serve the many customers whose health plans contract with the PBM. Importantly, this would include existing customers who have longstanding relationships with their pharmacists.

13. PBMs also require patients to use mail-order pharmacies for certain drugs and restrict access to many drugs by labeling them as "specialty drugs" to prevent patient access to local pharmacies. Both of these practices have little to do with patient care.

14. For example, PBMs have steered patients to PBM-affiliated pharmacies by offering lower copayments and other inducements—and this is particularly true for more-costly specialty medications. These PBM practices may cost beneficiaries less out of pocket in the form of copayments and coinsurance, but the PBMs make up for this by charging plans substantially more. According to the Federal Trade Commission report cited above, the three largest PBMs reimbursed their affiliated pharmacies more than 100 percent over their estimated acquisition cost on 63 percent of the specialty medications they dispensed, and 22 percent of the time they reimbursed their affiliated pharmacies at a markup of more than 1,000 percent. *See also* Joseph Walker, *Generic Drugs Should Be Cheap, but Insurers Are Charging Thousands of Dollars for Them*, Wall Street Journal, Sept. 11, 2023.

15. In addition, PBMs have deliberately limited access to their pharmacy networks—not out of considerations of safety or costs to their prescription-benefit-plan clients, but to further steer patients to their affiliated pharmacies. The Centers for Medicare and Medicaid Services

(CMS), for example, has long expressed concern that PBMs are using pharmacy contracts "in a way that inappropriately limits dispensing of specialty drugs to certain pharmacies." *Medicare Program; Contract Year 2019 Policy and Technical Changes*, 82 Fed. Reg. 56,336, 56,410 (Nov. 28, 2017).

16. Critically, Senate File 383 would ban such restrictions on customer choice, and open competition.

17. PBMs also abuse their leverage to force pharmacies to accept below cost pricing. PBMs' profit model is dependent upon their ability to dictate prices and impose upon pharmacies arbitrary and often below-cost reimbursement terms for generic drugs through maximum allowable cost (MAC) price lists. PBM reimbursements to pharmacies for generic drugs are based on PBMs' "proprietary" MAC lists, which bear no necessary relation to pharmacies' acquisition costs. Additionally, one of the many ways PBMs profit is by maximizing the difference between what they pay pharmacies for a drug and the inflated amount they charge a health care plan for that same transaction. To take just one reported example, an Iowa county was billed by its PBM $198.22 for a drug and the PBM reimbursed the dispensing pharmacy just $5.73—a markup of more than 3,400 percent. *See* Robert Langreth *et al.*, *The Secret Drug Pricing System Middlemen Use to Rake in Millions*, Bloomberg (Sept. 11, 2018).[1]

18. Hy-Vee experiences this firsthand. Looking at drugs with over 500 prescriptions filled, since January 1, 2025, Hy-Vee's pharmacies have dispensed *115* different drugs whose reimbursement rate was less than national average drug acquisition cost.

---

[1] https://www.bloomberg.com/graphics/2018-drug-spread-pricing/.

19. The PBM industry has resisted attempts to force price transparency that would reveal that their below-cost reimbursements are a result of market power, not pro-competitive efficiencies as they claim. Tellingly, pharmacies of all sizes are suffering because of PBMs' below-cost pricing—even pharmacies with massive supply chains and economies of scale.

20. Food retailers like Hy-Vee are being driven out of the retail pharmacy business. Unlike independent pharmacies, we are not dependent solely on retail pharmacy operations for survival. But PBM practices make it much more likely for food retailers to exit the pharmacy business by selling to the big players or abandoning pharmacy operations. We are not immune from these headwinds. Hy-Vee has closed 25 pharmacies since 2019.

21. Pharmacy closures, and abandoned expansion plans, contribute to the overall trend of decreased access to pharmacies and "pharmacy deserts." The effect of such closures is particularly acute in some rural communities, where closures are both more prevalent and more detrimental to the community's access to health care because it may lose the only pharmacy to which it has ready access. The closure of pharmacies in recent years has created these pharmacy deserts in some underserved urban communities as well.

22. According to the Iowa Pharmacy Association, in 2024 alone, 29 Iowa pharmacies closed their doors, both in urban and rural communities; and 204 Iowa pharmacies have closed since 2014. *See* Iowa Pharmacy Ass'n Blog, *29 Iowa Pharmacies Closed in 2024 – PBM Reform Needed to Save Our Pharmacies* (Jan. 20, 2025).[2] Thirty-nine percent of Iowa towns have no access to a pharmacy in a 5-mile radius. Eleven Iowa counties have only one pharmacy.

