# Exhibit 5

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA ASSOCIATION OF BUSINESS AND INDUSTRY, IOWA BANKERS BENEFIT PLAN, IOWA LABORERS DISTRICT COUNCIL HEALTH AND WELFARE FUND, DES MOINES ORTHOPAEDIC SURGEONS PC, and IOWA SPRING MANUFACTURING & SALES COMPANY,<br><br>*Plaintiffs*,<br><br>v.<br><br>DOUG OMMEN, in his official capacity as Insurance Commissioner of Iowa,<br><br>*Defendant*. | No. 4:25-cv-00211-RGE-WPK |

## DECLARATION OF CHARLES S. HARTIG IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 1746, I, Charles S. Hartig, PharmD, JD, declare under penalty of perjury under the laws of the United States of America as follows:

1. I am greater than 18 years of age and am competent to make this declaration.

2. I make this declaration on behalf of Hartig Drug Company in opposition of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. Unless otherwise indicated, all statements in this Declaration are based on my first-hand knowledge and on information that I acquired in the regular course of performing my business duties. These statements are based on actual claims data from payment sources by and through Pharmacy Benefit Managers ("PBM"), not "best guesses," estimates, or forward-looking statements.

I have direct, first-hand knowledge of how PBM practices affect pharmacies, patients, and healthcare access in Iowa.

3. I am an Owner and Chief Executive Officer at Hartig Drug Company, doing business as Hartig Drug Company and Hartig Pharmacy Services and supervise all business activities at Hartig Drug Company.

4. I have been a licensed pharmacist for 16 years and a licensed attorney in Iowa for 13 years. I have over 10 years of experience in the pharmacy industry and health law. I was previously employed as a pharmacist at Express Scripts, and also have worked as a pharmacist at Hartig Drug Company, and as a relief pharmacist working at various community pharmacies over my career.

5. In addition, I previously worked at Omnicare and CVS Health in the legal department as Regulatory Compliance Counsel and, later, Senior Legal Counsel. My practice area focused on pharmacy and corporate integrity agreement compliance, administrative laws, and government investigations.

6. I am a member of American Society for Pharmacy Law, American Society of Consultant Pharmacists, Iowa Pharmacy Association, Illinois Pharmacy Association, Wisconsin Pharmacist Association, and the National Community Pharmacy Association.

7. In my professional experience, PBMs' reimbursement practices and restrictive pharmacy networks have negatively impacted my business, all community pharmacies in the State of Iowa, and Iowans seeking care from Iowa pharmacies.

8. The impact has been so great Iowa pharmacies are closing at the fastest rate ever. In addition, new graduate pharmacists are leaving the State of Iowa for employment in non-

pharmacist roles with few remaining in Iowa due to the inability to financially support community pharmacy practice.

A. **Harm Caused to Pharmacies by PBM Practices**

9. Since at least 2018, commercial insurance sponsors, by and through PBMs, have paid Hartig Drug Company in a manner that has resulted in substantial losses and unsustainable margins for prescription drug products.

   a. In the last five calendar quarters (1/1/24 to 3/31/25), Hartig Drug Company averaged less than $5.75 in gross margin per commercially insured prescription. For brand drug medication, the average gross margin was a loss of -$26.37 per prescription.

   b. The State of Iowa (through its Department of Health and Human Services) and many other states estimate that the average costs to dispense medication ranges from $10 to $15 per prescription nationally. Current reimbursement from commercial insurance, by and through PBMs, do not support the long-term viability of local community pharmacy because PBMs reimburse pharmacies at rates far below that cost.[1]

   c. PBMs underpaid Hartig Drug Company below the cost to acquire the drug product on just under 10,000 prescription drug claims just between January 1, 2025 and March 31, 2025.

---

[1] See e.g., 42 CFR §§ 447.512, 447.518; ABT ASSOCIATES, COST OF DISPENSE STUDY, JANUARY 2020 (available at https://www.nacds.org/pdfs/pharmacy/2020/NACDS-NASP-NCPA-COD-Report-01-31-2020-Final.pdf).

10. Through unilateral and "opt-out" contracting practices, PBMs in Iowa enter pharmacies into "discount card" arrangements whereby the PBM will reduce agreed-upon contractual reimbursement and add administrative fees averaging $5.00, but sometimes much larger. These are just one type of hidden fee associated with PBM tactics.[2]

11. On February 25, 2025, members of the Iowa Pharmacy Association (IPA) and representatives of Wellmark (a health insurance provider) met to discuss the effectsof SF 383. In that meeting, Wellmark representatives stated that it was paying the equivalent of the National Average Drug Acquisition Cost ("NADAC") to pharmacies without any additional fee. When I asked if Wellmark understood that NADAC amount covers only a pharmacy's acquisition cost but not any other costs to complete the prescription process, there was no response beyond acknowledgment.