---

[2] https://www.iarx.org/blog_home.asp?Display=185

23. As explained below, Senate File 383 includes a variety of provisions that we anticipate will lead to a net savings for Iowans while forestalling further closures of pharmacies. As a result, granting an injunction now would be extremely detrimental. As the Wall Street Journal investigation mentioned above found, patients are being overcharged for drugs used to treat cancer, HIV, and multiple sclerosis every day that drags forward.

### B. Perspective as Employer and Plan Sponsor:

24. As an employer and the sponsor of an employee-benefits plan trying to manage health care costs for our more than 15,759 members—including our employees and other eligible enrollees—in Iowa, Hy-Vee has supported Senate File 383 because it ensures Iowans can access the medications and health care services they need. As the sponsor of a self-funded plan, we've witnessed firsthand how misaligned PBM incentives and lack of transparency can drive up drug costs—not reduce them. Our plan includes medical and dental care, prescription drug, life insurance, and short-term disability coverages. And Hy-Vee contributes significantly to the cost of these plans. We even offer a benefits program for our part time employees—which was the first of its kind in the retail industry.

25. All this is to say is that we are acutely aware of how PBMs' concentrated market power harms health care plans and beneficiaries. As mentioned above, today, the largest PBMs—UnitedHealth's Optum Rx, CVS Health's CVS Caremark and Cigna's Express Scripts—process over 80% of prescription claims.

26. The July 2024 Federal Trade Commission report mentioned above describes how vertical integration between PBMs and health insurers has created financial conflicts of interest and given large PBM-insurer-pharmacy entities the ability and incentive to preference their affiliated entities over rival entities, diminishing competition.

7

27. PBMs typically design the formularies—lists of covered medications—for their plan customers, and drug manufacturers compete to have their products included by offering rebates to PBMs. Because these rebates (a portion of which PBMs pocket) often scale with the cost of the drugs, PBMs are motivated to favor higher-priced medications. The lack of any transparency into these rebate arrangements makes it challenging to determine whether PBMs are selecting drugs to lower costs for the plan or to maximize their own profits at the expense of plans and their beneficiaries.

28. The same FTC report shows that PBMs regularly adjust formularies, including by designating drugs as specialty medications, which triggers exclusivity provisions in contracts with certain payers that require the use of the PBM's affiliated specialty pharmacy. This practice limits competition and gives PBMs a financial motive to promote higher-cost medications. According to the FTC report, the result is that PBMs have profited handsomely—to the tune of $7.3 billion over five years—at the expense of plans and patients.

29. The FTC study sheds light on PBMs' practice of steering patients to its affiliated specialty pharmacies at the expense of commercial health plans, which can cause plans to pay 20-40 times what they might pay an unaffiliated pharmacy. Similarly, the Wall Street Journal reported PBM-affiliated mail-order pharmacies had drug markups that were more than three times higher than the markups at retail pharmacies.

30. Unfortunately, these price distortions are unsurprising. True market competition only occurs when a broad range of pharmacies can compete for contracts with plan sponsors and PBMs—not when PBMs are allowed to funnel patients to their own affiliated pharmacies. The status quo not only fails to save employers like Hy-Vee money, but it also threatens community access and patient health.

31. Contrary to some claims, in states that have passed aggressive PBM reforms like Iowa's Senate File 383, premiums pre- and post-regulation have shown no unusual changes in premium growth rates. For example, studies by the insurance departments in West Virginia and Arkansas have shown no increase in premium growth rates at all as a result of those States' laws restricting PBMs from anticompetitive behavior.

32. Implementation costs for businesses and patients are low.

33. Indeed, by mandating more transparency by PBMs, banning spread pricing, and requiring PBMs to pass along rebates to their customers, Hy-Vee anticipates that the legislation will yield net savings for employers and patients—even after factoring in the reimbursement and dispensing-fee provisions.

34. Nor does Senate File 383 relate to matters of central plan administration under ERISA. As I understand it, Senate File 383 does not dictate which prescription medications are covered or who is eligible for coverage under an ERISA regulated plan. Many of the law's provisions are aimed exclusively at PBM businesses practices, which have nothing to do with how an ERISA fiduciary must administer an ERISA plan. Indeed, the plaintiffs' declarants themselves admit that their PBMs are not fiduciaries of the plans that they serve.