12. In my experience, PBMs regularly make decisions based on profit, not patient outcomes. Hartig Drug Company regularly loses access to its patients or specific patient prescriptions when large PBMs force patients to use PBM-affiliated pharmacy programs. For example, when Hartig Drug Company was fulfilling an anti-viral medication therapy for PrEP (HIV prevention), for a patient patient was directed by CVS/Caremark to switch his medication dispensing to CVS Health's mail-order pharmacy within the first three months the patient initiated the prescription with Hartig Drug. As a specialty medication, PrEP is profitable, as a result of Caremark's practice the patient was unable to continue receiving PrEP from his local pharmacy.[3]

---

[2] Keaveny Drug, Inc. v GoodRx, Inc. et al. 2:24-cv-9379; Community Care Pharmacy, LLC v GoodRx, Inc. et al. 2:24-cv-09490; Old Baltimore Pike Apothecary, Inc. et al v GoodRX Holdings, Inc. et al. 1:24-cv-00453.

[3] FEDERAL TRADE COMMISSION, PHARMACY BENEFIT MANAGERS: THE POWERFUL MIDDLEMEN INFLATING DRUG COSTS AND SQUEEZING MAIN STREET PHARMACIES (available at https://www.ftc.gov/reports/pharmacy-benefit-managers-report), JUNE 2024.

13. PBMs often charge health plans or employers more than they reimburse pharmacies, pocketing the difference. Patients do not recognize these savings, and it may even increase premiums and cost-sharing.

    a. Every day hundreds of claims are processed by Hartig Drug Company, whereby a patient pays for the full cost of the medication through copayment or co-insurance (e.g., cost-sharing obligation) and PBMs then claw back some of those funds from the pharmacy. Patients' reimbursements for medication at the pharmacy counter are subsidizing and funding PBM revenues.

    b. For example, on June 30, 2025 Hartig Drug had over 230 prescription drug claims where PBMs clawed back approximately $1,000 from payments made by individual patients to Hartig Drug Company.

14. PBMs negotiate large rebates from manufacturers in most cases over 60% of the listed price of Brand Drugs but do not pass them directly to patients. This can lead to higher list prices and higher coinsurance (since it's based on the list price, not the net price after rebates).

15. PBMs decide which drugs are "preferred" on formularies based on financial incentives, not clinical effectiveness. This can restrict access to the most effective or best-tolerated medication for a patient. This can destabilize treatment regimens, particularly for mental health, epilepsy, autoimmune disorders, or transplant patients.

16. PBMs charge insurers or patients more for mail order medications than the cash price at retail, undermining affordability.[4]

---

[4] FEDERAL TRADE COMMISSION, SPECIALTY GENERIC DRUGS: A GROWING PROFIT CENTER FOR VERTICALLY INTEGRATED PHARMACY BENEFIT MANAGERS (available at https://www.ftc.gov/system/files/ftc_gov/pdf/PBM-6b-Second-Interim-Staff-Report.pdf), JANUARY 2025.

17. Network restrictions and mandatory mail order requirements also have serious negative impacts on marginalized patients. Patients with mobility issues, disabilities, or outside caregivers can struggle to organize medications and often cannot have their questions answered without pharmacist involvement. In one such case, a patient brought into our pharmacist over 20 bottles of mail order medication. Our pharmacist reviewed the patient's profile, contacted the patient's physician, and performed a medication reconciliation to ensure the medication was correct. That patient's mail-order pharmacy did not provide those services, our pharmacist provided those services at no charge or cost to the patient or insurance.

18. In general, PBMs' pharmacy network practices have forced patients to travel farther or lose access to trusted local pharmacists, especially in rural areas which delays care, reduces medication adherence, and impacts clinical outcomes.

### C. Benefits of Senate File 383

19. Recently enacted Iowa legislation, Senate File 383, helps level the playing field by requiring fair reimbursement based on NADAC plus a fixed professional dispensing fee. This necessary adjustment to reimbursement rates will ensure that pharmacies are dispensing critical medication without substantial and unsustainable losses.

20. What is more, the current reimbursement process is convoluted and often results in losses to the pharmacy due to markups and additional fees. SF 383 requires that PBMs must adopt pass-through pricing, meaning what they receive from health plans must equal what they pay pharmacies—thereby eliminating hidden markups that erode pharmacy margins.

21. Hartig Drug Company has conducted estimated financial models of the new reimbursement methodology and it does not result in a financial windfall. Our financial models show an

increase of less than one-half of a percent (0.50%) to net profit as a percentage of sales. More importantly, however, SF 383's changes ensure that Hartig Drug Company receives a fair operating margin to ensure its personnel and fixed costs can be paid, and to allow us to develop our staff and facilities.

22. If the law is blocked or delayed by an injunction, the harmful PBM practices described above will continue unchecked. This will further destabilize community pharmacies and reduce access to care for Iowa patients.

23. Indeed, Hartig Drug Company already had to close two of its fifteen pharmacies in Iowa in 2024. If SF 383 is not enforced, we expect to close more pharmacies in Iowa.

24. Based on my experience and analysis, I believe SF 383 is necessary to protect Iowa patients, pharmacies, and communities.

Executed on this 3rd day of July, 2025, in Dubuque, Iowa.

_____
Charles S. Hartig
Owner and CEO, Hartig Drug Company