**C. Perspective as the Owner of a Transparent PBM – Vivid Clear Rx**

35. Since 2020, Hy-Vee has operated Vivid Clear Rx, a pharmacy benefit manager founded on the principles of transparency, accountability, and patient-first service. Vivid Clear Rx demonstrates that PBMs can deliver cost savings without hidden margins or conflicted incentives.

36. As the owner of a transparent PBM, Hy-Vee welcomes legislation like Iowa's because it reflects and reinforces the model we have already embraced. The reforms enacted by the Iowa Legislature don't harm those who act ethically—they highlight them.

37. By mandating rebate transparency, banning patient steering, and promoting fair pharmacy practices, the law enhances trust and upholds integrity in the marketplace. The catalyst to create and have our own PBM as a subsidiary to Hy-Vee was the size of Hy-Vee. We have over 70,000 employees, are a self-insured employer group, and frankly, concluded it was time to custom-tailor a comprehensive suite of benefits to offer our employees. Today, in addition to Hy-Vee, more than 200 employer groups trust Vivid Clear Rx as their pharmacy benefit manager.

38. Vivid Clear Rx is very different than traditional PBMs, which engage in a variety of harmful business practices. Traditional PBMs engage in "spread pricing," where they reimburse pharmacies at one price but charge their clients (health plans or employers) higher prices for those drugs. Not only do traditional PBMs keep this difference as profit; they also do not disclose to their plan customers how much they are marking up drug costs. Traditional PBMs also receive rebates from drug manufacturers and keep a portion of those rebates, rather than passing them all on to their clients. This lack of transparency makes it difficult to understand the true cost of prescription drugs and can lead to inflated drug spending.

39. In contrast, Vivid Clear Rx operates on a "pass-through" model, where all rebates and discounts received from drug manufacturers are passed along directly to the client. Vivid Clear Rx charges a flat administrative fee for services, which is separate from the drug costs. This model ensures that clients are aware of all costs associated with their pharmacy benefits and can negotiate effectively. Overall, Vivid Clear Rx offers a more efficient and honest way to manage pharmacy benefits by focusing on openness and eliminating hidden fees and profits.

40. Two recent examples are illustrative of how Vivid Clear Rx helps lower the overall cost of prescription medications:

41. First, an employer covering approximately 250 individuals was able to save approximately $35,000 per month on one expensive specialty medication used to treat aggressive prostate cancer. Under Vivid Clear Rx's cost-based pricing, their cost was approximately $40,000 per month as compared to approximately $75,000 per month under one of the largest PBMs and its affiliate specialty pharmacy. A broker helping the employer select coverage was amazed to discover that the savings were only because Vivid Clear Rx passes through all its rebates to clients rather than pocketing the difference.

42. Second, in another case, a plan sponsor covering approximately 150 individuals was shocked to discover that Vivid Clear Rx would have more than tripled the annual rebates the plan sponsor would receive—from approximately $35,000 to approximately $110,000—as compared to its traditional PBMs. The reason was because of the way the PBM handled rebates for Limited Distribution Drugs (expensive medications available at limited pharmacies because they require handling or injection and are used to treat rare or complex diseases like Cancer in the contract). The plan sponsor reviewing the contract did not realize that based on the somewhat standard exclusion of Limited Distribution Drugs from rebate guarantees in the PBM contract, that the sponsor would not receive rebates on Limited Distribution Drugs even when those drugs actually generated rebates. The PBM was hiding its intent to pocket these rebates by saying nothing about them. In contrast to this opacity, Vivid Clear Rx's contracts specifically spell out that its clients get those rebates.

43. Because of traditional PBMs' colossal market power, in the absence of this legislation, the free market would not resolve or correct the problems highlighted in this Declaration by rewarding transparent PBMs like Vivid Clear Rx. Traditional PBMs cut transparent PBMs out of contracts by making it cost-prohibitive for a business to switch to the transparent PBM—for example, by charging carve-out fees, utilization fees, and integration fees, or by matching in a bidding process the savings the transparent PBM can offer an employer group. In sum, PBMs undercut any real competitive threat to their large clients because of their massive market power and corresponding profits they have accrued from the exercise of such market power.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 7th day of July, 2025.

*Aaron Wiese*
Aaron Wiese (Jul 7, 2025 08:22 CDT)
Aaron Wiese, President, Hy-Vee, Inc.