## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA ASSOCIATION OF BUSINESS AND INDUSTRY,<br><br>IOWA BANKERS BENEFIT PLAN,<br><br>IOWA LABORERS DISTRICT COUNCIL HEALTH AND WELFARE FUND,<br><br>DES MOINES ORTHOPAEDIC SURGEONS PC,<br><br>and<br><br>IOWA SPRING MANUFACTURING & SALES COMPANY,<br><br>*Plaintiffs*<br><br>v.<br><br>DOUG OMMEN, in his official capacity as Insurance Commissioner of Iowa<br><br>*Defendant* | No. 4:25-cv-00211-SHL-WPK |

## DECLARATION OF KIRK VEENSTRA

Pursuant to 28 U.S.C. § 1746, I, Kirk Veenstra, declare under penalty of perjury under the laws of the United States of America as follows:

1.     I am greater than 18 year of age and I am competent to make this declaration.

2.     I am employed at Pella Corporation as Sr. Benefits Manager.

3.     I make this declaration in support of Plaintiffs' Reply in Support of their Motion for Temporary Restraining Order and Preliminary Injunction.  Unless otherwise indicated, all

statements in this Declaration are based on my personal knowledge and on information that I acquired in the regular course of performing my business duties.

4.      In my role as Sr. Benefits Manager, I am aware of the benefit plans Pella Corporation offers its employees and their dependents, including health coverage through a self-funded health plan ("Plan").

5.      Based on my responsibilities, I am knowledgeable about the Plan, including the Plan's design, the Plan's administration, the Plan's funding and finances, and Pella Corporation's dealings and contractual relationships with PBMs in relation to the Plan.

6.      In my role as Sr. Benefits Manager, I am familiar with the files and records maintained by Pella Corporation in relation to the Plan.

7.      As part of my job duties and for purposes of this Declaration, I am familiar with the Amended and Restated Prescription Benefit Services Agreement, effective January 1, 2025, between CaremarkPCS Health, L.L.C., and Employers Health Purchasing Corporation ("EHPC"), on behalf of EHPC's Participating Groups (the "Services Agreement"). Pella Corporation is an EHPC Participating Group.

8.      Attached hereto as **Exhibit 1** is a true and correct copy of the Services Agreement.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on this 9th day of July, 2025.

_____
Kirk Veenstra

# Exhibit  1

## AMENDED AND RESTATED
## PRESCRIPTION BENEFIT SERVICES AGREEMENT

This Amended and Restated Prescription Benefit Services Agreement, effective January 1, 2025 (the "Effective Date"), is entered into by and between CaremarkPCS Health, L.L.C., a Delaware limited liability company, ("Caremark") and Employers Health Purchasing Corporation, an Ohio corporation, located at 4771 Fulton Drive NW, Canton, Ohio 44718 ("EHPC"), on behalf of EHPC's Participating Group(s) ("Participating Group" or "Participating Groups").

## RECITALS

WHEREAS, EHPC arranges, on behalf of its Participating Groups, for Caremark to provide certain products and services, including prescription benefit management, disease management, mail and specialty pharmacy and other related services as detailed herein (collectively the "Services") for Participating Group's Plan(s);

WHEREAS, Caremark and EHPC have previously entered into a Prescription Benefit Services Agreement with an Effective Date of January 1, 2024;

WHEREAS, Caremark and EHPC now enter into this Amended and Restated Prescription Benefit Services Agreement (the "Agreement") to support the continued provision of Services for Participating Group's Plan(s), which Agreement, as of the Effective Date, supersedes and replaces the parties' Prescription Benefit Services Agreement dated January 1, 2024;

WHEREAS, Each Participating Group has established Plan(s) for its Plan Participants and desires to retain Caremark to provide Services to the Participating Group's Plan(s); and

WHEREAS, Caremark desires to provide such Services as of the Effective Date, pursuant to the terms and conditions of this Agreement.

Now, therefore, in consideration of the mutual promises set forth herein, the parties hereto agree as follows:

**1.** **Definitions.**

1.1. **"340B Claim"** means a Claim identified by the submission of "20" in any of the Submission Clarification Code fields and/or a Claim submitted by pharmacy owned by a covered entity, as defined in Section 340B(a)(4) of the Public Health Services Act, whose 340B status is coded as "38" or "39" in the NCPDP DataQ database. Covered Drugs dispensed by a Caremark operated pharmacy, including, but not limited to CVS retail pharmacies, Caremark Mail Service, and Caremark Specialty pharmacies, shall not be considered 340B Claims for financial or guarantee purposes.

1.2. **"AWP"** means the "**Average Wholesale Price**" for a standard package size of a prescription drug from the most current pricing information, loaded into Caremark's system at the time the Claim is dispensed, provided to Caremark by Medi-Span Prescription Pricing Guide (with supplements), or any other nationally available reporting service of pharmaceutical prices only to the extent Medi-Span is incomplete as selected by Caremark. Caremark uses a single data reporting source for determining all Participating Groups' AWP pricing and such pricing source will be used for invoices

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

and reimbursements. The standard package size applicable to a mail service pharmacy shall be the actual package size dispensed (i.e., NDC 11). The standard package size applicable to a retail pharmacy shall be the actual package size dispensed (i.e., NDC 11) as reported by the retail pharmacy to Caremark. Caremark does not have a repackaging facility and does not repackage drugs. If the reporting source used for determining Participating Group's AWP should not continue to support AWP or Caremark selects another nationally available reporting service of pharmaceutical pricing, the parties agree to modify the pricing hereunder to maintain the parties' respective economic position under this Agreement as of the Effective Date such that the aggregate net price of a product is the same as before such change occurred.

1.3.    "**AWP Discounted Rate**" means the percentage discount off AWP applied upon Claim adjudication to calculate the Ingredient Cost for covered drug paid Claims.

1.4     "**AWP Effective Rate**" means the actual aggregate AWP Discounted Rate achieved for each pricing category, as calculated, reported, and reconciled in accordance with the pricing conditions contained in the Exhibits in the Pricing Agreement.

1.5     "**Biosimilar Drug**" is a biological product that (a) is highly similar to a US-licensed reference biological product, notwithstanding minor differences in clinically inactive components, where there are no clinically meaningful differences between the biological product and the reference product in terms of the safety, purity, and potency of the product; and/or (b) is approved pursuant to 42 U.S.C. § 262(k).

1.6     "**Brand Drug**" means a single and/or multi-source brand Covered Product determined in accordance with the drug classification requirements set forth in Section 2.13 of this Agreement, and not determined to be a Generic Drug consistent with Section 1.14.

For purposes of measuring and reconciling financial guarantees, "Brand Drug" shall mean claims for Covered Products meeting at least one of these criteria as set forth in Medi-Span's National Drug Data file:

Brand Name code of "B" or "T" and Multisource Code of "N"
Brand Name code of "T" and Multisource Code of "M"
Brand Name code of "B" or "T" and Multisource Code "O" and a DAW code of 0, 1, 2,7, 8, or 9.

1.7     "**Claims**" means those prescription drug claims processed through Caremark's online claims adjudication system or otherwise transmitted or processed in accordance with the terms of this Agreement in connection with Participating Group's Plan.

1.8     "**Compound Drug**" means a prescription that meets the following criteria: two (2) or more solid, semi-solid, or liquid ingredients, at least one of which is a covered drug, that are weighed or measured and then prepared according to the prescriber's order and the pharmacist's art.

1.9     "**Covered Product**" means a drug or device that is covered under the formulary adopted by the Plan pursuant to Section 2.6 of this Agreement, and which requires a prescription for dispensing and/or coverage as a Plan benefit.

1.10    "**Contract Year**" means the full twelve (12) month period commencing on the Effective Date and each full consecutive twelve (12) month period thereafter that this Agreement remains in effect.

2

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

1.11    **"Cost Share"** means the amount which a Plan Participant is required to pay for a prescription in accordance with the PDD, which may be a deductible, a percentage of the prescription price, a fixed amount and/or other charge or penalty.

1.12    **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

1.13    **"Formulary"** for any standard Caremark formulary with exclusions, means Caremark's formulary, adopted by Participating Group pursuant to Section 2.6 of this Agreement, as created, maintained and amended by Caremark from time to time. The Formulary consists of (a) a ranking of Covered Products into preferred and non-preferred tiers, (b) a listing of Non-Covered Products, and (c) associated utilization review programs pursuant to Caremark's standard clinical criteria, which may include, but is not limited to, prior authorizations, step therapy and/or quantity limits for one or more Covered Products. These programs may be conducted prospectively or retrospectively. The Formulary has been approved by Caremark's P&T Committee. The pricing set forth in Exhibit A to this Agreement is conditioned upon Participating Group's adoption of the Formulary identified in Exhibit A as its Plan formulary.

   **"Formulary"** for any standard Caremark formulary with no exclusions, means Caremark's formulary, adopted by Participating Group pursuant to Section 2.6 of this Agreement, as created, maintained and amended by Caremark from time to time. The Formulary consists of (a) a ranking of Covered Products into preferred and non-preferred tiers, and (b) associated utilization review programs pursuant to Caremark's standard clinical criteria, which may include, but is not limited to, prior authorizations, step therapy and/or quantity limits for one or more Covered Products. These programs may be conducted prospectively or retrospectively. The Formulary has been approved by Caremark's P&T Committee. The pricing set forth in Exhibit A to this Agreement is conditioned upon Participating Group's adoption of the Formulary identified in Exhibit A as its Plan formulary.

1.14    **"Generic Drug"** means a single and/or multi-source generic prescription drug (non-brand) determined in accordance with the drug classification requirements set forth in Section 2.13 of this Agreement. Consistent with the requirements in Section 2.13, a generic drug, whether identified by its chemical, proprietary, or non-proprietary name, has a multisource code field in Medi-Span of "Y" (generic). A drug shall also be considered a generic drug if the Multisource Code is "O" and there is a DAW code of 3, 4, 5, or 6. Generic Drugs shall also include multi-source Brand Drugs that adjudicate at MAC, Brand Drugs that are treated as "house" generic drugs (DAW5) by the dispensing pharmacy, and Single Source Generic Drugs. "Single Source Generics" are defined as sole source or authorized generics, or select generics which may have limited availability, or competition. The previous sentence notwithstanding, in no instance shall a Biosimilar Drug be considered a Single Source Generic.

   For purposes of measuring and reconciling financial guarantees, "Generic Drug" shall mean Covered Products meeting at least one of the following criteria as set forth in Medi-Span's National Drug Data file:

   Brand Name code of "G"
   Multisource Code of "Y"
   Brand Name code of "B" and Multisource Code of "M"
   Brand Name code of "B" or "T" and Multisource Code "O" and a DAW code of 3, 4, 5, or 6.

1.15    **"Ingredient Cost"** means the amount payable by Participating Group for a covered prescription,

3

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

excluding dispensing fees, administrative fees, and applicable tax, and before Cost Share and/or coinsurance.

1.16    **"Limited Distribution Drugs"** means drugs that are generally recognized in the pharmacy benefit management industry as having limited distribution and are only available through a limited number of pharmacy providers due to preferred vendor arrangements with drug manufacturers, as determined by the manufacturer and so designated across Caremark's book of business. Caremark will provide a list of all Limited Distribution Drugs available through CVS Specialty upon execution of this Agreement and as part of each Market Check.

1.17    **"Losses"** means all claims, liabilities, demands, damages, losses, costs or expenses of any kind, including, without limitation, reasonable attorneys' fees and expenses.

1.18    **"Maximum Allowable Cost"** or **"MAC"** means the unit price that has been established by Caremark for a multi-source drug (i.e., a drug with more than two sources) included on the MAC drug list applicable to Participating Group, which list may be amended from time to time by Caremark in maintaining its generic pricing program.  Caremark shall update MAC pricing at least once every seven (7) days and shall, in a timely manner, eliminate Covered Drugs from the MAC drug list or modify MAC pricing based on changes in product availability and pricing data utilized by Caremark in establishing the MAC unit prices.  Participating Group acknowledges that the MAC list applicable to Participating Group is not the same as the MAC list published by the Centers for Medicare and Medicaid Services (formerly known as the Health Care Financing Administration, or "HCFA MAC"). A copy of such MAC drug list shall be provided to Participating Group prior to execution of this Agreement and thereafter upon Participating Group's reasonable request. The drugs on the MAC list applicable to Participating Groups are the same for all EHPC Participating Groups and for Claims processed at retail or mail.

1.19    "**New-To-Market**" means a drug or product that is newly introduced for sale by pharmaceutical manufacturers and made available for dispensing at pharmacies and not yet included on the specialty price list/exhibit. New-To-Market drugs will be added to the Specialty Fee Schedule during the annual Market Check.

1.20    "**Participating Group**" means an organization which elects to purchase prescription drug benefits through EHPC and receive Services under this Agreement. Participating Group is required to execute an Addendum as set forth in <u>Exhibit J</u>.

1.21    **"Participating Group Service Provider"** means a Participating Group's designated health benefit plan(s) stop loss carrier, data warehouse provider, wellness vendor, disease management vendor or medical claims adjudicator managing accumulators.

1.22    **"Participating Pharmacy"** shall mean a retail pharmacy that participates in the national retail network established by Caremark.

1.23    **"Plan"** means the health benefit plan(s) sponsored by Participating Group of which the prescription drug benefit is a part.

1.24    **"Plan Administrator"** means the Plan sponsor or committee designated by the Plan sponsor with respect to the Plan, as contemplated by Section 3(16)(A) of ERISA or other applicable statute.

1.25    **"PDD"** or **"Plan Design Document"** means various documents or forms, including

4

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

implementation forms, clinical management forms, clinical utilization or other documents, prepared by Caremark and approved by Participating Group, as may be modified by Participating Group from time to time in accordance with Section 6.3 of this Agreement, which detailthe relevant parts of the Plan for prescription drug benefits and clinical programs adopted by Participating Group and which are used by Caremark to provide Services under this Agreement.

1.26    **"Plan Participant"** means each individual who Participating Group identifies in the eligibility file to be eligible for prescription drug benefits under its Plan.

1.27    **"Prescriber"** means a health care practitioner licensed or authorized by law to issue an order for a prescription drug.

1.28    **"Pricing Agreement"** means that separate agreement entered into by and between Caremark and EHPC with an effective date of January 1, 2025, that contains the pricing and related terms and conditions for the Services provided to Participating Group under this Agreement.

1.29    **"Protected Health Information"** or **"PHI"** shall have the meaning given to such term at 45 C.F.R. 160.103, but is limited to that information created or received by Caremark in its capacity as a pharmacy benefit manager (and not as a mail service pharmacy or other health care provider) on behalf of the Plan.

1.30    **"Rebates"** means the formulary rebates, which will include base, market share, and price protection rebates, received by Caremark or its affiliates, whether directly or indirectly, including in its capacity as a group purchasing organization for the Plan from various pharmaceutical companies, that are attributable to the utilization of prescription drugs by Plan Participants.

1.31    **"Secondary Payer Claim"** shall mean a covered drug Claim for which Participating Group does not have primary payment responsibility.

1.32    **"Specialty Drugs"** means a biologic or traditional drug, including "biosimilars" or "follow-on biologics," which requires additional management for a complex, chronic, or life-threatening condition that has two (2) or more of the following attributes:

      a.  treats a condition, which requires intensive clinical monitoring of the patient;
      b.  requires special patient training or patient compliance assistance;
      c.  requires special handling, such as storage or preparation;
      d.  requires special administration by the patient or the healthcare professional; or
      e.  has a limited distribution network.

Caremark shall provide an exclusive list of all Specialty Drugs, attached as <u>Exhibit C to the Pricing Agreement</u> (which Caremark may amend from time to time).

1.33    **"Usual and Customary"** or **"U&C"** means the lowest price a Participating Pharmacy would charge to a particular customer if such customer were paying cash for filling an identical prescription on that particular day at that particular location, as submitted by the Participating Pharmacy.  This price must include any applicable dispensing fee and must include any applicable discounts offered to attract customers.

1.34    **"WAC"** means **"Wholesale Acquisition Cost"** for a prescription drug from the most current

5

pricing information provided to Caremark by Medi-Span, or such other nationally available reporting service of pharmaceutical prices as selected by Caremark. The standard package size applicable to a mail service pharmacy shall be the actual package size dispensed. The actual package size for retail pharmacy prescriptions will be based on the actual NDC-11 from the product dispensed as submitted by the Participating Pharmacy. If WAC pricing is not available for a particular prescription drug, then "WAC" with respect to such prescription drug shall be deemed to mean AWP for such prescription drug times 0.83333 for such prescription drug.

2.  **Services.** The terms of this Agreement shall be supplemented by the terms of the Pricing Agreement, which terms are incorporated herein by this reference. Caremark shall provide the Services hereunder in accordance with the PDD and the terms of this Agreement, the Pricing Agreement, and the terms of the Participating Group Addendum. Caremark may make changes to the Services from time to time and may use Claims information to improve or recommend additional Services to Participating Group, provided such changes do not materially alter any of the provisions of this Agreement. This Agreement and the Pricing Agreement may be amended from time-to-time, including pursuant to Section 13.15. This Agreement, together with the Pricing Agreement and the Participating Group Addendum shall collectively serve as the complete "Agreement" (as referenced herein), detailing the parties' respective rights and obligations.

2.1  Mail Service Pharmacy. Caremark's mail service pharmacies shall provide the following products and Services:

   (a) Dispense new or refill prescriptions upon receipt from a Plan Participant of (i) a prescription and a completed order or refill order form, and (ii) any applicable Cost Share;
   (b) Fill prescriptions subject to the professional judgment of the dispensing pharmacist, good pharmacy practices in accordance with local community standards, and product labeling and guidelines;
   (c) Provide certain utilization management and clinical Services as described in this Agreement; and
   (d) Ship all drugs to Plan Participants via U.S. Postal Service or other appropriate carriers to the address provided by Participating Group and/or the Plan Participant.

2.2  Retail Pharmacy Network. Caremark shall create and maintain a national network of Participating Pharmacies, which are independent contractors, and Participating Group selects Caremark's national network of Participating Pharmacies as its retail network, to provide prescription drugs and related products and Services with respect to the Plan. Caremark shall:

   (a) Require Participating Pharmacies to service Plan Participants during their normal business hours, in all applicable geographic areas;
   (b) Provide information to Participating Pharmacies concerning drug interaction, safety edits, and generic substitution and therapeutic intervention programs;
   (c) Direct Participating Pharmacies to collect all applicable Cost Shares or the lesser of co-payment or U&C from Plan Participants;
   (d) Provide and maintain toll-free telephone access to Participating Pharmacies to address claim submission and clinical drug utilization review issues;
   (e) Maintain a database of Participating Pharmacies so that Plan Participants and Participating Group may locate a Participating Pharmacy using Caremark's website;
   (f) Maintain a claims adjudication system to process payments of paper and electronic claims in accordance with the PDD;
   (g) Be solely responsible for payment to the Participating Pharmacies of the charge for

6

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

prescriptions dispensed (exclusive of Cost Shares), provided that the foregoing shall not release Participating Group from any payment obligation to Caremark under this Agreement; and

(h) As required by applicable federal, state or local law, Caremark shall not limit a Participating Pharmacy's ability to disclose to a Plan Participant whether their Cost Share exceeds the retail price for a Covered Drug, or the availability of a more affordable alternative drug.

2.3   <u>Participating Pharmacy Audit</u>.

(a) Caremark will conduct weekly on-site and off-site audits of Caremark selected Participating Pharmacies to verify the Participating Pharmacy's compliance with its retail pharmacy network agreement with Caremark ("Periodic Audits"). Caremark will have the sole right to audit Participating Pharmacies.

(b) To the extent Caremark determines, as the result of its Periodic Audits, that amounts have not been billed in accordance with Caremark's retail pharmacy network agreement ("Audit Discrepancies"), Caremark will make reasonable attempts to reconcile such Audit Discrepancies. In the event the Audit Discrepancy has a financial impact to Participating Group, Caremark will reconcile Participating Group's invoice based upon recovered Audit Discrepancies. Caremark will notify Participating Group of any Audit Discrepancy that has impacted Participating Group's financial obligation to Caremark by greater than $1,000 that Caremark determines to be reasonably uncollectible by Caremark. Caremark will not be required to institute litigation to collect any Audit Discrepancies. Caremark's obligation to conduct Periodic Audits and to attempt collection and reconciliation, as described, will be Caremark's sole obligation with respect to remedying Audit Discrepancies.

2.4   <u>Implementation</u>.

(a) In consultation with Participating Group, Caremark shall develop a mutually agreeable implementation project plan.

(b) Prior to the Effective Date, Participating Group or Participating Group's designee shall provide: (i) the initial eligibility test data and the initial full eligibility data to Caremark; (ii) the governing Plan documents, a summary plan description, and an executed PDD to Caremark; and (iii) a refill file (if available) in a format acceptable to Caremark. Any delays by Participating Group or its designee in providing this information may delay the implementation of Services by Caremark.

(c) Subject to timely receipt of a refill file, Caremark will begin filling prescriptions through its mail service pharmacies as of the Effective Date.

(d) Caremark will provide Participating Group with implementation kits for distribution to Plan Participants at no charge for new Participating Groups. The implementation kits will include the following materials: (i) introductory cover letter; (ii) standard identification cards for use within the retail network which shall include Caremark's name and toll-free number; (iii) a standard Participating Group benefit brochure; (iv) mail service order form; (v) paper claim reimbursement form, if applicable; and (vi) Formulary brochure, if applicable.  If Participating Group chooses to have Caremark prepare envelopes for mailing kits to Plan Participants, Participating Group must provide at least one data tape containing Plan Participant address information in a mutually acceptable format. Caremark shall bulk ship initial implementation kits to up to five (5) locations at no charge to Participating Group. Postage for bulk shipments to additional locations or distribution of implementation kits directly to Plan Participants shall be at Participating Group's expense.

(e) Any reprints or customization of any communication materials requested by Participating Group shall be at Participating Group's expense. Inclusion of a Participating Group's logo or

7

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

corporate identity is not deemed a customization requiring such expense.

2.5    <u>Eligibility Data</u>.

    (a)  Participating Group, or Participating Group's designee, at Participating Group's sole expense, will provide Caremark all information concerning its Plan and Plan Participants needed to perform the Services, including any updates thereto ("Eligibility Information"). This Eligibility Information must be complete and accurate, provided timely, and in a format and media acceptable by Caremark.

    (b)  Caremark will maintain the Eligibility Information provided by Participating Group.

    (c)  Caremark, Plan Participants' physicians and the Participating Pharmacies are entitled to rely on the accuracy and completeness of the Eligibility Information and updates thereto.

    (d)  Caremark is not liable for fraudulent Claims submitted by Plan Participants or by unauthorized persons using a Plan Participant's identification card or number.

2.6    **Formulary Management for any standard Caremark formulary with exclusions.**

    (a)  <u>Formulary Election</u>. Participating Group hereby adopts, as part of the Plan design and as Participating Group's formulary, the Caremark Formulary, as in effect from time to time. The specific formulary election made by Participating Group is identified in the PDD.

    (b)  <u>Formulary Additions/Changes</u>. Changes made by Caremark to the Formulary may be based upon, among other things, the introduction of new products, customer safety, clinical appropriateness, efficacy, cost effectiveness, changes in availability of products, new clinical information and other considerations, changes in the pharmaceutical industry or its practices, introduction of new Generic Drugs, and/or new legislation and regulations. Caremark shall provide quarterly notices to Participating Group regarding any additions or movement within the tiers of the Formulary or changes in utilization management programs, and shall use reasonable efforts to provide such notice at least sixty (60) days prior to such change. These changes may include, but are not limited to, movement of a drug from a preferred to a non-preferred tier, or vice versa, or the addition of or removal of utilization management edits.  The parties acknowledge that Caremark may elect to add to the Formulary new drugs introduced to the market, or line-extensions of certain currently available drugs, only after Caremark's P&T Committee has evaluated such drug and recommends such drug be added to the Formulary.

    (c)  <u>Non-Covered Products</u>. With regard to any drug(s) Caremark may identify as a Non-Covered Product and/or remove from the Formulary, Caremark may make such decisions based upon, among other things, new products, customer safety, clinical appropriateness, efficacy, cost effectiveness, changes in availability of products, new clinical information and other considerations, changes in the pharmaceutical industry, introduction of new Generic Drugs, excessive inflation in the cost of the product (i.e., hyperinflation), and/or new legislation and regulations. Participating Group acknowledges and agrees that Caremark (i) may remove drugs from the Formulary and/or identify drugs as Non-Covered Products from time to time on a quarterly basis; and (ii) will provide Participating Group at least sixty (60) days' prior notification of any such removals from the Formulary. In the event of a removal of a drug from the Formulary, Caremark shall provide targeted communications to Plan Participants prior to the date of removal. In the event safety concerns or regulatory action require Caremark to remove a Covered Product from the Formulary without prior notice, Caremark shall notify Participating Group of the removal within five (5) business days.

    (d)  <u>Prescriber Authority</u>. Participating Group acknowledges the Prescriber shall have final authority over the drug prescribed to a Plan Participant, regardless of benefit coverage.

**Formulary Management for any standard Caremark formulary with no exclusions.**

8

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

(e) <u>Formulary Election</u>. Participating Group hereby adopts, as part of the Plan design and as Participating Group's formulary, the Caremark Formulary, as in effect from time to time. The specific formulary election made by Participating Group is identified in <u>the PDD</u>.

(f) <u>Formulary Additions/Changes</u>. Changes made by Caremark to the Formulary may be based upon, among other things, the introduction of new products, customer safety, clinical appropriateness, efficacy, cost effectiveness, changes in availability of products, new clinical information and other considerations, changes in the pharmaceutical industry or its practices, introduction of new Generic Drugs, and/or new legislation and regulations. Caremark shall provide quarterly notices to Participating Group regarding any additions or movement within the tiers of the Formulary or changes in utilization management programs, and shall use reasonable efforts to provide such notice at least sixty (60) days prior to such change. These changes may include, but are not limited to, movement of a drug from a preferred to a non-preferred tier, or vice versa, or the addition of or removal of utilization management edits. The parties acknowledge that Caremark may elect to add to the Formulary new drugs introduced to the market, or line-extensions of certain currently available drugs, only after Caremark's P&T Committee has evaluated such drug and recommends such drug be added to the Formulary. In the event safety concerns or regulatory action require Caremark to remove a Covered Product from the Formulary without prior notice, Caremark shall notify Participating Group of the removal within five (5) business days.

(g) <u>Specialty Drugs that are Non-Covered Products</u>. With regard to any Specialty Drug(s) Caremark may identify as a Non-Covered Product and/or remove from the Formulary, Caremark may make such decisions based upon, among other things, new products, customer safety, clinical appropriateness, efficacy, cost effectiveness, changes in availability of products, new clinical information and other considerations, changes in the pharmaceutical industry, introduction of new Generic Drugs, excessive inflation in the cost of the product (i.e., hyperinflation), and/or new legislation and regulations. Participating Group acknowledges and agrees that Caremark (i) may remove Specialty Drugs from the Formulary and/or identify Specialty Drugs as Non-Covered Products from time to time on a quarterly basis; and (ii) will provide Participating Group at least sixty (60) days' prior notification of any such removals from the Formulary. In the event of a removal of a Specialty Drug from the Formulary, Caremark shall provide targeted communications to Plan Participants prior to the date of removal. In the event safety concerns or regulatory action require Caremark to remove a Covered Product from the Formulary without prior notice, Caremark shall notify Participating Group of the removal within five (5) business days.

(h) <u>Prescriber Authority</u>. Participating Group acknowledges the Prescriber shall have final authority over the drug prescribed to a Plan Participant, regardless of benefit coverage.

2.7    <u>Generic Substitution Program</u>.

(a) Generic substitution shall be conducted through Caremark's mail service pharmacies and Participating Pharmacies under a program which substitutes brand name drugs with generic equivalents, where available and clinically appropriate, unless (i) the Prescriber issues the prescription with a "dispense as written" notation, or (ii) the Plan Participant has notified Caremark or the Participating Pharmacy to dispense the brand name drug only.

2.8    <u>Drug Utilization Review ("DUR") Services/Clinical Programs</u>.

(a) Caremark will provide its automated concurrent DUR Services including but not limited to: (i) drug to drug interactions; (ii) therapeutic duplications; (iii) known drug sensitivity; (iv) over-utilization; (v) insufficient or excessive drug usage; and (vi) early or late refills.

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

(b) Prescribers or Pharmacists are individually responsible for acting or not acting upon information generated and transmitted through the DUR Services, and for performing services in each jurisdiction consistent with the scope of their licenses. The DUR Services are necessarily limited by the amount, type and accuracy of Plan Participant information made available to Caremark. Caremark will update DUR databases on a reasonable basis to reflect changes in available standards for pharmaceutical prescribing.

(c) Caremark shall provide the clinical programs identified in the PDD and elected by Participating Group for the fees set forth in Exhibit A of this Agreement.

(d) In accordance with applicable law, including HIPAA, Participating Group authorizes Caremark to perform the following service programs (collectively referred to herein as the "Additional Service Programs"): (i) local market clinical consulting; (ii) national clinical consulting; and (iii) compliance and persistency. Participating Group and Caremark acknowledge and agree that: (i) although the Additional Service Programs may be of benefit to Participating Group and its Plan Participants, Caremark will not charge Participating Group for the performance of such Additional Service Programs; (ii) the performance of such Additional Service Programs may utilize PHI; (iii) the performance of such Additional Service Programs is at the discretion of Caremark and such performance is not an obligation of Caremark; and (iv) Caremark may contract with, and pursue and retain reimbursement from, pharmaceutical companies for the funding and provision of such Additional Service Programs.

2.9     Plan Participant Services.  Caremark shall operate U.S.-based toll-free customer service lines twenty-four (24) hours a day, seven (7) days a week for the purpose of responding to inquiries from Plan Participants. Caremark shall also provide telephonic emergency pharmacist services twenty-four (24) hours a day, seven (7) days a week. Participating Group authorizes Caremark to communicate with Plan Participants as necessary and appropriate to provide the Services under this Agreement.

2.10    Communication Materials. In addition to materials provided under Section 2.4(d), Caremark shall produce and provide the following communication materials:

(a) Caremark will periodically distribute Formulary brochures directly to Prescribers and Plan Participants.

(b) Caremark will provide an Internet website where Plan Participants can access information with respect to Plan specific drug information, the Formulary, Cost Shares, Participating Pharmacy listings and prescriptions.

(d) Caremark, in its discretion, may provide communications to Plan Participants and/or Participating Group regarding drug recalls or withdrawals. Participating Group acknowledges that it shall look solely to pharmaceutical companies for any refunds or reimbursements.

2.11    Reports, Claims Data and SSAE. Caremark shall provide reports and detailed Claims data to Participating Group as follows:

(a) Caremark shall prepare and provide Participating Group with Caremark's standard management and utilization reports.

(b) With Participating Group's consent and at Participating Group's expense, Caremark may prepare and provide non-standard management and utilization reports and ad hoc reports within an agreed-upon time and format, at Caremark's prevailing rate.  Such expense shall not include reports generated by Caremark's account management staff utilizing Rx Navigator.

(c) With the issuance of each invoice, Caremark shall provide Participating Group up to five (5) sets of complete Claims data in Caremark's standard format.  At Participating Group's expense, request and direction, Caremark may provide detailed electronic files or Claims detail reports

10

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

to Participating Group's designated third-party service provider subject to such third-party's execution of Caremark's form confidentiality agreement. Participating Group may release or provide Claims data including pricing and other confidential information, to a mutually acceptable third-party provided such third-party signs a confidentiality agreement with Caremark prior to such disclosure.

(d) If requested, Caremark shall provide Participating Group with a copy of its most recent SSAE 18 (SOC 1) report, or a copy of the successor to such report, in accordance with the terms and conditions of such report.

2.12 **RxSavingsPlus Drug Discount Program**. Caremark shall provide the RxSavingsPlus® drug discount program in accordance with the terms and conditions described in Exhibit K.

2.13 <u>Drug Classification</u>. Caremark shall use the indicators of Medi-Span Master Drug Database (Medi-Span), and their then current associated files, as updated regularly by Medi-Span, or another nationally available reporting service of pharmaceutical drug information as used by Caremark across its book of business only to the extent Medi-Span is incomplete or unavailable in determining the classification of drugs (e.g. legend vs. over the counter, brand vs. generic, single-source vs. multi-source) for purposes of this Agreement.

2.14 <u>Specialty Pharmacy</u>. Subject to <u>Section 6.5 of this Agreement</u>, Caremark shall be the exclusive provider of Specialty Drugs to Plan Participants and shall provide the products and services, listed in <u>Exhibit C of the Pricing Agreement</u> (the "Specialty Drug Exhibit"), as follows:

(a) Dispense new or refill prescription orders for Specialty Drugs upon receipt from a Plan Participant of (i) a prescription and a completed order or refill order form, and (ii) the applicable Cost Share;

(b) Fill prescriptions for Specialty Drugs subject to the professional judgment of the dispensing pharmacist, good pharmacy practices in accordance with local community standards, and product labeling and guidelines;

(c) Ship Specialty Drugs to Plan Participants via U. S. Postal Service or other appropriate carriers to the address provided by Participating Group and/or the Plan Participant;

(d) Bill major medical benefits through the use of a CMS 1500 form when required subject to pricing terms as outlined in the Pricing Agreement incorporated herein; and

(e) Provide routine supplies required for the administration of the Specialty Drug (such as needles, syringes, alcohol swabs, etc.) to the extent deemed appropriate by Caremark.

2.15 <u>Government Agency Submitted Claims</u>. Participating Group acknowledges that government agencies, or their agents may seek eligibility or similar data from Caremark regarding Plan Participants. Additionally, government agencies, or their agents, may submit to Caremark claims for reimbursement for prescription drug benefits provided by such government agencies, or their agents, to Plan Participants ("Government Claims"). Participating Group authorizes Caremark to provide such data as requested by government agencies or their agents and further authorizes Caremark to process such Government Claims. Participating Group acknowledges that Caremark may advance payment for Government Claims on behalf of Participating Group. Participating Group will reimburse Caremark, in accordance with Participating Group's payment obligations under this Agreement, for all amounts advanced by Caremark for payment of GovernmentClaims. Participating Group acknowledges that Government Claims submitted by or on behalf ofa state Medicaid agency shall be paid if submitted within three (3) years from the original date of fill unless a longer period is required by applicable law. In addition, Government Claims submittedby or on

11

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

behalf of a state Medicaid agency may not be denied on the basis of the format of the Government Claim or failure to present proper documentation at the point-of-sale. Participating Group shall also reimburse Caremark for any adjustments or reconciliations to previously processed Government Claims that may be payable to government agencies in accordance with applicable laws and regulations. The administrative fee for processing Government Claims will be invoiced at the paper submitted Claim rate stated in the applicable Exhibit of the Pricing Agreement or as otherwise agreed in writing by Caremark and Participating Group. Caremark reserves the right (i) to terminate these services upon ninety (90) days' prior notice to Participating Group, or (ii) to delegate these services to a third-party claims processor.

2.16    Debit Card Program. Participating Group hereby authorizes and directs Caremark to disclose data, upon the request of Participating Group, to a third-party vendor for the purposes of administering payments under a health benefit reimbursement account program subject to such third-party's execution of Caremark's form confidentiality agreement. Caremark may provide such data, as requested by the third-party for this purpose, until such time as Participating Group advises it otherwise in writing.

2.17    Performance Guarantees. Caremark agrees to perform in accordance with the performance standards described in Exhibit D of this Agreement. Unless otherwise stated, all performance standards shall be measured across Caremark's book of business based on Caremark's standard calculation methodology and exclude Specialty Drugs and related services. In the event Caremark fails to meet the proposed standards, the penalties described in Exhibit D of this Agreement shall be the sole and exclusive remedy available to Participating Group for such failure.

2.18    Appeals. Caremark shall conduct all appeals and grievances in accordance with the terms and conditions described in Exhibit E.

2.19    RxNavigator®. Caremark agrees to provide access to RxNavigator for the rate specified in Exhibit A of this Agreement.

2.20    RESERVED

2.21    Maintenance Choice Program.

(a)    For Participating Group Plans Covered by ERISA. If elected by Participating Group(s) that are governed by ERISA, Participating Group acknowledges and agrees that Participating Group Plan(s) will receive Caremark's Maintenance Choice Program in accordance with the terms and conditions described in Exhibit F of this Agreement. Participating Group acknowledges and agrees that Participating Group's Plan(s) participating in the Maintenance Choice program may not participate in the Caremark Retail-90 Network program.

(b)    For Participating Group Plans NOT Covered by ERISA. If elected by Participating Group(s) that are NOT governed by ERISA, Participating Group acknowledges and agrees that eligible Participating Group Plan(s) will receive Caremark's Maintenance Choice Program in accordance with the terms and conditions described in Exhibit F of this Agreement. Participating Group acknowledges and agrees that Participating Group's Plan(s) participating in the Maintenance Choice program may not participate in the Caremark Retail-90 Network program.

2.22    Medicare Part B Real Time COB Services. Caremark shall provide the Medicare Retiree Drug Subsidy services to Participating Groups in accordance with the terms and conditions described in

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

Exhibit G of this Agreement.

2.23    Medicare Retiree Drug Subsidy. If elected by Participating Group, Caremark shall provide the Medicare Retiree Drug Subsidy services in accordance with the terms and conditions described in Exhibit H of this Agreement.

2.24    Vaccine Services. Caremark shall provide vaccine administration services in accordance with the terms and conditions described in Exhibit I of this Agreement.

2.25    **Point of Sale Estimated Rebate Program.** For the Participating Group Plans or groups designated by Participating Group in writing, Caremark shall provide its Point of Sale Estimated Rebate Program ("POS Rebate Program") as set forth below. For Plans or groups designated by Participating Group, a portion (as specified by Participating Group) of the estimated Rebate Caremark anticipates collecting for a Claim (the "POS Estimated Rebate") shall be applied by Caremark in adjudicating the Claim for purposes of calculating the applicable Plan Participant Cost Share amount. The POS Estimated Rebate shall be applied to the ingredient cost of the adjudicated Claim after applying the appropriate network discount and dispensing fee, and before calculating the applicable Cost Share amount. Participating Group acknowledges that the application of a POS Estimated Rebate may reduce the otherwise applicable Plan Participant Cost Share, resulting in a larger portion of the adjudicated Claim cost being invoiced to Participating Group. Caremark shall use good faith efforts to project the anticipated actual Rebate collection and shall review the POS Estimated Rebate at least quarterly and make adjustments, if necessary, based upon relevant factors such as the likelihood of actual Rebate collection from pharmaceutical manufacturers. Caremark may adjust the POS Estimated Rebate in a manner designed to account for the impact of the following events: (i) a generic version of a Brand Drug product is unexpectedly introduced in the market; (ii) a Brand Drug product is recalled or withdrawn from the market; (iii) actual collection experience varies significantly from that expected; or (iv) prior POS Estimated Rebate application varies significantly from actual Rebates earned. Caremark shall have no responsibility or liability to either Participating Group or Plan Participants for variance between POS Estimated Rebates and actual Rebate amounts collected.

In addition to Caremark's standard Participating Group Rebate reporting package, Caremark shall provide Participating Group a quarterly POS Estimated Rebate Summary Report comparing the aggregate totals of Participating Group's share of Rebates invoiced by Caremark, the POS Estimated Rebates applied to Claims pursuant to the POS Rebate Program, and the Plan Participant Cost Share reduction derived from the application of the POS Estimated Rebates. The POS Estimated Rebate Summary Report shall be in the aggregate and not at the drug-specific level.

Caremark shall apply POS Estimated Rebates on Claims for all rebated Covered Drugs or, as directed by Participating Group, only those rebated Covered Drugs identified on specific lists prepared by Caremark and elected by Participating Group in writing. Participating Group shall specify in writing the portion of the estimated Rebates that Caremark anticipates collecting for Claims that shall be applied as the POS Estimated Rebates. Participating Group is responsible for communicating to Plan Participants, as determined by Participating Group, the amount of Participating Group's estimated actual Rebates being applied to Claims during adjudication for purposes of calculating Plan Participant Cost Share.

If Participating Group desires only specified groups or benefit Plans to participate in the POS Rebate Program, Participating Group shall provide to Caremark a POS Rebate Indicator on the group file feeds provided to Caremark, or, alternatively, by Participating Group benefit Plan, as

13

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

elected by Participating Group during enrollment, which will trigger the application of POS Estimated Rebates for the designated group(s) or Plan(s). Participating Group is responsible for the accuracy of the group file POS Rebate Indicator, as applicable, and associated effective dates. Participating Group's election to provide a group file POS Rebate Indicator, as opposed to designating a Participating Group benefit Plan for participation in the POS Rebate Program, or vice versa, may only be changed upon at least ninety (90) days' prior written notice to Caremark.

Participating Group acknowledges that the Caremark Claims Experience Transmission (CET) files shall report the full Covered Drug ingredient cost, without adjustment for any POS Estimated Rebate applied. Participating Group further acknowledges that, for a client utilizing a custom CET format, this CET file reporting may require customized programming, which shall be billed to Participating Group at Caremark's standard rate.

2.26    **Transform Diabetes Care Program**. If elected by Participating Group, Caremark shall provide the Transform Diabetes CareProgram in accordance with the terms and conditions described in <u>Exhibit L</u>.

2.27    **Point Solutions Management**. If elected by Participating Group, Caremark shall provide point solutions management services inaccordance with the terms and conditions described in <u>Exhibit M</u>.

2.28    **Caremark Cost Saver.** Unless Participating Group opts out, Caremark shall provide, as part of the Services, its Caremark Cost Saver program to Participating Group's eligible Plan(s) in accordance with the terms and conditions described in <u>Exhibit N</u>.

3.    <u>**Maintenance of Records.**</u> Caremark shall maintain records with respect to the processing, payment, and denial of Claims by Caremark and shall retain such records for a period of ten (10) years after the transaction occurred or as otherwise required by applicable law.

4.    <u>**Use of Data**</u>  Caremark may use, disclose, reproduce, adapt or sell to third parties, for their business purposes, information obtained in connection with this Agreement, including Claims, as well as eligibility information, which is not identifiable on a Participating Group or Plan Participant basis. Caremark shall maintain the confidentiality of this information as required by applicable law, and may not use the information in any way prohibited by applicable law.

5.    <u>**Audit Rights.**</u>

5.1    <u>Claims Audits</u>. Participating Group, or a mutually acceptable independent third-party retained by Participating Group, may conduct an annual Claims audit of Caremark data that directly relates to Claims billings for the prior Contract Year. The scope of the Claims audit shall be in accordance with the procedures set forth in <u>Exhibit C of this Agreement</u>. Participating Group acknowledges that it shall not be entitled to audit agreements with vendors, pharmaceutical companies, Participating Pharmacies or other providers of products or services to Caremark.

5.2    <u>Rebate Audits</u>.

(a) Participating Group, through a mutually agreeable independent third-party retained by Participating Group, may conduct an annual Rebate audit for the prior Contract Year. Such audit shall be limited to a review of up to ten (10) pharmaceutical company contracts directly related to Participating Group's Rebates, as selected by Participating Group. Such review of

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

pharmaceutical company contracts may include Formulary and Rebate provisions to the extent permitted by such contracts and shall be limited to information necessary for validating the accuracy of the Rebate amounts distributed to Participating Group by Caremark. The scope of the Rebate audit shall be in accordance with the procedures set forth in <u>Exhibit C of this Agreement</u>.

(b) Any mutually agreed upon third-party auditor engaged by EHPC or Participating Group shall execute Caremark's form confidentiality agreement prior to conducting a Rebate audit ensuring that allinformation gathered during such audit and all details and terms of any pharmaceutical company contract reviewed will be treated as confidential and will not be revealed in any manner or form by or to any third-party, including EHPC and Participating Group.

5.3    <u>Audit of Retail Network Agreements</u>.  Participating Group may request to have audited up to five (5) retail pharmacy provider contracts once in each twelve (12) month period. Audit requests involving a review of retail pharmacy provider contracts must be performed by an independent accounting firm, agreeable to both parties. Such firm will sign a Caremark confidentiality agreement ensuring that all details and terms of pharmacy provider contracts with Caremark (except for the total aggregate amount due to Participating Group) will be treated as confidential to Caremark and will not be revealed in any manner or form by or to any person or entity. Such records shall be limited to information necessary for validating the accuracy of the Claims billing. The scope of the audit shall be in accordance with the procedures set forth in <u>Exhibit C of this Agreement</u>.

5.4    <u>Caremark Audit</u>. Upon reasonable notice, Caremark may inspect and audit, or cause to be inspected and audited, the books and records of Participating Group directly relating to the existence and number of Plan Participants. For purposes of audit verification, Participating Groupshall maintain eligibility records for Plan Participants for a period of twelve (12) months from thedate Caremark receives eligibility information from Participating Group.

5.5    <u>Required Payments</u>. Any adjustments, payments and/or reimbursements determined to be necessary as a result of any examination or audit shall be paid by the appropriate party within thirty (30) days of execution of an appropriate release document covering the audit period.

**6.    <u>Obligations of Participating Group and/or EHPC</u>.**

6.1    <u>Plan Participant Authorizations</u>. Participating Group represents and warrants that it has obtained from Plan Participants all consents and/or authorizations required, if any, for Caremark to perform the Services and for the use and disclosure of information including PHI, as permitted under this Agreement.

6.2    <u>Control of Plan</u>. Participating Group and/or Plan Administrator retains the sole and absolute authority to design, amend, terminate or modify, in whole or in part, all or any portion of the Plan, including the sole authority to control and administer the Plan and any assets of the Plan. Participating Group and/or Plan Administrator will also have complete discretionary, binding and final authority to construe the terms of the Plan, to interpret ambiguous Plan language, to make factual determinations regarding the payment of Claims or provision of benefits, to review denied Claims and to resolve complaints by Plan Participants.  Nothing in this Agreement shall be deemed to confer upon Caremark the status of plan administrator or fiduciary as defined in ERISA, or applicable state law, or any responsibility for the terms or validity of the Plan.

6.3    <u>PDD</u>.

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

(a) Participating Group represents and warrants that the PDD, as may be amended from time to time, accurately reflects the applicable terms of the Plan for purposes of this Agreement.

(b) Participating Group shall provide Caremark with ninety (90) days' prior written notice of any proposed changes to the PDD, which changes shall be consistent with the scope and nature of the Services to be performed by Caremark under this Agreement. EHPC and Participating Group agree that they are responsible for Losses resulting from any failure to implement Plan design changes which are not communicated in writing to Caremark. In addition, Participating Group shall notify Plan Participants of any Plan design changes prior to the effective date of any such changes.

6.4    <u>Participating Group's Obligation</u>. Caremark shall not be held responsible for any performance standard or obligation if Participating Group, or Participating Group's designee, fails to provide Caremark with accurate, timely and complete information as needed to meet such performance standard or obligation.

6.5    <u>Exclusivity</u>. Unless otherwise stated in this Agreement, Participating Group shall make Caremark the exclusive provider of the Services described in this Agreement to the Plan and its Plan Participants. Nothing in this Section shall be construed to prohibit a Participating Group from: (a) offering prescription drug coverage under a third-party managed care, HMO, major medical plan or similar benefit plan provided that such third-party managed care, HMO, major medical plan or similar benefit plan is in existence as of the effective date of each Participating Group's Addendum; or (b) continuing with another provider for prescription drug coverage, provided however that (i) Participating Group purchased another company or entity during the Term that provided prescription drug benefits through such provider; (ii) Participating Group purchased another entity prior to the Term that provided prescription drug benefits through such provider and (iii) such provider does not provide any service to Covered Plan Participants during the Term.

6.6    <u>EHPC's/Participating Group's Obligation</u>. Caremark shall not be held responsible for any performance standard or obligation if EHPC, Participating Group or such parties' designee fails to provide Caremark with information needed to meet such performance standard or obligation.

6.7    <u>Participating Group Addendum</u>. In order for Caremark to timely implement Services, whether Plan elections or pricing terms, EHPC shall be responsible for ensuring that each Participating Group, at least sixty (60) days prior to the date on which Caremark begins providing Services to such Participating Group (including any change in Services or terms), signs an Addendum hereto in the form attached as <u>Exhibit J to this Agreement</u>**.** Such Participating Group Addendum shall constitute an agreement between Caremark and the applicable Participating Group (e.g. "Participating Group Agreement") wherein Participating Group adopts the terms and conditions contained in this Agreement, including the applicable terms of the Pricing Agreement, except to the extent specifically identified/modified in said Participating Group Addendum

**7.    <u>Invoicing and Payment</u>.**

7.1    <u>Invoicing</u>. Caremark shall invoice Participating Group in accordance with the pricing terms set forth in the <u>Pricing Agreement</u> per the following schedule:

(a) <u>Claims</u>. Caremark shall issue Participating Group an invoice for prescription Claims four (4) times monthly.

(b) <u>Administrative Fees</u>. Caremark shall issue Participating Group an invoice for administrative

16

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

fees on a monthly basis.

7.2 <u>Payment</u>. Participating Group shall pay Caremark for the Services provided in accordance with the terms set forth in <u>Exhibit A of this Agreement</u> and the applicable <u>Exhibit(s) of the Pricing Agreement</u>. Participating Group shall pay Caremark all invoiced amounts for Claims and administrative fees within five (5) days after Participating Group receives an invoice from Caremark. Participating Group shall have no right to offset disputed amounts or amounts due or allegedly due from Caremark from such payment except for those amounts that are disputed in good faith, provided Caremark is notified of the dispute and Participating Group has provided a detailed description justifying the dispute, or as otherwise approved in writing by Caremark. Any sales, use or other tax or assessment, including any surcharge or similar fee imposed under any applicable law on any health care provider, Plan Participant, Service, supply or product provided under this Agreement, will be the sole responsibility of Participating Group and shall be added to the invoice.

7.3 <u>Late Payments</u>. Except as related to political subdivisions, payments not received in accordance with <u>Section 7.2</u> shall bear a service fee of eight percent (8%) per annum (or, if less, the highest rate allowed by law).

7.4 <u>Financial Responsibility</u>. If at any time during this Agreement Caremark reasonably determines that Participating Group may have difficulty meeting its financial commitments under this Agreement, then Caremark may request information, reasonable assurances or both from Participating Group as to its financial responsibility (including a deposit in an amount equal to the average billing amount based upon the average of the last three (3) months of billing history). If Caremark requires Participating Group to provide a deposit, Participating Group will provide such deposit within ten (10) days of Caremark's request. If Participating Group gives Caremark a deposit, Caremark may apply the deposit to past due balances and shall return the remaining deposit, if any, after the termination of this Agreement and the payment of all amounts payable to Caremark hereunder.

7.5 <u>Suspension of Performance</u>. In the event Participating Group: (i) is fifteen (15) days in arrears on its payment obligations under this Agreement or does not provide a deposit pursuant to <u>Section 7.4</u>; (ii) makes an assignment for the benefit of creditors; (iii) is the subject of a voluntary or involuntary petition for bankruptcy, or is adjudged insolvent or bankrupt; or, (iv) a receiver or trustee is appointed for any portion of its property, Caremark may immediately, and without penalty or any liability for any losses, suspend performance of Services hereunder. Suspension of performance by Caremark shall not constitute termination of this Agreement.

**8.     Pharmaceutical Contracts and Rebates.**     The applicable Exhibit and corresponding Attachment(s) to the Pricing Agreement detail the Rebates to be paid or credited by Caremark to Participating Group subject to the terms of this Agreement and the Pricing Agreement. It is the intention of the parties that, for purposes of the Federal Anti-Kickback Statute, all Rebates shall constitute and shall be treated as discounts against the price of drugs within the meaning of 42 U.S.C. 1320a 7b(b)(3)(A). Rebates are subject to the following terms and conditions:

8.1 <u>Participating Group's Authorization</u>. Participating Group authorizes Caremark to contract as a group purchasing organization for the Plan with pharmaceutical companies for Rebates. Participating Group acknowledges that whether and to what extent pharmaceutical companies are willing to provide Rebates to Participating Group may depend upon a variety of factors, including

17

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

the content of the Formulary adopted by Participating Group, the Plan's design features and participating in Caremark's Formulary management programs, as well as Caremark receiving sufficient information regarding each Claim that is submitted to pharmaceutical companies for Rebates.

8.2    <u>Remittance of Rebates</u>. Caremark will remit to EHPC, on behalf of and at the direction of Participating Group, Rebates with respect to Participating Group's Claims during the prior calendar quarter, if any, net of the fees retained by Caremark. EHPC and Participating Group acknowledge and agree that they shall not have a right to interest on, or the time value of, any Rebate payments received by Caremark or monies payable under this Agreement. Caremark may delay remittance of Rebates to allow for final adjustments upon termination of this Agreement.

8.3    <u>Rebate Limitations</u>. EHPC and Participating Group waive, release and forever discharge Caremark from any Losses arising from a pharmaceutical company's (i) failure to pay any Rebate; (ii) breach of an agreement related to Rebates; or (iii) negligence or misconduct. EHPC and Participating Group acknowledge that Rebates will not be paid with respect to Claims reimbursed on a unit basis by Medicaid agencies or other federal or state healthcare programs.

8.4    <u>Disclosure of Manufacturer Fees</u>. In accordance with <u>Section 8.1</u> of this Agreement, Caremark or its affiliates may hold contracts with pharmaceutical companies relating to products covered under this Agreement. In connection with such contracts, Caremark or its affiliates may have a financial relationship with such pharmaceutical companies and may receive and retain fees or other compensation from pharmaceutical companies for services rendered and property provided to pharmaceutical companies, including, without limitation, administrative fees that range between one percent (1%) and four percent (4%) of the Wholesale Acquisition Cost ("WAC") of the products dispensed across Caremark's book of business. In addition, Caremark or its affiliates may receive concurrent or retrospective discounts from pharmaceutical companies which are attributable to or based on products purchased by Caremark affiliated dispensing pharmacies. The term "Rebates" as used in this Agreement does not include the fees, compensation, and concurrent or retrospective discounts associated with the purchase price of products described in this Section, which belong exclusively to Caremark or its affiliates.

8.5    <u>Pharmaceutical Company Agreements</u>. EHPC may, at some future time, establish an internal pharmacy and therapeutics committee to develop a customized Formulary. EHPC and Participating Group agree that until such time during the Term of this Agreement that the parties mutually consent to an alternative approach, EHPC and Participating Group will not negotiate, contract, or agree with any pharmaceutical company for the purpose of obtaining Rebates or other discounts related to the drug utilization, including the use of over the counter products, of Plan Participants. EHPC and Participating Group further agree to cancel any existing agreements, arrangements and/or contracts with any pharmaceutical company related to such Rebates or discounts as of the Effective Date.  In the event of a breach of this Section by EHPC or Participating Group, Caremark may terminate this Agreement or EHPC's or Participating Group's participation in the Rebates and may retain 100% of any and all Rebates that have not been remitted to EHPC or Participating Group as of the date of such termination. The pursuit or award of damages shall in no event preclude the right of Caremark to seek an injunction or other equitable relief to enforce this Section, or any remedy available at law. The above shall not prohibit EHPC or its parent corporation from contracting with pharmaceutical companies to obtain over-the-counter medications, grants, sponsorships and any other financial remuneration associated with community health improvement initiatives, symposia and scientific studies, including but not limited to EHPC's data warehouse projects.

18

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

8.6     Participating Group acknowledges and agrees that it shall not have a right to interest on, or the time value of, any payment received by EHPC or monies payable under this Agreement. Participating Group agrees that EHPC may deduct any fees and/or participation fees owed to EHPC and/or its parent corporation from payments associated with Participating Group. To the extent fees for any third-party consultants are specified in the Participating Group Agreement, EHPC may deduct such fees from payments associated with Participating Group.

## 9.     Term and Termination.

9.1     Term Between Caremark and EHPC. This Agreement shall expire on December 31, 2027, unless extended or terminated early as hereinafter set forth (the "EHPC Initial Term"). **THE INITIAL TERM SHALL BE AUTOMATICALLY RENEWED FOR SUCCESSIVE ONE (1) YEAR PERIODS (EACH AN "EHPC RENEWAL TERM") UNLESS EITHER CAREMARK OR EHPC SENDS NOTICE OF NON-RENEWAL TO THE OTHER AT LEAST ONE-HUNDRED AND EIGHTY (180) DAYS PRIOR TO THE END OF THE EHPC INITIAL TERM OR ANY EHPC RENEWAL TERM.**

9.2     Term Between Caremark and Participating Group. The Agreement between Participating Group and Caremark (as memorialized in the Participating Group Addendum) shall commence upon Participating Group's Activation Date (as defined in the Participating Group Addendum) and shall expire on the later of (i) December 31, 2027, or (ii) three (3) calendar years following Participating Group's Activation Date, unless extended or terminated early as hereinafter set forth (the "Participating Group's Initial Term"). **THE PARTICIPATING GROUP'S INITIAL TERM SHALL BE AUTOMATICALLY RENEWED FOR SUCCESSIVE ONE (1) YEAR PERIODS (EACH A "PARTICIPATING GROUP RENEWAL TERM") UNLESS CAREMARK OR PARTICIPATING GROUP SENDS NOTICE OF NON-RENEWAL TO THE OTHER AT LEAST ONE-HUNDRED AND EIGHTY (180) DAYS PRIOR TO THE ANNIVERSARY OF PARTICIPATING GROUP'S ACTIVATION DATE, WHETHER DURING PARTICIPATING GROUP'S INITIAL TERM OR DURING ANY SUBSEQUENT PARTICIPATING GROUP RENEWAL TERM. IN THE EVENT THAT PARTICIPATING GROUP TERMINATES WITHOUT PROVIDING NOTICE OF TERMINATION OR NON-RENEWAL AS DESCRIBED HEREIN, SUCH TERMINATION SHALL CONSTITUTE A MATERIAL BREACH OF THE AGREEMENT.**

**UNLESS OTHERWISE SET FORTH IN THIS AGREEMENT, PARTICIPATING GROUP'S SPECIFIC PARTICIPATING GROUP ADDENDUM OR THE APPLICABLE ATTACHMENT FROM THE PRICING AGREEMENT, AS IDENTIFIED IN THE PARTICIPATING GROUP ADDENDUM, CAREMARK AND PARTICIPATING GROUP MAY ONLY TERMINATE THE AGREEMENT UPON THE ANNIVERSARY OF PARTICIPATING GROUP'S ACTIVATION DATE UNDER THIS AGREEMENT WITH ONE-HUNDRED AND EIGHTY DAYS' NOTICE, WITH OR WITHOUT CAUSE.**

9.3     Termination Events.
         (a) Any party, EHPC, Caremark or Participating Group, may terminate this Agreement upon written notice to all others in the event of a material breach of this Agreement by any other which is not cured within thirty (30) days of notice thereof. In the event of a material breach of this Agreement by Participating Group, Caremark may terminate Participating Group's participation in the Rebates and retain 100% of any and all Rebates that have not been remitted

19

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

to Participating Group as of the date of such termination. The pursuit or award of damages shall not constitute a penalty or liquidated damages, and shall in no event preclude the right of Caremark to such an injunction or other equitable relief, or any remedy available at law or equity.

(b) Upon notice, Caremark may terminate this Agreement upon EHPC's or Participating Group's breach of <u>Section 6.5 of this Agreement</u>. In the case of such a breach by a Participating Group, the Agreement shall terminate only with respect to that Participating Group.

(c) Participating Group may terminate this Agreement upon a material breach by Caremark of <u>Exhibit B of this Agreement</u> (Business Associate Obligations) if Caremark does not cure the breach or, if a cure is not possible, end the violation, within thirty (30) days of receipt of written notice by Caremark of such breach. Such termination shall only apply with respect to that Participating Group.

9.4    <u>Termination for Change in Law</u>.

(a) Any party, EHPC, Caremark or Participating Group, may terminate this Agreement upon written notice to the other parties if, as a result of any change in law, the rights or obligations of the requesting party would be materially adversely affected. Any such termination shall be effective on the day immediately preceding the effective date of such change in law, subject to the provisions of <u>Section 9.4(b)</u> below. If in the case of such a written notice by a Participating Group, the Agreement shall terminate only with respect to that Participating Group.

(b) Notwithstanding <u>Section 9.4(a)</u>, all parties agree to use prompt, good faith efforts to renegotiate the terms of this Agreement. If the parties successfully conclude such negotiations prior to the effective date of the change in law, this Agreement shall not terminate and shall be amended to reflect the negotiated terms. In the event the parties are unable to successfully conclude such negotiations, this Agreement shall terminate as provided above.

9.5    <u>Obligations Upon Termination</u>.

(a) Upon termination of this Agreement, Caremark will, at Participating Group's request, provide mutually agreed upon post-termination services at Caremark's prevailing rate.

(b) Except as provided in <u>Section 9.5(c)</u> below, upon termination of this Agreement, for any reason, Caremark shall return or destroy all PHI created or received by Caremark as a business associate of Participating Group in connection with this Agreement.

(c) In the event that Caremark determines that returning or destroying the PHI is not feasible, Caremark may retain PHI, provided that Caremark shall extend the protections contained in <u>Exhibit B of this Agreement</u> to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Caremark maintains such PHI.

(d) Upon termination of this Agreement by EHPC, Caremark will transition claims files and/or history that do not contain Caremark's cost and pricing information for all Participating Groups to EHPC's new pharmacy benefit manager.

**10.    <u>Confidential and Proprietary Information</u>.**

10.1    <u>Confidential Information</u>. The term "<u>Confidential Information</u>" includes, but is not limited to, any information of any party (whether oral, written, visual or fixed in any tangible medium of expression) relating to another party's services, operations, systems, programs, inventions, techniques, suppliers, customers and prospective customers, contractors, costs and pricing data, trade secrets, know-how, processes, plans, designs and other information of or relating to either

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

party's business, including its therapeutic and disease management programs. "Confidential Information" does not include Protected Health Information, the use and disclosure of which is governed by Section 12 of this Agreement.

10.2    Obligations of Officers or Employees. Neither Caremark, EHPC, Participating Group, nor any party's officers or employees shall disclose or make use of any Confidential Information except as permitted under this Agreement without the prior written consent of the non-disclosing party, which consent may, *inter alia,* be conditioned upon the execution of a confidentiality agreement prior to any disclosure to a third-party. Each party will disclose Confidential Information of the other parties only to its officers or employees who have a need to know the Confidential Information in order to accomplish the purpose of this Agreement and who (i) have been informed of the confidential and proprietary nature of the Confidential Information, and (ii) have agreed not to disclose it to others and to treat it in accordance with the requirements of this Section.

10.3    Permitted Disclosure of Confidential Information. The foregoing shall not apply to such Confidential Information to the extent: (i) the information is or becomes generally available or known to the public through no fault of the receiving party; (ii) the information was already known by or available to the receiving party prior to the disclosure by the other party on a non-confidential basis; (iii) the information is subsequently disclosed to the receiving party by a third-party who is not under any obligation of confidentiality to the party who disclosed the information; (iv) the information has already been or is hereafter independently acquired or developed by the receiving party without violating any confidentiality agreement or other similar obligation; or (v) the information is required to be disclosed pursuant to a non-appealable court order. If any party is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand, formal or informal investigation by any government or governmental agency, judicial process or otherwise) to disclose the Confidential Information of either of the other parties, such party shall give such prior written notice to the other party to allow the other party to seek an appropriate protective order or modification of any disclosure. The receiving party agrees not to oppose any action by the disclosing party to obtain a protective order or other appropriate remedy. If the receiving party is ultimately legally required to disclose such Confidential Information, the receiving party shall disclose the minimum required pursuant to the court order or other legal compulsion.

10.4    Public Entities. In the event Participating Group is a public entity and subject to state laws governing public records, such Participating Group agrees that the Agreement, and the confidential and proprietary information of Caremark, shall be afforded protection under applicable law.  Such Participating Group shall immediately notify Caremark of any requests for information made by a third-party pursuant to applicable state statute or local ordinance and shall provide Caremark sufficient notice to allow Caremark to seek an appropriate protective order or modification of any disclosure prior to such Participating Group releasing any Confidential Information pursuant to applicable state statute or local ordinance.

10.5    Remedies. Any unauthorized disclosure or use of Confidential Information including but not limited to, the sharing of this Agreement, any of the financial terms related to this Agreement, or Claims tapes with any consulting agents, advisors, brokers, or any other third-party, would cause Caremark, EHPC or Participating Group immediate and irreparable injury or loss that may not be adequately compensated with money damages. Accordingly, if any party fails to comply with this Section 10, the other party will be entitled to specific performance including immediate issuance of a temporary restraining order or preliminary injunction enforcing this Agreement, and to any other remedies provided by law.

21

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

10.6    <u>Authorization to Release Data to EHPC's and Participating Group's Designated Third-Party Service Providers</u>. EHPC and Participating Group hereby authorize Caremark to disclose Confidential Information and other data, including Claims, utilization, eligibility, and cost data to EHPC or Participating Group Service Provider so that such Participating Group Service Provider may provide services to Participating Group with regard to such Confidential Information and data. EHPC and Participating Group each acknowledge that any such disclosure shall be subject to either the execution of a separate confidentiality agreement by Caremark and Participating Group Service Provider or with respect to disclosure to EHPC, <u>Section 10 of the Agreement</u>, which shall govern the disclosure and use of such Confidential Information as between Caremark and Participating Group Service Provider. EHPC and Participating Group each authorize Caremark to provide Confidential Information to such Participating Group Service Provider for whatever time periods Caremark holds the Confidential Information and other data or until EHPC or Participating Group revokes this authorization in writing. EHPC and Participating Group each acknowledge and agree that to the extent any data disclosed to a Participating Group Service Provider includes Plan Participant information, including PHI, such Plan Participant information shall be disclosed by Caremark on behalf of Participating Group and subject to the Business Associate Agreement between Participating Group and Participating Group services provider. Participating Group acknowledges that Participating Group Services Provider is not a downstream business associate of Caremark for any purpose in connection with any such disclosure of data or Confidential Information. EHPC and Participating Group agree that Caremark and its subsidiaries and affiliates, and each of their respective officers, directors, employees and agents, will have no liability arising, in whole or in part, from: (i) the release of Confidential Information or PHI by Caremark to a Participating Group Service Provider pursuant to EHPC's or Participating Group's direction; or (ii) the use or subsequent release of Confidential Information or PHI by Participating Group Service Provider, EHPC or Participating Group.

## 11.    <u>Indemnification.</u>

11.1    <u>Caremark Indemnification</u>. Caremark shall defend, indemnify and hold harmless EHPC, Participating Group, and their subsidiaries and affiliates and each of their respective officers, directors, and employees (the "Participating Group Parties") from and against any and all Losses incurred by any Participating Group Parties to the extent arising out of or relating to Caremark's negligence or breach of its obligations or warranties set forth in this Agreement, except to the extent such Losses are caused by the negligence or willful misconduct of any Participating Group Party.

11.2    <u>Participating Group Indemnification</u>. Unless otherwise prohibited by applicable law, Participating Group shall defend, indemnify and hold harmless Caremark, its subsidiaries and affiliates and each of their respective officers, directors, and employees (the "Caremark Parties") from and against any and all Losses incurred by any Caremark Parties arising out of or relating to (i) Participating Group's negligence or breach of its obligations or warranties set forth in this Agreement, except to the extent such Losses are caused by the negligence or willful misconduct of any Caremark Party, (ii) any legal defects in the design of the Plan, (iii) any deficiencies in the PDD, or (iv) actions conducted by Participating Group's designated third-party concerning high dollar Claims that have been appropriately approved by Caremark through its prior authorization process.

11.3    <u>EHPC Indemnification</u>. Unless otherwise prohibited by applicable law, EHPC shall defend, indemnify and hold harmless the Caremark Parties from and against any and all Losses incurred by any Caremark Parties arising out of or relating to (i) EHPC's negligence or breach of its

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

obligations or warranties set forth in this Agreement, except to the extent such Losses are caused by the negligence or willful misconduct of any Caremark Party, (ii) any legal defects in the design of the Plan, or (iii) any deficiencies in the PDD.

11.4    <u>Notice of Claim</u>. The party seeking indemnification shall notify the other party in writing within thirty (30) days of the assertion of any claim or the commencement of any action or proceeding for which indemnity may be sought under this Agreement. Failure to notify the other party shall not result in the waiver of indemnity rights with respect to such claim, suit, action or proceeding unless such failure materially prejudices the ability of the indemnifying party to defend such claim, suit, action or proceeding. The parties shall cooperate with each other in the defense and settlement of any such claim, action or proceeding.

**12.    Business Associate Relationship.** The parties acknowledge and agree that Caremark is a Business Associate, as defined under HIPAA, of the Plan in connection with the provision of certain Services, and is a health care provider and Covered Entity, and not a Business Associate of Participating Group, under HIPAA in connection with its provision of certain Services. To the extent Caremark acts as a Business Associate of the Plan, and in accordance with HIPAA, Caremark shall adhere to the applicable requirements established for Business Associates as set forth in <u>Exhibit B-1 of this Agreement</u>. To the extent EHPC acts as a Business Associate of the Plan, and in accordance with HIPAA, EHPC shall adhere to the applicable requirements established for Business Associates as set forth in <u>Exhibit B-2 of this Agreement</u>.

**13.    General Provisions.**

13.1    <u>Assignment</u>. No party may assign this Agreement without the prior written consent of the other parties, provided such consent will not be unreasonably withheld.  However, Caremark may assign this Agreement or delegate the duties to be performed under this Agreement without the consent of EHPC or Participating Group to any of its subsidiaries or affiliates at any time, or as part of a sale of all, or substantially all, of the assets to which this Agreement pertains.

13.2    <u>Compliance with Law</u>. Each party shall comply with the provisions of all applicable law relating to the performance of its obligations under this Agreement. No party has any responsibility to advise the other about such party's compliance with any law.

Without limiting the generality of this Section, to the extent mandated by applicable law, the terms and conditions set forth in Schedule 1 (Regulatory Requirements) shall be incorporated herein, as applicable.

13.3    <u>Force Majeure</u>. Except for payment obligations, no party shall be liable for failure or delay of performance arising from an act of God or other events beyond the reasonable control of such party, such as the acts of a regulatory agency, fires, floods, explosions, strikes, labor stoppages, and acts of terrorism, war or rebellion. This Agreement does not require Caremark to dispense those products to which Caremark has no reasonable access.

13.4    <u>Limitation of Liability</u>.

(a) Except as otherwise expressly set forth in this Agreement, Caremark makes no additional representations or warranties, including without limitation, warranties of merchantability or fitness for a particular purpose.

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

(b) In no event shall any party be liable to the other parties for any incidental, special or consequential damages incurred by the other party as a result of the performance or any default in the performance of their respective obligations under this Agreement.

(c) EHPC and Participating Group acknowledge that Caremark does not establish AWP, and Caremark shall have no liability to EHPC or Participating Group arising from the use of First DataBank, Medi-Span or any other nationally available reporting service.

13.5    <u>General</u>. Except as otherwise provided herein, this Agreement may not be amended except in a writing signed by both parties. Unless expressly stated otherwise herein, Participating Group acknowledges that any amendment of this Agreement executed by Caremark and EHPC shall be binding upon Participating Group. If any provision of this Agreement is held to be invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect the remainder of this Agreement, which shall remain in full force and effect and enforceable in accordance with its terms. This Agreement, including all documents referred to herein and attached hereto, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior oral or written representations, understanding and agreements between the parties with respect thereto. Any waiver of any breach of any provision of this Agreement shall not be a waiver of any subsequent breach of any provision of this Agreement. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

13.6    <u>Governing Law</u>. This agreement shall be governed by and enforced in accordance with the Laws of the State of Ohio, without regard to its conflict of laws rules. All parties agree that any action or proceeding brought to enforce the rights or obligations of any party under this Agreement may be commenced and maintained in any court of competent jurisdiction located in the State of Ohio, and that any court sitting in Stark County, Ohio shall have exclusive jurisdiction over such action, suit or proceeding brought by any of the parties. THE PARTIES ACKNOWLEDGE AND AGREE THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

13.7    <u>Notices</u>. Any notice given under this Agreement shall be given in writing, and sent by hand delivery, facsimile transmission (receipt confirmed), overnight courier that provides confirmation of delivery, or certified mail, return receipt requested, to the applicable party at its address set forth below:

If to Caremark:

CVS Caremark
Attn: PBM Legal Notices
2100 E. Lake Cook Road, 5th Floor
Buffalo Grove, IL 60089
Email: RS4096@CVSHealth.com
Fax No: (847) 559-4879

24

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

With a copy to:

9501 E. Shea Blvd.
Scottsdale, AZ 85260
Attn: Senior Vice President, Health Care Services

Fax No: (480) 391-4704

If to Participating Group:

Address of Participating Group as identified in <u>Exhibit J of this Agreement</u>.

With a copy to:

Employers Health Purchasing Corporation
4771 Fulton Drive NW
Canton, Ohio 44718
Attn: Chief Executive Officer
Fax No:  (330) 305-9055

or to such other address or to the attention of such other person as the parties may designate in writing pursuant to this Section. Written notices shall be deemed received on the date actually delivered to the other parties.

13.8    <u>Independent Contractors</u>. Nothing contained herein shall be deemed or construed by the parties hereto, or by any third-party, as creating a relationship of employer and employee, principal and agent, or joint venture of the parties hereto; it being understood and agreed that no provision contained in this Agreement, nor any acts of the parties hereto shall be deemed to place Caremark in any relationship with Participating Group other than as an independent contractor.

13.9    <u>Third-Party Beneficiary</u>. This Agreement has been entered into solely for the benefit of EHPC, Participating Group and Caremark and is not intended to create any legal, equitable, or beneficial interest in any third-party or to vest in any third-party any interest as to enforcement or performance, including but not limited to, Participating Pharmacies or Plan Participants.

13.10    <u>Survival</u>. Sections 4 (Use of Data), 6.2 (Control of Plan), 7.2 (Payment), 9.5 (Obligations Upon Termination), 10 (Confidential and Proprietary Information), 11 (Indemnification), 13.4 (Limitation of Liability), and 13.10 (Survival) shall survive the termination or expiration of this Agreement.

13.11    <u>Use of Name</u>. Each party shall use the other parties' names, logos and trademarks only in the manner specified by the other party in writing, or as expressly permitted by this Agreement.

13.12    <u>Authority</u>.  Each party represents and warrants that it has the necessary power and authority to enter into this Agreement and to consummate the transactions contemplated by this Agreement.

13.13    <u>Government Programs</u>. To the extent required by applicable law or contractual commitment, EHPC and Participating Group agree to fully and accurately disclose and report to Medicare, Medicaid or other government health care programs any discount or rebate or other credit receivedby EHPC or Participating Group under this Agreement, whether reflected in the fees for the products and

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY
AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

services or otherwise provided hereunder, as discounts against the price of the drugs under all applicable state or federal programs that provide reimbursement to EHPC or Participating Group for products or services provided by Caremark. It is the intention of the parties, that for purposes of the Federal Anti-Kickback Statute, any discount, rebate or other EHPC or Participating Group credit shall constitute and be treated as a discount against the price of drugs within the meaning of 42 U.S.C. §1320a-7b(b)(3)(A).

13.14   <u>Market Check</u>. Participating Group authorizes EHPC to negotiate with Caremark on its behalf, for each Contract Year during the Term, adjustments that will become effective for the following Contract Year. On an annual basis, in the fourth quarter of each Contract Year upon EHPC's written request, Caremark and EHPC will review the terms of the Agreement compared to offerings presented to similar employers in the marketplace as deemed appropriate. The parties agree for the purpose of this Market Check that Caremark will compare the following factors to determine whether EHPC is entitled to revised terms: (i) the aggregate pricing terms of such applicable clients of comparable size and geographic market, inclusive of the program savings, the mail and retail pricing for Brand Drugs and Generic Drugs, pricing for Specialty Drugs, administrative fees, Rebates and guarantees; (ii) the services provided by Caremark to such clients; and (iii) the plan design of such clients, which may include plan formulary, brand/generic utilization information and mail and retail utilization information, available to Caremark. Any such adjustment in terms as a result of a Market Check review will be effective January 1st, of the Contract Year subsequent to the year in which the Market Check is completed; however, contingent upon EHPC's execution of a contract amendment memorializing the same and incorporating a one-year extension of the Term on or before October 1st of the year in which the Market Check is completed. Any adjustment as a result of this Market Check will be communicated by either Caremark or EHPC to Participating Group within thirty (30) days of the final executed Market Check amendment and/or restatement.

13.15   **Compliance with the Consolidated Appropriations Act, 2021.** If elected by Participating Group, Caremark shall assist Participating Group in connection with reporting requirements that are applicable to the Plan under Code section 9825, ERISA section 725, and Public Health Service Act section 2799A-10, as added by section 204 of division BB of the Consolidated Appropriations Act, 2021 and any implementing regulations ("CAA Reporting Requirements") and directly related to the Services provided by Caremark under this Agreement. Caremark shall be responsible for reviewing the CAA Reporting Requirements and any modifications thereto and, on Participating Group's behalf, shall provide the Prescription Drug Data Collection (RxDC) Annual Report directly to Centers for Medicare and Medicaid Services as deemed necessary to comply with the CAA Reporting Requirements, subject to the RxDC Annual Reporting fees as set forth in Exhibit A of this Agreement.

If elected by Participating Group, Caremark shall assist Participating Group in connection with reporting requirements that are applicable to the Plan under Code section 9825, ERISA section 725, and Public Health Service Act section 2799A-10, as added by section 204 of division BB of the Consolidated Appropriations Act, 2021 and any implementing regulations ("CAA Reporting Requirements") and directly related to the Services provided by Caremark under this Agreement. Caremark shall be responsible for reviewing the CAA Reporting Requirements and any modifications thereto and shall provide Participating Group with the data as deemed necessary to comply with the CAA Reporting Requirements, subject to the Prescription Drug Data Collection (RxDC) Annual Reporting fees as set forth in Exhibit A. Participating Group acknowledges that the data disclosed to Participating Group in connection with the CAA Reporting Requirements is highly confidential and proprietary and competitively sensitive to Caremark. Accordingly, Participating Group agrees that such data (i) is subject to the confidentiality obligations set forth in

26

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

Docusign Envelope ID: E0884410-629C-4931-A599-24EE85940318

this Agreement; (ii) is disclosed to Participating Group solely to allow Participating Group or the Plan to submit reports directly to Centers for Medicare and Medicaid Services to meet the Plan's CAA Reporting Requirements; and (iii) may not be disclosed to any third-party (e.g., consultants, advisors) without the prior written consent of Caremark.

The parties agree that nothing in this Agreement is intended to be or shall be construed as restricting or prohibiting the sharing of information or data in violation of 26 USC § 9824, 29 USC § 1185m and 42 USC § 300gg-119 (Prohibition on Gag Clauses) and any other applicable Laws.

**14**     **Exhibits.** The Exhibits listed in the Exhibit Reference Guide following the signature page are hereby incorporated into and made a part of this Agreement.

* * * * *

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

The parties hereto have caused this Agreement to be executed by their duly authorized representatives.



**CAREMARKPCS HEALTH, L.L.C.**

By: *Alona Smith*

Its: VP, Employer

Date: 09.19.2024

**EMPLOYERS HEALTH PURCHASING CORPORATION**

By: *David Uldricks*

Its: Vice President, PBM Contracting

Date: September 18, 2024

28

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

## Exhibit Reference Guide – For Reference Use Only

**EXHIBIT A – SELECTED FINANCIAL TERMS**...............................................................30

**EXHIBIT B – BUSINESS ASSOCIATE OBLIGATIONS**...................................................42

**EXHIBIT C – AUDIT PROCEDURES**...............................................................................50

**EXHIBIT D – PERFORMANCE GUARANTEES**...............................................................52

**EXHIBIT E – APPEALS**.....................................................................................................69
    ATTACHMENT 1 – APPEALS ADDENDUM FOR PARTICIPATING GROUPS THAT ARE GOVERNED BY ERISA
    ATTACHMENT 2 – APPEALS ADDENDUM FOR PARTICIPATING GROUPS THAT ARE NOT GOVERNED BY ERISA

**EXHIBIT F – MAINTENANCE CHOICE PROGRAM**......................................................74

**EXHIBIT G – MEDICARE PART B REAL TIME COB SERVICES**...................................76
    ATTACHMENT 1 TO EXHIBIT G – SERVICES AND SERVICE FEES
    ATTACHMENT 2 TO EXHIBIT G – DESCRIPTION OF PARTICIPATING GROUP SECONDARY COVERAGE UNIQUE TO MEDICARE

**EXHIBIT H – MEDICARE PART D SUBSIDY**.................................................................81

**EXHIBIT I – VACCINE PROGRAM**.................................................................................85

**EXHIBIT J – FORM OF ADDENDUM**...........................................  ..................................86

**EXHIBIT K - RXSAVINGSPLUS DRUG DISCOUNT PROGRAM**...................................87

**EXHIBIT L - TRANSFORM DIABETES CARE PROGRAM**............................................93

**EXHIBIT M - POINT SOLUTIONS MANAGEMENT**......................................................102

**EXHIBIT N – CAREMARK COST SAVER PROGRAM**...................................................113

**EXHIBIT O – REGULATORY REQUIREMENTS**...........................................................115

**EXHIBIT P – EXPLOYERS HEALTH GUIDE TO SERVICES AND COMPENSATION**...............................121

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

# Exhibit A Selected
# Financial Terms

**All pricing options shall have the following Optional Services, Clinical Programs and Special Fees:**

1.   **Clinical Programs and Services.** As consideration for the clinical services and programs selected by Participating Group as described in the PDD and this Agreement, Participating Group shall pay to Caremark the fees set forth in Attachment 1 to Exhibit A.

   A.   <u>Generic Step Therapy Program</u>**.** If elected by Participating Group, Participating Group acknowledges and agrees that, as a condition of the pricing, it adopts Caremark's Generic Step Therapy Plans (hereinafter referred to as the "GSTP Program"), as amended from time to time by Caremark, as part of its Plan design. Participating Group directs Caremark to implement the coverage limitations, generic substitutions, step-therapies or prior authorizations for the therapeutic classes as identified in the PDD. Participating Group shall be responsible for amending any applicable Plan documents,as it deems appropriate, to reflect the GSTP Program as part of its benefit.

   B.   Formulary Prior Authorization. With respect to Non-Covered Products, Participating Group adopts as part of its plan design Caremark's Formulary Prior Authorization Program and the associated criteria, which may be amended from time to time by Caremark.  Participating Group directs Caremark to implement the prior authorizations for all of the therapeutic classes recommended by Caremark, as amended from time to time and consistent with the PDD, and authorizes Caremark to implement prior authorization for Non-Covered Products.  Participating Group acknowledges that the prior authorizations for the Non-Covered Products implemented by Caremark shall supersede all other clinical criteria or programs that otherwise may be in place for such drugs. Caremark shall invoice Participating Group for such prior authorizations fees consistent with the terms of this Agreement.  Adoption of the Formulary Prior Authorization Program in conjunction with the elected Formulary shall not be deemed to be non-alignment with the elected Formulary.

2.   **Participating Group Credits.**

   This Section and the Participating Group Addendum set forth various credits to be paid or credited by Caremark to Participating Group(collectively "Participating Group Credits").  It is the intention of the parties that, for purposes of the FederalAnti-Kickback Statute, these Participating Group Credits shall constitute and shall be treated as discounts against the price of drugs within the meaning of 42 U.S.C. 1320a-7b(b)(3)(A) or paid to EHPC in accordancewith the provisions of 42 USC §1320a-7b(b)(3)(C).

   EHPC represents and warrants that: (i) in connection with this Agreement it is acting as a group purchasing organization on behalf of certain Participating Groups and shall satisfy and comply with the applicable requirements of 42 C.F.R. 1001.952(j); (ii) each Participating Group is responsible, directly or indirectly, for the provision of health care benefits, including pharmaceutical benefits, (iii) none of the Participating Groups is wholly-owned by EHPC or a subsidiary of a parent company which wholly owns EHPC, and (iv) each Participating Group has entered into a written agreement with EHPC as required by 42 C.F.R. 1001.952(j) via execution of a Form of Addendum as provided in Exhibit J, or a substantially similar document. Upon Participating Group's request but no more frequently than annually, EHPC will disclose in writing to Participating Group the amount received from Caremark with respect to purchases made by or on behalf of Participating Group.

   Credits due are subject to the following terms and conditions:

2.1   <u>Data Analytics Support.</u> On behalf of all Participating Groups, Caremark shall pay $75,000 per Contract Year to EHPC to support EHPC data analytics under the Agreement. This $75,000 will be paidto EHPC on an

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

annual basis by electronic fund transfer ("EFT") or check.

2.2    <u>Audit Credit</u>.  On behalf of all Participating Groups, Caremark shall provide an audit credit of up to $150,000 for each Contract Year to EHPC, which shall constitute an additional discount off the prices of drugs dispensed under the Agreement.  The $150,000 for each Contract Year of the Agreement provided shall be applied to offset costs incurred by EHPC in the administration of an audit EHPC or its third-party designee performs on behalf of Participating Groups pursuant to the terms of the Agreement. This audit credit will be paid to EHPC by EFT or check, and treated as an additional discount by Participating Groups. EHPC shall provide Caremark with documentation of expenses actually incurred in the form of an invoice, an account statement, or other detailed documentation.  Expenses applied to this audit credit will not exceed fair market value of such expenses. Additionally, Caremark agrees to consider in good faith the waiving of CET fees for EHPC-wide audits under certain circumstances.

2.3    <u>General Administration Credit</u>. On behalf of all Participating Groups, Caremark shall provide a credit of $100,000 per Contract Year to EHPC to support provision of additional CET file feeds to Participating Groups. The fees and expenses associated with such file feeds shall be applied against the credit and will be reflected as such on Participating Group's invoice.  Any unused amounts shall be forfeited by EHPC.

**3.**    **<u>Additional Pricing Terms.</u>**

3.1    <u>Plan Participant Cost Share</u>. Caremark may, but shall not be obligated to, dispense a prescription even if the prescription is not accompanied by the Cost Share consistent with the debit threshold elected by Participating Group. Caremark will refund any amount submitted by Plan Participant in excess of the Plan Participant's Cost Share. In the event a Plan Participant submits to Caremark an insufficient Cost Share and the Plan Participant fails to remit the balance of the Cost Share amount to Caremark within thirty (30) days of Caremark's request, then Caremark shall have the right to invoice Participating Group for, and Participating Group shall have an obligation to pay Caremark, the amount of the uncollected Cost Share(s). Shipping of prescriptions submitted without the appropriate Cost Share may be delayed. On an annual basis, Caremark shall invoice each Participating Group within one hundred twenty (120) days of the end of each calendar year for the amount of any uncollected Plan Participant Cost Shares that have been outstanding for more than ninety (90) days as of the calendar year end. Upon termination of a Participating Group's agreement with Caremark and upon request from such Participating Group, Caremark will invoice such Participating Group for the amount of the uncollected Cost Shares within ninety (90) days after the date of termination. Participating Groups which elect a $0.00 debit threshold will not be responsible or billed for uncollected Cost Shares.

3.2    <u>Reservation of Rights</u>. Upon one hundred twenty (120) days' prior written notice to EHPC, Caremark reserves the right to modify or amend the financial provisions in this Agreement in a manner designed to maintain economic equivalency with the pricing terms and conditions of this Agreement where feasible, and to account for the impact of the events identified below.  Such notice will include Caremark's explanation, rationale and detailed analysis of the manner in which the modification accounts for the following events:

(a)    A change in the scope of Services to be performed by Caremark or the assumptions upon which the financial provisions included in this document are based and/or any government imposed or industry-wide change that would impede Caremark's ability to provide the pricing described in this document, including any prohibition or restriction on Caremark's ability to receive Rebates from pharmaceutical manufacturers;

(b)    A change in EHPC or Participating Group alignment with Caremark's Formulary;

(c)    Implementation or addition of a high deductible health Plan/consumer driven health Plan option;

(d)    Implementation or addition of 100% member-paid Plan;

(e)    A greater than twenty percent (20%) decrease in the total number of Claims from the number provided during pricing negotiations;

(f)    A change in the coverage of Medicare eligible Plan Participants, irrespective of the resulting change in total number of Plan Participants, as defined above; or

(g)    A change in methodology by which AWP is calculated and reported.

31

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

## Attachment 1 to Exhibit A

# Caremark® Commercial Employer Fee Schedule – Core Services
**Unless otherwise specified, the services outlined below are included at no additional cost.**

| PBM Services | |
|---|---|
| **Included in Core Services** | **Included in Core Services** |
| **PBM Benefit Administration** | **Plan Participant Services** |
| ○ Maintenance Choice | ○ Plan Participant Call Center – Available 24/7 (if applicable) |
| ○ Standard Preventive Drug List (HDHP) | ○ Smartphone App and Web Tool |
| ○ Standard Preventive Drug List (ACA) | ○ Medication Pricing Tool Available Through Smartphone App |
| ○ Benefit Automation | ○ Real Time Benefits |
| ○ Loading Participating Group Benefit Plan | |
| ○ RxSavingsPlus® Drug Discount Program | **Participating Group Services** |
| ○ Generic Substitution/DAW Penalties | ○ Account Management |
| **Standard Integration Accumulation** | ○ Implementation Support |
| ○ Integration with Standard NCPDP File Layout | ○ Participating Group Authorized Override |
| ○ Outbound Transaction Support | ○ Meetings to Discuss Program Performance |
| ○ Inbound Transaction Support | ○ Plan design development and selection support |
| ○ Priming Balance Support | ○ Plan Participant Satisfaction Surveys |
| ○ Connectivity Production Support | ○ Regulatory and Compliance Support (Line of Business Specific) |
| **Eligibility Support** | ○ Participating Group Education Materials on Key Healthcare Topics |
| ○ Administration of Eligibility | ○ Post Reject Communications (PRC) |
| ○ Eligibility Verification & Maintenance | ○ Proactive Retail Refill Notice |
| ○ Standard file format | **Plan Participant Communication Materials** |
| ○ Setup with Eligibility Provider | ○ Initial Implementation Benefit Communication Materials |
| ○ Eligibility File Feeds (up to 2) | ▪ 2 Identification Cards |
| **Claims Processing Services** | ▪ Standard Introductory Letter |
| ○ Electronic Claims Adjudication | ▪ Profile/Order Form |
| **PBM Mail Service Pharmacy** | ○ Standard Brochures |
| ○ Use of Caremark Mail Service Pharmacy | ○ Newsletters Content |
| ○ Information System Infrastructure & Maintenance | ○ Standard Payroll Stuffers |
| ○ Profile/Order Form and Return Envelope | ○ Fulfillment of Pre-Printed Communication Materials (Bulk-shipped via ground service) |
| ○ Plan Participant Counseling Label (drug specific) | ○ Paper Claim Forms in Sufficient Quantities |
| ○ First Time Fill Prescription Processing | ○ Clinical Program Plan Participant Letters (production and shipping) |
| **Online Participating Group Access** | |
| ○ Online Services (On-site eligibility maintenance and prior authorization overrides - Viewing Plan Participant Claims History) | |
| ○ Website Access Through Caremark.com Allowing Customized Dashboard Creation for Plan Participants | |

| Analytics & Reporting |
|---|

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Included in Core Services |
|---|
| **Analytic Support** |
| ○ RxNavigator Self-Service Reporting Tool Suite |
| E Tools Access (Self Service for RX Insight Reports) |
| ○ Clinical Program Opportunity Analysis |

| Included in Core Services |
|---|
| **Analytic Support continued** |
| ○ Account Team Supported Reporting |
| ○ Standard on-going claim files up to the contractually allowed amount |
| |

## Clinical Programs

| Included in Core Services |
|---|
| **Clinical Solutions** |
| ○ Core Medication Management: Automatic Refill & Renewal Programs |
| ○ Diabetic Meter Program |
| ○ Standard Utilization Management Edits (e.g., quantity limits, step therapy) |
| ○ Core Medication Management: Adherence to Drug Therapy |
| ○ Mail Order DAW Solution |

| Included in Core Services |
|---|
| **Clinical Solutions continued** |
| ○ Dose Optimization |
| ○ Core Medication Management: Closing Gaps in Medication Therapy |
| ○ Retrospective Safety Review |
| ○ Point of Sale (POS) Drug Safety Alerts |
| |

## Savings Programs

| Included in Core Services |
|---|
| **Savings Program** |
| ○ Comprehensive Generics Solutions<br>  ▪ DAW Solution 1 and or 2<br>  ▪ Value Drug Savings Tool<br>  ▪ DAW Penalty |

| Included in Core Services |
|---|
| **Savings Program continued** |
| ○ Generic Step Therapy (Prior Auth fee will apply) |

## Formulary

| Included in Core Services |
|---|
| **Standard Formulary Administration** |
| ○ Formulary Maintenance |
| ○ Template Exclusions Lists |
| ○ Hyperinflation Management |

| Included in Core Services |
|---|
| **Standard Formulary Administration continued** |
| ○ Compound Management |
| ○ Point of Sale (POS) Rebates Type 3 |
| ○ Rebate Administration |

## Specialty

| Included in Core Services |
|---|
| **Specialty Clinical Solutions** |
| ○ Specialty Starter Fill |
| ○ Specialty Guideline Management (SGM): Criteria Development & Maintenance |
| ○ AccordantCare Specialty (f.k.a. Care Team Choice (CTC))<br>  ○ Underwritten program that supports 9 rare conditions identified via CVS Specialty dispense data, available to Employer Group clients with Exclusive Specialty. This program embeds Accordant nurses into the Specialty Pharmacy Care Team to create a personalized care plan based on a Plan Participant's needs. The primary focus of this program is medication access, injection training, |

| Included in Core Services |
|---|
| **CVS Specialty® Pharmacy** |
| ○ Use of CVS Specialty Pharmacy |
| ○ Information System Infrastructure & Maintenance |
| ○ Plan Participant Onboarding |
| ○ Plan Participant Counseling Label (drug specific) |
| ○ Supply Management Optimization (SMO) (Exclusive and Preferred Specialty Participating Groups) |
| ○ Specialty Connect |
| ○ Digital - Secure Messaging |

33

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| education, compliance, inventory coordination and refill reminders. | | o Specialty Expedite |
|---|---|---|
| **Specialty Benefit Administration** | | o Specialty CareTeam |
| o Specialty Copay Card Plan Designs | | |
| o Standard Specialty List | | |
| o Exclusive Specialty Grace Fill Plan Participant Letter (Under Plan Participant Communication Materials) | | |

| **Digital** | |
|---|---|
| **Included in Core Services** | **Included in Core Services** |
| **Standard Digital Services** | **Standard Digital Services continued** |
| o Open Enrollment Links | o Single Sign-On (SSO) |
| o Caremark.com Configurations | |

# Caremark Fee Schedule – Mandatory Fees

The services outlined below are associated with meeting federal, state, and local regulatory compliance requirements

| Regulatory Programs | Member Threshold, if any | Fee | Basis |
|---|---|---|---|
| **State Regulatory Impact Assessment**[1] | | $0.30 | Per Retail Claim Only |
| **Traditional Pricing Auxiliary Fee**[2] | | $1.50 | Per Retail Claim Only |
| **Retail Network Pharmacy Third Party Appeal** | | Pass through Fees Per Review | |

[1]Applies to claims in select states with relevant regulatory requirements.  The current list of states includes AL, AR, AZ, CO, DE, FL, GA, IA, LA, MD, MI, ND, NM, OK, SD, MS, NJ, TN, VA, TX, WA, WV, WY and is subject to change

[2]APPLICABLE TO PARTICIPATING GROUPS UNDER TRADITIONAL PRICING ARRANGEMENTS ONLY.  APPLIES TO CLAIMS IN STATES WITH EXTRATERRITORIAL REGULATIONS REQUIRING TRANSPARENT PRICING.  THE CURRENT LIST OF STATES INCLUDES AR, FL, OK, TN, WV AND IS SUBJECT TO CHANGE.

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

# Caremark® Fee Schedule – Additional Services

## The services outlined below are included at an additional cost.

| Enhanced Safety, Adherence and Gaps in Care Programs | Plan Participant Threshold, if any | Fee | Basis |
|---|---|---|---|
| CMP FWA - Collaborative Fraud Waste & Abuse | | Quoted Upon Request | |
| CVS Weight Management | | $145.00 | PEPMPM |
| CVS De-prescribing (DeRx) | | $140.00 | PEPMPM |
| Transform Care (Oncology) | | Quoted Upon Request | |
| Transform Diabetes Care: Diabetes Program[1] | | $9.93 | PDPM |
| Transform Diabetes Care: Diabetes + Co-Morbid Hypertension | | $13.35 | PDPM |
| Pharmacy Advisor Counseling at CVS Pharmacy (Commercial)[2] | | $0.20 | PMPM |
| Pharmacy Advisor Counseling All Channels (Commercial)[2] | | $0.50 | PMPM |
| Pharmacy Advisor Counseling Retail All Channels (Commercial) | | $0.50 | PMPM |
| Medication Therapy Management: Commercial | | $110.00 | Per Review |
| Integrated Fraud & Safety Solutions | | $0.06 | PMPM |
| Drug Savings Review (DSR) (First Clinical Program Year - 2:1 ROI over 1 year)[3] | | $0.30 | PMPM |
| Drug Savings Review (DSR) (Subsequent Clinical Program Years - 3:1 ROI over 1 year)[3] | | $0.30 | PMPM |
| Health Advisor – Medical Cost Avoidance (2:1 ROI over 1 year)[4] | | $0.45 | PMPM |
| Health Advisor – Site of Care (2:1 ROI over 1 year)[4] | | $0.45 | PMPM |
| HealthTag | | Quoted Upon Request | |
| Well-Being Coaching | < 10,000 Plan Participants | $2.27 | PMPM |
| | > 10,000 Plan Participants | $2.05 | PMPM |
| Initial Reviews & Appeals | Plan Participant Threshold, if any | Fee | Basis |
| Initial Clinical and Non-Clinical Reviews, including Prior Authorization and Exceptions[6] | | $45.00 | Per Review |
| ἰ    Appeals | | | |
| ἰ    First Level Appeals | | $100.00 | Per Review |
| ἰ    Second Level Appeals | | $500.00 | Per Review |
| ἰ    Urgent Appeals (Combination of 1st & 2nd Level Appeals) | | $600.00 | Per Review |
| External Review | | $500.00 | Per Review |
| Formulary Administration | Plan Participant Threshold, if any | Fee | Basis |
| Customization of Formulary or Drug List | | $100,000 | Per Formulary Per Year |

35

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| Point of Sale (POS) Rebates Type 1 | | Quoted Upon Request |
|---|---|---|

| **Additional Specialty Programs** | **Plan Participant Threshold, if any** | **Fee** | **Basis** |
|---|---|---|---|
| **Custom Specialty Network - When Accreditation Support is Required** | | Quoted Upon Request | |
| **AccordantCare Rare**<br>Whole-person care management services enhancing Plan Participant care while reducing health care costs for 20 rare, complex, and costly conditions. Includes one-on-one telephonic support along with digital tools and engagement to transform Plan Participant behavior and improve outcomes. Program enrollment requires ongoing medical claim files along with pharmacy data.<br><br>This selection covers:<br>1) New AccordantCare Rare Participating Groups<br>2) Participating Groups with Exclusive Specialty or AccordantCare Specialty buying up to Rare program (f.k.a. CareTeam Advanced)<br><br>*For existing AccordantCare Rare Participating Groups enrolled in less than 20 conditions, Participating Group's existing AccordantCare Rare PEMPM fee will apply if additional conditions are added. | 15K-150K Plan Participants<br>150K-300K Plan Participants<br>300K-500K Plan Participants<br>500K-1.5M Plan Participants<br>1.5M-3M Plan Participants | $132.00<br>$127.00<br>$122.00<br>$116.00<br>$106.00 | PEMPM<br>PEMPM<br>PEMPM<br>PEMPM<br>PEMPM |
| **AccordantCare Rare – Chronic Kidney Disease Standalone**<br>CKD standalone condition delivered through the AccordantCare Rare program. | | $132.00 | PEMPM |
| **NovoLogix Medical PA System**<br>ї Utilization Management (UM) for specialty drugs billed under the medical benefit. This solution helps to ensure safe, effective, and appropriate use with initial, ongoing, and retrospective clinical evaluation. Reduced cost for payors through automation of UM<br><br>**NovoLogix Claims System**<br>Provides payors with a range of strategies to contain specialty drug spend under the medical benefit, and increase the value of care delivered through improved clinical outcomes and lower cost<br><br>ї **National Comprehensive Cancer Network (NCCN)**<br>Provides physicians a tool to access the latest evidence-supported information and help payors manage this therapeutic category. Treatment Guidelines from the NCCN will be directly integrated into NovoLogix | 100,000 - 249,999 Plan Participants<br>250,000 - 499,999 Plan Participants<br>500,000 - 999,999 Plan Participants<br>>1 million Plan Participants | $0.45<br>$0.35<br>$0.25<br>Quote<br><br><br><br><br><br>$300.00 | PMPM<br>PMPM<br>PMPM<br><br><br><br><br><br>Per Case Review |

| **Pre-Implementation Materials** | **Plan Participant Threshold, if any** | **Fee** | **Basis** |
|---|---|---|---|
| **Identification Cards - (more than 2 per household)** | | $1.50 | Per Mailing Plus Postage |
| **Custom Introductory Letter**<br>**Custom Brochures**<br>**Custom Payroll Stuffers** | | Quoted Upon Request | |

| **Communications Post-Implementation** | **Plan Participant Threshold, if any** | **Fee** | **Basis** |
|---|---|---|---|
| **Explanation of Benefits**<br>- Note: An additional fee will be charged for including an insert. | | Print - $1.75 | Per Letter Plus Postage |

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| | | Fee | Basis |
|---|---|---|---|
| - Braille | | $25.00 | Per Page |
| - Large Print | | $2.50 | Per Letter Plus Postage |
| - Audio | | $31.00 | Per Page |
| Data File | | $8,580.00 | Per Month |
| **Welcome Kit** | | Print - $2.00 | Per Kit |
| **ID Card Only – Print (Digital - No Cost)** | | $1.50 | Per Mailing Plus Postage |
| **Negative Formulary Change Letters** | | $1.35 | Per Letter Plus Postage |
| **Pharmacy Termination Service / Network Disruption** | | $1.35 | Per Letter Plus Postage |

| Communications Post-Implementation | Plan Participant Threshold, if any | Fee | Basis |
|---|---|---|---|
| **Other Mailings Letters (Black/White, up to 4 pages)** | | $1.35 | Per Letter Plus Postage |
| **Non-Listed Plan Participant Communications (including Color, 5+ pages)** | | Quoted Upon Request | |
| **Translation of alternate languages (Set-Up Fee)** | | $175.00 | Per Page |
| **All non-standard Plan Participant communications sent digitally – (except for ID cards which are included at no cost)** | | $0.75 | Per Letter |
| **Notice of Creditable Coverage (NOCC)** | | $1.35 | Per Letter Plus Postage |
| **Vendor Transition Files** | **Plan Participant Threshold, if any** | **Fee** | **Basis** |
| **Claims History Upon Termination** (12 months of data) (Up to 3 Files during transition period) | | $2,500.00 | Per File |
| **Refill Transfers Upon Termination** (one test and two production files) | | $4,500.00 | Per File |
| **Optional Pre-transition Open Refill Transfer** (Contains all open refills) | | $1,500.00 | Per File |
| **Prior Authorization File Upon Termination** (Up to 3 Files during transition period) Active PAs only | | $3,500.00 | Per File |
| **Custom Integrated Accumulations** | **Plan Participant Threshold, if any** | **Fee** | **Basis** |
| **Non-NCPDP File Format** | | Quoted upon request | Per File |
| **Audit and Audit Related Services** | **Plan Participant Threshold, if any** | **Fee** | **Basis** |
| **Additional Audit Support (**beyond contractual agreement) | | $35,000 | Per Audit |
| - **Limited Audit Support** | | Quoted upon request | |
| **Audit Claim History Files** | | $125.00 | Per Month for Audit Period |
| **Audit Claim Files for data over 24 months old** | | $5,000.00 | Per Year |
| **Government Audits Post-Termination** | | $35,000 | Per Audit |
| **Additional Services** | **Plan Participant Threshold, if any** | **Fee** | **Basis** |

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

Docusign Envelope ID: E0884410-629C-4931-A599-21EE85040318

| | Plan Participant Threshold, if any | Fee | Basis |
|---|---|---|---|
| **Government Subrogation**<br>**Claims activity between a government agency and a PBM for the purpose of reimbursement** | | | Same as the manual claim administration fee |
| **Claim History Files (prior 24 months of data)** | | $125.00 | Per Month |
| **Standard on-going claim files for additional vendors beyond the contractually allowed amount** | | $125.00 | Per Month Per Vendor |
| **RxNavigator Self-Service Reporting Tool Licenses (Post Termination) - per user for up to 6 months.** | | $1,500.00 | Per License |
| **Point Solutions Management** | | Quoted Upon Request | |
| **Custom Programming (includes** Participating Group **specific data file formats, reporting, or IT systems work)** | | $150.00 | Per Hour |
| **Claim Experience Transmission (CET File) – Existing Layout Changes** | 1 - 5<br>6 - 10 | $15,000<br>$20,000 | Per File |
| **Claim Experience Transmission (CET File) – Custom Layout Build** | 1 – 25 Fields<br>26 – 50 Fields<br>51 – 100 Fields<br>>100 Fields | $25,000<br>$50,000<br>$75,000<br>Quote | Per File |

| Additional Services - Cont | Plan Participant Threshold, if any | Fee | Basis |
|---|---|---|---|
| **Outbound Customer Care Calling Campaign** | | $40.00 | Per Hour |
| **Pharmacy Reimbursement for Vaccine Administration** | | $20.00 | Per Administered Vaccine Claim |
| **Vaccine Program Management Fee** | | $0.05 | PMPM |
| **Shipping and Handling of Temperature Sensitive Products** | | $22.00 | Per Non-Specialty Mail Rx Temperature Sensitive |
| **Prescription Drug Data Collection (RxDC) Annual Reporting-2023 and subsequent annual reporting** | | $0.02 | PMPY |
| **Retiree Drug Subsidy Enhanced – Drug cost reporting and final reconciliation plus eligibility management[5]** | | $1.10 | PMPM |
| **Retiree Drug Subsidy Basic – Drug cost reporting and final reconciliation[5]** | | $0.60 | PMPM |
| **Digital Services** | **Plan Participant Threshold, if any** | **Fee** | **Basis** |
| **Additional Development** | | $150.00 | Per Hour |

Charges for services not identified above and/or changes in financial terms resulting from a change in the scope of services shall be quoted upon request.

Pricing and availability for the programs noted above which are not implemented within twelve (12) months from the time of pricing negotiations are subject to change.

**NOTES:**
[1] Transform Diabetes Care ("TDC") additional terms and conditions, may apply.  Participating Groups with at least 5,000 total Plan Participant lives and greater than 4.5% diabetes prevalence rate are eligible for an ROI.  See TDC Exhibit for full terms and conditions applicable to the ROI.

[2] Pharmacy Advisor Counseling Program Additional Terms:
   (a) Participating Group may terminate the Pharmacy Advisor Counseling Program ("Counseling Program") by providing Caremark at least 60-days prior written notice.

38

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

(b)  The pricing described above for Counseling Program is based on the following conditions being met for the full Clinical Program Term:

(i)  In the event Participating Group desires to include additional lines of business, implement a portion of the Plan Participants, or reduces the Plan Participants participating in the Counseling Program, Caremark may revise pricing for the program;

(ii)  Each Participating Group agrees to implement all of the current conditions in Pharmacy Advisor Counseling: Asthma/COPD, Breast Cancer, Depression, Diabetes, Cardiovascular conditions, and Osteoporosis; and

(iii)  The above pricing reflects the current program and future program expansions may require an additional fee; and

(iv)  EHPC has more than 20,000 Plan Participants enrolled in the Counseling Program for the full Clinical Program Term.

(c)  Provided the conditions in (b) above are met, Caremark guarantees that the aggregate gross savings realized from the Counseling Program services over the Clinical Program Term shall be 200% of the aggregate fees paid by all EHPC Participating Groups for the Clinical Program Term. For the purpose of this guarantee, the term "Clinical Program Term" means the twelve (12) month period following implementation of the Counseling Program.

This ROI is contingent upon Participating Groups providing Caremark with (a) the required prior year Plan Participant, Eligibility and Prescription data elements prior to calculation of the ROI if Caremark was not Participating Group's PBM in the calendar year prior to Participating Group's implementation of the Counseling Program; and (b) sufficient and accurate eligibility information, which includes Plan Participant current telephone numbers.

Participating Groups not participating in the Counseling Program for the full Clinical Program Term, or not implementing the Counseling Program for all conditions covered under the Counseling Program, shall be excluded from this ROI guarantee and their respective Plan Participants will not be considered for determination as to whether the minimum number (20,000) of participating Plan Participants has been met.

The ROI savings calculation shall be determined as follows:

1.  Medication Possession Ratio: If a Plan Participant's Medication Possession Ratio is equal to or greater than 80% (i.e., the Plan Participant is "optimally adherent") then the associated savings, which may include productivity savings, for each Plan Participant who is optimally adherent will be credited to the ROI guarantee based on the condition-specific savings identified in current peer reviewed clinical literature; and

2.  Gaps in therapy closure: For each gap in therapy closed, (i.e., a first fill of a recommended drug) Caremark will include the associated savings in its ROI guarantee.

Participating Group acknowledges and agrees that the estimated health care savings described above in paragraph 1 and 2, reflect an estimate of the healthcare costs presumed to be avoided through the actions of Caremark to improve medication adherence and close gaps in care associated with certain chronic conditions that typically have high levels of medical costs. This amount will be an estimate of the healthcare costs avoided by the Plan through the associated condition-specific savings identified in current peer reviewed clinical literature.

Caremark reserves the right to revise the ROI in the event of changes to Plan design or Plan Participant population that materially impacts the effectiveness of the Pharmacy Advisor Counseling Program. Participating Group acknowledges it shall not be eligible to receive an ROI savings guarantee under any other program, which includes adherence or closing gaps in therapy, during any period that Participating Group receives an ROI savings guarantee under the Pharmacy Advisor Counseling Program. In the event Caremark fails to meet the ROI guarantee, Caremark shall, within one-hundred fifty (150) days after the close of the Clinical Plan Term, credit Participating Group for its portion of any ROI short-fall following the end of the applicable Clinical Program Term. Caremark's maximum obligation under the ROI shall be the amount of fees

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

paid by Participating Group during the Clinical Program Term.

[3] Drug Savings Review Additional Terms:

Caremark guarantees that the gross client savings realized from DSR Program over the first Clinical Program Year shall be 200% of the DSR Program fees paid by Participating Group during the first Clinical Program Year. For the subsequent Clinical Program Years, Caremark guarantees that the gross client savings realized from DSR Program shall be 300% of the DSR Program fees paid by Participating Group during subsequent Clinical Program Years. "Clinical Program Year" means the twelve (12) month period commencing on the start date of the Drug Savings Review Program and each full consecutive twelve (12) month period thereafter that the Drug Savings Review Program is provided. In the event Caremark fails to meet the targeted savings, Participating Group shall be credited for any guaranteed savings short-fall following the end of the applicable Clinical Program Year, up to the amount of fees paid by Participating Group for the Drug Savings Review Program during the Clinical Program Year. Reconciliation will occur during the quarter after the conclusion of Clinical Program Year.

Caremark may revise the performance guarantee at time of reconciliation in a manner designed to account for membership shifts of 20% or more during the Clinical Program Year. The performance guarantee offered for the Drug Savings Review Program is conditioned on (1) Participating Group maintaining a monthly average of at least 1,500 Plan Participants throughout the Clinical Program Year and (2) Participating Group participating in the Drug Savings Review Program for the entire Clinical Program Year.

[4] Health Advisor additional terms and conditions, including conditions to the ROI, may apply.

[5] See Medicare Part D Subsidy Exhibit for full terms and conditions related to the Retiree Drug Subsidy. The PMPM fee is charged for Covered Retirees, as defined in the Medicare Part D Subsidy Exhibit. Aggregate fees for Medicare Part D Subsidy services are subject to a minimum of $2,500 annual fee. All pricing, rates and fees are subject to change and are contingent upon final CMS requirements.

[6] Reviews through the Specialty Guideline Management and Specialty Preferred Drug Plan Design programs will be charged this per review fee.

**\*DEFINITIONS:**
PMPM = Per Member Per Month
PEMPM = PER ENGAGED MEMBER PER MONTH

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

# Caremark Fee Schedule – 3rd Party Services
## The services outlined below are provided by 3rd party providers.

| Optional 3rd Party Services | Plan Participant Threshold, if any | Fee | Basis |
|---|---|---|---|
| **PrudentRx Solution**<br>ῑ   The PrudentRx solution utilizes a third party vendor, PrudentRx, to provide co-pay program related services to plan sponsors that include guidance on plan benefit design for specialty products and assistance to Plan Participants to secure available co-pay assistance for specialty drugs through the programs funded by pharmaceutical companies.<br>ῑ   The PrudentRx solution is offered under Caremark's Point Solutions Management (PSM) Program.<br>ῑ   Costs for the solution are outlined in the Vendor Election Form and are billed monthly by PrudentRx as PSM vendor fees. | | Quoted Upon Request | |

41

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

# Exhibit B-1
## Caremark Business Associate Obligations

In accordance with the Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191 ("HIPAA") and the Health Information Technology For Economic and Clinical Health Act, Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009 ("HITECH Act"), Caremark shall, to the extent it acts in its capacity as a Business Associate to the Plan, adhere to the applicable requirements established in the HIPAA Rules (as defined below) for Business Associates as set forth below.

1. Definitions.

Capitalized terms used, but not otherwise defined, in this Exhibit or the Prescription Benefit Services Agreement shall have the same meaning as those terms as used or defined in the HIPAA Rules, including but not limited to the following terms: Breach, Data Aggregation, Designated Record Set, Individual, Minimum Necessary, Notice of Privacy Practices, Plan Sponsor, Required By Law, Secretary, Subcontractor, Unsecured Protected Health Information, and Workforce.

A. Business Associate. "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this Exhibit, shall mean Caremark.

B. HIPAA Rules. "HIPAA Rules" shall mean the requirements of the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164, implementing HIPAA and the HITECH Act, in each case only as of the applicable compliance date for such requirements.

C. Incident Response Team. "Incident Response Team" shall mean the unit designated by Caremark that is responsible for investigating and responding to information privacy and security incidents and complaints.

D. Privacy Rule. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR part 160 and part 164, subparts A and E.

E. Protected Health Information (PHI) and Electronic Protected Health Information (EPHI). PHI and EPHI shall have the same meaning as such terms as defined in 45 CFR 160.103, but limited to such information created or received by Caremark in its capacity as a Business Associate (and not a pharmacy or other health care provider) of Plan.

F. Security Rule. "Security Rule" shall mean the Standards for Security of Electronic Protected Health Information at 45 CFR parts 160 and 164, subpart C.

2. Obligations and Activities of Business Associate.

A. Business Associate agrees not to use or disclose PHI other than as permitted or required by the Agreement or this Exhibit, or as permitted or Required By Law.

B. Business Associate agrees to use appropriate safeguards to protect against any use or disclosure of PHI not provided for herein and to comply, where applicable, with Subpart C of 45 CFR Part 164 with respect to EPHI. Without limiting the foregoing, Business Associate agrees to implement

42

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

appropriate administrative, physical, and technical safeguards designed to prevent the unauthorized use and disclosure of Protected Health Information, and to protect the confidentiality, integrity, and availability of Electronic Protected Health Information, including maintaining an Incident Response Team to investigate and respond to unauthorized uses and disclosures of PHI upon learning thereof, as required by 45 CFR § 164.308, 164.310, 164.312, and 164.316, as may be amended from time to time.

C.  Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of this Exhibit.

D.  In addition to the reporting required by Section 2.L, Business Associate agrees to report to Plan upon request any use or disclosure of PHI, not provided for by the Agreement or this Exhibit, of which the Incident Response Team becomes aware, including such uses and disclosures arising from a Security Incident.

E.  In accordance with 45 CFR 164.502 (e)(1)(ii) and 164.308(b)(2) Business Associate agrees to require that any Subcontractor, to whom it delegates any function or activity it has undertaken to perform on behalf of Plan, and to whom it provides PHI received from or created on behalf of Plan, agrees to substantially the same restrictions and conditions on the use or disclosure of PHI as apply through this Exhibit to Business Associate through a Business Associate Agreement between such Subcontractor and Business Associate.

F.  Upon the Plan's written request, and in a reasonable time and manner, Business Associate agrees to provide to Plan such PHI maintained by Business Associate in a Designated Record Set as required for Plan to respond to a request for access under 45 CFR 164.524.

G.  Upon the Plan's written request, and in a reasonable time and manner, Business Associate agrees to make available PHI maintained by it in a Designated Record Set, and to make amendments to such PHI, in order for Plan to respond to a request for amendment under 45 CFR 164.526.

H.  Business Associate agrees to make its internal practices, policies, procedures, books, and records relating to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of Plan, available for inspection and copying by the Secretary upon the Secretary's written request for same for purposes of the Secretary determining the Plan's compliance with the HIPAA Rules.

I.  Business Associate agrees to document such disclosures of PHI made by it, and information related to such disclosures, as would be required for Plan to respond to a request by an Individual for an accounting of disclosures of PHI under 45 CFR 164.528.

J.  Upon written request by Plan, and in a reasonable time and manner, Business Associate agrees to provide to Plan information collected in accordance with Paragraph I of this Section for Plan to provide an accounting under 45 CFR 164.528.

K.  To the extent Plan specifically delegates to Business Associate one or more of Plan's obligation(s) under Subpart E of 45 CFR Part 164, Business Associate agrees to comply with the requirements of Subpart E that apply to Plan in the performance of such obligation(s).

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

L. Following the discovery by Business Associate of any Breach of Unsecured PHI by Business Associate or its Subcontractors, Business Associate agrees to notify Plan of such Breach without unreasonable delay, but no later than within ten (10) business days after the Incident Response Team is notified of the Breach. Such notification shall include, to the extent available, the identity of each Individual whose Unsecured PHI has been, or is reasonably believed by Business Associate to have been, accessed, acquired, used, or disclosed during the Breach. At the time of notification or promptly thereafter as such information becomes available, Business Associate shall also provide Plan with such other available information as is required for Plan to notify an Individual of the Breach as required by 45 CFR 164.404(c). Business Associate agrees that to the extent the Breach is solely as a result of Business Associate's negligent acts or omissions, Business Associate shall provide the notifications required under 45 CFR 164.404, 45 CFR 164.406 and 164.408(b). Notwithstanding the above, if a law enforcement official provides Business Associate with a statement that the notification required under this paragraph would impede a criminal investigation or cause damage to national security, Business Associate may delay the notification for the period of time set forth in the statement as permitted under 45 CFR 164.412.

3. <u>Permitted Uses and Disclosures by Business Associate</u>.

   A. Business Associate may use or disclose PHI to perform functions, activities and services for or on behalf of, Plan as provided in the Agreement. Such uses and disclosures shall be limited to those that would not violate the Privacy Rule if done by Plan except that Business Associate may use and disclose PHI:

      (i) for the proper management and administration of the Business Associate or to carry out its legal responsibilities; provided that, in the case of any disclosures for this purpose, the disclosure is Required by Law or Business Associate obtains reasonable assurances in writing from the person to whom the information is disclosed, that it will remain confidential and used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and that the person will notify Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached;

      (ii) to provide Data Aggregation services to Plan as permitted by 45 CFR 164.504(e)(2)(i)(B).

   B. Business Associate may also use and disclose PHI: (i) to respond to requests for PHI either accompanied by an authorization that meets the requirements of 45 CFR 164.508 or from a covered entity or health care provider in accordance with 45 CFR 164.506(c); (ii) to de-identify the information or create a limited data set in accordance with 45 CFR §164.514, which de-identified information or limited data set may be used and disclosed by Business Associate as permitted by law, including HIPAA; (iii) to report violations of law to appropriate federal and state authorities, consistent with 45 CFR §164.502(j)(1); and (iv) as authorized in writing by Plan.

   C. Business Associate agrees to request, use and disclose PHI in compliance with the Minimum Necessary standard of the HIPAA Rule.

4. <u>Obligations of Plan</u>

   A. Plan shall provide PHI to Business Associate in compliance with the Minimum Necessary standard of the Privacy Rule. Plan shall not ask or require Business Associate to use or disclose Protected

44

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

Health Information in a manner in which Plan could not do as a Covered Entity except as permitted by 45 CFR 164.504(e) to perform Data Aggregation services.

B.  Plan represents and warrants that its Notice of Privacy Practices complies with 45 C.F.R. 164.520 and permits Plan to use and disclose Protected Health Information in the manner that Business Associate is authorized to use and disclose Protected Health Information under this Exhibit.

C.  To the extent that the Plan honors a request to restrict the use or disclosure of PHI pursuant to 45 C.F.R. 164.522(a), Plan agrees not to provide such PHI to Business Associate unless Plan notifies Business Associate of the restriction and Business Associate advises Plan that it is able to accommodate the restriction. Plan agrees to reimburse Business Associate for any increase in costs required to accommodate such restriction.

D.  Plan shall be responsible for using administrative, physical and technical safeguards at all times to maintain and ensure the confidentiality, privacy and security of PHI transmitted to Business Associate in accordance with the standards and requirements of the HIPAA Rules, until such PHI is received by Business Associate.

E.  Plan shall obtain any consent or authorization that may be required by applicable federal or state laws in order for Business Associate to provide its services under the Agreement.

F.  Plan shall provide to Business Associate a written list of the names of those individuals in its Workforce that are authorized to receive or access PHI on its behalf, and to provide reasonable prior written notice to Business Associate of any changes to such list. In the absence of Plan providing such list, Business Associate may assume that those individuals that are members of the Workforce of Plan or, if applicable, Plan Sponsor, who request or receive PHI from Business Associate are performing plan administration activities for Plan, and are authorized to receive or access PHI on its behalf.

5.  <u>Miscellaneous</u>.

A.  Regulatory References. A reference in this Exhibit to a section in the HIPAA Rules means the section as in effect or as amended, and as of its applicable compliance date.

B.  Changes to this Exhibit. The parties agree to negotiate in good faith to amend this Exhibit or the Agreement as necessary to comply with any changes in the HIPAA Rules. If, within sixty (60) business days after Business Associate receives a proposed amendment for this purpose from Plan, the parties are unable in good faith to reach agreement on its terms, either party may terminate the Agreement and this Exhibit by written notice to the other.

C.  Interpretation. Any ambiguity in this Exhibit shall be resolved to permit the parties to comply with the HIPAA Rules.

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

# Exhibit B-2
# Employers Health Business Associate Obligations

In accordance with the Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191 ("HIPAA") and the Health Information Technology For Economic and Clinical Health Act, Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009 ("HITECH Act"), EHPC shall, to the extent it acts in its capacity as a Business Associate to the Plan, adhere to the applicable requirements established in the HIPAA Rules (as defined below) for Business Associates as set forth below.

1. <u>Definitions</u>.

Capitalized terms used, but not otherwise defined, in this Exhibit or the Prescription Benefit Services Agreement shall have the same meaning as those terms as used or defined in the HIPAA Rules, including but not limited to the following terms: Breach, Data Aggregation, Designated Record Set, Individual, Minimum Necessary, Notice of Privacy Practices, Plan Sponsor, Required By Law, Secretary, Subcontractor, Unsecured Protected Health Information, and Workforce.

   A. Business Associate. "Business Associate" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this Exhibit, shall mean EHPC.

   B. HIPAA Rules. "HIPAA Rules" shall mean the requirements of the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164, implementing HIPAA and the HITECH Act, in each case only as of the applicable compliance date for such requirements.

   C. Incident Response Team. "Incident Response Team" shall mean the individuals designated by EHPC that is responsible for investigating and responding to information privacy and security incidents and complaints.

   D. Privacy Rule. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR part 160 and part 164, subparts A and E.

   E. Protected Health Information (PHI) and Electronic Protected Health Information (EPHI). PHI and EPHI shall have the same meaning as such terms as defined in 45 CFR 160.103, but limited to such information created or received by EHPC in its capacity as a Business Associate of Plan.

   F. Security Rule. "Security Rule" shall mean the Standards for Security of Electronic Protected Health Information at 45 CFR parts 160 and 164, subpart C.

2. <u>Obligations and Activities of Business Associate</u>.

   A. Business Associate agrees not to use or disclose PHI other than as permitted or required by the Agreement or this Exhibit, or as permitted or Required By Law.

   B. Business Associate agrees to use appropriate safeguards to protect against any use or disclosure of PHI not provided for herein and to comply, where applicable, with Subpart C of 45 CFR Part 164 with respect to EPHI. Without limiting the foregoing, Business Associate agrees to implement

46

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

appropriate administrative, physical, and technical safeguards designed to prevent the unauthorized use and disclosure of Protected Health Information, and to protect the confidentiality, integrity, and availability of Electronic Protected Health Information, including maintaining an Incident Response Team to investigate and respond to unauthorized uses and disclosures of PHI upon learning thereof, as required by 45 CFR § 164.308, 164.310, 164.312, and 164.316, as may be amended from time to time.

C.    Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of this Exhibit.

D.    In addition to the reporting required by Section 2.L, Business Associate agrees to report to Plan upon request any use or disclosure of PHI, not provided for by the Agreement or this Exhibit, of which the Incident Response Team becomes aware, including such uses and disclosures arising from a Security Incident.

E.    In accordance with 45 CFR 164.502 (e)(1)(ii) and 164.308(b)(2) Business Associate agrees to require that any Subcontractor, to whom it delegates any function or activity it has undertaken to perform on behalf of Plan, and to whom it provides PHI received from or created on behalf of Plan, agrees to substantially the same restrictions and conditions on the use or disclosure of PHI as apply through this Exhibit to Business Associate through a Business Associate Agreement between such Subcontractor and Business Associate.

F.    Upon the Plan's written request, and in a reasonable time and manner, Business Associate agrees to provide to Plan such PHI maintained by Business Associate in a Designated Record Set as required for Plan to respond to a request for access under 45 CFR 164.524.

G.    Upon the Plan's written request, and in a reasonable time and manner, Business Associate agrees to make available PHI maintained by it in a Designated Record Set, and to make amendments to such PHI, in order for Plan to respond to a request for amendment under 45 CFR 164.526.

H.    Business Associate agrees to make its internal practices, policies, procedures, books, and records relating to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of Plan, available for inspection and copying by the Secretary upon the Secretary's written request for same for purposes of the Secretary determining the Plan's compliance with the HIPAA Rules.

I.    Business Associate agrees to document such disclosures of PHI made by it, and information related to such disclosures, as would be required for Plan to respond to a request by an Individual for an accounting of disclosures of PHI under 45 CFR 164.528.

J.    Upon written request by Plan, and in a reasonable time and manner, Business Associate agrees to provide to Plan information collected in accordance with Paragraph I of this Section for Plan to provide an accounting under 45 CFR 164.528.

K.    To the extent Plan specifically delegates to Business Associate one or more of Plan's obligation(s) under Subpart E of 45 CFR Part 164, Business Associate agrees to comply with the requirements of Subpart E that apply to Plan in the performance of such obligation(s).

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

L.   Following the discovery by Business Associate of any Breach of Unsecured PHI by Business Associate or its Subcontractors, Business Associate agrees to notify Plan of such Breach without unreasonable delay, but no later than within thirty (30) calendar days after the Incident Response Team is notified of the Breach. Such notification shall include, to the extent available, the identity of each Individual whose Unsecured PHI has been, or is reasonably believed by Business Associate to have been, accessed, acquired, used, or disclosed during the Breach. At the time of notification or promptly thereafter as such information becomes available, Business Associate shall also provide Plan with such other available information as is required for Plan to notify an Individual of the Breach as required by 45 CFR 164.404(c). Business Associate agrees that to the extent the Breach is solely as a result of Business Associate's negligent acts or omissions, Business Associate shall provide the notifications required under 45 CFR 164.404, 45 CFR 164.406 and 164.408(b). Notwithstanding the above, if a law enforcement official provides Business Associate with a statement that the notification required under this paragraph would impede a criminal investigation or cause damage to national security, Business Associate may delay the notification for the period of time set forth in the statement as permitted under 45 CFR 164.412.

3. <u>Permitted Uses and Disclosures by Business Associate.</u>

A.   Business Associate may use or disclose PHI received from Plan or Caremark to perform functions, activities and services for or onbehalf of, Plan related to this Agreement. Such uses and disclosures shall be limited to those that would not violate the Privacy Rule if done by Plan except that Business Associate may use anddisclose PHI:

   (i)   for the proper management and administration of the Business Associate or to carry out its legal responsibilities; provided that, in the case of any disclosures for this purpose, the disclosure is Required by Law or Business Associate obtains reasonable assurances in writingfrom the person to whom the information is disclosed, that it will remain confidential and usedor further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and that the person will notify Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached;

   (ii)  to provide services and contract oversight functions related to Caremark's performance under this Agreement for or on behalf of the Plan that may include but is not limited to receiving, housing, and maintaining current and historic claims information for the benefit of the Plan and Participating Groups;

   (iii) to provide Data Aggregation services to Plan as permitted by 45 CFR 164.504(e)(2)(i)(B).

B.   Business Associate may also use and disclose PHI: (i) to respond to requests for PHI either accompanied by an authorization that meets the requirements of 45 CFR 164.508 or from a covered entity or health care provider in accordance with 45 CFR 164.506(c); (ii) to de-identify the information or create a limited data set in accordance with 45 CFR §164.514, which de-identified information or limited data set may be used and disclosed by Business Associate as permitted by law, including HIPAA; (iii) to report violations of law to appropriate federal and state authorities, consistent with 45 CFR §164.502(j)(1); and (iv) as authorized in writing by Plan.

C.   Business Associate agrees to request, use and disclose PHI in compliance with the Minimum Necessary standard of the HIPAA Rule.

48

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

4. Obligations of Plan

    A.    Plan shall provide PHI to Business Associate in compliance with the Minimum Necessary standard of the Privacy Rule. Plan shall not ask or require Business Associate to use or disclose Protected Health Information in a manner in which Plan could not do as a Covered Entity except as permitted by 45 CFR 164.504(e) to perform Data Aggregation services.

    B.    Plan represents and warrants that its Notice of Privacy Practices complies with 45 C.F.R. 164.520 and permits Plan to use and disclose Protected Health Information in the manner that Business Associate is authorized to use and disclose Protected Health Information under this Exhibit.

    C.    To the extent that the Plan honors a request to restrict the use or disclosure of PHI pursuant to 45 C.F.R. 164.522(a), Plan agrees not to provide such PHI to Business Associate unless Plan notifies Business Associate of the restriction and Business Associate advises Plan that it is able to accommodate the restriction. Plan agrees to reimburse Business Associate for any increase in costs required to accommodate such restriction.

    D.    Plan shall be responsible for using administrative, physical and technical safeguards at all times to maintain and ensure the confidentiality, privacy and security of PHI transmitted to Business Associate in accordance with the standards and requirements of the HIPAA Rules, until such PHI is received by Business Associate.

    E.    Plan shall obtain any consent or authorization that may be required by applicable federal or state laws in order for Business Associate to provide its services under the Agreement.

    F.    Plan shall provide to Business Associate a written list of the names of those individuals in its Workforce that are authorized to receive or access PHI on its behalf, and to provide reasonable prior written notice to Business Associate of any changes to such list. In the absence of Plan providing such list, Business Associate may assume that those individuals that are members of the Workforce of Plan or, if applicable, Plan Sponsor, who request or receive PHI from Business Associate are performing plan administration activities for Plan, and are authorized to receive or access PHI on its behalf.

5. Miscellaneous.

    A.    Regulatory References. A reference in this Exhibit to a section in the HIPAA Rules means the section as in effect or as amended, and as of its applicable compliance date.

    B.    Changes to this Exhibit. The parties agree to negotiate in good faith to amend this Exhibit or the Agreement as necessary to comply with any changes in the HIPAA Rules. If, within sixty (60) business days after Business Associate receives a proposed amendment for this purpose from Plan, the parties are unable in good faith to reach agreement on its terms, either party may terminate this Exhibit by written notice to the other.

    C.    Interpretation. Any ambiguity in this Exhibit shall be resolved to permit the parties to comply with the HIPAA Rules.

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

# Exhibit C
# Audit Procedures

An audit of the Services is intended to enable Participating Group to confirm that Caremark has complied with its obligations under the Agreement related to administration of the PDD. To accomplish the review in an efficient and timely manner, the following guidelines will apply to the audit process:

### 1.  Audit Notification Letter

A Participating Group request for an audit of Caremark will be directed to the Participating Group Contract Audit Manager either in writing on Participating Group's letterhead or by e-mail.  Audits require sixty (60) days' prior written notice.

### 2.  Use of Third-Party Auditor

In the event a third-party auditor is used, the auditor shall be a mutually acceptable independent third-party retained by Participating Group. The third-party auditor shall execute a confidentiality agreement with Caremark in a form and substance reasonably acceptable to Caremark prior to conducting an audit.

### 3.  Teleconference

Upon Caremark's receipt of a request for an audit, Caremark will organize and conduct an initial teleconference between Participating Group and Caremark. This teleconference will address the following:

- Individual audit participants;
- Requirement and purpose of an approved confidentiality agreement (for use with outside audit firms or other Participating Group representatives, as applicable);
- Onsite requirements;
- Mutually established timelines;
- Claims tape needs and costs;
- Prescription copies: timelines, availability and cost;
- Guidelines for acceptable verification of audit questions;
- Caremark's right to respond within a reasonable time after questions arise and before audit results are disseminated by the auditor to Participating Group;
- Audit Process Confirmation Letter; and
- Other appropriate issues.

### 4.  Mutually Agreed Upon Timelines

Participating Group and Caremark will mutually agree upon an audit timeline, taking into consideration individual circumstances and constraints.  An example of a standard timeline is as follows (*from the time a signed confidentiality agreement is secured*):

50

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

- ï    Claim tape request – two (2) weeks
- ï    Standard screen prints – two (2) weeks
- ï    Mail service prescription copies – six (6) weeks (cost is typically $5.00 per script copy)
- ï    Audit Report Reply – one (1) month.

## 5.  Response to Sampling Questions

The Participating Group can submit to Caremark questions related to provided claim samples. Answers to sampling questions are normally provided within two (2) weeks after the questions have been presented.

## 6.  Audit Claim File Requests

Claims file specifications shall be clarified during the initial teleconference and processed in the order of receipt of a signed Confidentiality Agreement. Delivery to the specified party normally takes place within two (2) weeks.

## 7.  Audit Report

In the event of an audit by a third-party, Caremark and Participating Group will be provided a copy of any proposed audit report and Caremark will have a reasonable opportunity to comment on any such report before it is finalized.

## 8.  Close of Audit

Upon finalization of audit results and agreement between Participating Group and Caremark on any identified financial discrepancies, the period under review will be considered closed.

## 9.  Audit Costs

Participating Group shall be responsible for all reasonable expenses of the Claims audit.

## 10.  Audit Document Limitations

Participating Group acknowledges that it shall not be entitled to audit documents that Caremark is barred from disclosing by applicable law or pursuant to an obligation of confidentiality to a third-party.

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

# Exhibit D
# Performance Guarantees

**Definitions and Limitations Applicable to the Performance Standards**

The proposed performance standards are subject to the definitions and limitations set forth in the Definitions and Limitations descriptions below.

**Definitions:**

For purposes of the performance standards herein:
- Business Day will mean Caremark's Normal Business Hours on any day other than a Saturday or Sunday or a day on which Caremark is closed for general business purposes.

**Limitations:**

Caremark will diligently attempt to maintain its performance at the levels represented herein, provided that failure to achieve or maintain those levels does not constitute a default for purposes of the termination provisions set forth in the Agreement. The proposed performance standards will be adjusted equitably by the parties to the extent that Caremark has suffered a Force Majeure Event during the applicable measurement period.

Caremark will not be liable to Participating Group for any failure to satisfy a performance standard during any time that no agreement existed between Caremark and EHPC as to the applicable Performance Guarantees, even if a subsequent written agreement between the parties provides that the effective date of the Agreement is prior to the time at which the written agreement actually was executed by the parties.

Caremark shall not be held responsible for Performance Guarantees to the extent negatively affected by external review of high dollar Claims.

The maximum amount that Caremark will have at risk for any Plan year will be as stated below for EHPC for that calendar year. The total amount at risk will be calculated and allocated as set forth below. Unless otherwise specified, all performance guarantees are to be paid to EHPC. EHPC will distribute monies equitably (based on covered lives) among all Participating Groups.

- Amount at Risk for Ongoing Guarantees – EHPC's annual performance pool will be equal to the total number of Plan Participants among the EHPC Participating Groups, as determined below, multiplied by $15.00. The total amount at risk for each Participating Group toward applicable performance guarantees will equal the number of Plan Participants within the Participating Group multiplied by $15.00.

- Amount at Risk for Implementation Guarantees – EHPC's annual performance pool will be equal to the total number of Plan Participants among the EHPC Participating Groups, as determined below, multiplied by $15.00. The total amount at risk for each Participating Group toward applicable performance guarantees will equal the number of Plan Participants within the Participating Group multiplied by $15.00.

- Amount at Risk for Medicare Part D Subsidy Guarantees – EHPC's annual performance pool will

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

be equal to the total number of Plan Participants among the EHPC Participating Groups, as determined below, multiplied by $2.00. The total amount at risk for each Participating Group toward applicable performance guarantees will equal the number of Plan Participants within the Participating Group multiplied by $2.00.

ı̇   Determining Number of Plan Participants – For amount at risk calculation purposes, the number of covered lives will be based on the actual number of Plan Participants within the Participating Group as of the effective date or the first day of the anniversary being measured (Example: for the period 1/1/25 – 12/31/25, total amount at risk available will be $10.00 multiplied by the actual number of covered lives on 1/1/25).

ı̇   Effective Date – Performance guarantees will be based on a calendar year for Participating Groups with January 1 effective dates when Caremark begins providing services under this Agreement. For those Participating Groups whose effective date is other than January 1 when Caremark begins providing services under this Agreement, Performance guarantees will be prorated for the first calendar year and based on a calendar year for any subsequent years.

If Caremark fails to satisfy a performance standard that is measured for all Caremark customers utilizing the same process platform, Caremark will have satisfied a performance standard regarding EHPC if it satisfies that standard with respect to EHPC only.

Caremark's obligations to meet the performance standards described herein are subject to the terms and conditions set forth in the Agreement. In the event of any conflict between the terms herein and the terms of the Agreement, the terms of the Agreement will control and govern the obligations of the parties regarding such matters.

If Caremark fails to meet the proposed standards, the penalties described herein will be the sole and exclusive remedy available to EHPC for such failure. To the extent permitted by law, any statutory remedies that are inconsistent with the provisions hereof are waived.

If any period covered by the Agreement is less than the period covered by the proposed performance standard, and Caremark has not met such performance standard for such period, the payment associated with such failure will be prorated to reflect the actual period during which the Agreement was in effect.

Caremark shall provide the Performance Guarantee report card no later than ninety (90) days after the end of the applicable calendar year. Any applicable amounts owed will be credited on the month end invoice following the month of the reporting date. Unless otherwise indicated with respect to a specific performance standard, Caremark's satisfaction of the proposed performance standards will be:

(i)   Monitored internally by Caremark on a quarterly basis for those Participating Groups who have 5,000 or more cardholders and on an annual basis for the remaining Participating Groups.
(ii)  Measured by Caremark on a calendar-year basis for all Caremark customers utilizing the same process platform.

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| Service Performance Standards | Guarantee | Measurement Basis | Measurement | Amount at Risk |
|---|---|---|---|---|
| Percent of available pharmacies in largest network nationally. This guarantee assumes a pharmacy universe of active retail stores, and that pharmacies remain in business, are not involved in fraudulent activities, or perform any actions that warrant removal from the network. This guarantee does not apply to pharmacy changes due to EHPC or Participating Groups' request for removal of pharmacies from the network. | 98% | Quarterly within sixty (60) days after the end of the quarter. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |
| **Network Pharmacy POS Compliance** | | | | |
| Percent of time internal on-line system are available. Percent of time Caremark's online claims processing system will be available for access by Caremark's contracted pharmacies, excluding normal scheduled maintenance, as measured on a contract year basis. This standard will not apply when Caremark does not have total control over the environment or communication links that impact the claims adjudication process due to third-party involvement. Scheduled maintenance will not be performed during routine pharmacy business hours. | 99.90% | Quarterly within sixty (60) days after the end of the quarter as measured on a Caremark book of business basis for clients utilizing the same process platform. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |
| **Network Pharmacy Management** | | | | |
| Percent of EHPC network pharmacies that submit 500 or more Claims a year to Caremark audited on-site each year. | 2% | Annually within sixty (60) days after the end of the year. | Annual | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each |

54

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| | | | | Participating Group. |
|---|---|---|---|---|
| Subject to the availability of any active retail pharmacy within the specific area, Caremark shall include a pharmacy within five (5) miles of the residence of Plan Participants when Plan Participants have an active retail pharmacy within five (5) miles of their residences. | 95% of Plan Participants | Annually within sixty (60) days before the end of the calendar year on an EHPC book of business basis. | Annual | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group |
| **Enrollment Eligibility Updating** | | | | |
| Percent of ongoing eligibility updates processed within two (2) business days of receipt of a clean and complete eligibility file in an agreed upon format. | 99% | It is measured as a percentage of all eligibility and dependent data transmitted to Caremark on a quarterly basis. This is measured on a Participating Group basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |
| **Retail Paper Claims Processing Time** | | | | |
| Percent commercial paper claims submitted by Plan Participants, not requiring clarification processed within a weighted average of ten (10) business days. Business days are calculated from the date the Claim is received to the date the Claim is processed. | 90% | Quarterly within sixty (60) days after the end of the quarter. This is measured on a Participating Group basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |

55

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| | | | | |
|---|---|---|---|---|
| On average, the number of business days within which Caremark shall process 100% of commercial paper claims submitted by plan participants not requiring intervention. Business days are calculated from the date the Claim is received to the date the Claim is processed. | Fifteen (15) business days | Quarterly within sixty (60) days after the end of the quarter. This is measured on a Participating Group basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |
| **Mail Order Claims Processing Time** | | | | |
| On average the number of business days within which Caremark shall dispense and ship at least 100% of all clean (not requiring intervention or clarification) mail service pharmacy prescriptions, as measured on a contract year basis. The average calculation is determined by taking the total number of prescriptions metered (as recorded by Caremark's systems) multiplied by the number of days these prescriptions to be metered divided by the total number of metered prescriptions. | Two (2) business days | Quarterly within sixty (60) days after the end of the quarter. This is measured on an EHPC book of business basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 5% of the total amount at risk for each Participating Group. |
| On average the number of business days within which Caremark shall dispense and ship at least 100% of all non-clean (requiring intervention or clarification) mail service pharmacy prescriptions. The average calculation is determined by taking the total number of prescriptions metered (as recorded by Caremark's systems) multiplied by the number of days these prescriptions took to be metered divided by the total number of metered prescriptions. | Five (5) business days | Quarterly within sixty (60) days after the end of the quarter. This is measured on an EHPC book of business basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 5% of the total amount at risk for each Participating Group |
| **Retail Claims Processing Accuracy** | | | | |

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| | | | | |
|---|---|---|---|---|
| Caremark guarantees electronic Claims processing accuracy for retail pharmacies will be at least 99.5% in any Contract Year for which EHPC conducts a Claims audit as provided in the audit rights section of this Agreement. Upon a final and conclusive determination of any discrepancies discovered by such a Claims audit, the electronic Claims processing accuracy rate shall be calculated based upon the following formula: ((total number of electronic retail paid Claims processed in sample) - (number of electronic retail paid Claims processed incorrectly in sample)) / (total number of electronic retail paid Claims processed in sample). | 99.5% | Quarterly within sixty (60) days after the end of the quarter. This is measured on an EHPC specific basis. A report will be provided for each Participating Group upon request. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |
| **Mail Order Claims Processing Accuracy** | | | | |
| Caremark's accuracy in dispensing prescriptions from its mail service pharmacy (correct drug, correct strength, correct dosage form and correct participant). | 99.995% | Quarterly within sixty (60) days after the end of the quarter. This is measured on an EHPC book of business basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |
| **Customer Service** | | | | |
| Average time in seconds that inbound calls to Caremark's toll-free customer service lines shall be answered. Measurement excludes calls routed to an IVR. | 30 seconds | Quarterly within sixty (60) days after the end of the quarter. This is measured on an EHPC book of business basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 6% of the total amount at risk for each Participating Group. |

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| | | | | |
|---|---|---|---|---|
| Minimum percentage of inbound calls to Caremark's toll-free customer service lines that are abandoned. Measurement excludes calls routed to an IVR and excludes calls abandoned by the participant within the first thirty (30) seconds. | <3% | Quarterly within sixty (60) days after the end of the quarter. This is measured on an EHPC book of business basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |
| Minimum percentage of inbound calls to Caremark's toll-free customer service lines that will be blocked. | 1% | Quarterly within sixty (60) days after the end of the quarter. This is measured on an EHPC book of business basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group |
| Percent of written inquiries received by Caremark's Customer Care Department from all plan participants will be responded to within 10 business days following the business day on which such inquiry was received. | 96% | Quarterly within sixty (60) days after the end of the quarter. This is measured on an EHPC book of business basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |
| Percent of issues Caremark will resolve at the first point of contact. First call resolution is the number of inquiries completely resolved at the time of initial contact divided by the total inquiries. | 90% | Quarterly within sixty (60) days after the end of the quarter. This is measured on an EHPC book of business basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| | | | | |
|---|---|---|---|---|
| Percent of issues Caremark will resolve within 5 business days. | 95% | Quarterly within sixty (60) days after the end of the quarter. This is measured on an EHPC book of business basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group |
| **Plan Participant Satisfaction Survey** | | | | |
| **Retail Pharmacy Plan Participant Satisfaction Survey** Satisfaction surveys shall be conducted during the plan year among Caremark's base of prescription drug benefit plan participants. Survey respondentsshall be selected at random from plan participants who have recent experiences with one or more of the following Services: 1) Retail Pharmacy benefits; 2) Mail Service Pharmacy benefits; 3) Customer Care.  Based upon a statistically valid sample, overall satisfaction ratings of at least 90% shall be guaranteed for Retail Pharmacy benefits. For the purposes of this guarantee, satisfaction shall be defined as Satisfied or better on the following 5-point scale; Completely Satisfied, Very Satisfied, Satisfied, Dissatisfied, Very Dissatisfied. Caremark shall be responsible for survey design, data collection, analysis and all costs associated with conducting the surveys. | 90% | Quarterly within sixty (60) days after the end of the quarter. This is measured on an EHPC book of business basis. Results for each Participating Group will be provided at least annually | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 6% of the total amount at risk for each Participating Group. |

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| | | | |
|---|---|---|---|
| **Mail Pharmacy Plan Participant Satisfaction Survey** Satisfaction surveys shall be conducted during the plan year among Caremark's base of prescription drug benefit plan participants. Survey respondentsshall be selected at random from plan participants who have recent experiences with one or more of the following Services: 1) Retail Pharmacy benefits; 2) Mail Service Pharmacy benefits; 3) Customer Care.<br><br>Based upon a statistically valid sample, overall satisfaction ratings of at least 90% shall be guaranteed for Mail Service Pharmacy Benefits. For the purposes of this guarantee, satisfaction shall be defined as Satisfied or better on the following 5-point scale; Completely Satisfied, Very Satisfied, Satisfied, Dissatisfied, Very Dissatisfied. Caremark shall be responsible for survey design, data collection, analysis and all costs associated with conducting the surveys. | 90% | Quarterly within sixty (60) days after the end of the quarter. This is measured on an EHPC book of business basis. Results for each Participating Group will be provided at least annually. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 6% of the total amount at risk for each Participating Group thereafter for each consecutive quarter of below standard results. |
| **Account Service** | | | |
| Percent of calls returned by account service representative within one (1) business day of receipt. | 95% | Quarterly within sixty (60) days after the end of the quarter. This is measured on an EHPC book of business basis. Results for each Participating Group will be provided at least annually. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| | | | | |
|---|---|---|---|---|
| Caremark guarantees that if any issue cannot be resolved within 2 business days, Caremark will, within 1 business day of receipt by the account manager, provide an estimated time of resolution via electronic or verbal communication to requestor. | 90% | Quarterly within sixty (60) days after the end of the quarter. This is measured on an EHPC book of business basis. Results for each Participating Group will be provided at least annually. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |
| Number of days for a response to a written inquiry. | Three (3) business days | Quarterly within sixty (60) days after the end of the quarter. This is measured on an EHPC book of business basis. Results for each Participating Group will be provided at least annually. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |
| | | | | |

61

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| | | | | |
|---|---|---|---|---|
| Caremark guarantees that based on receipt of a clean, accurate and complete electronic eligibility file no later than the 5th day of the month that is prior to the effective date of the Agreement or mutually agreed upon re-issue date, that 99% of enrollees to Caremark will be mailed ID cards and/or Welcome Booklets five (5) days prior to the effective date or re-issue date. | 99% | Quarterly within sixty (60) days after the end of the quarter on a Participating Group basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |
| Caremark guarantees that 99% of new plan participants will be mailed ID cards and/or Welcome Booklets within five (5) business days of receipt of a clean, accurate and complete electronic file for ongoing eligibility updates. Implementation and re-issues are not considered part of this guarantee. | 99% within five (5) business days | Quarterly within sixty (60) days after the end of the quarter on a Participating Group basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |
| **Reporting Guarantee** | | | | |
| All monthly, quarterly, and annual reports will reflect accurate data, based upon data contained in Caremark's data systems at the time the reports are produced. Caremark is exempt from this standard if incomplete or inaccurate data were received on the claim or externally processed files, and/or were due to circumstances beyond Caremark's control as will all updates to the on-line reporting tool provided to the division. | 100% | Quarterly within sixty (60) days after the end of the quarter on a Participating Group basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |
| **Generic Substitution** | | | | |

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| | | | | |
|---|---|---|---|---|
| Caremark guarantees at least 95% of total mail service prescriptions with qualifying generics shall be dispensed with a generic product, where substitution is permitted by applicable law, the Plan Participant consents, and Caremark is unrestricted in its ability to promote the dispensing of generic drugs as measured on a Contract Year. | 95% | Measured on an EHPC book of business basis. | Annual | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |
| **Management Report Timeliness** | | | | |
| Quarterly standard management reports for Participating Groups shall be available within forty-five (45) days after the end of each calendar quarter. | 100% | Quarterly within sixty (60) days after the end of the quarter on a Participating Group basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group. |
| **Account Management** | | | | |
| Caremark guarantees a satisfaction rating of at least 4.0 on a 5-point scale. For the purposes of this guarantee, satisfaction shall be defined as Satisfied or better on the following 5-point scale; Completely Satisfied, Very Satisfied, Satisfied, Dissatisfied, Very Dissatisfied. | 4.0 satisfaction rating | Guarantee will be measured during the fourth quarter every year on an EHPC book of business basis. Survey results for Participating Groups will be made available upon request. | Annual | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 3% of the total amount at risk for each Participating Group |
| **Medicare RDS Support** | | | | |
| RDS Subsidy reporting shall be in compliance with all MMA Part D requirements | 100% | Quarterly within sixty (60) days after the end of the calendar quarter on a Participating Group basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 25% of the total amount at risk for each |

63

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| | | | | Participating Group |
|---|---|---|---|---|
| Caremark shall retain all RDS claims information for the required time frame | 100% | Quarterly within sixty (60) days after the end of the calendar quarter on a Participating Group basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 25% of the total amount at risk for each Participating Group |
| Caremark shall identify all Medicare Part B prescriptions and provide to EHPC entities concurrent with each RDS Subsidy submission. | 95% | Quarterly within sixty (60) days after the end of the calendar quarter on a Participating Group basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 25% of the total amount at risk for each Participating Group |
| RDS Subsidy submission reports will be accurate 99.99% in all areas. Caremark is exempt from this standard if incomplete or inaccurate data is received on the claim or eligibility files received by Caremark. | 99.99% | Quarterly within sixty (60) days after the end of the calendar quarter on a Participating Group basis. | Quarterly | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 25% of the total amount at risk for each Participating Group. |
| **Specialty Guarantees** | | | | |
| Specialty Average Speed of Answer. Calls to Caremark's toll free Specialty Customer Care lines shall be answered within an average time of thirty (30) seconds or less. | 100% within an average time of thirty (30) seconds or less. | This standard will be measured and reported quarterly on Caremark's book of business. | Quarterly | Should Caremark fail to meet the above stated standard, Caremark shall credit EHPC $0.15 per Plan Participant. |

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| Specialty Abandonment Rate. Calls to Caremark's toll free Specialty Customer Care lines shall have an abandonment rate of 5% or less. Measurement excludes calls abandoned by participants within the first thirty (30) seconds. | 5% or less, excluding calls abandoned by participants within the first thirty (30) seconds. | This standard will be measured and reported quarterly on Caremark's book of business. | Quarterly | Should Caremark fail to meet the above stated standard,Caremark shall credit EHPC $0.15 per Plan Participant. |
|---|---|---|---|---|
| Specialty Participant Satisfaction. Caremark guarantees its participant satisfaction using Caremark's survey tool will achieve at least a 90% satisfaction rating annually among CVS/specialty Plan Participant respondents. If EHPC does not have sufficient Plan Participants with specialty claims at any time during the measurement period, or if EHPC has not provided Caremark with sufficient Plan Participantcontact information to support a statistically valid sample, the guarantee shall be measured and reported on Caremark's book of business. | 90% satisfaction rating annually among CVS/specialty Plan Participant respondents. | This guarantee shall be reported and measured annually on EHPC's combined book of business. | Annually | Should Caremark fail to meet the above stated standard,Caremark shall credit EHPC $0.15 per Plan Participant. |

## Implementation (For New Participating Groups)

65

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| | | | |
|---|---|---|---|
| Group Structure, Benefit Plan Design | **Plan Administration Turnaround Time.** With written Participating Group sign-off of the accuracy of Participating Group Plan design and/or requested changes and testing, Caremark guarantees that Participating Group's standard Plan design changes will be implemented within 10 days. Plan design changes during November, December and January, as well as complex Plan design changes, will be implemented by a mutually agreed upon date. Participating Group will be responsible for reporting any failure to meet the above stated guarantee to Caremark on an annual basis. This is measured on a Participating Group specific basis | | Within 60 days after the effective date of the Participating Group being implemented | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 11% of the total amount at risk for each Participating Group |
| Eligibility Load | Plan Participant eligibility will be loaded within 15 days of receipt of a clean and complete eligibility file in an agreed upon format. | | Within 60 days after the effective date of the Participating Group being implemented | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 11% of the total amount at risk for each Participating Group |
| Initial ID Cards | **ID Card Implementation or Re-Issue.** Caremark guarantees that, based on receipt of a clean, accurate and complete electronic eligibility file no later than the 5th day of the month that is prior to the effective date of the Agreement or mutually agreed upon re-issue date, Caremark will mail ID cards and/or welcome booklets to 99% of Plan Participants ten (10) days prior to the effective date or re-issue date. | | Within 60 days after the effective date of the Participating Group being implemented | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 11% of the total amount at risk for each Participating Group |

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| | | | | |
|---|---|---|---|---|
| Toll Free Telephone Number (Availability) | A single integrated and dedicated toll-free telephone number for both retail and mail service assistance will be established and maintained by the date indicated in the implementation work plan for each Participating Group. | | Within 60 days after the effective date of the Participating Group being implemented | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 11% of the total amount at risk for each Participating Group |
| Communications | The Caremark Implementation Project Manager will provide regular weekly updates to EHPC entities tracking the status of the implementation. | | Within 60 days after the effective date of the Participating Group being implemented | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 11% of the total amount at risk for each Participating Group |
| Post Implementation Review Meeting | The Caremark Implementation Project Manager will conduct a post-implementation review meeting with EHPC entities within thirty (30) days after the effective date. | | Within 60 days after the effective date of the Participating Group being implemented | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 11% of the total amount at risk for each Participating Group |
| Turnaround Time on Resolution of Implementation Issues | Caremark guarantees a turnaround time of five (5) business days for resolution of implementation issues, to be measured and based on a mutually developed Implementation Plan. | | Within 60 days after the effective date of the Participating Group being implemented | Should Caremark fail to meet this guarantee, Caremark shall credit EHPC 11% of the total amount at risk for each Participating Group |

67

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

| | | | | |
|---|---|---|---|---|
| Participating Group's Overall Satisfaction With Implementation Process | All timeline deadlines are met, cards are distributed to the correct addresses on time, communication materials are created and distributed as indicated and agreed, the benefit is set-up to adjudicate claims according to the documentation provided and agreed upon by the EHPC, and Claims adjudicate correctly based on Plan design, accepted or rejected clinical and utilization management programs, pricing and cost sharing parameters.  All reporting and group, and account structure set-up are as agreed upon by the EHPC. | | Within 60 days after the effective date of the Participating Group being implemented | Should Caremark fail to meet this guarantee, Caremark shall credit  EHPC 11% of the total amount at risk for each Participating Group |
| Timing of EHPC's Receipt of Comments on Contract Draft by Caremark Legal Department. | Caremark guarantees the timing of EHPC's receipt comments to the contract draft within five (5) business days of receipt of contract comments from EHPC. For the purpose of this requirement, the business day following Caremark's receipt of the EHPC 's requests/comments relating to the contract shall be the first day in measuring the five (5) business day turnaroundtime. | Guarantee measured from delivery of each contract draft to Caremark. This is measured on an EHPC basis. | Assessed after each occurrence. | Should Caremark fail to meet this guarantee, Caremark shall credit  EHPC 12% of the total amount at risk for each Participating Group |

Administrative Fees Paid by Caremark to EHPC. Should Caremark fail to pay EHPC the fees due EHPC as set forth in the Exhibits of the Pricing Agreement within thirty (30) days of the timing for such payment, then Caremarkshall pay EHPC $500.00 per day that such payment is late.

On-Time Delivery. Caremark guarantees 98% of prescriptions from its specialty pharmacies will be received by the Plan Participant or Physician on the scheduled delivery date. Such guarantee shall exclude prescriptions that are subsequently cancelled or requested to be held for future processing. This standard will be measured and reported quarterly on EHPC's combined book of business. Should Caremark fail to meet the above stated guarantee, Caremark shall credit EHPC $0.12 per Plan Participant.

Prescription Accuracy. Caremark accuracy in dispensing prescriptions from its specialty pharmacies (correct drug, correct strength, correct dosage form, correct labeling) shall be at least 99.8%. This standard will be measured and reported quarterly on EHPC's combined book of business.  Should Caremark fail to meet the above stated standard, Caremark shall credit EHPC $0.12 per Plan Participant.

68

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

## Exhibit E
## Appeals

Whereas, Caremark and Participating Group desire to have Caremark provide the Caremark Appeals Program (the "Appeals Program") to Participating Group as part of the Services provided pursuant to the Agreement.

Whereas, Caremark will provide the Appeals Program as described in Attachment 1 to Participating Groups that are governed by ERISA.

Whereas, Caremark will provide the Appeals Program as described in Attachment 2 to Participating Groups that are NOT governed by ERISA.

69

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

## Attachment 1
### Appeals Addendum for Participating Groups that are governed by ERISA

Now, therefore, Participating Group and Caremark agree as follows:

1. Participating Group represents that its Plan is governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

2. Participating Group represents that it will provide Caremark with a current and accurate copy of the Plan Document. The "Plan Document" shall be the written document, as required by ERISA, which sets forth the Plan design and all other information concerning Participating Group's prescription drug benefit plan including, but not limited to, eligibility for such benefits, the benefits to be provided, limitations on such benefits and the Plan's Claims and review procedures. Throughout the term of this Addendum, Participating Group, at its expense, will provide Caremark with sufficient advance notice of any proposed amendments to the Plan Document.

3. Caremark will provide Participating Group with the Appeals Program.

   a. *Review of Benefit Coverage.* Caremark shall conduct appeals relating to eligibility and coverage of prescription drug benefit determinations. Such reviews will be based on the Plan Document provisions and criteria approved by the Plan, with respect to coverage of prescription drug benefits only, and shall not include a review of medical necessity as may be defined under the terms of the Plan Document. With respect to such review of benefit coverage, Caremark shall have the sole and absolute discretion to interpret the Plan Document and to make factual findings. The decision of Caremark shall be final, subject to External Review under Section 4 of this Attachment 1 to this Exhibit, if applicable to Participating Group, or available judicial review. Caremark may, in its sole discretion, consider the opinions of additional medical and/or legal experts with respect to interpretation of the Plan Document. Under the Appeals Program, Caremark agrees to be a fiduciary solely for the purpose of adjudicating appeals relating to the coverage of prescription drug benefits. Caremark will review appeals in accordance with the rules and procedures established by Caremark to govern appeals from the denials of claims, as may be amended from time to time.

   b. *Review of Medical Necessity.* Caremark has contracted with an independent vendor or vendors for the processing of appeals resulting from a denial of authorization of prescription benefits where the Plan beneficiary is entitled to obtain a review of the denial by an independent physician specialist. Caremark has entered or will enter into an agreement with the independent vendor(s), which provides for an appeals process consistent with the Appeals Program. With respect to such reviews, the independent vendor shall act as a fiduciary and shall have the sole and absolute discretion to interpret the Plan Document and to make factual findings. The decision of the independent vendor shall be final, subject to External Review under Section 4 of this Attachment 1 to this Exhibit or available judicial review only for abuse of discretion.

4. *External Review.* This section 4 shall apply only if Participating Group has elected to receive "Independent (External) Appeals Review" in the PDD or other mutually agreed form(s) of documentation. Caremark has contracted with independent review organizations ("IROs") to provide External Review of benefit determinations that are subject to External Review under PPACA. The decision of the independent review organization shall be final and binding on the Plan and Plan Participant, subject only to any judicial review. Either party may terminate, at any time, the External

70

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

Review services provided under this Exhibit by providing the other parties with thirty (30) days' prior written notice.

5. As consideration for the services provided hereunder, Participating Group shall pay Caremark the fees set forth in <u>Exhibit A of this Agreement</u> (the "Fees"). Caremark will invoice such Fees on a monthly basis, and payment shall be due within five  (5) days after Participating Group's receipt of each invoice.

6. Participating Group agrees that if Participating Group fails to pay on or prior to the due date any amount owed to Caremark hereunder, finance charges shall be imposed on such overdue amount in accordance with the Agreement. In addition, Caremark shall have all rights and remedies for non-payment specified in the Agreement.

7. Participating Group agrees to indemnify and hold harmless Caremark for, from, and against any and all costs, Losses or damages Caremark may incur as a result of (i) Participating Group's breach of this Exhibit, or (ii) any claim by Plan Participant as a result of Caremark's denial of an appeal, provided that Caremark followed the procedures set forth in this Exhibit.

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

## Attachment 2
### Appeals Addendum for Participating Groups that are NOT governed by ERISA

Now, therefore, Participating Group and Caremark agree as follows:

1. Participating Group represents that its Plan is NOT governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Participating Group acknowledges that Caremark will administer the Appeals Program consistent with the requirements of ERISA.

2. Participating Group represents and warrants to Caremark that the Appeals Program satisfies any and all laws applicable to the Plan with respect to appeals from denials of Claims for prescription drug benefits. Participating Group shall promptly notify Caremark in writing in the event a change in law causes the Appeals Program to be in non-compliance with applicable laws. Upon such notice, Caremark shall have the option of revising its Appeals Program to be in compliance with such change in law or terminating this Appeals Program.

3. Caremark may from time to time modify the Appeals Program. In the event of any such modification, Caremark shall provide Participating Group with written notice of such modification at least thirty (30) days prior to its implementation. If Participating Group determines that any such modification would cause the Appeals Program to be in non-compliance with applicable laws, Participating Group shall so notify Caremark prior to the end of the thirty-day period. Caremark shall then have the option of further modifying its Appeals Program to be in compliance with applicable laws or terminating this Appeals Program. If Participating Group does not so notify Caremark, then Caremark shall implement the modification and shall continue to rely on the representation and warranty set forth in Section 2 of this Attachment 2 to this Exhibit above.

4. Participating Group represents that it will provide Caremark with a current and accurate copy of the Plan Document. The "Plan Document" shall be the written document which sets forth the Plan Design and all other information concerning Participating Group's prescription drug benefit plan including, but not limited to, eligibility for such benefits, the benefits to be provided, limitations on such benefits and the Plan's Claims and review procedures. Throughout the term of this Addendum, Participating Group, at its expense, will provide Caremark with sufficient advance notice of any proposed amendments to the Plan Document.

5. Caremark will provide Participating Group with the Appeals Program.

   a. *Review of Benefit Coverage.* Caremark shall conduct appeals relating to eligibility and coverage of prescription drug benefit determinations. Such reviews will be based on the Plan Document provisions and criteria approved by the Plan, with respect to coverage of prescription drug benefits only, and shall not include a review of medical necessity as may be defined under the terms of the Plan Document. With respect to such review of benefit coverage, Caremark shall have the sole and absolute discretion to interpret the Plan Document and to make factual findings. The decision of Caremark shall be final, subject to External Review under Section 6 of this Attachment 2 to this Exhibit, if applicable to Participating Group, or available judicial review. Caremark may, in its sole discretion, consider the opinions of additional medical and/or legal experts with respect to interpretation of the Plan Document. Under the Appeals Program, Caremark agrees to be a fiduciary solely for the purpose of adjudicating appeals relating to the coverage of prescription drug benefits. Caremark will review appeals in accordance with the rules and procedures established by Caremark to govern appeals from the denials of claims, as may be amended from time to time.

72

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

    b.    *Review of Medical Necessity.* Caremark has contracted with an independent vendor or vendors for the processing of appeals resulting from a denial of authorization of prescription benefits where the Plan beneficiary is entitled to obtain a review of the denial by an independent physician specialist. Caremark has entered or will enter into an agreement with the independent vendor(s), which provides for an appeals process consistent with the Appeals Program. With respect to such reviews, the independent vendor shall act as a fiduciary and shall have the sole and absolute discretion to interpret the Plan Document and to make factual findings. The decision of the independent vendor shall be final, subject to External Review under Section 6 of this Attachment 2 to this Exhibit, or available judicial review only for abuse of discretion.

6.    *External Review.* This Section 6 shall apply only if Participating Group has elected to receive "Independent (External) Appeals Review" in the PDD or other mutually agreed form(s) of documentation. Caremark has contracted with independent review organizations ("IROs") to provide External Review of benefit determinations that are subject to external Review under PPACA. The decision of the independent review organization shall be final and binding on the Plan and Plan Participant, subject only to any judicial review. Either party may terminate, at any time, the External Review services provided under this Exhibit by providing the other parties with thirty (30) days' prior written notice.

7.    As consideration for the services provided hereunder, Participating Group shall pay Caremark the fees set forth in <u>Exhibit A of this Agreement</u> (the "Fees"). Caremark will invoice such Fees on a monthly basis, and payment shall be due within five (5) days after Participating Group's receipt of each invoice.

8.    Participating Group agrees that if Participating Group fails to pay on or prior to the due date any amount owed to Caremark hereunder, finance charges shall be imposed on such overdue amount in accordance with the Agreement. In addition, Caremark shall have all rights and remedies for non-payment specified in the Agreement.

9.    Participating Group agrees to indemnify and hold harmless Caremark for, from, and against any and all costs, Losses or damages Caremark may incur as a result of (i) Participating Group's breach of this Exhibit, or (ii) any claim by Plan Participant as a result of Caremark' denial of an appeal, provided that Caremark followed the procedures set forth in this Exhibit.

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

## Exhibit F
## Maintenance Choice Program
### [Mandatory, Opt-Out Mandatory, or Voluntary]

Whereas, Caremark will provide the Maintenance Choice Program (the "Program") as described below to ParticipatingGroups that are governed by ERISA. The Program allows Plan Participants to obtain certain over 83-day supply maintenance medication prescriptions at local retail pharmacies or mail service pharmacies participating in the Program (referred to as "Select Participating Pharmacies"), which include Caremark mail service pharmacies and CVS Retail pharmacies. A list of Select Participating Pharmacies can be found on Caremark.com through the Pharmacy Locator tool. Below are the terms and conditions applicable to the Program and to participation by Participating Group's Plan(s) in the Program.

PROGRAM TERMS AND CONDITIONS

1.  Each of Participating Group's Plans that participate in the Caremark Maintenance Choice Program (the "Program") must be a qualified ERISA Plan, and Participating Group must have a qualifying Plan design as identified by Caremark. Some Plan designs may not qualify for participation in the Program. The Program may not be available to Plan Participants in certain states.  If the Program is no longer available in certain states, supplies of 84+ days will be available through a Retail 90 network at a copay that mirrors that of a 90-day supply through Caremark mail service pharmacies. Prescriptions filled in this Retail 90 network will be included in the Retail 90 pricing, rebates, and generic dispensing rate guarantees. If the number of states where the Program is not available increases in a way that would impede Caremark's ability to provide the pricing described in this document, Caremark reserves the right to equitably adjust the financial terms in this Agreement.

2.  The Program will be a change to Participating Group's existing plan design.  Participating Group's Plan is responsible for complying with all laws and regulations applicable to Participating Group's Plan, for making any appropriate notifications to its Plan Participants concerning the Program and for making any appropriate changes to its Plan design documents to reflect Participating Group's participation in the Program.

3.  Caremark will implement and administer the Program as part of the Services Caremark provides under this Agreement. All terms and conditions set forth in this Agreement will apply to the Program, although the Program will be governed by the terms and conditions in this Exhibit to the extent of any conflict between this Exhibit and the Agreement.

4.  The Program applies only to "Maintenance Choice prescriptions." A Maintenance Choice Prescription is a prescription for more than an 83-day supply of certain medications that are covered by Participating Group's Plan(s), excluding specialty medications, and except with regard to prescriptions dispensed in states where Maintenance Choice is not permitted due to state law.

5.  A Maintenance Choice Prescription will be dispensed by a Select Participating Pharmacy, but ParticipatingGroup's Plan(s) will receive the same pricing discounts and dispensing fees, if any, that would apply if the prescription had been filled at one of Caremark's mail service pharmacies. The Plan Participant will pay, and Caremark will direct the dispensing Select Participating Pharmacy to collect, the same "Cost Share" the Plan Participant would have paid if the prescription had been filled at one of Caremark's mail service pharmacies. Maintenance Choice prescriptions will not be subject to theUsual and Customary price or other retail network pricing charged by the Select Participating Pharmacy.

74

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

6. Maintenance Choice prescriptions will be treated the same as prescriptions filled at Caremark's mail service pharmacies for purposes of any mail pricing guarantees and generic dispensing rate guarantees set forth in this Agreement. Maintenance Choice prescriptions will be disregarded and therefore excluded for purposes of calculating all mail service pharmacy non-financial performance guarantees set forth in the Agreement.

7. **For Participating Groups electing Opt-Out Maintenance Choice.** In addition to the other terms set forth in this Exhibit F, the following will also apply if Participating Group has elected to allow the Plan's Participants to "opt out" of the Program by calling Caremark's Customer Care Center. Upon opting out, Plan Participants can continue to fill their 30-day maintenance medication prescriptions at a retail pharmacy of their choice. The prescriptions that are dispensed pursuant to the opt out request: (i) are excluded from the definition of Maintenance Choice prescriptions set forth in Section 4 above and (ii) are subject to the retail network pricing set forth in the Agreement.

8. **For Participating Groups electing Voluntary Maintenance Choice.** In addition to the other terms set forth in this Exhibit F, the following will also apply if Participating Group has elected Caremark's voluntary Maintenance Choice Program. This voluntary Program allows Plan Participants to: (i) receive prescriptions from all Participating Pharmacies for 30-day maintenance medications; and (ii) receive 90-day prescriptions of Maintenance Choice prescriptions from Select Participating Pharmacies. All 30-day maintenance medications dispensed by Participating Pharmacies will be charged in accordance with the retail rates set forth in the Agreement.

Adoption of the voluntary Program requires that Participating Group's Plan implement a Plan design that: (i) requires the Cost Share for a Maintenance Choice Prescription to be the same as or similar to the Cost Share (e.g., co-payment or co-insurance) for the same days' supply at mail to provide an incentive for Plan Participants to move to a 90-day supply; (ii) allows Caremark to communicate with Plan Participants regarding the benefits of moving to a 90-day supply consistent with the Plan design; and (iii) limits the ability of Plan Participants to receive 90-day supplies to Select Participating Pharmacies only.

9. Upon written notice to Participating Group, Caremark may modify the Program or suspend Participating Group's participation in the Program. Additionally, upon written notice to Participating Group, Caremark may modify the financial guarantees in this Agreement that are impacted by Participating Group's participation in the Program, but only in a manner that maintains the total aggregate economic value of Participating Group's existing financial guarantees.

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

## Exhibit G
## Medicare Part B Real Time COB Services

**WHEREAS**, Participating Group desires to have Caremark coordinate and support the appropriate payment of benefits for prescription drugs and other items covered by Medicare Part B as the primary payer when those items are dispensed by Caremark's mail order pharmacies ("Caremark Pharmacies") or by non-Caremark network retail pharmacies; and

**WHEREAS**, pursuant to the terms and conditions of this Exhibit, Caremark agrees to offer and Participating Group agrees to obtain the Medicare Part B real time COB services described herein.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein and in the Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  **Real Time COB Services.**

    a.  As an additional, separate service under the Agreement, Caremark shall provide the following real time coordination of benefits administrative services (the "Real Time COB Services") if the specific service is selected by Participating Group as indicated in Attachment 1 to this Exhibit:

        i.   Determine Plan Participants of Participating Group's Plan who are eligible for Medicare Part B.

        ii.  Before program implementation, Caremark mails a letter with the following descriptions to Plan Participants who are aged 65 or over and who are utilizing items and therapies that may be covered under Medicare Part B:

             1.  A program overview and the implications of Medicare Part B coverage; and

             2.  Impacted Medicare Part B items and therapeutic drug classes.

        iii. For Caremark Pharmacies:

             1.  Support unique secondary coverage rules for Part B Claims;

             2.  Oversee secondary billing compliance; and

             3.  Reconcile Plan paid secondary coverage with any autocross secondary coverage.

        iv.  For non-Caremark network retail pharmacies, send Claim rejection to pharmacy to the extent those Claims are for items covered under Medicare Part B as the primary payor.

    b.  Participating Group acknowledges that if the beneficiary has not provided Caremark Pharmacies with the beneficiary documentation necessary (e.g., Assignment of Benefits) to submit a Claim to Medicare, Caremark Pharmacies are not permitted to bill Medicare. Therefore, in order to permit a Caremark Pharmacy to dispense drugs or items to that beneficiary, Participating Group

76

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

acknowledges and agrees that Claims for Medicare Part B prescriptions submitted during the standard 85-day response period described herein will be processed through and under the terms of the Participating Group's Plan as if the Participating Group's Plan is the primary payer unless Caremark obtains the required Medicare documentation. To obtain the required documentation, Caremark Pharmacies will initiate a standard beneficiary outreach process when an initial Medicare Part B prescription is submitted for the beneficiary. Under the standard outreach process, the beneficiary will have up to 85 days from the time of the initial submission of a prescription to Caremark Pharmacies to return the required Medicare documentation. If the beneficiary does not return the required documentation within that time period, then for subsequent prescriptions, Caremark will inform the beneficiary that the Caremark Pharmacy will not dispense drugs or items unless and until the beneficiary provides the beneficiary documentation necessary for Caremark Pharmacy to submit the Claim to Medicare. If the beneficiary fails to return the necessary documentation within the standard outreach period, Participating Group may elect to continue covering drugs and items as if the Participating Group's Plan is the primary Plan as set forth in the PDD. If not otherwise stated in the PDD, Participating Group agrees to continue to cover Claims that may be Medicare Part B eligible Claims if its Plan Participant does not provide the documentation necessary for Caremark Pharmacies to submit the Claim to Medicare.

c.  Participating Group agrees that to the extent the item or drug is excluded from coverage under Medicare or is not otherwise covered by Medicare and the Caremark Pharmacies have complied with Medicare law (e.g., obtained an Advance Beneficiary Notice ("ABN") from the beneficiary), then Participating Group acknowledges and agrees that the Claim for the item or drug will be processed through and under the terms of the Participating Group's Plan as if Participating Group's Plan is primary.

d.  In order to determine if a drug or item is covered under Medicare Part B, Participating Group shall provide and authorizes Caremark to provide all necessary Claims and eligibility information to Caremark and any Caremark subcontractor. Further, Participating Group acknowledges that Caremark may subcontract some or all of the Real Time COB Services. In addition, Participating Group acknowledges that Caremark and its subcontractor, on behalf of Caremark Pharmacies, may contact Participating Group's beneficiaries and their physicians to obtain information and documents necessary to support a Claim to Medicare Part B. Participating Group acknowledges that billing Medicare for any item or drug is conditioned upon a Caremark Pharmacy or any other pharmacy, as a Medicare supplier, complying with all Medicare requirements. Participating Group understands that whether and how to bill Medicare must be determined by Caremark Pharmacies or non-Caremark pharmacies in their sole discretion.

2.  **Administrative Fees and Payment**.

In consideration for providing Real Time COB Services, Participating Group agrees to pay Caremark a fee equal to the amounts set forth in Attachment 1 to this Exhibit (the "Service Fee"). Participating Group agrees to pay the Service Fee to Caremark within 30 days of receipt of an invoice. Caremark agrees to pay to EHPC $1.50 per Claim for the Real Time COB Services under this Exhibit. Such fees shall be paid to EHPC within thirty (30) days of the end of each month and reconciled annually.

3.  **Cost Sharing and Medigap**. Unless and to the extent the beneficiary has other secondary insurance that is primary to Participating Group's Plan and if Participating Group's Plan covers such amounts, Participating Group agrees to pay part or all of the beneficiary's Medicare Part B co-payment/cost share obligation ("Medicare Co-pay"). Participating Group acknowledges that under Medicare law

77

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

Docusign Envelope ID: E0884110-629C-4931-A599-24EEE85D40318

pharmacies must seek payment from the beneficiary of the Medicare Co-pay to the extent not covered and paid by the Participating Group or another secondary insurer. If the beneficiary has a Medigap insurance or other secondary insurance policy that will also cover the Medicare Co-pay, Participating Group represents and warrants that Participating Group is secondary to the Medigap or other secondary insurance and, upon payment by the secondary insurer to Caremark, Caremark will return to Participating Group any Medicare Co-pay amounts previously paid by Participating Group, unless Caremark determines in its sole discretion that the secondary insurer is not primary to Participating Group's secondary insurance coverage.

4. **Reports**. As part of the Real Time COB Services, Caremark will provide Participating Group with standard real time reports on a quarterly basis, which at a minimum include activity and savings metrics.

5. **Term and Termination**. The term of this Exhibit shall continue until the end of the term of the Agreement or until the Agreement is terminated. The Services of this Exhibit may be terminated independent of the Agreement by Participating Group or Caremark at any time, without cause, upon 90 days' prior written notice to the other party. After termination, Caremark's sole obligation under this Exhibit shall be for Caremark Pharmacies to pursue appropriate adjudication of Claims that Caremark Pharmacies have submitted to Medicare prior to termination. Further, termination of this Exhibit by itself shall not terminate or otherwise affect the Agreement.

6. **Miscellaneous**. Participating Group acknowledges and agrees that any Claims paid by a third-party payer, including Medicare, shall be excluded from the calculation of Rebates and Rebate or other guarantees under the Agreement, and that no Rebate payments or other guarantee payments shall be made to Participating Group based on such Claims. Additionally, upon written notice to Participating Group, Caremark is permitted to modify any financial guarantees set forth in the Agreement that may be affected by the Real Time COB Services. Participating Group acknowledges and agrees that Caremark is not making any representations, warranties, promises or agreements with respect to the value or volume of Medicare Claims payable by Medicare under this Exhibit. The parties acknowledge and agree that Caremark Pharmacies and any other pharmacy that is a Medicare supplier each has legal obligations with respect to submission of Medicare Claims and the Service Fee is intended to compensate Caremark for the Real Time COB Services only, not a Caremark Pharmacy or any other pharmacy's legal obligations with respect to submission of the Claims. The determination of which Plan is primary or secondary will be made by Caremark with information provided by Participating Group or by the beneficiary and under the terms and conditions of any applicable insurance arrangement including Medicare.

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

# Attachment 1 to Exhibit G

### Services and Service Fees

Participating Group may select some or all of the Real Time COB Services through the PDD as follows:

$15 for each mail order prescription identified by Caremark as eligible to be processed under Medicare Part B, as payment for the services referred to in <u>Section 1(a)(i)</u> of the Exhibit to identify Medicare Part B eligible Claims and beneficiaries and transmit that information to the mail order pharmacy.

$1 for each letter sent to a Plan Participant as described in <u>Section 1(a)(ii)</u> of the Exhibit.

$5 per mail order Claim identified by Caremark as eligible to be processed under Medicare Part B, as payment for the services described in <u>Section 1(a)(iii)</u> of the Exhibit to support real time coordination of benefits with Medicare Part B as primary when Participating Group Plan provides unique Medicare secondary coverage detailed in this Exhibit.

$5 per retail Claim identified by Caremark as eligible to be processed under Medicare Part B, as payment for the services referred to in <u>Section 1(a)(iv)</u> of the Exhibit to identify Medicare Part B eligible Claims and beneficiaries, and provide a notice to the retail pharmacy rejecting the Medicare Part B Claim.

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

**Attachment 2 to Exhibit G**

<u>**Description of Participating Group Secondary Coverage Unique to
Medicare**</u>

Notwithstanding Participating Group's standard coordination of benefits (COB) rules, Participating Group agrees to cover the Medicare Co-pay amount due from a beneficiary for the item or service and, as the secondary payer when Medicare is primary, pay Caremark these amounts, unless another party is determined to be responsible for such payment.

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

# Exhibit H
# Medicare Part D Subsidy

**WHEREAS,** the Centers for Medicare and Medicaid Services ("CMS") have adopted regulations regarding the Medicare Prescription Drug Benefit ("Part D"), which regulations allow for a retiree drug subsidy ("Subsidy") from CMS; and

**WHEREAS**, Participating Group has informed Caremark that Participating Group intends to apply for the Subsidy payments specified in 42 CFR §423, Subpart R for its prescription drug coverage for qualifying covered retirees as defined in 42 CFR §423.880 ("Covered Retirees"); and

**WHEREAS**, Participating Group desires to have Caremark assist Participating Group with applying for such Subsidy and, if qualified, to assist Participating Group with complying with CMS requirements for obtaining and maintaining such Subsidy.

1. **Caremark Responsibilities – Retiree Drug Subsidy Basic.** If Participating Group elects Caremark Retiree Drug Subsidy Basic services, Caremark will provide the following services.

　　1.1.　__Part D Subsidy Services__. Caremark will provide Participating Group the services set forth in this Exhibit and the services described in any attachment, Exhibit or amendment hereto (collectively the "Services"). Caremark may recommend changes to the Services from time to time, and may use Claims Information and other Protected Health Information (as defined in the Agreement) to improve or recommend additional Services to Participating Group, or suggest alternate drug coverage options for Covered Retirees, so long as such changes are consistent with the requirements of Part D and do not materially alter any of the provisions of this Exhibit or the Agreement. Participating Group, acting on behalf of its Plan, also authorizes Caremark to use and disclose Protected Health Information as necessary to perform its Services and otherwise assist the Plan in submitting information to CMS as necessary to enable Participating Group to claim the Subsidy from CMS.

　　1.2.　__Application__. Caremark agrees to assist Participating Group with completing the Subsidy Application (the "Application"). Upon Participating Group's written request at least thirty (30) business days prior to the Application submission deadline, Caremark agrees to provide to Participating Group Caremark's vendor ID, cost reporter designee ID and plan sponsor technical contact as obtained by Caremark from CMS' Retiree Drug Subsidy ("RDS") website and other information held by Caremark and required by Participating Group to complete the Application.

　　1.3.　__Actuarial Equivalence Determination__. Caremark agrees to provide claims data and analytical tools to Participating Group to assist Participating Group in determining whether its Plan meets the actuarial equivalence tests specified in 42 CFR §423.884(d)(1). Participating Group acknowledges and agrees that it is responsible for determining that its Plan meets the actuarial equivalence tests in 42 CFR §423.884(d)(1) and for obtaining and providing to CMS the actuarial equivalence attestation required by 42 CFR §423.884(d).

　　1.4.　__Drug Cost Reporting__. If requested by Participating Group, Caremark agrees to upload directly to the CMS RDS website, in an electronic format required by CMS and on the frequency indicated by Participating Group, the drug costs incurred by Participating Group's Covered Retirees as Caremark reasonably believes is required by 42 CFR §423.888(b)(2) and (b)(4). Participating Group, shall remain fully responsible for determining whether drug cost data provided by Caremark meets CMS' requirements, including, without limitation, the definitions of "gross retiree costs" and "allowable retiree costs" as provided in 42 CFR §423.882. In the case of direct uploads to the CMS RDS website, Caremark agrees to upload the

81

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

data in sufficient time for Participating Group to review and formally initiate the request for payment via the RDS website. If Participating Group does not request Caremark directly submit to CMS, reporting will be provided to the Participating Group and not to CMS. In the case of submissions to the Participating Group, Caremark agrees to provide such data in sufficient time to allow Participating Group to submit such information via the CMS RDS website within the time periods specified by CMS. Additionally, Caremark agrees to respond to the records returned from CMS related to the submission of the Participating Group's drug cost data. For all interim and final drug cost data whether uploaded by Caremark or Participating Group to the RDS website, Participating Group shall be responsible for reviewing the cost data, determining whether it meets CMS requirements, deciding to submit the payment request, accepting the terms of the payment agreement and providing its electronic signature for final submission of the payment request to CMS. The CMS RDS Payment Instructions are available on the Medicare Retiree Drug Subsidy Center website at http://rds.cms.hhs.gov and may be amended by CMS from time to time.

      1.5.   <u>Drug Cost Reconciliation</u>. Caremark agrees to submit the drug cost information required for final reconciliation to CMS within fifteen (15) months after the end of the Plan year, or within any other longer time limit permitted by CMS. Participating Group agrees to take such steps and provide such information as are required to complete final reconciliation, including providing any additional information necessary to resolve reject responses from CMS, if applicable. As part of final reconciliation, Caremark shall: (i) adjust drug costs for actual rebates and other required cost adjustments; (ii) take into account any additional claims or changes in claims; and (ii) revise the Covered Retiree list as necessary to reflect actual Covered Retirees.

**2.**   **<u>Caremark Responsibilities – Retiree Drug Subsidy Enhanced</u>.** If Participating Group elects Caremark Retiree Drug Subsidy Enhanced services, Caremark will provide the following services.

      2.1.   <u>Retiree Drug Subsidy Basic</u>. The Retiree Drug Subsidy Enhanced service includes the Retiree Drug Subsidy Basic services described in Section 1 above.

      2.2.   <u>Eligibility Reporting and Reconciliation</u>. Caremark agrees to submit to CMS, in an electronic format acceptable to CMS, the eligibility information about Covered Retirees and periodic updates to such information, that Participating Group provides to Caremark pursuant to Section 4.3. Caremark shall have no responsibility, or liability to Participating Group, for verifying that the eligibility information it submits to CMS on behalf of Participating Group is complete, accurate or correct, and its sole responsibility shall be to transmit the information, as provided by Participating Group, to CMS.

**3.**   **<u>Additional Services</u>.**

      3.1.   <u>Creditable and Non-Creditable Coverage Notices</u>. Upon Participating Group's independent determination as to whether its Plan qualifies as creditable prescription drug coverage within the meaning of 42 CFR §423.56(a), Caremark agrees to send to Participating Group's Part D eligible Covered Retirees notices of creditable or non-creditable coverage, as applicable, in accordance with Part D requirements under 42 CFR §423.56(f) based on creditable coverage information provided by Participating Group. This includes mailing of one (1) letter of creditable coverage to each beneficiary once per year, or as required by CMS, which will be subject to the additional fee referenced in Attachment 2 to Exhibit A. Participating Group agrees that Caremark shall not have any further responsibility to provide any further services under this Exhibit with respect to non-creditable coverage plan(s).

      3.2.   <u>Supplemental Customized Reporting</u>. Participating Group may request customized reports which will be subject to an additional fee referenced in Attachment 2 to Exhibit A.

**4.**   **<u>Participating Group Responsibilities</u>.**

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

4.1.     <u>Non-Part D Drugs</u>. Participating Group acknowledges and agrees that it is responsible for complying with the laws governing determination of whether a drug is a covered Part D drug (as defined in 42 CFR §423.100). Participating Group will indicate the method for determining whether drug costs for certain categories of prescription drugs that may be covered under either Medicare Part B or Part D depending upon the circumstances under which they were prescribed, dispensed or administered are for Part D drugs, and thus eligible for inclusion in the drug cost data to be provided to CMS pursuant to Section 1.6. Participating Group shall pay for such services in accordance with the fee schedule set forth in Attachment 2 to Exhibit A.

4.2.     <u>Actuarial Equivalence and Creditable Coverage</u>. Participating Group shall be responsible for obtaining and submitting the actuarial equivalence attestation required by 42 CFR §423.884(d) and for determining whether its Plan qualifies as creditable coverage under 42 CFR §423.56, and Caremark shall not have any responsibility to Participating Group for making such determinations.

4.3.     <u>Identification of Covered Retirees</u>. Participating Group will provide to Caremark eligibility file(s), in the format designated by Caremark that include the Covered Retirees. Such files shall include each Covered Retiree's (i) social security number or Health Information Claims number; (ii) date of birth, and (iii) such other information as may be required by Caremark. Participating Group shall provide the initial file and periodic updates to such files to Caremark in a timely manner If Participating Group wishes Caremark to submit the eligibility information directly to CMS on Participating Group's behalf, Participating Group agrees to provide such eligibility file, including periodic updates, to Caremark at least fifteen (15) business days prior to the required submission date to CMS. Otherwise, if Participating Group will be submitting the eligibility file to CMS itself, Participating Group will provide the file to Caremark no later than the date it submits its Application to CMS and will provide periodic updates to the eligibility file on a timely basis thereafter. Participating Group also agrees to forward to Caremark the RDS retiree response file it receives from CMS immediately upon receipt of such files by Participating Group.

5.   <u>**Fees.**</u>

5.1.     Participating Group shall pay to Caremark the fees set forth in Attachment 2 to Exhibit A of the Agreement for Services under this Exhibit. Caremark will invoice Participating Group for such fees, and payment will be due as set forth in the Agreement.

**5.2.**     Participating Group acknowledges and agrees that if Participating Group should discontinue coverage of Covered Retirees under Participating Group's plan during the term of the Agreement, then upon mutual agreement of the parties, Caremark shall have the right to adjust fees, rebates and other pricing terms set forth in the Agreement to reflect accurately the discontinuation of coverage for such Covered Retirees.

6.   <u>**General Provisions.**</u>

6.1.     <u>Books and Records</u>. Caremark shall maintain documentation of all claims processed for six (6) years. In addition, Caremark shall maintain, for a period of six (6) years, or such longer period as may be required pursuant to 42 CFR §423.888(d)(2), books, records, documents and other evidence of accounting procedures and practices directly related to the financial and other aspects of its administration of the Plan consistent with 42 CFR §423.888(d)(1). Subject to this Section, all such records, while maintained by Caremark, shall be accessible by Participating Group for examination and audit during the term of and in accordance with this Agreement.

6.2.     <u>Audit Services</u>. Caremark agrees to make available for audit by CMS or its designee the claims data and such data in Caremark's possession as required to be disclosed pursuant to 42 CFR §423.884(b) and

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

as required to be retained pursuant to 42 CFR §888(d)(3), for CMS to verify the Subsidy payment claimed by Participating Group, for the period specified in 42 CFR §423.888(d)(1) or 42 CFR §423.888(d)(2), as applicable.

  6.3. <u>Federal Funds</u>. Caremark acknowledges that information and services it provides in connection with this Exhibit will be used by Participating Group for the purpose of obtaining Federal Funds, as that term is further described in the Application.

  6.4. <u>Retiree Drug Subsidy Payment Instructions</u>. Subsidy payment instructions are available on the Medicare Retiree Drug Subsidy Center website at <u>http://rds.cms.hhs.gov</u>.

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

# Exhibit I
## Vaccine Program Terms and Conditions

If elected by the Participating Group in the PDD, Caremark shall provide vaccine administration services in accordance with such elections. Vaccines administered by Participating Pharmacies shall be adjudicated using the same AWP discount and dispensing fee as would a standard 30-day supply Brand Drug Claim, plus an administration fee as described in Exhibit A. In the event of a change in the administration fee, Caremark shall provide Participating Group written notification of such change at least thirty (30) days prior to the effective date of the change and Participating Group shall have fifteen (15) days from receipt of such notification to make any changes in its vaccine program elections, including terminating its participation in the vaccine program, which changes, if any, shall be made by written notification to Caremark. If Participating Group does not elect to change its vaccine program elections, the charges in Caremark's notification to Participating Group shall apply to any vaccinations administered to Plan Participants on and after the effective date set forth in Caremark's notification. Caremark Retail-90, CVS-90, Maintenance Choice and other 90-day network pricing terms, if any, do not apply to vaccines. Participating Group may, upon at least thirty (30) days' prior written notice to Caremark, terminate participation in the vaccine program at any time.

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

## Exhibit J
## FORM OF ADDENDUM

Participating Group Name: _____

Participating Group Address: _____

_____

Addendum Effective Date: _____

Participating Group Pricing: _____

1.      This Addendum ("Addendum") supplements Amended and Restated Prescription Benefit Services Agreement ("Agreement") between CaremarkPCS Health, L.L.C. ("Caremark") and Employers Health Purchasing Corporation ("EHPC") dated as of January 1, 2025. All capitalized terms used in this Addendum shall have the meaning set forth in the Agreement.

2.      The undersigned Participating Group ("Participating Group") is a Plan Participant of EHPC. Participating Group has reviewed the Agreement and desires that Caremark provide to it the products and Services described in the Agreement on the terms and conditions set forth in the Agreement and this Addendum. By signing this Addendum, Participating Group agrees to the terms and conditions of the Agreement, as may be amended or restated from time to time, including the Exhibits attached thereto, and this Addendum.  Specific Plan and Service elections shall be implemented by Caremark per the Plan Design Documents completed by and between Caremark and Participating Group and/or as otherwise set forth in the Agreement.

3.      This Addendum, together with the Agreement constitutes the entire agreement between the parties with respect to the subject matter herein and supersedes all prior understandings, agreements, contracts or arrangements between the parties, whether oral or written.

_____

Name of Participating Group

By: _____

Name: _____

Title: _____

Date: _____

86

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

## Exhibit K
## RxSavingsPlus® Drug Discount Program

Participating Group may choose to implement this program that provides discounts on prescription drugs to non-benefit eligible populations as well as discounts on certain non-covered drugs to Plan Participants, as described herein (the "RxSavingsPlus Program" or "Program"). Such program may be amended by Caremark from time to time, with reasonable advance notice to Participating Group. The Program will be implemented the first day of the calendar month beginning sixty (60) days after Caremark has received a prescription benefit services agreement or amendment thereto containing this Exhibit.

Below are the terms and conditions applicable to the Program and to participation by the Plan(s) in the Program.

### A. Program Terms

1.        Program Components.  The Program is available for the following populations:
        a.    Terminated Plan Participants. Any Plan Participant of Participating Group's Plan who is no longer eligible for benefits through Plan coverage, including former employees and their dependents, will be eligible to receive discounts on prescription drugs at retail pharmacies within the available discount network ("Program Pharmacies").  Such former Plan Participants are referred to herein as "Enrollees" in the Program. Caremark Specialty and Mail service pharmacies are not Program Pharmacies, however, certain Specialty Drugs may be available at certain Program Pharmacies. Enrollees will have access to Program discounts through the same Caremark Member ID number that identified them while participating in Participating Group's Plan.

        b.    Non-Benefit Eligible Populations. Caremark may provide discounts on prescription drugs filled at Program Pharmacies to Participating Group's non-benefit eligible populations (e.g., part-time employees and new employees prior to benefit eligibility) and their dependents ("Discount Program Participants"). Caremark will provide Participating Group with a sub-domain to the RxSavingsPlus website which will include digital card link for the Discount Program Participants. Participating Group will be responsible for sending communications with information about how to access the sub-domain to Discount Program Participants. This sub-domain tool will allow Discount Program Participants to enroll and to access Program discounts by presenting a paper or digital copy of a drug discount card made available there.

        c.    Drug Discounts for Certain Non-Covered Products. If elected by Participating Group in the PDD, Caremark may provide to Plan Participants filling prescriptions at Program Pharmacies discounts on certain prescription drugs from drug classes that are not covered by the Plan. Plan Participants will have access to Program discounts through the same Caremark Member ID number through which they receive Plan benefits. Non-Covered Products that are excluded from the Formulary elected by Participating Group, if any, will not be available through this Program.

2.        Participating Group acknowledges that Program Pharmacies will collect from the Enrollee, Discount Program Participants and Plan Participants, as applicable (each one referred to throughout this Exhibit as "Program Participants"), one hundred percent (100%) of the applicable prescription price, as indicated in Section D below.  Caremark undertakes no responsibility to bill any payer other than Program

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

Participant for the services described in this Exhibit and specifically disclaims any obligation to engage in any coordination of benefits with respect to such services. Prescription claims that process through this Program may not be combined with any Medicaid, Medicare or any other government program and cannot be submitted for reimbursement through any such program.

3.      Prescription claims that process under this Program are excluded from any and all commitments Caremark may have to Participating Group under the Agreement, including but not limited to those relating to audits, discounts, dispensing fees, Rebates, Performance Guarantees and any other financial guarantees.

4.      The formulary for this Program is different than the formulary adopted by Participating Group under the Agreement. The Program formulary for Enrollees and Discount Program Participants is broad and without exclusions. For Plan Participants, as noted above, the Program allows access to discounts on certain prescription drugs from drug classes that are not covered by the Plan, but not on products excluded from the Formulary elected by Participating Group under the Agreement.

5.      Caremark shall operate toll-free customer service lines twenty-four (24) hours a day, seven (7) days a week for the purpose of responding to inquiries from Program Participants. Caremark shall also provide telephonic emergency pharmacist services twenty-four (24) hours a day, seven (7) days a week.

6.      <u>MinuteClinic Discounts</u>. Caremark's affiliates, MinuteClinic, L.L.C. and its managed entities (collectively, "MinuteClinic") will provide services at walk-in health care centers to Enrollees and Discount Program Participants at a discounted rate as described in Attachment 1 attached hereto. Plan Participants who are currently eligible for health benefits offered by Participating Group are not eligible for discounts on MinuteClinic services and screenings.

7.      Caremark can provide aggregate standard utilization reports to Participating Group upon request.

8.      Either party may terminate this Program upon sixty (60) days' prior written notice to the other party.

## B. Participating Group Authorizations and Obligations

1.      Participating Group authorizes Caremark to provide the Program in accordance with the terms of this Exhibit and the PDD, if applicable.

2.      Participating Group authorizes the use by Caremark, and its designated affiliates or vendors, of Program Participant eligibility information provided by Participating Group, or Participating Group's designee, or Enrollees, to Caremark, as needed to enroll them in the Program (with respect to Enrollees) and to administer the Program, subject to and in accordance with the terms of the Agreement, including this Exhibit, and the Business Associate Obligations. Prescription claims that process under this Program, as well as eligibility information received with respect to Program Participants, which are de-identified in accordance with HIPAA and other applicable law, and which is not identifiable on a Participating Group or Program Participant basis, may be used, disclosed, reproduced, adapted or sold by Caremark.

3.      Participating Group acknowledges that a Program Participant's prescription price for claims processed through this Program by Caremark and/or the Program Pharmacy may include Program fees.

4.      Participating Group acknowledges that the Program is a value-added service offered under the Plan. The Plan is responsible for complying with all laws and regulations applicable to the Plan and for making any appropriate changes to Plan documents to reflect Participating Group's participation in the Program.

88

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

a. With respect to terminated Plan Participants, Participating Group is responsible for providing information to Plan Participants about this Plan benefit which can be done by either (a) providinga letter to employees who are losing prescription drug benefit coverage for themselves andtheir Plan-eligible dependents, or (b) including information regarding the Program in Plandocuments. The letter or the Plan document must include Caremark-approved informationabout the Program, including Program enrollment information, and that the Program can be terminated at any time and without notice to Enrollee. Caremark shall providerecommended language upon request.

b. With respect to Discount Program Participants and Plan Participants, Participating Group is responsible for providing information to them about this Plan benefit which can be done by either (a) sending Caremark approved communications to Discount Program Participants and Plan Participants, or (b) including information regarding the Program in Plan documents. Caremark shall provide recommended language upon request.

5. Participating Group agrees (i) to use only Caremark's approved marketing brochures and other materials (in any medium, including, but not limited to, written communications, verbal communications and web-based marketing) or other materials that have been approved by Caremark, and (ii) to pay a reasonable charge, as established by Caremark, for such materials if created or provided by Caremark.

6. Participating Group authorizes Caremark, and the Program Pharmacies, to communicate with Program Participants related to the Program.

## C. Pharmaceutical Contracts and Rebates.

1. <u>Rebates</u>. Notwithstanding anything in the Agreement to the contrary, no Rebates will be shared with Participating Group under this Program. Participating Group acknowledges and agrees that Participating Group shall have no right to any Rebate monies generated by Program Participants' claims under this Program.

2. <u>Non-Interference</u>. Participating Group agrees that while Caremark provides the Program, Participating Group will not directly or indirectly negotiate, contract, or agree with any pharmaceutical company, or any other third-party, for the purpose of obtaining rebates, other discounts related to the drug utilization of Program Participants, or any services that are similar to the Program provided by Caremark, including, but not limited to the use of over the counter products. Participating Group represents and warrants that, as of the implementation of this Program, it does not have any direct or indirect agreements, arrangements and/or contracts with any pharmaceutical company or other third-party related to any rebates, discounts or such services.

## D. Program Discounts.

ï Subject to the terms and conditions of this Exhibit, when prescription drugs are purchased at a Program Pharmacy, Program Participants will receive discounts up to 80% on Generic Drugs and up to 40% on Brand Drugs, with an anticipated average savings of 55% for Generic Drugs and 24% for Brand Drugs, as compared to the Program Pharmacy's Usual and Customary prices. Program Participants will not pay more for a prescription drug transaction by using the Program than the Program Pharmacy's Usual and Customary price.

ï The Program Pharmacy will collect from the Program Participant the lower of the Program price plus applicable dispensing and transaction fees, or the Usual and Customary price.

89

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

ì   Prices may vary in certain areas for reasons such as local legal requirements, geographic location, specialized manufacturer processes, limited availability, extraordinary shipping requirements or other factors beyond Caremark's control.

ì   Program Pharmacies shall collect from the Program Participant all applicable taxes for covered items, and Caremark is not liable for the payment of applicable taxes.

ì   Caremark does not guarantee Program Participant savings; the estimate set forth above is based upon anticipated pharmacy network performance. Actual discount rates will vary by drug and Program Pharmacy. Certain claims may be excluded from these rates, including but not limited to claims for select injectable drugs and select oral drugs that are bio-technical in nature, compound drugs, vaccines, and those requiring special handling.

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

**Attachment 1 to Exhibit K**

MinuteClinic Discount Terms and Conditions

Participating Group desires to include discounted MC Services (as defined below) at MinuteClinic in the RxSavingsPlus Program for Enrollees and Discount Program Participants. Plan Participants who are currently eligible for health benefits offered by Participating Group are not be eligible for discounts on MinuteClinic services and screenings. MinuteClinic operates walk-in health care centers where licensed health care providers, such as nurse practitioners (NPs) and physician assistants (PAs), diagnose and treat common illnesses and perform certain medical screenings ("MC Services").

1.    *SERVICES*

(a)    **Provision of MC Services.** MinuteClinic shall provide MC Services to Enrollees and Discount Program Participants solely in accordance with the terms of the RxSavingsPlus Program Exhibit and this Attachment 1 and terms and conditions in the Agreement shall not apply to MC Services, except as explicitly stated herein. MinuteClinic shall contract for or employ NPs and PAs necessary to provide the MC Services offered under this Program. MinuteClinic reserves the right to provide the MC Services through the use of subcontractors or other Affiliates that employ licensed health professionals. As used in this Attachment 1, "**Affiliate**" means, with respect to MinuteClinic, any corporation, partnership or other legal entity directly or indirectly owned or controlled by, or which owns or controls, or which is under common ownership or control with, MinuteClinic.

(b)    **Limitations on MC Services.** MinuteClinic may impose such processes, conditions and/or limitations as it deems appropriate to provide the MC Services safely, effectively, efficiently and in a commercially reasonable manner. For example, MinuteClinic may elect not to provide MC Services to an individual for whom the requested MC Services may be contraindicated or when it appears an individual may be trying to fraudulently obtain an MC Service.  Certain MC Services may not be available in particular jurisdictions.

2.    *PAYMENT FOR SERVICES*

(a)    MinuteClinic shall offer to Enrollees and Discount Program Participants a 15% discount off the MinuteClinic retail price for MC Services. MinuteClinic will bill and collect payment directly from Enrollees and Discount Program Participants for these MC Services. This rate for will be provided to Discount Program Participants who present valid photo identification and their RxSavingsPlus ID card with the MinuteClinic discount referenced and to Enrollees who present valid photo identification, their Caremark Member ID card that identified them with participate in Participating Group's Plan plus the MinuteClinic Discount Voucher provided by the Plan (each referred to herein as "Program identification cards"). MinuteClinic shall be entitled to rely upon the respective Program identification cards as presented, and MinuteClinic shall be eligible for payment of the fee upon the provision of MC Services, in reliance upon such Program identification cards. MinuteClinic may conclusively presume that any individual presenting a Program identification card to MinuteClinic shall be responsible for payment for all MC Services rendered in reliance upon a Program identification card.

(b)    **Other Coverage.** MinuteClinic shall not be responsible for inquiring about (or ensuring the lack of) any available coverage that an individual may have for the MC Services under any health plan or other available health care benefit.  MinuteClinic undertakes no responsibility to bill any for

91

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

Docusign Envelope ID: E0884410-629C-4931-A599-21EE85040318

the MC Services, and specifically disclaims any obligation to engage in any coordination of benefits with respect to such MC Services, except where required by applicable law.

3.      *USE OF NAMES.* Participating Group agrees (i) to use only MinuteClinic's approved marketing brochures and other materials (in any medium, including, but not limited to, written communications, verbal communications and web-based marketing) or other materials that have been approved by MinuteClinic, and (ii) to pay a reasonable charge, as established by Caremark or MinuteClinic, for such materials if created or provided by Caremark or MinuteClinic. While the Program is in effect, MinuteClinic may, without further consent of Participating Group, reference Participating Group's name, trademark, service mark and/or symbols to inform the individuals eligible for the MC Services and the general public that MinuteClinic is providing the MC Services.

4.      *MEDICAL AND OTHER RECORDS*

     (a)                    Ownership of Medical Records.  **All medical records, files, charts, and other similar data regarding the MC Services shall be the property of MinuteClinic.**

     (b)                    Confidentiality of Medical Records.  **Participating Group and MinuteClinic each agree to comply with all laws, regulations and standards applicable to the confidentiality of medical information.**

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

# Exhibit L
# Transform Diabetes Care Program

For each Participating Group that has chosen to implement the Transform Diabetes Care Program established by Caremark, as may be amended from time to time by Caremark with reasonable advance notice to Participating Group, (referred to in this Exhibit as the "Program") Caremark will provide Services as described herein.

## I.    GENERAL PROGRAM TERMS AND CONDITIONS

1.  The Program is designed to offer a more personal, local and connected way to manage diabetes plus hypertension, if elected by Participating Group.  The Program combines multiple data elements and analytics, enhanced by local care, to support the Plan Participant through multiple channels, including retail pharmacists and health alert communications. Participating Group may elect an optional nutrition component which includes (i) individualized nutrition support, (ii) personalized digital support through additional features on the digital platform and (iii) titration of diabetes and blood pressure medications with Board Certified medical providers (the "Deprescribing Component" or "DeRx"). To support better clinical outcomes and address a Plan Participant's needs, the Program focuses on these five areas:

    ï    Monitoring blood glucose, and blood pressure, if hypertension component elected;
    ï    Managing lifestyle, nutrition and comorbidity;
    ï    Receiving preventive screenings;
    ï    Adhering to medication; and
    ï    Taking the correct medication, and medication reduction, if DeRx is elected.

2.  The Program may be a change to the existing Plan design.  Participating Group and the Plan(s) are responsible for complying with all laws and regulations applicable to the Plan(s), for making any appropriate notifications to the Plan Participants concerning the Program required by law and for making any appropriate changes to the Plan design documents to reflect participation in the Program.

3.  Caremark or its designated affiliates or vendor will implement and administer the Program as part of the Services Caremark provides under the Agreement to the Plan(s).  The Agreement continues to govern the respective rights and obligations Participating Group and Caremark have with respect to the prescription benefit management services provided by Caremark.  Applicable terms and conditions set forth in the Agreement will apply to the Program; provided, however, that the Program will be governed by the terms and conditions in this Exhibit to the extent there is any conflict between this Exhibit and the Agreement.

4.  <u>Participating Group Obligations and Authorizations</u>.

    a.  <u>General.</u>  Participating Group hereby authorizes and directs Caremark, and shall reasonably cooperate with Caremark, to undertake the Program, including, without limitation: (i) Caremark identifying and working with eligible Plan Participants, and (ii) Caremark, or its designated affiliates or vendor, outreaching to Plan Participants, medical vendors, other healthcare providers and case management team members. Participating Group shall facilitate Caremark's communication with such groups when necessary during Program implementation.

    b.  As part of this Program election by the Plan, Participating Group hereby authorizes and directs Caremark, or its designated affiliates or vendor, to contact Eligible Plan Participants (as defined herein) through various modalities including, but not limited to, through telephone, direct mail, e-mail,

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

text messages, prescription label messages, discussions at the CVS retail pharmacy counter, and Program-related digital platform, as deemed appropriate by Caremark, to provide information about the Program, Program materials and surveys, and for enrollment, diabetes education, nutrition information, hypertension information if such component is elected by Participating Group, nutrition support if DeRx is elected, program evaluations on an annual basis, and coaching. Participating Group will not prevent or otherwise restrict Caremark from contacting Eligible Plan Participants or Eligible Plan Participant providers for purposes of the Program and hereby authorizes Caremark to deliver all Program campaigns and communications.

c.   <u>Initial Data Requirements</u>.  Participating Group shall direct its designee, at Participating Group's sole expense, to provide to Caremark, or its affiliate, no later than sixty (60) days prior to the implementation of the Program (the "Program Effective Date") or the implementation of any new group, a minimum of twelve (12) months* of the data as specified by Caremark in order to deliver the Program (collectively, "Data"), including but not limited to the following:

   i.     Complete data set of a minimum of one (1) year* of historical medical and pharmacy claims;
   ii.    A monthly feed of a complete data set of medical and pharmacy claims;
   iii.   All required data attributes from medical and pharmacy claims (e.g., CPT codes, ICD codes, provider information);
   iv.    All required eligibility data attributes;
   v.     All required demographic data attributes (e.g., age, gender, address) and optional demographic data attributes;
   vi.    All required laboratory data attributes; and
   vii.   Accurate and up-to-date Plan Participant contact information, including mailing address, mobile and/or landline number, SMS consent, and/or email address.

   * For more comprehensive evaluation of Plan Participant history, Caremark would prefer twenty-four (24) months of data.

   The format and detail of the required Data is outlined in the data dictionary provided separately upon request which Caremark may update from time to time.

d.   <u>Ongoing Data Requirements</u>.  Participating Group shall direct its designee, at Participating Group's sole expense, to provide to Caremark, or its affiliate, no later than the 15th day of each month after the Program Effective Date updated Data in accordance with the data dictionary, unless otherwise stated in this Exhibit.

e.   <u>General Data Requirements</u>.  Unless otherwise agreed to by the parties, the Data must be accurate, provided timely, a complete record of all claims of all members within the time period, and in a mutually agreeable format in order to provide the Program.  Any delays by Participating Group or its designee in providing such data or other information required in this Exhibit or the Agreement may delay the provision of the Program or other obligations of Caremark.  Participating Group permits Caremark to share Data with third parties as part of implementation activities prior to the go-live date of the Program and for ongoing Program support.

f.   <u>Deidentified Data</u>.  The Data which is deidentified in accordance with HIPAA and other applicable law, and which is not identifiable on a Participating Group or Plan Participant basis, may be used, disclosed, reproduced or adapted by Caremark and its affiliates.

g.   Participating Group may provide supplementary information to Plan Participants about this Program.  Participating Group agrees to use only Caremark approved marketing brochures and other materials

94

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

(in any medium, including, but not limited to, written communications, verbal communications and web-based marketing) or other materials that have been approved by Caremark.

5.  Caremark will identify Plan Participants who satisfy Caremark's Program eligibility requirements ("Eligible Plan Participants") based on the Data provided to Caremark. Caremark identifies Eligible Plan Participants as diabetic by utilizing a combination of diagnosis codes from medical claims, lab values (e.g., A1c), procedure codes (e.g., insulin therapy) and prescription claims. Caremark utilizes multiple markers and specific exclusion criteria to increase accuracy of identification.

6.  Caremark will provide to Eligible Plan Participants a welcome kit, which will include information about the Program. Caremark, or its designated affiliates or vendor, may contact Eligible Plan Participants through live outreach and digital channels such as direct mail, e-mail, text messages, IVR, phone calls, direct contact, digital platform, Certified Diabetes Care Team ("CDCT") and pharmacist interactions as deemed appropriate by Caremark, to provide information about the Program, Program materials, for enrollment purposes, diabetes education, nutrition information, hypertension information if such component is elected by Participating Group, and coaching, when applicable. The CDCT is made up of Registered Nurses that have diabetes care and education specialist certificates.

7.  Eligible Plan Participants will also be informed of the applicable services and Program features available (e.g., MinuteClinic® health evaluations, access to coaching with a CDCT and/or CVS pharmacists, digital platform, virtual care options when and where available) as part of the Program, as further detailed hereinafter. Caremark is authorized and directed to receive and/or request from MinuteClinic, and other providers and case management team members as the case may be, Protected Health Information on Participating Group's behalf as permitted by relevant law for purposes of administering the Program. Participating Group will ensure that it has or will obtain all necessary authorizations for Caremark, or its designated affiliate or vendor, to contact Eligible Plan Participants and their providers including by using automated technology, and for the collection and use of such information.

8.  The Program includes, but is not limited to the following clinical services and program features available for Eligible Plan Participants:

    a.  Two diabetes condition preventative evaluations per Program year through MinuteClinic, which include services such as an A1c test, blood pressure check, foot exam, diabetic retinopathy exam, and cholesterol test to help prevent diabetes related complications.
    b.  Qualifying Eligible Plan Participants, as determined based on Caremark's glucose meter program criteria, will be provided either a formulary blood glucose meter or a cellular blood glucose meter. Both the formulary and cellular meters allows Eligible Plan Participants to share their blood glucose readings with a care management support team for coaching or education on their diabetes.
    c.  Access to remote health coaching via qualified health coaches. The health coaches will conduct coaching in the area of lifestyle and comorbidity management (e.g., smoking cessation, weight management, nutrition counseling, hypertension management if such component is elected by Participating Group). Health coaches may also outreach to Plan Participants to provide adherence counseling as well as provide medication optimization recommendations, as identified by the Program model as an open care gap that the Program recommends addressing. Providers may be sent information on the recommendations as appropriate.

9.  Eligible Plan Participants may need to access a digital platform, including a CVS Health mobile application, to access certain Program benefits (e.g., accessing information related to diabetes management and secure messaging with clinicians).

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

10.    <u>Hypertension Comorbidity Component.</u>  If Participating Group elects in the PDD to implement the supplemental Hypertension comorbidity program component, the Program will also include the following care management services and program features focused on hypertension:

    a.    All Plan Participants with diagnosed hypertension will have a connected blood pressure cuff available to them, upon request of Plan Participant. Caremark will proactively outreach to Plan Participants who will likely benefit most from the cuff based on Caremark's program criteria;

    b.    Relevant screenings for both hypotension and hypertension crisis as part of the diabetes condition preventative evaluations included in the Program;

    c.    Lifestyle coaching for stage 1 hypertensives;

    d.    Coaching provider outreach to facilitate individualized titration of blood pressure-lowering medications for Plan Participants initiating therapy for the first time or who are not yet controlled; and

    e.    Plan Participant outreach with hypertension comorbidity education.

11.    <u>DeRx Component</u>.  If Participating Group elects in the PDD to implement the supplemental Deprescribing Component, the Program will also include the following care management services and program features:

    a.  Eligible Plan Participants who meet the eligibility requirements for DeRx ("Eligible DeRx Participants") will receive a multi-channel awareness campaign which may include any combination of letters, phone calls, emails or SMS (i) informing them that they are eligible to participate in DeRx and (ii) inviting them to participate in the enrollment process. Eligible DeRx Participants will also receive customer service support for questions related to DeRx, digital platform, or devices.

    b.  A member of the DeRx care team will work through the enrollment process with Eligible DeRx Participants. The enrollment process includes reviewing a description of the DeRx Component, checking for any exclusion criteria, and the completion of a medical exam including review of labs (either existing labs or obtained as part of DeRx).

    c.  An "Enrolled DeRx Participant" is an Eligible DeRx Participant who:

        i.  Meets eligibility criteria, does not meet any exclusion criteria, passes the medical exam, is deemed able to safely participate in the Deprescribing Component of the Program by Caremark;

        ii.  Agrees to participate in DeRx, schedules and attends an initial visit with a member of the DeRx care team and enrolling in the digital platform; and

        iii.  Adheres to clinically appropriate biometric logging regimen.

    d.  Enrolled DeRx Participants are required to access the digital platform to receive key Deprescribing Component benefits.

    e.  Enrolled DeRx Participants will receive, at no-cost to the Enrolled DeRx Participant:

        i.  Nutrition coaching from registered dietitians,

        ii.  Medication titration by licensed clinicians,

        iii.  Access to the digital platform, and

        iv.  the following, if required by clinical guidance and Plan Participant does not already have a compatible device: a body weight scale, a Bluetooth enabled blood pressure cuff, ketone meter, and/or ketone strips.

    f.  DeRx support may be provided to Enrolled DeRx Participants via telephone or other appropriate methods (e.g., direct mail, e-mail, secure chat via the digital platform, text message).

    g.  Caremark is also hereby authorized and directed to receive and/or request test results from or related to the Program from Eligible DeRx Participants' and Enrolled DeRx Participants' providers.

    h.  Participating Group agrees to defend, indemnify and hold harmless Caremark and its affiliates from and against any and all claims, liabilities, demands or damages of any kind, including, without

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

limitation, reasonable attorneys' fees and expenses, incurred by Caremark or its affiliates due to any third party claims, government investigations or fines, to the extent attributable to Participating Group's election to participate in the Deprescribing Component, any claims of discrimination related to the terms of the Deprescribing Component, or any legal defects in the design of Participating Group's benefit plan.

12.   Each party may disclose Confidential Information of the other party only to its employees, affiliates, agents, consultants, contractors, or authorized representatives who have a need to know the Confidential Information in order to accomplish the purpose of this Agreement and who (i) have been informed of the confidential and proprietary nature of the Confidential Information, and (ii) with respect to agents, consultants or authorized representatives, have agreed in writing not to disclose it to others and to treat it in accordance with the requirements of this Section.

13.   Participating Group hereby authorizes and directs Caremark, or its designated affiliates and/or vendor, and Caremark may rely on this direction, to provide Participating Group's third-party vendors (e.g., consultants and providers of disease management services), with information regarding Eligible Plan Participants and the Program, which may include Eligible Plan Participants' Protected Health Information and/or Personally Identifiable Information (as defined by applicable law). Any such information provided by Caremark shall be on behalf of Participating Group and at Participating Group's direction and in no event will any such Participating Group third-party vendor be deemed a business associate of Caremark for any purpose. Caremark shall have no obligation to obtain authorizations from Eligible Plan Participants for Caremark to provide the referenced information to Participating Group's third-party vendors.

## II.   PROGRAM COSTS

1.   <u>Cost Share</u>.  The Program shall be fully funded by Participating Group and provided without additional charge to Eligible Plan Participants.  No Cost Share applies to the program services provided pursuant to this Exhibit (collectively referred to as the "Program Services").  Notwithstanding the foregoing in this paragraph, testing supplies for Plan Participants eligible for a formulary blood glucose meter will adjudicate according to the Plan design.

2.   <u>Pricing, Invoicing and Payment</u>.

   a.   <u>Base Program Fees.</u> Participating Group shall pay Caremark a program fee set forth in Attachment 2 to Exhibit A of the Agreement per Diabetic Plan Participant per month (PDPM) for the Program, which amounts will be invoiced on a monthly basis (the "Program Fee"). Diabetic Plan Participants are identified based on an ICD-10/9 code for diabetes plus at least one additional identifier which corroborates diabetes. Additional identifiers may include, but are not limited to, pharmacy claims within the antidiabetic class or HbA1c result.

   b.   <u>Deprescribing Component Fees</u>. If elected by Participating Group, Participating Group shall pay to Caremark a program fee set forth in Attachment 2 to Exhibit A of the Agreement per Engaged DeRx Plan Participant (as defined below) per month (the "DeRx Component Fee"). Notwithstanding the foregoing, the Participating Group shall pay the DeRx Component Fee for the first six months following the Enrolled DeRx Participant's initial engagement regardless of whether the Enrolled DeRx Participant meets the Engaged DeRx Plan Participant engagement level in any of the first six months. Starting in the seventh month, the Participating Group shall only pay the DeRx Component Fee for "Engaged DeRx Plan Participants".

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

    i.   <u>Engaged DeRx Plan Participant</u>. Engaged DeRx Plan Participants means any Enrolled DeRx Participant that is actively enrolled in the Deprescription Component of the Program (e.g., have not exited DeRx for any reason such as graduation, dismissal, or loss of entitlement), and have at least one of the following activities per month:

       ǐ   At least one (1) telephonic or virtual visit completed with DeRx care team in the calendar month; or

       ǐ   At least one (1) secure message exchange where Enrolled DeRx Participant has received and responded to secure chat messages sent by DeRx care team in the calendar month.

c.    <u>Invoicing and Payment</u>.  For purposes of invoicing and payment, the Program Fees, DeRx Component Fees if applicable, and any other amounts owed under this Exhibit shall be treated as service fees, from the "Invoicing and Payment" provision in the Agreement.  The parties acknowledge and agree that the Program Fees and DeRx Component Fees represent fair market value for the provision of the Program Services.

## III. RETURN ON INVESTMENT ("ROI") GUARANTEE

Caremark will guarantee that the gross savings achieved for the Program during the Measurement Period (as defined below) will be equal to two times the total annual Program Fees and DeRx Component Fees (collectively, the "ROI Fees"), subject to a maximum of the difference between fifty percent (50%) of the actual gross savings and the ROI Fees paid by Participating Group (the "ROI Guarantee"), in accordance with and subject to the terms and conditions set forth below.  The ROI Guarantee will be offered on an annual basis unless Caremark provides ninety (90) days' notice to Participating Group of non-renewal of the ROI Guarantee for the next Measurement Period.  The "Measurement Period" means the twelve (12) months commencing on the Program Effective Date and each full consecutive twelve (12) month period thereafter that the Program is provided.

### 1.  ROI Measurement

To determine gross savings, Caremark will use an analysis methodology which uses outcomes across all eligible Plan Participants via a standard analytic design that compares the Participating Group's population before implementing the Program to the population after implementing the Program (referred to as a "pre/post analytical design"), where appropriate.  Caremark will use Participating Group Data to establish an annual baseline and measure Program performance; provided, however that if Participating Group has between 225-450 Diabetic Plan Participants managed in the Program, only book of business data will be used. Notwithstanding the foregoing, Caremark may incorporate book of business and industry data to adjust the baseline and measure Program performance.

The cost savings calculations in the analysis methodology are also based on identified behavior changes resulting from the Program. Specifically, Caremark will observe the occurrence of identified behavior changes and directly measure savings, where appropriate. Additionally, Caremark will measure differences in the identified behaviors between managed members during the Measurement Period and a comparable group of non-managed members, where appropriate. Examples of changes in behaviors that will be measured may include, but are not limited to, screenings, vaccinations, adherence to diabetes-related medications, and use of blood glucose monitoring devices. Each identified behavior change will have a dollar savings associated with it which will be evaluated and established at the Program level prior to the start of the Measurement Period. The dollar savings for all identified behaviors will be aggregated for purposes of the ROI Guarantee.

The methodology will take into account exceptional or unexpected changes (e.g., addition or removal of

98

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

complementary programs, COVID-19 impact on utilization, enhancement to the Program to include different subsets of diabetes if Caremark is fundamentally changing the population) by leveraging multi-year, Participating Group-specific and book of business experience. The savings calculation methodology will remove cost outliers and normalize for:

    a.  differences in costs such as, but not limited to, demographic and Plan design differences between the Pre-Program Group and the Post-Program Group, and

    b.  the potential impact of Program overlap with other care management programs.

Caremark reserves the right to restrict the cost savings calculation to Plan Participants continuously enrolled in the Plan during the Pre-Program period and the Measurement Period and to Plan Participants managed in the Program within the first four months of the Measurement Period.

**2. ROI Calculation**

If the gross savings realized from the Program over the Measurement Period is less than two times the ROI Fees paid by Participating Group for such period, then Caremark shall pay Participating Group the difference between the ROI Fees paid by Participating Group and fifty percent (50%) of the actual gross savings (the "Program Guarantee Payment"). Caremark will calculate the gross savings within 180 days of the end of the Measurement Period. The Program Guarantee Payment, if any, shall be paid by Caremark to Participating Group within sixty (60) days after Caremark's calculation of the gross savings for the previous Measurement Period.

Within sixty (60) days after its calculation, Caremark will provide Participating Group with a written report explaining its methodology and conclusions.

**3. Conditions to ROI**

The ROI Guarantee does not contemplate the changes in costs, utilization, risk or any form or type of testing associated with novel conditions or circumstances affecting broad populations that place a strain on the health care system and/or Participating Group's Plan(s). These conditions include but are not limited to COVID-19. Caremark reserves the right to adjust the terms and factors of this guarantee in response to these conditions and/or circumstances.

Participating Group agrees and understands that the ROI Guarantee is subject to the conditions below. Caremark reserves the right to revise or remove the ROI Guarantee if any of the following conditions are not met.

| Category | Participating Group or Book Of Business (BOB) Level | Required Conditions |
|---|---|---|
| Minimum Enrollment | Participating Group | At least 5,000 total Plan Participant lives and lessthan 20 percent turnover during the Measurement Period |
| Enrollment Changes | Participating Group | Actual pharmacy enrollment of Participating Group does not change by 15 percent or more during the Measurement Period. |

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

Docusign Envelope ID: E989141D-628C-4031-A590-21EE95040318

| Contact Information | Participating Group | Valid contact information for the eligible Plan Participants demographic data meeting the following minimum thresholds fully loaded in Caremark's eligibility system at least sixty (60) days prior to Program Effective Date:<br>ǐ   35% of email addresses;<br>ǐ   60% of phone numbers; and<br>ǐ   90% of residential mailing addresses. |
|---|---|---|
| Plan Design Changes | Participating Group | Participating Group does not make changes to its Plan design during the Measurement Period that materially impacts the effectiveness of the Program. |
| Program Design Changes | Participating Group | Participating Group does not make changes to the Program design during the Measurement Period that materially impacts the effectiveness of the Program. |
| Diabetes Prevalence and HbA1c Test Rate | Participating Group | At least 4.5% diabetes prevalence rate and at least 70% of the diabetic population have an HbA1c test result on file. |
| Diabetes Prevalence and HbA1c Test Rate | Book of Business | At least 7% diabetes prevalence rate and at least 70% of the diabetic population have an HbA1c test result on file. |
| Book of Business Program Enrollment | Book of Business | Minimum of 25,000 Plan Participants continuouslymanaged in the Program across all clients enrolled in the Program during the Measurement Period. |

| DeRx Minimum Managed (if elected) | At least 25 Plan Participants managed by the Deprescribing Component in the first four months of the Measurement Period. |
|---|---|

## IV. ADDITIONAL TERMS AND CONDITIONS

1. Upon prior written notice to Participating Group, Caremark may modify the Program or suspend Participating Group's participation in the Program.  Additionally, upon prior written notice to Participating Group, Caremark may modify the financial guarantees in the Agreement that are impacted by participation in the Program (but only in a manner that maintains the total aggregate economic value of such financial guarantees as existed prior to the start of the Program).

2. Either party may terminate this Program at any time for convenience upon ninety (90) days prior written notice to the other party.  In the event of Participating Group default, Caremark may immediately suspend the provision of Program Services until the default is resolved.

3. Guarantee Termination. Termination of the ROI Guarantee obligations shall become effective upon written notice by Caremark in the event one or more of the following occur:

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

i.      A material change in the Plan initiated by Participating Group or any government imposed change that impacts Caremark's ability to offer or administer the Program;

ii.     Participating Group's failure to meet its payment obligations for Program Fees, DeRx Component Fees or Claims under the Agreement;

iii.    Participating Group's failure to meet its administrative responsibilities as outlined in this Exhibit (for example, a submission of incorrect or incomplete eligibility information); and

iv.     Participating Group's failure to implement, maintain, or satisfy the conditions of the ROI Guarantee as described in this Exhibit.

4.     <u>Termination during Measurement Period</u>.  The ROI Guarantee is considered met if, prior to the end of the Measurement Period, Participating Group either (a) terminates the Program or (b) terminates the Agreement in whole or in part (defined as a 50 percent or greater membership reduction from the membership at the start of the Measurement Period) prior to the end of the Measurement Period.

5.     The fees, expenses or terms for the Program identified in this Exhibit shall supersede all other commitments or agreements described in any previous document, or the Agreement.

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

## EXHIBIT M
## POINT SOLUTIONS MANAGEMENT

EHPC has elected to make available at Participating Groups' election Caremark's Point Solutions Management Service pursuant to which, in addition to the Services provided to Participating Groups' Plan, Caremark shall make available certain third-party digital applications and other products and services (each a "PSM Solution" provided by a "PSM Vendor") as set forth below. PSM Vendors are contracted as subcontractors of Caremark.

1.    Participating Group will enroll in individual PSM Solutions by executing a Vendor Election Form (VEF) as provided by Caremark, which shall constitute part of the PDD. Implementation dates of individual PSM Solutions will be as described in their respective Vendor Election Forms. Caremark shall collect from Participating Group and remit to PSM Vendors, the fees described in each Vendor Election Form. Caremark shall not be responsible for funding any portion of the PSM Solutions, but rather shall remit applicable fees only for amounts properly funded by Participating Group. Unless otherwise stated in this exhibit or the VEF, the PSM Solution will be available to employees of Participating Group residing in the United States, even if they do not receive other PBM services through Caremark.

2.    Effective January 1, 2025, the PrudentRx PSM Solution shall be available to Participating Groups pursuant to the terms and conditions described in Attachment 1 to this Exhibit.

3.    The Point Solutions Management Service processes payments for third-party products and services. The PSM Solution may include access or use, or otherwise interact with third-party applications, websites and services ("Third-Party Applications") to make the PSM Solution available to Participating Group. These Third-Party Applications may have their own terms and conditions of use. PBM does not endorse and is not responsible for the terms and conditions of use of those Third-Party Applications.

4.    PSM Solutions and related payments shall not constitute Claims under the Agreement, and are excluded from the calculation of any and all financial and performance guarantees in the Agreement. Fees for PSM Solutions may not be paid from any Participating Group Credits available to Participating Group pursuant to Section 3 of Exhibit A of the Agreement. In the event a PSM Solution impacts the underlying financial terms of the Agreement, Caremark will review such impact with Participating Group and may equitably adjust the same.

5.    Communication campaigns, including but not limited to campaigns that raise awareness of the PSM Solutions, will be designed and executed by PSM Vendors in coordination with Participating Group. Data regarding PSM Solutions may be audited pursuant to existing audit rights, and may take up to ninety (90) days from the date of the data request if records need to be secured from PSM Vendors. Caremark will not be liable for any obligations arising from existing agreements with a PSM Vendor, or for services provided by PSM Vendors other than those provided pursuant to a Vendor Election Form. To the extent a party authorizes the disclosure of protected health information of its Plan Participants toa PSM Vendor for a PSM Solution, it will comply with and be subject to the HIPAA Rules.

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

Docusign Envelope ID: E9891410-628C-4031-A590-215F9F040318

6.      Caremark, EHPC, or Participating Group may at any time terminate the party's participation in the Point Solutions Management Service, or any individual PSM Solution, upon ninety (90) days' prior written notice to the other parties. In the event safety concerns with a PSM Solution or breach of a PSM Vendor's contract with Caremark require Caremark to terminate a PSM Solution, Caremark shall notify EHPC and Participating Group of the termination within five (5) business days. Upon the termination of Participating Group's participation in the Point Solutions Management Service, all Vendor Election Forms will terminate simultaneously with such termination.

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

Attachment 1

**PrudentRx Terms and Conditions**

| Account Team Information | |
|---|---|
| SAE Name: | See Client Specific VEF |
| SAE Phone: | |
| SAE Email: | |
| AM Name: | |
| AM Phone: | |
| AM Email: | |
| | |

| Client Type | |
|---|---|
| ☐  Employer      ☐  Coalition      ☐  TPA Liable      ☐  TPA Non-Liable      ☐  Health Plan | |

| Client Information | |
|---|---|
| Client Name ("**Client**"): | (Please insert full legal name of Client – Caremark Contracted Client)<br><br>See Client Specific VEF |
| Eligible Carrier, Account, & Group(s) (CAG)<br><br>Downstream Entity(ies) or Group(s) Name(s) | (Please list hierarchy or use "*" to signify that entire population under given carrier or account is eligible). |
| Coalition/TPA/Health Plan name if different from Client/Downstream Entity or Group name: | Employers Health |
| Line of Business (applicable to **Health Plan only**) | ☐  Self Funded      ☐  Fully Insured |
| High-Deductible Health Plan ("**HDHP**") with health savings accounts ("**HSA**") included | ☐  Yes      ☐  No |
| **HDHP with HSA CAG(s):** Eligible Carrier, Account, & Group(s) (CAG) | (Please list hierarchy or use "*" to signify that entire population under given carrier or account is HDHP with HSA – only complete section if implementing the PrudentRx solution on HDHPs with HSAs and include **only** those CAG(s) that are HDHPs with HSAs within this section ). |
| Onsite/External Pharmacy Included in ES/EES Network | ☐  Yes      ☐  No |

This Vendor Election Form ("**VEF**") is an exhibit to the Point Solutions Management Amendment ("**Amendment**") between CaremarkPCS Health, L.L.C. ("**CVS Caremark**"), and Client.  All capitalized terms used in this VEF and not otherwise defined shall have the meanings set forth in the Amendment or Agreement.  In the event of a conflict between

104

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

the terms of this VEF and the terms of this Amendment, the terms of this VEF shall control.

PrudentRx, LLC ("**Vendor**" or "**PrudentRx**") provides co-pay program related services to plan sponsors that include guidance on plan benefit design for specialty products and assistance to members to secure available copay assistance for specialty drugs through the various programs funded by pharmaceutical companies ("**PrudentRx Solution**").

Client agrees to implement the PrudentRx Solution pursuant to the Point Solutions Management Amendment effective with the following parameters:

## PRUDENTRX SOLUTION:

### Additional Defined Terms:

"**Benefit Cap**" means the maximum amount of funds available from the drug manufacturer under a Pharma Copayment Assistance Program. The Benefit Cap and copay program periods can vary by drug manufacturer and the Participating Member's enrollment date in the program. If a Specialty Drug does not have a Pharma Copayment Assistance Program, the Benefit Cap will be zero for such Specialty Drug for purposes of the PrudentRx Solution.

"**Covered Class**" means a therapeutic class that is included in the PrudentRx Solution, as specified on Attachment 2. Covered Classes are updated from time to time and are available to Client upon request. Covered Classes may vary depending on Client's exclusive specialty setup and Program Drug List selected by Client.

"**Eligible Member**" means a Member who is prescribed a Program Product and whose prescription benefit includes the PrudentRx Solution. For clarity, all Members whose prescription benefit includes the PrudentRx Solution are eligible to participate in the PrudentRx Solution when prescribed a Program Product.

"**Essential Health Benefits**" shall have the meaning given to such term at 42 U.S.C. § 18022(b), which currently includes items and services in the following ten benefit categories: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.

"**HDHP Member**" means a Participating Member who is enrolled in a HDHP with an HSA.

"**Non-Participating Member**" means a Member who: (i) affirmatively elects to opt-out of the PrudentRx Solution; (ii) fails to complete any required enrollment process for the PrudentRx Solution (as described below); or (iii) fails to comply with the terms of the PrudentRx Solution (e.g., fails to enroll in an available Pharma Copayment Assistance Program).

"**Participating Member**" means an Eligible Member, subject to completing any required enrollment process for the PrudentRx Solution (as described below); but excluding any Non-Participating Member.

"**Pharma Copayment Assistance Program**" means a program sponsored by a pharmaceutical company that provides financial assistance for payment of the patient's cost-share for those patients who meet the program eligibility criteria, as established by the pharmaceutical company, but excluding any program that conditions assistance on financial need.

"**Program Drug List**" means a "*PrudentRx Program Drug List*," which is a listing of Specialty Drugs that will be included in the PrudentRx Solution for Client, selected by Client for the Plan and subject to modification to align

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY
AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

with Client Plan design and Client specialty drug list.

"**Program Product**" means a Specialty Drug that is listed on the Program Drug List selected by Client for the Plan.

"**Specialty Tier**" means the adjudication tier for Specialty Drugs.

**Program Description:**  The PrudentRx Solution shall consist of the following elements:

ï    Scope:  Pharma Copayment Assistance Programs.  The PrudentRx Solution is available only to Eligible Members.

ï    Plan Design:  For the Plans participating in the PrudentRx Solution, as designated by Client in the "Client Information" in the table above, Client shall adopt a plan design for Specialty Drugs in a Covered Class that consists of the following elements:

> ➢ Specialty Tier:  Client will implement a Specialty Tier.  Products on the Specialty Tier shall be subject to a thirty percent (30%) Cost Share for both Participating Members and Non-Participating Members, after satisfaction of any applicable deductible.  All Specialty Drugs in a Covered Class shall be adjudicated at the Specialty Tier.

> ➢ Non-Essential Health Benefits: Products in a Covered Class exceeding the maximum count required for that Covered Class by any state benchmark plan shall be deemed non-Essential Health Benefits. Program Drug Lists meet or exceed the benchmark plan requirements of all fifty states and Washington, D.C.

> ➢ Coverage Process:  When the Benefit Cap has been reached based on a Pharma Copayment Assistance Program for a Participating Member for a Program Product and thus the Pharma Copayment Assistance Program is not available, including where the Program Product does not have a Pharma Copayment Assistance Program available and thus the Benefit Cap is zero, the Plan shall assume responsibility for the Cost Share for the Program Product unless and until financial assistance is again available to the Participating Member under the Pharma Copayment Assistance Program. This shall include any amounts not paid by a Pharma Copayment Assistance Program, such as when there is a residual leftover after applying the maximum copay assistance to the claim. As an exception to the foregoing, when the Benefit Cap has been reached for an HDHP Member for a Program Product that is not listed on the plan's HDHP Preventive Drug List, the Plan shall not assume responsibility for the Cost Share for such Program Product until such time as the Member deductible has been satisfied.

> ➢ Deductible and OOP Max:  Amounts paid *for the benefit of a Member*, including amounts paid by a Pharma Copayment Assistance Program, for a Program Product shall *not* be counted toward any Member deductible or any Member out of pocket maximum obligation, unless otherwise required by applicable law. Amounts paid *by a Member* for a Program Product that is *not* an Essential Health Benefit shall *not* be counted toward any Member deductible or any Member Affordable Care Act ("ACA") out of pocket maximum obligation, unless otherwise required by applicable law; except that amounts paid by an HDHP Member shall be counted toward the Member deductible. Amounts paid *by a Member* for a Program Product that is an Essential Health Benefit shall be counted toward any Member deductible and any Member ACA out of pocket maximum obligation.

> ➢ Summary Plan Description. The Client shall adopt language in its Summary Plan Description that aligns with the above requirements. A template for such language is provided on Attachment 3.

106

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

Although PrudentRx will assist with the language in the Summary Plan Description, the Client and the Plan administrator remain responsible for fulfilling their fiduciary duties under ERISA with respect to the content of the Summary Plan Description.

ï̈   <u>Program Drug List</u>: Client shall select a standard Program Drug List, which Program Drug List shall be subject to review and approval by CVS Caremark to verify plan design alignment with the Formulary (i.e., no cost share disadvantage of preferred formulary products).

ï̈   <u>Member Notification & Participation</u>:   PrudentRx will  work in conjunction with Client to develop a communication and participation process regarding the PrudentRx Solution, to include the following:

    ➢   Following receipt of the Eligible Member information where Eligible Member is confirmed as currently prescribed a Program Product, PrudentRx will send a standardized and non-editable notice to Eligible Members. These Eligible Members will be identified via historic claim files approximately thirty-five (35) days prior to intended implementation date of the PrudentRx Solution.

    ➢   In order to complete enrollment in the PrudentRx Solution, following receipt of the welcome letter, Eligible Members who are utilizing a Program Product for which there is an available Pharma Copayment Assistance Program must contact PrudentRx to register (or validate prior registration) in the Pharma Copayment Assistance Program. Eligible Members who are utilizing a Program Product for which there is <u>no</u> available Pharma Copayment Assistance Program require no additional action to complete enrollment in PrudentRx Solution.

    theApproximately five (5) to seven (7) business days after notice has mailed, PrudentRx will coordinate telephonic outreach to Members utilizing a Program Product for which there is an available Pharma Copayment Assistance Program, but who have yet to contact PrudentRx. If telephonic outreach does not result in contact with a Member, PrudentRx will make additional attempts either via telephonic or digital communication to participate in the PrudentRx Solution. PrudentRx outreach may also include a written letter to the Member providing notice that the Member needs to contact PrudentRx to participate in the PrudentRx Solution and that if the Member fails to call PrudentRx within time frame specified in the letter, the Member will be responsible for the full amount of the member cost share on the specialty medication. For clarity, digital communications will be sent by CVS Specialty to Members who have opted to receive digital communication who cannot be reached telephonically.

    ➢   PrudentRx will implement a high touch comprehensive communication process for Members who are projected to participate in the PrudentRx Solution at the Client's launch date.

Once the PrudentRx Solution is live for Client, PrudentRx will identify net-new utilizers of Program Products within one (1) business day of receipt of a claim for a Program Product.  PrudentRx shall conduct outreach to the Member if the Member is not currently enrolled in an available Pharma Copayment Assistance Program. PrudentRx shall coordinate with the Member and seek to complete Member enrollment in the applicable Pharma Copayment Assistance Program within three (3) business days of receipt of such claim, subject to Member satisfaction of the eligibility requirements of such Pharma Copayment Assistance Program.

ï̈   <u>Pharma Copayment Assistance Program Enrollment</u>:  PrudentRx shall assist Participating Members with enrollment in Pharma Copayment Assistance Programs for Specialty Drugs and securing financial assistance under such Pharma Copayment Assistance Programs.

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

ǐ   Coordination with CVS Caremark. PrudentRx collaboratively works with CVS Caremark and, if requested by CVS Caremark, the dispensing pharmacies, to ensure timely prescription processing with minimal member abrasion, by providing real time data feeds to include notification to CVS Caremark of: (i) decision by a Member to not participate in the PrudentRx Solution, including any Member who elects not to enroll in an available Pharma Copayment Assistance Program; (ii) inability to contact a Member; and (iii) enrollment of a Participating Member in a Pharma Copayment Assistance Program.

   Client hereby directs and authorizes CVS Caremark to: (i) exclude from any Member deductible and any Member annual out of pocket maximum obligation any amounts paid for the benefit of a Member, including amounts paid by a Pharma Copayment Assistance Program, for Specialty Drugs in a Covered Class, unless otherwise directed by Client due to requirements of applicable law; (ii) exclude from any Member deductible and any Member annual ACA out of pocket maximum any amounts paid by a Member for a Specialty Drug in a Covered Class that is not an Essential Health Benefit, unless otherwise directed by Client due to requirements of applicable law; provided that amounts paid by an HDHP Member for any Program Product shall be counted toward the Member deductible; (iii) provide to PrudentRx daily paid claims, daily reject files, and monthly claims files for Program Products dispensed to Participating Members so that PrudentRx may implement and operate the PrudentRx Solution (collectively, "**Data**"); and (iv) provide PrudentRx with Member portal (Client Online Services) access for designated PrudentRx employees performing Participating Member benefit verification and eligibility in real time, if possible.

ǐ   Confidentiality. In the event Client receives any Confidential Information (as such term is defined in the Agreement) of PrudentRx, Client shall maintain the confidentiality of such Confidential Information consistent with the requirements imposed in the Agreement for confidential treatment of CVS Caremark Confidential Information.

ǐ   Release of Data. Client hereby authorizes and directs CVS Caremark to disclose the Data and other Client or Member information to PrudentRx in order to provide the PrudentRx Solution to Client. Client acknowledges and agrees that to the extent any data disclosed to PrudentRx includes Member information, such Member information shall be disclosed by CVS Caremark subject to the Business Associate Agreement between Client and CVS Caremark.

ǐ   Claims Audits. On a monthly basis, PrudentRx shall: (i) retroactively audit claims for the prior month to ensure the PrudentRx Solution was implemented appropriately for each Participating Member for whom a claim was adjudicated in such month, including implementation of the coverage process whereby the Plan assumes responsibility for the Cost Share; and (ii) provide a written report with the results of such audit to CVS Caremark and Client within thirty (30) days of the end of the month subject to the audit. If any issues are identified, PrudentRx shall consult with CVS Caremark to coordinate on an appropriate resolution.

ǐ   ERISA Plans. In the event the Plan is subject to ERISA, Client acknowledges and agrees that PrudentRx shall not be: (i) the administrator (as that term is defined in Section 3(16) of ERISA) of any Plan for any purpose; (ii) a named fiduciary with respect to any Plan for purposes of ERISA or any applicable state law; (iii) delegated discretionary authority or responsibility, or exercise discretionary authority or control, with respect to any Plan or its administration; or (iv) deemed to be a fiduciary with respect to any Plan for purposes of ERISA or any applicable state law.

ǐ   Plan Compliance. Client shall ensure that: (i) the Plan is at all times in compliance with all applicable laws, rules and regulations relating to the Plan's implementation of the PrudentRx Solution, including, without limitation, state insurance laws, rules and regulations; and (ii) the Plan timely and accurately submits all

108

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

required governmental filings and obtains all required governmental approvals relating to the Plan's implementation of the PrudentRx Solution.

ǐ   <u>HDHP</u>.  Client is solely responsible for evaluating compliance with the Internal Revenue Code and IRS guidance, in consultation with its own counsel, in connection with any contemplated implementation of the PrudentRx Solution for any HDHPs or HSAs and Client is solely responsible for, and shall indemnify CVS Caremark and PrudentRx against, any loss, cost, damage or expense resulting from any non-compliance with the Internal Revenue Code or IRS guidance.

ǐ   <u>Reporting</u>. On a monthly basis, PrudentRx will provide a summary report to Client of the claims processed under the PrudentRx Solution with respect to the Plan, which shall include the following metrics:
- PrudentRx Generated Savings
- Total Specialty Drug spend subject to PrudentRx Solution
- Total net savings after Service Fee
- Summary YTD by Covered Class
  - ǐ   Including the number of Participating Members and number of claims under each Covered Class

All information disclosed on the foregoing report shall comply with the privacy requirements under HIPAA and any other applicable law.

ǐ   <u>Invoicing</u>:  PrudentRx shall provide monthly claims detail and the Service Fee to CVS Caremark. CVS Caremark will invoice Client the Service Fee on the monthly administrative service fees invoice.

ǐ   <u>Early Termination</u>:  CVS Caremark may immediately terminate this VEF in the event CVS Caremark determines, in its reasonable discretion, that such termination is necessary to avoid or limit an adverse financial impact on CVS Caremark and/or Client.  CVS Caremark may terminate this VEF for any reason by providing Client with written notice of such termination at least ninety (90) days prior to the effective date of such termination.

| |
|---|
| **PrudentRx Solution Effective Date: <mark>XX/XX/20XX</mark>**<br><br>**Note:** The PrudentRx Solution Effective Date must be the first day of the month, cannot be sooner than the effective date of the Point Solutions Management Amendment, and cannot be sooner than 90 calendar days from the date of delivery of an executed copy of this Vendor Election Form to PointSolutionsManagement@CVSHealth.com. **In the event this Vendor Election Form is not delivered at least 90 calendar days prior to the proposed PrudentRx Solution Effective Date or otherwise fails to meet the timing requirements of the prior sentence**, this Vendor Election Form shall not take effect and the Client shall be requested to submit a new Vendor Election Form with a conforming PrudentRx Solution Effective Date. |
| **Eligible Member Population:**<br>⊘ Client's PBM-covered employees<br>⊘ Dependents of Client's employees |
| **<u>Compensation</u>:** Client will pay a service fee equal to twenty-five percent (25%) of Generated Savings ("**Service Fee**"). |

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

> ï   "**Generated Savings**" are calculated as the Member Cost Share before the PrudentRx Solution is applied: (a) less any remaining amount of the Member Cost Share billed back to the Client; and (b) less the Discount Factor
> ï   "**Discount Factor**" is calculated as 10% of the total of the following: the Member Cost Share less any remaining amount of the Member Cost Share billed back to the Client.
>
> PrudentRx may share a portion of the above service fee with third parties, including CVS Caremark, for services rendered in connection the PrudentRx Solution.  There are no separate fees for administration, Member outreach and support, monthly reporting, or any of the other services provided by PrudentRx under this Agreement.

By signing below, Client acknowledges that they have read, understand, and agree to all terms and conditions outlined within this VEF.

_____         _____
Signature of Client's Authorized Representative      Signature of Strategic Account Executive

Name (Print):_____         Date Signed: _____
                                                                       (MM/DD/YYYY)
Title:_____

Date Signed: _____
        (MM/DD/YYYY)

_____

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

**Attachment 2**
**Covered Classes**

ACROMEGALY
ALPHA-1 ANTITRYPSIN DEFICIENCY
AMYLOIDOSIS
ANEMIA
ASTHMA
AUTOIMMUNE
BONE DISORDERS - OTHER
COAGULATION DISORDERS
CRYOPYRIN-ASSOCIATED PERIODIC
SYNDROMES
CYSTIC FIBROSIS
ELECTROLYTE DISORDERS
GASTROINTESTINAL DISORDERS-OTHER
GOUT
GROWTH HORMONE AND RELATED
DISORDERS
HEMATOPOIETICS
HEMOPHILIA
HEPATITIS B[*]
HEPATITIS C
HEREDITARY ANGIOEDEMA
HORMONAL THERAPIES
HUMAN IMMUNODEFICIENCY VIRUS[*]
IMMUNE DEFICIENCIES AND RELATED
DISORDERS
INFECTIOUS DISEASE - OTHER
INFERTILITY[**]
IRON OVERLOAD
LYSOSOMAL STORAGE DISORDER
MENTAL HEALTH CONDITIONS
MOVEMENT DISORDERS
MULTIPLE SCLEROSIS
NEUROLOGICAL DISORDERS
NEUROMUSCULAR
NEUTROPENIA
OCULAR DISORDERS[*]
ONCOLOGY
OSTEOPOROSIS

111

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY
AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

PAROXYSMAL NOCTURNAL
HEMOGLOBINURIA
PHENYLKETONURIA
PRE-TERM BIRTH
PULMONARY ARTERIAL HYPERTENSION
PULMONARY DISORDERS - OTHER
RARE DISORDERS - OTHER
RENAL DISEASE
RESPIRATORY SYNCYTIAL VIRUS
SEIZURE DISORDERS
SICKLE CELL DISEASE
SLEEP DISORDER
SYSTEMIC LUPUS ERYTHEMATOSUS
THROMBOCYTOPENIA
TRANSPLANT*
UREA CYCLE DISORDERS

   * ONLY AVAILABLE IF CLIENT HAS ENHANCED EXCLUSIVE SPECIALTY

** NOT AVAILABLE IF THE PARTICIPATING CLIENT HAS A FERTILITY MAB

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY
AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

## Exhibit N
## Caremark Cost Saver Program

As part of the Services provided pursuant to the Agreement, Caremark shall provide its Caremark Cost Saver Program (the "Program"), which utilizes a third-party contracted Participating Pharmacy network to enable Plan Participants to take advantage of lower discount card prices, when available, while retaining the benefit of the drug utilization and clinical programs provided under the Plan. There is no cost for Participating Group's Plan(s) to participate in the Program. Below are the terms and conditions applicable to participation by Participating Group's Plan(s) in the Program.

1. When the Plan Participant presents a prescription for an eligible Covered Product at a Participating Pharmacy that participates in the Program, Caremark may compare the price available under the Caremark contracted network with the price available through a non-Caremark contracted network. If the price for the Covered Product is lower through a non-Caremark contracted network, the Claim will be processed through that network (a "Program Claim"). If the price for the Covered Product is lower through the Caremark contracted network, the Claim will process through the Caremark contracted network. The selection of the lowest cost option shall occur automatically and no enrollment or additional action is required by the Plan Participant(s) beyond presenting their pharmacy benefit identification card. Caremark shall perform all standard utilization review services with respect to Program Claims that it performs for other Claims pursuant to this Agreement.

2. Participating Group acknowledges the following regarding the Program:

   a. Program Claims process through a third-party contracted retail pharmacy network. This network is not owned by Caremark and is contracted as a discount card network. Accordingly, Program Claims constitute discount card program claims and may not be subject to all pharmacy reimbursement price procedures and terms that apply to a Caremark contracted pharmacy network.

   b. The price for each Program Claim includes a fee that the Participating Pharmacy remits to the third-party that contracts for access to the pharmacy network. For avoidance of doubt, the total cost of the Program Claim, including such fee, must be lower than the total cost that would otherwise apply under the Caremark contracted network in order for the Claim to process as a Program Claim. The Plan Participant and/or Participating Group will never pay a higher cost for a Program Claim than they would if the Program was not in place.

   c. If Participating Group participates in Caremark's Maintenance Choice® Program, notwithstanding anything to the contrary elsewhere in the Agreement, Maintenance Choice prescriptions that process as Program Claims will process at a price that is lower than the price at the Caremark mail service pharmacy.

   d. Even if Participating Group is exempt from sales or use taxes, Program Claims may include a sales tax allocation where required by applicable law that cannot be removed or reported under the Program.

113

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

    e.   Participating Pharmacies are not obligated to submit Program Claims to a secondary payor, when applicable, and even if submitted to a secondary payor, such secondary payor may refuse to make a coordination of benefit payment toward Program Claims.

3.    Program Claims constitute Claims, as defined in the Agreement, and are included in the reconciliation of all financial guarantees under the Agreement in the same manner and to the same extent as other Claims. Program Claims will be included in all Claim reporting Caremark makes to Participating Group or its designated vendor pursuant to the Agreement. For purposes of Claim reporting and reconciliation of financial guarantees, the Program shall allocate a portion of the total Program Claim cost as a dispensing fee, consistent with the maximum dispensing fee guarantees set forth in Exhibit A of this Agreement. Participating Group acknowledges that the dispensing fee reported on the Program Claim may differ from the dispensing fee the Participating Pharmacy is entitled to under the third-party contracted pharmacy network, provided that Participating Group and/or Plan Participant shall in no event be liable for any differential in the dispensing fee.

4.    Participating Group acknowledges and agrees that Caremark is not guaranteeing savings for Plan Participants or Participating Group through the Program.

5.    The Plan is responsible for complying with all laws and regulations applicable to the Plan, for making any appropriate notifications to Plan Participants concerning the Program and for making any appropriate changes to Plan documents to reflect Participating Group's participation in the Program, if necessary.

6.    Upon prior written notice to Participating Group, Caremark may modify the Program. Either party may terminate Participating Group's participation in the Program upon sixty (60) days' prior written notice to the other party. In the event that Participating Group terminates its participation in the Program, Caremark may modify the financial guarantees in this Agreement that are impacted by such termination, but only to the extent reasonably necessary to account for the impact of such termination.

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

## Exhibit O

## Regulatory Requirements

This Schedule 1 (Regulatory Requirements) consists of one or more sub-schedules setting forth specific contractual provisions required to be included in the Agreement by a specific State, U.S. Territory or governmental agency that may have authority over (a) one or more of the Services provided by Caremark, (b) the Participating Group's Plan, and/or (c) certain Plan Participants. Provisions of the sub-schedules are taken directly from the relevant statute or regulation in effect at the time the Agreement or Amendment to which this Schedule 1 is attached is executed. In the event of a change with respect to any Regulatory Requirements after a sub-schedule is effective, the applicable terms shall be considered amended as necessary to comply with any such change (as of the required compliance date). The contractual provisions set forth in the sub-schedules shall apply to the Services provided by Caremark to the extent mandated by their terms and with respect to the specific elements of the Services provided or populations of Plan Participants (the "Subject Services and Plan Participants"), as mandated in the relevant provision. To the extent these provisions differ from the terms contained elsewhere in the Agreement, the following rules of interpretation shall apply:

1. If compliance with the terms and conditions stated elsewhere in the Agreement with respect to the Subject Services and Plan Participants would comply with the applicable requirements of any sub-schedule of this Schedule 1, the terms and conditions stated elsewhere in the Agreement shall prevail, and

2. If compliance with the terms and conditions stated elsewhere in the Agreement with respect to the Subject Services and Plan Participants would not comply with the applicable requirements of any sub-schedule of this Schedule 1, the terms and conditions of the applicable sub-schedule(s) of this Schedule 1 shall apply to the extent required by applicable law.

The following sub-schedules are attached hereto:

 ï    Schedule 1-FL (State of Florida Regulatory Requirements)

115

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

**Schedule 1-FLA**

**(State of Florida Regulatory Requirements)**

Florida Statutes §626.8825 Pharmacy benefit manager transparency and accountability.

(1)  DEFINITIONS.  As used in this section, the term:

(a)    "Adjudication transaction fee" means a fee charged by the pharmacy benefit manager to the pharmacy for electronic claim submissions.

(b)    "Affiliated pharmacy" means a pharmacy that, either directly or indirectly through one or more intermediaries:

1.    Has an investment or ownership interest in a pharmacy benefit manager holding a certificate of authority issued under this part;

2.    Shares common ownership with a pharmacy benefit manager holding a certificate of authority issued under this part; or

3.    Has an investor or a holder of an ownership interest which is a pharmacy benefit manager holding a certificate of authority issued under this part.

(c)    "Brand name or generic effective rate" means the contractual rate set forth by a pharmacy benefit manager for the reimbursement of covered brand name or generic drugs, calculated using the total payments in the aggregate, by drug type, during the performance period. The effective rates are typically calculated as a discount from industry benchmarks, such as average wholesale price or wholesale acquisition cost.

(d)    "Covered person" means a person covered by, participating in, or receiving the benefit of a pharmacy benefits plan or program.

(e)    "Direct and indirect remuneration fees" means price concessions that are paid to the pharmacy benefit manager by the pharmacy retrospectively and that cannot be calculated at the point of sale. The term may also include discounts, chargebacks or rebates, cash discounts, free goods contingent on a purchase agreement, upfront payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits from manufacturers, pharmacies, or similar entities.

(f)    "Dispensing fee" means a fee intended to cover reasonable costs associated with providing the drug to a covered person. This cost includes the pharmacist's services and the overhead associated with maintaining the facility and equipment necessary to operate the pharmacy.

(g)    "Effective rate guarantee" means the minimum ingredient cost reimbursement a pharmacy benefit manager guarantees it will pay for pharmacist services during the applicable measurement period.

(h)    "Erroneous claims" means pharmacy claims submitted in error, including, but not limited to, unintended, incorrect, fraudulent, or test claims.

(i)    "Group purchasing organization" means an entity affiliated with a pharmacy benefit manager or a pharmacy benefits plan or program which uses purchasing volume aggregates as leverage to negotiate discounts and rebates for covered prescription drugs with pharmaceutical manufacturers, distributors, and wholesale vendors.

(j)    "Incentive payment" means a retrospective monetary payment made as a reward or recognition by the pharmacy benefits plan or program or pharmacy benefit manager to a pharmacy for meeting or

116

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

exceeding predefined pharmacy performance metrics as related to quality measures, such as Healthcare Effectiveness Data and Information Set measures.

(k)    "Maximum allowable cost appeal pricing adjustment" means a retrospective positive payment adjustment made to a pharmacy by the pharmacy benefits plan or program or by the pharmacy benefit manager pursuant to an approved maximum allowable cost appeal request submitted by the same pharmacy to dispute the amount reimbursed for a drug based on the pharmacy benefit manager's listed maximum allowable cost price.

(l)    "Monetary recoupments" means rescinded or recouped payments from a pharmacy or provider by the pharmacy benefits plan or program or by the pharmacy benefit manager.

(m)    "Network" means a group of pharmacies that agree to provide pharmacist services to covered persons on behalf of a pharmacy benefits plan or program or a group of pharmacy benefits plans or programs in exchange for payment for such services. The term includes a pharmacy that generally dispenses outpatient prescription drugs to covered persons.

(n)    "Network reconciliation offsets" means a process during annual payment reconciliation between a pharmacy benefit manager and a pharmacy which allows the pharmacy benefit manager to offset an amount for overperformance or underperformance of contractual guarantees across guaranteed line items, channels, networks, or payors, as applicable.

(o)    "Participation contract" means any agreement between a pharmacy benefit manager and pharmacy for the provision and reimbursement of pharmacist services and any exhibits, attachments, amendments, or addendums to such agreement.

(p)    "Pass-through pricing model" means a payment model used by a pharmacy benefit manager in which the payments made by the pharmacy benefits plan or program to the pharmacy benefit manager for the covered outpatient drugs are:

1.    Equivalent to the payments the pharmacy benefit manager makes to a dispensing pharmacy or provider for such drugs, including any contracted professional dispensing fee between the pharmacy benefit manager and its network of pharmacies. Such dispensing fee would be paid if the pharmacy benefits plan or program was making the payments directly.

2.    Passed through in their entirety by the pharmacy benefits plan or program or by the pharmacy benefit manager to the pharmacy or provider that dispenses the drugs, and the payments are made in a manner that is not offset by any reconciliation.

(q)    "Pharmacist" has the same meaning as in s. 465.003.

(r)    "Pharmacist services" means products, goods, and services or any combination of products, goods, and services provided as part of the practice of the profession of pharmacy as defined in s. 465.003 or otherwise covered by a pharmacy benefits plan or program.

(s)    "Pharmacy" has the same meaning as in s. 465.003.

(t)    "Pharmacy benefit manager" has the same meaning as in s. 626.88.

(u)    "Pharmacy benefits plan or program" means a plan or program that pays for, reimburses, covers the cost of, or provides access to discounts on pharmacist services provided by one or more pharmacies to covered persons who reside in, are employed by, or receive pharmacist services from this state.

1.    The term includes, but is not limited to, health maintenance organizations, health insurers, self-insured employer health plans, discount card programs, and government-funded health plans, including the Statewide Medicaid Managed Care program established pursuant to part IV of chapter 409 and the state group insurance program pursuant to part I of chapter 110.

117

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

2.    The term excludes such a plan or program under chapter 440.

(v)    "Rebate" means all payments that accrue to a pharmacy benefit manager or its pharmacy benefits plan or program client or an affiliated group purchasing organization, directly or indirectly, from a pharmaceutical manufacturer, including, but not limited to, discounts, administration fees, credits, incentives, or penalties associated directly or indirectly in any way with claims administered on behalf of a pharmacy benefits plan or program client.

(w)    "Spread pricing" is the practice in which a pharmacy benefit manager charges a pharmacy benefits plan or program a different amount for pharmacist services than the amount the pharmacy benefit manager reimburses a pharmacy for such pharmacist services.

(x)    "Usual and customary price" means the amount charged to cash customers for a pharmacist service exclusive of sales tax or other amounts claimed.

(2)    CONTRACTS BETWEEN A PHARMACY BENEFIT MANAGER AND A PHARMACY BENEFITS PLAN OR PROGRAM.—In addition to any other requirements in the Florida Insurance Code, all contractual arrangements executed, amended, adjusted, or renewed on or after July 1, 2023, which are applicable to pharmacy benefits covered on or after January 1, 2024, between a pharmacy benefit manager and a pharmacy benefits plan or program must include, in substantial form, terms that ensure compliance with all of the following requirements and that, except to the extent not allowed by law, shall supersede any contractual terms to the contrary:

(a)    Use a pass-through pricing model, remaining consistent with the prohibition in paragraph (3)(c).

(b)    Exclude terms that allow for the direct or indirect engagement in the practice of spread pricing unless the pharmacy benefit manager passes along the entire amount of such difference to the pharmacy benefits plan or program as allowable under paragraph (a).

(c)    Ensure that funds received in relation to providing services for a pharmacy benefits plan or program or a pharmacy are used or distributed only pursuant to the pharmacy benefit manager's contract with the pharmacy benefits plan or program or with the pharmacy or as otherwise required by applicable law.

(d)    Require the pharmacy benefit manager to pass 100 percent of all prescription drug manufacturer rebates, including nonresident prescription drug manufacturer rebates, received to the pharmacy benefits plan or program, if the contractual arrangement delegates the negotiation of rebates to the pharmacy benefit manager, for the sole purpose of offsetting defined cost sharing and reducing premiums of covered persons. Any excess rebate revenue after the pharmacy benefit manager and the pharmacy benefits plan or program have taken all actions required under this paragraph must be used for the sole purpose of offsetting copayments and deductibles of covered persons.  This paragraph does not apply to contracts involving Medicaid managed care plans.

(e)    Include network adequacy requirements that meet or exceed Medicare Part D program standards for convenient access to the network pharmacies set forth in 42 C.F.R. s. 423.120(a)(1) and that:

1.    Do not limit a network to solely include affiliated pharmacies;

2.    Require a pharmacy benefit manager to offer a provider contract to licensed pharmacies physically located on the physical site of providers that are:

1.    Within the pharmacy benefits plan's or program's geographic service area and that have been specifically designated as essential providers by the Agency for Health Care Administration pursuant to s. 409.975(1)(a);

2.    Designated as cancer centers of excellence under s. 381.925, regardless of the pharmacy

118

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

benefits plan's or program's geographic service area;

3.    Organ transplant hospitals, regardless of the pharmacy benefits plan's or program's geographic service area;

4.    Hospitals licensed as specialty children's hospitals as defined in s. 395.002; or

5.    Regional perinatal intensive care centers as defined in s. 383.16(2), regardless of the pharmacy benefits plan's or program's geographic service area.

Such provider contracts must be solely for the administration or dispensing of covered prescription drugs, including biological products, which are administered through infusions, intravenously injected, or inhaled during a surgical procedure or are covered parenteral drugs, as part of onsite outpatient care;

3.    Do not require a covered person to receive a prescription drug by United States mail, common carrier, local courier, third-party company or delivery service, or pharmacy direct delivery unless the prescription drug cannot be acquired at any retail pharmacy in the pharmacy benefit manager's network for the covered person's pharmacy benefits plan or program. This subparagraph does not prohibit a pharmacy benefit manager from operating mail order or delivery programs on an opt-in basis at the sole discretion of a covered person, provided that the covered person is not penalized through the imposition of any additional retail cost-sharing obligations or a lower allowed- quantity limit for choosing not to select the mail order or delivery programs;

4.    For the in-person administration of covered prescription drugs, prohibit requiring a covered person to receive pharmacist services from an affiliated pharmacy or an affiliated health care provider; and

5.    Prohibit offering or implementing pharmacy networks that require or provide a promotional item or an incentive, defined as anything other than a reduced cost-sharing amount or enhanced quantity limit allowed under the benefit design for a covered drug, to a covered person to use an affiliated pharmacy or an affiliated health care provider for the in-person administration of covered prescription drugs; or advertising, marketing, or promoting an affiliated pharmacy to covered persons. Subject to the foregoing, a pharmacy benefit manager may include an affiliated pharmacy in communications to covered persons regarding network pharmacies and prices, provided that the pharmacy benefit manager includes information, such as links to all nonaffiliated network pharmacies, in such communications and that the information provided is accurate and of equal prominence. This subparagraph may not be construed to prohibit a pharmacy benefit manager from entering into an agreement with an affiliated pharmacy to provide pharmacist services to covered persons.

(f)    Prohibit the ability of a pharmacy benefit manager to condition participation in one pharmacy network on participation in any other pharmacy network or penalize a pharmacy for exercising its prerogative not to participate in a specific pharmacy network.

(g)    Prohibit a pharmacy benefit manager from instituting a network that requires a pharmacy to meet accreditation standards inconsistent with or more stringent than applicable federal and state requirements for licensure and operation as a pharmacy in this state. However, a pharmacy benefit manager may specify additional specialty networks that require enhanced standards related to the safety and competency necessary to meet the United States Food and Drug Administration's limited distribution requirements for dispensing any drug that, on a drug-by-drug basis, requires extraordinary special handling, provider coordination, or clinical care or monitoring when such extraordinary requirements cannot be met by a retail pharmacy. For purposes of this paragraph, drugs requiring

119

**NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

extraordinary special handling are limited to drugs that are subject to a risk evaluation and mitigation strategy approved by the United States Food and Drug Administration and that:

1.    Require special certification of a health care provider to prescribe, receive, dispense, or administer; or

2.    Require special handling due to the molecular complexity or cytotoxic properties of the biologic or biosimilar product or drug.

For participation in a specialty network, a pharmacy benefit manager may not require a pharmacy to meet requirements for participation beyond those necessary to demonstrate the pharmacy's ability to dispense the drug in accordance with the United States Food and Drug Administration's approved manufacturer labeling.

(h)    1.    At a minimum, require the pharmacy benefit manager or pharmacy benefits plan or program to, upon revising its formulary of covered prescription drugs during a plan year, provide a 60-day continuity-of-care period in which the covered prescription drug that is being revised from the formulary continues to be provided at the same cost for the patient for a period of 60 days. The 60-day continuity-of-care period commences upon notification to the patient. This requirement does not apply if the covered prescription drug:

a.    Has been approved and made available over the counter by the United States Food and Drug Administration and has entered the commercial market as such;

b.    Has been removed or withdrawn from the commercial market by the manufacturer; or

c.    Is subject to an involuntary recall by state or federal authorities and is no longer available on the commercial market.

2.    Beginning January 1, 2024, and annually thereafter, the pharmacy benefits plan or program shall submit to the office, under the penalty of perjury, a statement attesting to its compliance with the requirements of this subsection.

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

# Exhibit P

## EMPLOYERS HEALTH PURCHASING CORPORATION
## GUIDE TO SERVICES AND COMPENSATION

The following is a guide to important information that Participating Group should consider in connection with the services to be provided by Employers Health Purchasing Corporation ("EHPC"), and includes disclosures required by ERISA §408(b)(2).

Should you have any questions concerning this guide or the information provided to you concerning our services or compensation, please contact your Employers Health Client Solutions Executive.

**Description of EHPC's services provided to Participating Group**:
EHPC arranges, on behalf of Participating Group, for Caremark to provide certain products and services, including prescription benefit management, disease management, mail and specialty pharmacy and other related services for Participating Group's Plan.

| Required Information | Location(s) |
|---|---|
| Compensation EHPC receives from Participating Group ("direct" compensation). | • Participating Group's applicable Pricing Agreement Exhibit B (Pricing Schedule) - §1.2 & §1.3<br>• Customizations contained in Participating Group-specific Participating Group Addendum, as applicable. |
| Compensation EHPC will receive from other parties that are not related to Participating Group ("indirect" compensation). | • As applicable, Prescription Benefit Services Agreement - §8.6. |
| Compensation EHPC will pay to other parties related to Participating Group ("compensation paid among related parties"). | • Participating Group's applicable Pricing Agreement Exhibit B (Pricing Schedule) - §1.2<br>• Customizations contained in Participating Group-specific Participation Group Addendum, as applicable. |

**Additional ERISA §408(b)(2) Disclosures**
1. EHPC is not a fiduciary for Participating Group's Plan.
2. Participating Group will not receive any reimbursement of compensation from EHPC if it terminates the agreement.

121

NOT FOR DISTRIBUTION.  THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

**PRICING AGREEMENT**
**TO THE**
**PRESCRIPTION BENEFIT SERVICES AGREEMENT**

This Pricing Agreement is entered into as of January 1, 2025 (the "Effective Date"), between CaremarkPCS Health, L.L.C., a Delaware limited liability company, ("Caremark") and Employers Health Purchasing Corporation, an Ohio corporation, located at 4771 Fulton Drive NW, Canton, Ohio 44718 ("EHPC"), on behalf of EHPC's Participating Group(s) ("Participating Group" or "Participating Groups").

## RECITALS

**WHEREAS**, Caremark provides certain prescription benefit management, disease management and pharmacy services either directly or through its affiliate and/or their subcontractors (the "Services");

**WHEREAS**, EHPC acts as a purchasing cooperative and arranges on behalf of its clients (each a "Participating Group" or collectively the "Participating Groups") for the provision of certain prescription benefit management, disease management and specialty pharmacy services;

**WHEREAS**, Each Participating Group has established a health benefit plan(s), including prescription benefits (the "Plan"), for its eligible benefit plan members (the "Plan Participants");

**WHEREAS**, Caremark and EHPC are parties to a Prescription Benefit Services Agreement ("PBSA") through which EHPC has negotiated with Caremark, for Caremark to provide Participating Groups with Services; and

**WHEREAS**,   Caremark desires to provide such Services pursuant to the terms and conditions of the PBSA as further supplemented by this Pricing Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Integration**. The terms of this Pricing Agreement shall supplement and shall be incorporated into the parties' PBSA. This Pricing Agreement and the PBSA constitute the entire agreement of the parties with respect to the subject matter hereof, and supersede any previously executed agreements between the parties with respect to the subject matter hereof. This Pricing Agreement and the PBSA, along with the Participating Group Addendum (the "PGA"), shall collectively serve as the "Agreement", detailing the respective rights and obligations of Caremark, EHPC and Participating Groups. Caremark shall make available to Participating Groups the applicable financial terms detailed in the Exhibits (including the Attachments thereto) to this Pricing Agreement. Capitalized terms shall be defined as set forth in either the PBSA or this Pricing Agreement.

Docusign Envelope ID: E989141D-628C-4031-A590-215395040318

The parties hereto have caused this Agreement to be executed by their duly authorized representatives.



**CAREMARKPCS HEALTH, L.L.C.**

By: _Ilona Smith_

Its: VP, Sales and Account Services

Date: 09.19.2024

**EMPLOYERS HEALTH PURCHASING CORPORATION:**

By: _David Uldrichs_

Its: Vice President, PBM Contracting

Date: September 18, 2024

Exhibit A<br/>Pricing Terms and Conditions

1.    **Pricing Assumptions.**  For prescriptions dispensed by Caremark to Participating Groups, the pricing set forth in the Pricing Agreement is contingent upon the following assumptions:

1.1    Subject to Section 6.5 of the Prescription Benefit Services Agreement, Caremark shall be the exclusive mail service provider for Participating Groups.

1.2    Subject to Section 6.5 of the Prescription Benefit Services Agreement, Caremark shall be the exclusive Specialty Drug provider for Participating Groups.

1.3    Generic Drug products represented on the MAC drug list for Caremark's Generic Drug pricing program are established at a Generic Drug class level. Caremark accomplishes this by continually surveying the market for pricing changes, performing timely and regular updates to the Generic Drug pricing program, and validating product availability through pharmacy and wholesaler communications. This Generic Drug pricing program is monitored based on utilization, and prices are adjusted to meet Caremark's pricing commitments.

1.4    Generic Drug Effective Rate Guarantees apply to all Generic Drugs, including single-source generics (SSGs), unless otherwise excluded as provided herein.

1.5    Intentionally omitted.

1.6    Participating Groups may elect Caremark Retail 90 Network (Extended Days' Supply) or Maintenance Choice, in conjunction with the National Network.

1.7    Financial guarantees and administrative fees shall apply/count only on paid Claims.

1.8    Intentionally omitted.

1.9    For Participating Groups with traditional pricing, the amount paid to the Participating Pharmacy may not be equal to the amount billed to Participating Group and Caremark shall retain or absorb any difference.

For Participating Groups with transparent pricing, the amount billed to Participating Group will be equal to the amount paid to the Participating Pharmacies.

1.10    Reconciliation of Claims included in the Discount Guarantees shall be treated in accordance with the applicable discount guarantee schedule in Exhibit B subject to the exceptions and clarifications contained herein.  Retail Network Guarantees (National Retail, Advanced Choice, Exclusive Choice, and Extended Days' Supply (a.k.a. Retail 90)) and Mail Service Network Guarantees (Mail Service and Maintenance Choice)  require a non-Specialty Drug type and Specialty Drug Claims are excluded. Specialty Network Guarantees (Caremark Exclusive Specialty, including Specialty Connect) require a Specialty Drug Claim type and all Non-Specialty Claims are excluded. Any Claim dispensed outside the Caremark Mail Service Network or the Caremark Specialty Network shall be included in the applicable Retail Network guarantee unless otherwise excluded herein. Specialty at Retail Claims, as described below, shall be reconciled with Retail Claims, at the Specialty at Retail guarantees. Subject to the exceptions detailed herein, Caremark shall include in

the Retail Network Guarantees, the Mail Service Network Guarantees, and the Specialty Network Guarantees all Claims meeting those criterion except the following: Compound Drugs, Coordination of Benefits (COB) or Secondary payer paid Claims, Claims paid at government required amounts, Vaccines (including for COVID) and vaccine administration Claims, Paper or Plan Participant submitted Claims, and Veterans Administration Claims.

a.   Retail Network (National Retail, Advanced Choice, Exclusive Choice, and Extended Days' Supply (a.k.a. Retail 90))

1.   Any Claim for a New to Market Specialty Drug, including New to Market Specialty LDDs, dispensed through a Retail Network shall be excluded from the Retail Network Guarantees and adjudicate and reconcile in accordance with the rates set forth in the Notes section of Exhibit C (Participating Group Specialty Fee Schedule – Exclusive).

2.   Unless excluded under Section 1.10(a)(1) above, any Claim for a Specialty LDD dispensed through a Retail Network shall be excluded from the retail Network Guarantees and adjudicate and reconcile at AWP – 17.00%.

3.   Unless excluded under Section 1.10(a)(1) or 1.10(a)(2), the discount guarantees for any Specialty Drug listed in Exhibit C (Participating Group Specialty Fee Schedule – Exclusive) dispensed through a Retail Network pharmacy shall adjudicate and reconcile subject to the Specialty at Retail Rates in Exhibit B.  The previous sentence notwithstanding, for clarity, any specialty Drug listed in Exhibit C (Participating Group Specialty Fee Schedule – Exclusive) dispensed through a Caremark Specialty Connect retail pharmacy shall be considered a Claim dispensed through the CVS Specialty Pharmacy Network as provided in Section 1.10(b)(2).

4.   Any Claim dispensed through a Retail Network and not otherwise excepted in Section 1.10 shall adjudicate and reconcile subject to the discount guarantees contained in Exhibit B according to the days supply and specific Retail Network dispensed.

b.   CVS Specialty Pharmacy Network

1.   Any Claim for a Specialty New to Market Drug, other than New to Market Biosimilars, dispensed through the CVS Specialty Pharmacy Network shall be excluded from the Specialty Network Guarantees and adjudicate and reconcile in accordance with the rates set forth in the Notes section of Exhibit C (Participating Group Specialty Fee Schedule – Exclusive).  New to Market Biosimilars shall be included in the Specialty BER and Specialty GER guarantees.

2.   Any Claim dispensed through the Caremark Specialty Connect network shall be subject to the Specialty Drug guarantees detailed in Exhibit B.

3.   Any Claim for a non-Specialty drug dispensed through the CVS Specialty Pharmacy Network with less than 84 Days' Supply shall be included in the Retail Network guarantees set forth in Exhibit B.  Any Claim for a non-Specialty drug dispensed through the CVS Specialty Pharmacy Network with 84 Days' Supply or more shall be included in the Mail Service Network guarantees set forth in Exhibit B.

4.   Any Claim dispensed through the CVS Specialty Network and not otherwise excepted in Section 1.10 shall adjudicate and reconcile subject to the discount guarantees contained in Exhibit B according to the days supply and specific Network dispensed.

1.11    Intentionally omitted.

1.12    Intentionally omitted.

1.13    Intentionally omitted.

1.14    For retail Claims, the Participating Pharmacy shall collect from the Plan Participant the lowest of the applicable Cost Share, or the discounted price, or the Participating Pharmacy's U&C. For Mail Order and Specialty Drug Claims, the pharmacy shall collect from the Plan Participant the lowest of the discounted cost or applicable Cost Share.

1.15    For retail Claims, the Participating Group pays Caremark the lower of (1) the Participating Pharmacy's U&C, (2) MAC price plus dispensing fee, or (3) the Ingredient Cost plus dispensing fee less the amount of any Cost Share paid by a Plan Participant. For Mail Order and Specialty Drug Claims, the Participating Group pays Caremark the lower of (1) MAC, or (2) the Ingredient Cost less any Cost Share paid by a Plan Participant.

1.16    All covered drugs dispensed from Caremark's mail-order pharmacy, unless otherwise excluded herein, are included in the mail order AWP Effective Rate guarantees for Brand Drugs and Generic Drugs regardless of the days' supply.

1.17    The AWP Effective Rate achieved for each pricing category will be calculated by multiplying the AWP for dispensed covered drug paid Claims (in the aggregate for the pricing category) by one (1) minus the applicable AWP Effective Rate achieved for each pricing category. For reference, this is expressed for each pricing category as AWP * (1-AWP Effective Rate).

1.18    Generic Drug Dispensing Rate ("GDR") Guarantee. Participating Group acknowledges and agrees the GDR guarantees are dollar for dollar with a maximum amount at risk of $150,000 for mail and $150,000 for retail that will be measured across all Participating Groups. The GDR guarantee calculation assumes the following: (i) the data received is a full data set and accurately reflects Participating Group's utilization, (ii) AWP source for the data supplied is consistent with the go-forward measurement database (Medi-Span or another nationally available reporting source), or will be adjusted for any difference in the previous source, and (iii) Plan design and membership will remain reasonably constant. Participating Group further acknowledges and agrees certain changes to the Plan design or demographic may materially affect Caremark's ability to meet the GDR guarantees (for example, situations where generically available medications are excluded from the benefit such as OTC equivalent strengths). In the event of any changes to the Plan design, or the Plan's demographics, both parties agree to work in good faith to determine if the GDR guarantee(s) should be adjusted to account for such change. If a Brand Drug does not lose patent expiration when expected due to unforeseen circumstances, including but not limited to litigation, the parties acknowledge and agree an adjustment may need to be made to the GDR guarantees. Any potential amount owed will be determined based on the following formula: (Average Amount Paid per Multi-Source Brand Prescription – Average Amount Paid per Generic Drug prescription) multiplied by (GDR guarantee – GDR measured) multiplied by total Claims in each calendar year. GDR guarantees will be measured and reconciled in the aggregate. Specialty Drugs, Compound Claims, Paper Claims, COB Claims and Vaccines are not included in the GDR guarantee calculation. The table below details the GDR Guarantee:

| GDR Guarantee | 2025 | 2026 |
|---|---|---|
| Retail | 89.80% | 89.80% |
| Mail | 90.10% | 90.10% |

1.19 Claims for specialty products will not be processed through the retail network, except for those Specialty Drugs that Caremark's Specialty pharmacies are unable to dispense. Participating Group agrees and acknowledges that specialty medications will not have any grace fills and will be required to be filled at Caremark specialty pharmacies.

1.20 Caremark agrees that any Specialty Drug dispensed by a CVS Specialty pharmacy shall not be considered a 340B Claim for financial or guarantee purposes.

1.21 The overall Generic Drug Effective Rate Guarantees ("GER") and the Specialty Drug Discount Guarantees (collectively, "Network Guarantees") are included in the reconciliation of the calendar year the Participating Group joins EHPC and are measured and reconciled on an individual component basis at the Participating Group level. Network Guarantees will be calculated for each of the following components: (i) Retail Generic; (ii) Mail Generic; (iii) Specialty Generic; and (iv) Specialty Brand. Any component guarantee that generates dollar savings in excess of a stated guarantee may not be used to offset any dollar shortfall on any other component guarantee. Any amounts due as part of this provision will be calculated and reported to EHPC within 180 days of the end of each Contract Year. All Network Guarantees will be reconciled and paid on a dollar-for-dollar basis.

1.22 Retail Brand and Mail Brand Covered Drugs shall adjudicate at the guaranteed rates set forth in the "Network Guarantees and Fees"

1.23 Intentionally omitted.

1.24 Intentionally omitted.

1.25 Intentionally omitted.

1.26 The Caremark Exclusive Choice Network is a narrow network that includes all CVS retail pharmacy locations, including Long's Pharmacy, Navarro, Target, and Wal-Mart locations as well as selected independent pharmacies. The Caremark Advanced Choice Network is a national managed network that was solicited to balance savings while eliminating network access redundancy and it includes most major chains and independent pharmacies. The Caremark EDS-90 Network is a 90-day network comprised of many major chains and independent pharmacies providing the combination of member access and market competitive pricing. The Caremark Access Based Network is a customized retail network including all CVS retail pharmacies plus certain independent retail pharmacies identified based on Member access parameters. Implementation of these networks require a minimum 60 days' advance notice, as well as implementation of program conditions developed from time-to-time by Caremark and communicated to Participating Groups, and may be limited by applicable law.

1.27 The Access Based Network Discount Guarantee Improvements

|  | CVS Share |
|---|---|

| ACCESS BASED NETWORK | <10% | 10% to 30% | 30% to 50% | 50% to 70% | >70% |
|---|---|---|---|---|---|
| Brand Drug Discount Guarantee Improvement | N/A | 5.75% | 5.25% | 2.75% | 1.75% |
| * Access is defined as: 2 Miles Urban; 5 Miles Suburban; 10 Miles Rural | | | | | |

1.28    Intentionally omitted.

1.29    Intentionally omitted.

1.30    Composition of the retail networks may vary from time to time.

1.31    Shipping fees and/or postage will be increased by an increase in shipping fees and/or postage costs over the term of the Agreement.

1.32    Subject to Section 1.17 of the Prescription Benefit Services Agreement, Caremark may update the Specialty Drugs on the Specialty Drug List. Caremark will provide Participating Group quarterly notifications regarding such updates (each a "Specialty Drug Update") upon request from the Participating Group. Any new Specialty Drug (each a "New Specialty Drug") will be dispensed at the New-to-Market Specialty Drug Rate. Should the addition of any New Specialty Drug at the New-to-Market Specialty Drug Rate not be satisfactory to either party, the parties shall negotiate mutually agreeable terms for such New Specialty Drug within ninety (90) days of the date of the Specialty Drug Update. New Specialty Drugs will be added to the Specialty Drug fee schedule during the annual market check process, at which point they will lose their status as a New-to-Market Specialty Drug and shall become a Specialty Drug that is not subject to the New-to-Market Specialty Drug exclusion.

**2.    Participating Group Credits.**   This Section sets forth various Rebates and credits to be paid or credited by Caremark to Participating Group (collectively "Participating Group Credits"). It is the intention of the parties that, for the purpose of the Federal Anti-Kickback Statute, these Participating Group Credits shall constitute and shall be treated as discounts against the price of drugs within the meaning of 42 U.S.C. 1320A 7b(b)(3)(A).

2.1    On behalf of and at the direction of Participating Group, Caremark will remit to EHPC all Rebate guarantees for Claims adjudicated in a calendar quarter within sixty (60) days of the close of such calendar quarter. Caremark will pay such Rebate guarantees at the Participating Group level as described in the tables contained in Exhibit C.

2.2    Caremark may add "Rebate Credit" to Rebates when remitting and reconciling each Rebate guarantee component.  Rebate Credit shall be the difference between the product of the "Baseline WAC" multiplied by the number of units in a "Rebate Credit Eligible Claim" minus the product of the "Updated WAC per Unit" multiplied by the number of units in said Rebate Credit Eligible Claim.

"Rebate Credit" is an adjustment that Caremark may apply when remitting and reconciling Rebate guarantee payments.

Rebate Credit shall not exceed the Baseline Rebate less the earned Rebates on the Rebate Credit Eligible Claim. "Baseline Rebate" is calculated as follows: in the year the price reduction occurred, Baseline Rebate will be the Rebate available for coverage of the product prior to the WAC reduction or, as applicable, for any product on the list of Rebate Credit Eligible Claim products where Humira or Stelara are the reference Brand Drug or for any other products as mutually agreed by EHPC and Caremark, the Baseline Rebate will be the Rebate for the reference Brand Drug on the date of Claim processing. For a product experiencing a WAC reduction, in years subsequent to 2024, the Baseline Rebate will increase over the prior year Baseline Rebate at the WAC inflation rate of the GPI subclass (GPI-6) of the applicable product.

"Baseline WAC" shall be the WAC of the product prior to a reduction in WAC, or, as applicable, for any product on the list of Rebate Credit Eligible Claim products where Humira or Stelara are the reference Brand Drug or any other products as mutually agreed by EHPC and Caremark, the Baseline WAC will be the WAC of the reference Brand Drug at the time of Claim processing.

"Rebate Credit Eligible Claim" shall mean: (1) Any Biosimilar product processed where Humira or Stelara are the reference Brand Drug; (2) any Insulin product that experienced a WAC decrease; and (3) any other products as mutually agreed by EHPC and Caremark. Caremark will provide sixty (60) days' advance notice of any Covered Product(s) that it would like to add to or delete from the list of Rebate Credit Eligible Claim products. If EHPC objects to the addition or deletion of said Rebate Credit Eligible Claim products within the sixty (60) day notice period, such products will not be added to, or deleted from the list of Rebate Credit Eligible Claim products, and Caremark may modify the financial guarantees in this Agreement that are impacted by such objection, but only to the extent reasonably necessary to account for the impact of any lost Rebate Credit value.

"Updated WAC per Unit" shall be the WAC per unit on the date of adjudication of a Rebate Credit Eligible Claim.

Caremark shall provide reporting upon Participating Group request demonstrating the net-cost impact in the therapeutic category. Validation of the Rebate Credit application is available as part of the Client Rebate Audit.

2.3     Rebate guarantees will be effective upon the later of Participating Group's effective date or the first day of the calendar quarter following Caremark's receipt of a signed Participating Group Addendum (Form of Addendum). Caremark may adjust the Guaranteed Rebate Amount in an equitable manner if: (i) a Generic Drug version of a branded product is unexpectedly introduced in the market; or (ii) a branded product is recalled or withdrawn from the market.

2.4     Rebate guarantees are calculated and reconciled on a per Brand Drug Claim basis and require fully-funded Plan designs as defined by PDD which allow a ninety (90) day supply at mail.

2.5     Opt-In Rebate guarantees documented in the Pricing Agreement are based on full alignment with the Caremark formulary, including exclusions. The Opt-out Rebates are based on alignment with the formulary, but will exclude the exclusions.

2.6     Qualifying Plan designs will have at least a $15.00 co-payment differential between preferred and non-preferred Brand Drugs prescriptions, a $15.00 differential in the minimum co-payment for coinsurance, or a differential of coinsurance 1.5 times between the preferred and non-preferred Brand Drug (for example, if preferred Brand coinsurance was 20%, non-preferred Brand Drug would need to be 30% to qualify).

2.7        Intentionally omitted.

2.8        Subject to Section 8.5 of the Prescription Benefit Services Agreement, Participating Group agrees not to participate in any other formulary or similar direct discount program, or enter into any direct or indirect contracts with pharmaceutical manufacturers with respect to the products and Services dispensed to Participating Group's Plan Participants.

2.9        Specialty Rebates assume alignment with the elected Formulary; any utilization management programs on the Hepatitis C class must align with the product label; estimates assume utilization mix and volume remains consistent through the life of the Prescription Benefit Services Agreement. Fees for utilization management or prior authorization for this Specialty Drug category need to be evaluated independently.

2.10      Rebates do not apply to 340B Claims , Claims approved through formulary exception, Generic Drug Claims, DAW 5 Claims, COVID treatment Claims, Vaccines (including COVID vaccines) and vaccine administration Claims. Caremark may adjust the Participating Group Rebate payments in an equitable manner if: (i) a Generic Drug version of a branded product is unexpectedly introduced in the market; or (ii) a branded product is recalled or withdrawn from the market.

2.11      Rebate Guarantees will not be prorated in any way based on a Claim's days' supply. Specialty Rebate Guarantees must be based on no more than a 30-Day supply. Claims for Specialty Drugs listed in Exhibit C (Participating Group Specialty Fee Schedule – Exclusive) shall receive Specialty Rebate guarantees regardless of the channel dispensed.  Claims for a drugs not listed in Exhibit C (Participating Group Specialty Fee Schedule – Exclusive) and under 84 Days' Supply shall receive the Retail 30 Rebate guarantees.  Claims for drugs not listed in Exhibit C (Participating Group Specialty Fee Schedule – Exclusive) with 84 or more Days' Supply shall receive the Mail Service Rebate guarantees.

2.12      Rebate guarantees herein shall be effective January 1, 2025.

2.13      Intentionally Omitted.

2.14      In the event the Participating Group elects a Maintenance Choice variant, Voluntary or Incentivized Maintenance Choice, such Participating Group will receive the Maintenance Choice rebate rate for the applicable Rebate Schedule.

2.15      Advanced Control Formulary™ Rebate. Advance Control Formulary™ Rebate guarantees assume alignment with the Caremark Formulary with a broader range of pharmaceutical products and/or categories for exclusion than the Caremark template formulary offering (aligned), and allow up to ninety (90) days' supply at mail, Claim utilization, and removal of any utilization management programs that may conflict with formulary Rebate strategy. Rebates do not apply to Claims processed through pharmacies that participate in the Federal government 340B drug pricing program. This formulary includes a select list of drug exclusions to further help Plan Participants select preferred, lower-cost Brand Drugs and Generic Drugs. This formulary compliments plan designs used to encourage utilization of lower-cost drugs through both drug exclusions and copay tiering, while also addressing high-cost specialty medications. Newly introduced Brand Drugs and line extensions will be reviewed to determine if addition to the formulary is warranted, taking into consideration both clinical and economic factors. Drugs must be actively added to the formulary in order to be eligible for coverage. Caremark will provide timely notification to both Participating

Docusign Envelope ID: E2891410-628C-4D31-A590-215F3F040318

Groups and Plan Participants to support the awareness and actions steps needed to minimize disruption and transition.

2.16    For Participating Groups with Adjusted Rebate Guarantees for Specialty Drugs, Caremark will not apply the Rebate Credit methodology to claims for Adalimumab biosimilars.

For Participating Groups with Adjusted Rebate Guarantees for non-Specialty Drugs, Caremark will not apply the Rebate Credit methodology to claims for NovoLog, Novolin, Levemir, Insulin Aspart, Insulin Lispro, Humalog, Humulin, Apidra and Lantus.

2.17    Advanced Control Specialty Formulary™ Rebate. Caremark's proposed specialty Rebate guarantees assume the adoption of our Advanced Control Specialty Formulary™, which will provide the greatest level of management for select specialty categories. Strategies included in the higher control formulary will vary by category depending on the clinical attributes, available treatment options, and utilizations concerns. This expanded control for Specialty Drugs provides control for those high-cost medications in selected specialty classes. Strategies include, but are not limited to the following: utilization management edits including prior authorization and quantity edits to ensure safe and appropriate use; exclusions of select specialty medications to shift utilization to the preferred lowest net cost products; Generic Drug strategies including step therapy or exclusions to require use of the most cost-effective Generic Drug products over Brand Drugs in specialty categories where Generic Drugs are available; and pipeline management to review products prior to launch and determine if they will be eligible for inclusion on the higher control specialty formulary.

2.18    Implementation Credit. Caremark will provide an implementation credit to an amount up to $8.00 per net new Plan Participant to defray certain transition costs associated with moving eligible Participating Group's business from its current pharmacy benefit manager vendor to Caremark. If Caremark is the current pharmacy benefit manager for Participant Group as of the Effective Date, such Participating Group is not eligible for this credit. This credit can be used to offset implementation costs related to consulting services, and/or typical and/or mutually agreed upon implementation costs in transferring from the current provider to Caremark. However, this credit shall not be used for costs related to procurement. Participating Group shall be responsible for all transition and implementation expenses in excess of the Implementation Credit provided to Participating Group as set forth above. Examples of transition and implementation expenses include costs of customized Plan Participant I.D. cards, postage expenses for direct mail of I.D. cards and other communication materials to Plan Participants, and special programming required by Participating Group's prior pharmacy benefit manager to provide data to Caremark. For those eligible expenses directly incurred by Participating Group, Participating Group shall provide Caremark with documentation of such expenses actually incurred in the form of an invoice, an account statement, or other detailed documentation. For agreed upon implementation or transition Services provided by Caremark towards this credit, Caremark will provide expense detail for such items. If Participating Group terminates this Prescription Benefit Services Agreement prior to the expiration of Participating Group Initial Term for any reason (other than Caremark's breach) or if Caremark terminates this Agreement as a result of Participating Group's breach, Participating Group shall refund to Caremark an amount equal to the pro-rata portion (based on the length of the initial contract term) of the transition and implementation charges incurred by Caremark. The parties acknowledge and agree that the payments of credits provided by Caremark are commercially reasonable and necessary Services related to the implementation of this Agreement and represent fair market value for the Services provided.

Docusign Envelope ID: E288141D-628C-4031-A590-21553F040318

3. **Rebate Impacting Clinical Programs.** Subject to Section 3.2, the adoption of additional clinical programs will have the corresponding per Brand Rebate impact, as detailed below in Section 3.1. Additional requested edits will be evaluated on a case-by-case basis.

    a. Rebate Impacting Clinical Programs may only be implemented at the beginning of a calendar quarter.

    b. Subject to Section 3.2, applicable Rebate impact shall be in effect only during the "Rebate Impact Period" for the corresponding Rebate Impacting Clinical Program.

    c. In the event additional programs are released, this table will be updated accordingly.

    d. For Participating Groups moving from one Rebate Impacting Clinical Program to another Rebate Impacting Clinical Program which addresses any of the same target medications, the full Rebate adjustment will apply for the entire Rebate Impact Period of the newly implemented Rebate Impacting Clinical Program.

| 3.1 UM PROGRAM REBATE ADJUSTMENTS [1] | | | |
|---|---|---|---|
| **UM PROGRAM** | RETAIL/RETAIL 90 | MAIL / MAINT CHOICE | SPECIALTY |
| ANTIDIABETIC GLP-1: 30 DAY SUPPLY LIMIT [2] | $5.83 | - | - |
| ANTIOBESITY BUNDLE (CVS STANDARD) | $7.50 | $5.00 | - |
| ANTIOBESITY BUNDLE (EH CUSTOM: 10% WEIGHT LOSS FOR CONTINUATION OF THERAPY) | $36.00 | $38.00 | - |
| ANTIOBESITY BUNDLE (EH CUSTOM: BMI 35 + STEP THERAPY AND 10% WEIGHT LOSS FOR CONTINUATION OF THERAPY) | $36.00 | $38.00 | |
| ANTIOBESITY BUNDLE (EH CUSTOM: BMI 40 + STEP THERAPY AND 10% WEIGHT LOSS FOR CONTINUATION OF THERAPY) | $36.00 | $38.00 | |
| ANTIOBESITY BUNDLE (EH CUSTOM: BMI 40 + STEP THERAPY) | $45.00 | $47.00 | - |
| ANTIOBESITY CLASS EXCLUSION: LEVEL 1 [3] | - | - | - |
| ANTIOBESITY CLASS EXCLUSION: LEVEL 2 [3] | $9.00 | $4.00 | - |
| ANTIOBESITY CLASS EXCLUSION: LEVEL 3 [3] | $14.00 | $7.00 | - |
| ANTIOBESITY CLASS EXCLUSION: LEVEL 4 [3] | $29.00 | $10.00 | - |
| ANTIOBESITY CLASS EXCLUSION: LEVEL 5 [3] | $55.00 | 12.00 | - |
| ANTIOBESITY GLP-1: 30 DAY SUPPLY LIMIT [2] | - | - | - |
| AUVI-Q PRIOR AUTHORIZATION | - | - | - |
| CGM & DISPOSABLE INSULIN PUMP | - | - | - |
| COPAXONE STEP THERAPY | - | - | $300.00 |
| DERM BUNDLE 1.0 | - | - | - |
| DERM BUNDLE 2.0 | - | - | - |
| DERM BUNDLE 3.0 (ROSACEA THERAPY) | - | - | - |
| DRUG EXCLUSION PLAN DESIGN (DEPD) | $5.00 | $2.00 | - |
| DRY EYE THERAPY | $2.00 | $12.00 | - |
| DUEXIS / VIMOVO | - | - | - |
| ENHANCED SGM ACTHAR | - | - | - |
| ENHANCED SGM ATOPIC DERMATITIS | - | - | - |
| ENHANCED SGM PSORIASIS | - | - | $685.00 |
| GI MOTILITY BUNDLE | $2.75 | $4.00 | - |
| GLP-1 PRIOR AUTHORIZATION (SMART EDIT) | - | - | - |
| GLP-1 PRIOR AUTHORIZATION (NON-SMART EDIT) | $80.00 | $125.00 | - |
| GLP-1 QUANTITY LIMIT | - | - | - |
| JUBLIA / KERYDIN | $1.50 | - | - |
| MAKENA EXCLUSION | - | - | - |
| TRANSFORM DIABETES CARE | $0.10 | $2.50 | - |

| XHANCE PRIOR AUTHORIZATION | - | - | - |
|---|---|---|---|

[1] Rebate adjustments expressed on a per Brand claim basis.

[2] Program may only be applied at Retail channel

[3] Participating Group categorization will be provided upon request

3.2     Participating Group may be exempt from certain Rebate impacts; provided that Participating Group meets the Rebate Impacting Clinical Program's Exemption Criteria, as later defined. The applicability of the Rebate Impact Exemption for Participating Groups shall be evaluated annually.

a.  For Participating Groups with a start date that is within the prior Contract Year or earlier, and implemented a Rebate Impacting Clinical Program within the prior Contract Year, the "Rebate Impact Period" for the corresponding Rebate Impacting Clinical Program shall be defined as all Contract Years from the remainder of the Contract Year in which the Rebate Impacting Clinical Program was implemented, plus the following Contract Year.

b.  For any Participating Groups implementing a Rebate Impacting Clinical Program in the current Contract Year, the "Rebate Impact Period" for the corresponding Rebate Impacting Clinical Program shall be defined as the remainder of the current Contract Year from when the applicable Rebate Impacting Clinical Program was implemented until the end of the current Contract Year, plus the following Contract Year.

c.  Participating Groups that elected the EH Custom Antiobesity Bundle in 2024 may carry over the existing Rebate adjustment to Contract Year 2025.

**Tier 5.1**

**TRADITIONAL**

**SECTION 1: NETWORK GUARANTEES AND FEES**

| Network | Term | Brand Drug Discount Guarantee | Generic Drug Effective Rate Guarantee | Dispensing Fee |
|---|---|---|---|---|
| Mail / Maintenance Choice | 2025 | 20.50% | 91.90% | $0.00 |
| | 2026 | 20.50% | 92.00% | $0.00 |
| | 2027 | 20.50% | 92.10% | $0.00 |
| National Retail | 2025 | 19.50% | 87.75% | $0.40 |
| | 2026 | 19.50% | 87.85% | $0.40 |
| | 2027 | 19.50% | 87.95% | $0.40 |
| Advanced Choice | 2025 | 20.00% | 87.75% | $0.35 |
| | 2026 | 20.00% | 87.85% | $0.35 |
| | 2027 | 20.00% | 87.95% | $0.35 |
| Exclusive Choice | 2025 | 21.50% | 87.75% | $0.35 |
| | 2026 | 21.50% | 87.85% | $0.35 |
| | 2027 | 21.50% | 87.95% | $0.35 |
| Extended Days' Supply | 2025 | 20.00% | 89.20% | $0.00 |
| | 2026 | 20.00% | 89.30% | $0.00 |
| | 2027 | 20.00% | 89.40% | $0.00 |
| Specialty Drugs | 2025 | 18.25% | 86.50% | $0.00 |
| | 2026 | 18.25% | 86.60% | $0.00 |
| | 2027 | 18.25% | 86.70% | $0.00 |
| Specialty at Retail | 2025 | 17.00% | 87.00% | $0.40 |
| | 2026 | 17.00% | 87.10% | $0.40 |
| | 2027 | 17.00% | 87.20% | $0.40 |

\* Manual or Paper Claims shall incur a fee of $1.50 per Manual or Paper Claim.

**1.1**  Please refer to Exhibit A, Pricing Terms and Conditions, Section 1.10 for exclusions from Network Guarantees.

**1.2**  Per Participating Group's direction, Caremark shall pay EHPC the following fees:
   a.  $ 0.90 per all Claims for contract and administrative services; and
   b.  $ 1.00 per all claims for consulting services to be provided by EHPC and/or third parties.

**1.3**  On an annual basis, Caremark will collect from Participating Group and remit to Employers Health a "Program Participation Fee" of $15,000.  The annual Program Participation Fee is billed to Participating Group and will appear on a Caremark administrative invoice.

**1.4**  Caremark shall provide Participating Group with a Pharmacy Management Allowance (PMA) credit of up to $4.00 per Plan Participant annually, which must be submitted and utilized within the Contract Year and will not carry over to the following year. This PMA credit is to be used by Participating Group to offset the cost of actions intended to maximize the value of the pharmacy program. Funds may be used for items including, but not restricted to, programming for customization, design and implementation of clinical or other mutually agreed programs, Pharmacy benefit related communications (i.e., SPD development), auditing, data integration and analytics, and consulting fees. Participating Group will be required to submit documentation to support the third-party expenses for which it seeks reimbursement. The parties acknowledge that the credit provided by PBM for such services represents fair market value. If Participating Group terminates before the end of the Initial Term, Participating Group shall refund to Caremark within thirty (30) days after the effective date of such termination the full PMA credit applicable to the year of termination. It is the intention of the parties that, for the purposes of the Federal Anti-Kickback Statute, this PMA credit shall constitute and shall be treated as a discount against the price of drugs within the meaning of 42 U.S.C. 1320a-7b(b)(3)(A).

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

**TIER 5 (.25)**
**SECTION 2: REBATE GUARANTEES**

| | | DEFAULT | | | ADJUSTED | | |
|---|---|---|---|---|---|---|---|
| | | **2025** | **2026** | **2027** | **2025** | **2026** | **2027** |
| Opt-In Standard | Mail / MC | $1,167.53 | $1,170.23 | $1,287.25 | $1,097.12 | $1,101.54 | $1,214.26 |
| | Retail 30 | $452.52 | $525.13 | $669.76 | $442.36 | $513.09 | $654.27 |
| | EDS | $1,080.04 | $1,088.31 | $1,197.14 | $1,055.83 | $1,069.18 | $1,129.26 |
| Opt-In Standard Choice | Mail / MC | $1,167.53 | $1,170.23 | $1,287.25 | N/A | N/A | N/A |
| | Retail 30 | $452.52 | $525.13 | $669.76 | N/A | N/A | N/A |
| | EDS | $1,080.04 | $1,088.31 | $1,197.14 | N/A | N/A | N/A |
| Opt-Out Standard | Mail / MC | $958.84 | $958.84 | $1,037.25 | $958.84 | $958.84 | $1,037.25 |
| | Retail 30 | $361.21 | $392.94 | $433.30 | $361.21 | $392.94 | $433.30 |
| | EDS | $862.34 | $938.00 | $1,034.23 | $862.34 | $938.00 | $1,034.23 |
| Opt-In VBF | Mail / MC | $630.67 | $632.13 | $695.34 | $630.67 | $632.13 | $695.34 |
| | Retail 30 | $211.91 | $245.99 | $313.85 | $211.91 | $245.99 | $313.85 |
| | EDS | $513.53 | $595.91 | $646.67 | $513.53 | $595.91 | $646.67 |
| Basic Control | Mail / MC | $1,140.40 | $1,140.40 | $1,228.94 | $1,071.63 | $1,071.63 | $1,159.26 |
| | Retail 30 | $423.88 | $461.34 | $508.81 | $414.37 | $450.76 | $497.05 |
| | EDS | $1,011.76 | $1,014.45 | $1,142.92 | $989.08 | $996.62 | $1,078.11 |
| Opt-In ACF | Mail / MC | $1,259.95 | $1,344.73 | $1,479.20 | $1,189.14 | $1,271.58 | $1,401.39 |
| | Retail 30 | $464.79 | $523.01 | $558.43 | $452.17 | $508.50 | $542.77 |
| | EDS | $1,109.30 | $1,248.11 | $1,332.56 | $1,079.21 | $1,213.52 | $1,295.23 |
| Opt-In ACF Choice | Mail / MC | $1,259.95 | $1,344.73 | $1,479.20 | N/A | N/A | N/A |
| | Retail 30 | $464.79 | $523.01 | $558.43 | N/A | N/A | N/A |
| | EDS | $1,109.30 | $1,248.11 | $1,332.56 | N/A | N/A | N/A |
| Specialty Options | Std Opt-In | $3,870.84 | $3,870.84 | $3,948.39 | $2,769.20 | $2,872.55 | $3,010.65 |
| | Std Opt-Out | $2,501.53 | $2,770.56 | $2,986.40 | $1,789.60 | $2,056.03 | $2,277.13 |
| | ACSF | $4,418.39 | $4,418.39 | $4,506.90 | $3,231.24 | $3,231.25 | $3,295.97 |
| | Basic Control | $2,736.88 | $3,031.15 | $3,267.25 | $1,957.96 | $2,249.42 | $2,491.28 |

2.1   All Rebate Guarantees are stated per Brand Drug Paid Claim. Rebate Overperformance shall mean the extent by which aggregate Rebate collections exceed aggregate Rebate guarantee payments. At the direction of Participating Groups, Caremark shall reconcile and pay 100% of Rebate Overperformance for Participating Groups in Tiers 3, 4, and 5 to EHPC within 180 days of the end of each Contract Year. EHPC shall disburse said Rebate Overperformance equitably among Participating Groups that generated said Overperformance.

2.2   Please refer to Exhibit A, Pricing Terms and Conditions, Section 2.10 for exclusions from Rebate Guarantees.

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

Exhibit C

Participating Group Specialty Fee Schedule - Exclusive

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| Acromegaly | BYNFEZIA PEN | 15.00% | |
| Acromegaly | LANREOTIDE ACETATE INJ | 16.00% | |
| Acromegaly | octreotide | 55.00% | |
| Acromegaly | SANDOSTATIN | 17.75% | |
| Acromegaly | SOMATULINE | 18.00% | |
| Acromegaly | SOMAVERT | 16.75% | |
| Allergic Asthma | CINQAIR | 15.00% | |
| Allergic Asthma | DUPIXENT_ASTHMA | 15.00% | |
| Allergic Asthma | FASENRA | 10.00% | |
| Allergic Asthma | NUCALA | 17.25% | |
| Allergic Asthma | TEZSPIRE | 10.00% | |
| Allergic Asthma | XOLAIR | 16.50% | |
| Alpha-1 Antitrypsin Deficiency | ARALAST NP | 10.00% | *** |
| Alpha-1 Antitrypsin Deficiency | GLASSIA | 20.50% | *** |
| Alpha-1 Antitrypsin Deficiency | ZEMAIRA | 20.50% | *** |
| Amyloidosis | AMVUTTRA | 10.00% | |
| Amyloidosis | ONPATTRO | 10.00% | |
| Amyloidosis | VYNDAMAX | 10.00% | |
| Amyloidosis | VYNDAQEL | 10.00% | |
| Anemia | ARANESP | 16.25% | |
| Anemia | ENJAYMO | 10.00% | |
| Anemia | EPOGEN | 12.00% | |
| Anemia | PROCRIT | 15.25% | |
| Anemia | REBLOZYL | 10.00% | |
| Anemia | RETACRIT | 10.00% | |
| Atopic Dermatitis | ADBRY | 10.00% | |
| Atopic Dermatitis | CIBINQO | 16.00% | |
| Atopic Dermatitis | DUPIXENT_ATOPIC DERMATITIS | 15.00% | |
| Bone Disorders - Other | SOHONOS | 10.00% | |
| Bone Disorders - Other | VOXZOGO | 10.00% | |
| Cardiac Disorders | CAMZYOS | 10.00% | |
| Cardiac Disorders | dofetilide | MAC | |
| Cardiac Disorders | TIKOSYN | 14.25% | |
| Coagulation Disorders | CEPROTIN | 17.50% | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| Cryopyrin Associated Periodic Syndromes | ARCALYST | 17.50% | |
| Cryopyrin Associated Periodic Syndromes | ILARIS | 18.25% | |
| Cystic Fibrosis | BETHKIS | 17.50% | |
| Cystic Fibrosis | BRONCHITOL | 10.00% | |
| Cystic Fibrosis | CAYSTON | 10.00% | |
| Cystic Fibrosis | KITABIS PAK | 19.50% | |
| Cystic Fibrosis | PULMOZYME | 17.00% | |
| Cystic Fibrosis | TOBI | 17.75% | |
| Cystic Fibrosis | TOBI PODHALER | 17.75% | |
| Cystic Fibrosis | tobramycin | MAC | |
| Dupuytren's Contracture | XIAFLEX | 10.00% | |
| Electrolyte Disorders | dichlorphenamide | 16.50% | |
| Electrolyte Disorders | SAMSCA | 18.00% | |
| Electrolyte Disorders | tolvaptan | MAC | |
| Endocrine Disorders | CORTROPHIN | 10.00% | |
| Enzyme Deficiency Disorders - Other | betaine anhydrous | MAC | |
| Enzyme Deficiency Disorders - Other | nitisinone | MAC | |
| Gastrointestinal | GATTEX | 16.75% | |
| Gastrointestinal | OCALIVA | 16.50% | |
| Gastrointestinal | SOLESTA | 10.00% | |
| Gout | KRYSTEXXA | 18.00% | |
| Growth Hormone | EGRIFTA | 17.50% | |
| Growth Hormone | GENOTROPIN | 17.00% | |
| Growth Hormone | HUMATROPE | 24.00% | |
| Growth Hormone | INCRELEX | 20.00% | |
| Growth Hormone | NGENLA | 10.00% | |
| Growth Hormone | NORDITROPIN | 35.00% | |
| Growth Hormone | NUTROPIN | 16.50% | |
| Growth Hormone | OMNITROPE | 16.25% | |
| Growth Hormone | SAIZEN | 17.25% | |
| Growth Hormone | SEROSTIM | 17.50% | |
| Growth Hormone | SKYTROFA | 10.00% | |
| Growth Hormone | SOGROYA | 10.00% | |
| Growth Hormone | ZOMACTON | 14.00% | |
| Growth Hormone | ZORBTIVE | 18.50% | |
| Hematopoietics | MOZOBIL | 18.00% | |
| Hematopoietics | plerixafor | 16.50% | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| Hemophilia | ADVATE | 46.00% | |
| Hemophilia | ADYNOVATE | 38.00% | |
| Hemophilia | AFSTYLA | 42.00% | |
| Hemophilia | ALPHANATE | 46.00% | |
| Hemophilia | ALPHANINE SD | 43.50% | |
| Hemophilia | ALPROLIX | 23.00% | |
| Hemophilia | ALTUVIIIO | 10.00% | |
| Hemophilia | BENEFIX | 23.00% | |
| Hemophilia | COAGADEX | 10.00% | |
| Hemophilia | CORIFACT | 33.00% | |
| Hemophilia | ELOCTATE | 30.00% | |
| Hemophilia | ESPEROCT | 10.00% | |
| Hemophilia | FEIBA | 32.50% | |
| Hemophilia | FIBRYGA | 15.00% | |
| Hemophilia | HEMLIBRA | 15.00% | |
| Hemophilia | HEMOFIL M | 45.50% | |
| Hemophilia | HUMATE-P | 38.00% | |
| Hemophilia | IDELVION | 20.00% | |
| Hemophilia | IXINITY | 32.00% | |
| Hemophilia | JIVI | 15.00% | |
| Hemophilia | KOATE | 48.50% | |
| Hemophilia | KOGENATE | 47.00% | |
| Hemophilia | KOVALTRY | 47.00% | |
| Hemophilia | MONONINE | 30.00% | |
| Hemophilia | NOVOEIGHT | 44.00% | |
| Hemophilia | NOVOSEVEN RT | 30.00% | |
| Hemophilia | NUWIQ | 40.00% | |
| Hemophilia | OBIZUR | 12.00% | |
| Hemophilia | PROFILNINE SD | 22.50% | |
| Hemophilia | REBINYN | 15.00% | |
| Hemophilia | RECOMBINATE | 43.50% | |
| Hemophilia | RIASTAP | 29.50% | |
| Hemophilia | RIXUBIS | 15.00% | |
| Hemophilia | SEVENFACT | 10.00% | |
| Hemophilia | STIMATE | 15.00% | |
| Hemophilia | TRETTEN | 16.00% | |
| Hemophilia | VONVENDI | 12.50% | |
| Hemophilia | WILATE | 47.00% | |
| Hemophilia | XYNTHA | 47.00% | |
| Hepatitis B | adefovir dipivoxil | MAC | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| Hepatitis B | BARACLUDE | 16.75% | |
| Hepatitis B | entecavir | MAC | |
| Hepatitis B | EPIVIR HBV | 11.50% | |
| Hepatitis B | HEPSERA | 16.50% | |
| Hepatitis B | lamivudine_hepb | MAC | |
| Hepatitis B | VEMLIDY | 13.00% | |
| Hepatitis C | EPCLUSA | 20.50% | |
| Hepatitis C | HARVONI | 20.50% | |
| Hepatitis C | LEDIPASVIR/SOFOSBUVIR | 15.00% | |
| Hepatitis C | MAVYRET | 15.00% | |
| Hepatitis C | PEGASYS | 16.00% | |
| Hepatitis C | PEG-INTRON | 19.25% | |
| Hepatitis C | ribavirin | MAC | |
| Hepatitis C | SOFOSBUVIR/VELPATASVIR | 15.00% | |
| Hepatitis C | SOVALDI | 20.50% | |
| Hepatitis C | VIEKIRA PAK | 20.25% | |
| Hepatitis C | VOSEVI | 15.00% | |
| Hepatitis C | ZEPATIER | 21.50% | |
| Hereditary Angioedema | BERINERT | 19.50% | |
| Hereditary Angioedema | CINRYZE | 16.00% | |
| Hereditary Angioedema | FIRAZYR | 16.50% | |
| Hereditary Angioedema | HAEGARDA | 10.00% | |
| Hereditary Angioedema | icatibant acetate | MAC | |
| Hereditary Angioedema | KALBITOR | 16.75% | |
| Hereditary Angioedema | RUCONEST | 17.00% | |
| Hereditary Angioedema | TAKHZYRO | 10.00% | |
| HIV | abacavir | MAC | |
| HIV | abacavir sulfate-lamivudine | MAC | |
| HIV | abacavir sulfate-lamivudine-zidovudine | 15.00% | |
| HIV | APRETUDE | 10.00% | |
| HIV | APTIVUS | 17.00% | |
| HIV | atazanavir sulfate | MAC | |
| HIV | BIKTARVY | 15.00% | |
| HIV | CABENUVA | 10.00% | |
| HIV | CIMDUO | 15.00% | |
| HIV | COMBIVIR | 16.00% | |
| HIV | COMPLERA | 17.50% | |
| HIV | CRIXIVAN | 14.00% | |
| HIV | darunavir | MAC | |
| HIV | DELSTRIGO | 15.00% | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| HIV | DESCOVY | 17.00% | |
| HIV | didanosine | 26.12% | |
| HIV | DOVATO | 15.00% | |
| HIV | EDURANT | 16.00% | |
| HIV | efavirenz | MAC | |
| HIV | efavirenz/lamivudine/tenofovir | 16.00% | |
| HIV | efavirenz-emtricitabine-tenofovir disoproxil fumarate | MAC | |
| HIV | emtricitabine | 16.00% | |
| HIV | emtricitabine-tenofovir disoproxil fumarate | MAC | |
| HIV | EMTRIVA | 14.50% | |
| HIV | EPIVIR | 9.50% | |
| HIV | EPZICOM | 16.75% | |
| HIV | etravirine | MAC | |
| HIV | EVOTAZ | 17.00% | |
| HIV | fosamprenavir | 15.00% | |
| HIV | FUZEON | 17.50% | |
| HIV | GENVOYA | 17.50% | |
| HIV | INTELENCE | 16.50% | |
| HIV | INVIRASE | 16.25% | |
| HIV | ISENTRESS | 16.75% | |
| HIV | JULUCA | 15.00% | |
| HIV | KALETRA | 16.25% | |
| HIV | lamivudine/zidovudine | MAC | |
| HIV | lamivudine_hiv | MAC | |
| HIV | LEXIVA | 17.00% | |
| HIV | lopinavir/ritonavir | MAC | |
| HIV | maraviroc | 16.00% | |
| HIV | nevirapine | MAC | |
| HIV | NORVIR | 12.25% | |
| HIV | ODEFSEY | 17.50% | |
| HIV | PIFELTRO | 15.00% | |
| HIV | PREZCOBIX | 17.00% | |
| HIV | PREZISTA | 16.75% | |
| HIV | RETROVIR | 12.50% | |
| HIV | REYATAZ | 17.00% | |
| HIV | ritonavir | MAC | |
| HIV | RUKOBIA | 15.00% | |
| HIV | SELZENTRY | 17.00% | |
| HIV | stavudine | 86.00% | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| HIV | STRIBILD | 17.50% | |
| HIV | SUNLENCA | 10.00% | |
| HIV | SUSTIVA | 16.25% | |
| HIV | SYMFI | 15.00% | |
| HIV | SYMTUZA | 15.00% | |
| HIV | TEMIXYS | 15.00% | |
| HIV | tenofovir disoproxil fuma | MAC | |
| HIV | TIVICAY | 17.00% | |
| HIV | TRIUMEQ | 17.50% | |
| HIV | TRIZIVIR | 17.25% | |
| HIV | TROGARZO | 10.00% | |
| HIV | TRUVADA | 17.00% | |
| HIV | TYBOST | 9.75% | |
| HIV | VIRACEPT | 16.50% | |
| HIV | VIRAMUNE | 16.25% | |
| HIV | VIRAMUNE XR | 15.75% | |
| HIV | VIREAD | 16.50% | |
| HIV | ZIAGEN | 13.50% | |
| HIV | zidovudine | MAC | |
| Hormonal Therapies | AVEED | 13.50% | |
| Hormonal Therapies | ELIGARD | 16.00% | |
| Hormonal Therapies | FENSOLVI | 10.00% | |
| Hormonal Therapies | FIRMAGON | 13.25% | |
| Hormonal Therapies | leuprolide acetate | MAC | |
| Hormonal Therapies | LEUPROLIDE ACETATE_BRAND | 16.00% | |
| Hormonal Therapies | LUPANETA PACK | 16.75% | |
| Hormonal Therapies | LUPRON DEPOT | 17.25% | |
| Hormonal Therapies | SUPPRELIN | 18.50% | |
| Hormonal Therapies | TRELSTAR | 16.75% | |
| Hormonal Therapies | VANTAS | 17.25% | |
| Hormonal Therapies | ZOLADEX | 14.00% | |
| I.V.I.G. | ASCENIV | 10.00% | |
| I.V.I.G. | BIVIGAM | 42.00% | |
| I.V.I.G. | CUTAQUIG | 10.00% | |
| I.V.I.G. | CUVITRU | 33.00% | |
| I.V.I.G. | CYTOGAM | 9.50% | |
| I.V.I.G. | FLEBOGAMMA | 21.50% | |
| I.V.I.G. | GAMASTAN S/D | 10.00% | |
| I.V.I.G. | GAMMAGARD | 39.00% | |
| I.V.I.G. | GAMMAGARD LIQUID | 44.00% | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| I.V.I.G. | GAMMAKED | 37.00% | |
| I.V.I.G. | GAMMAPLEX | 44.00% | |
| I.V.I.G. | GAMUNEX | 34.00% | |
| I.V.I.G. | HEPAGAM B | 1.00% | |
| I.V.I.G. | HIZENTRA | 47.00% | |
| I.V.I.G. | HYPERHEP B | 10.00% | |
| I.V.I.G. | HYPERRHO S/D | 10.00% | |
| I.V.I.G. | HYQVIA | 35.00% | |
| I.V.I.G. | MICRHOGAM | 16.00% | |
| I.V.I.G. | NABI-HB | 16.00% | |
| I.V.I.G. | OCTAGAM | 46.00% | |
| I.V.I.G. | PANZYGA | 15.00% | |
| I.V.I.G. | PRIVIGEN | 46.00% | |
| I.V.I.G. | RHOGAM | 16.00% | |
| I.V.I.G. | RHOPHYLAC | 10.00% | |
| I.V.I.G. | VARIZIG | 16.00% | |
| I.V.I.G. | WINRHO | 16.00% | |
| I.V.I.G. | XEMBIFY | 10.00% | |
| Infectious Disease | ACTIMMUNE | 18.50% | |
| Infectious Disease | ALFERON N | 11.50% | |
| Infertility | cetrorelix acetate | 16.00% | |
| Infertility | CETROTIDE | 13.00% | |
| Infertility | CHORIONIC GONADOTROPIN | 16.00% | |
| Infertility | FOLLISTIM AQ | 15.00% | |
| Infertility | fyremadel | MAC | |
| Infertility | ganirelix acetate | MAC | |
| Infertility | GANIRELIX ACETATE_BRAND | 16.00% | |
| Infertility | GONAL-F | 17.00% | |
| Infertility | MENOPUR | 16.50% | |
| Infertility | NOVAREL | 16.00% | |
| Infertility | OVIDREL | 16.00% | |
| Infertility | PREGNYL | 16.00% | |
| Inflammatory Bowel Disease | CIMZIA | 18.75% | |
| Inflammatory Bowel Disease | CIMZIA POW | 16.50% | |
| Inflammatory Bowel Disease | ENTYVIO | 17.25% | |
| Inflammatory Bowel Disease | ENTYVIO SC | 10.00% | |
| Inflammatory Bowel Disease | RENFLEXIS | 10.00% | |
| Inflammatory Bowel Disease | VELSIPITY | 10.00% | |
| Iron Overload | deferasirox | MAC | |
| Iron Overload | deferiprone | MAC | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| Iron Overload | deferoxamine | 16.00% | |
| Iron Overload | DESFERAL | 16.75% | |
| Iron Overload | EXJADE | 17.75% | |
| Iron Overload | JADENU | 17.75% | |
| Lysosomal Storage Diseases | ALDURAZYME | 17.50% | *** |
| Lysosomal Storage Diseases | CERDELGA | 15.75% | |
| Lysosomal Storage Diseases | CEREZYME | 17.50% | *** |
| Lysosomal Storage Diseases | CYSTAGON | 10.00% | |
| Lysosomal Storage Diseases | ELAPRASE | 16.25% | *** |
| Lysosomal Storage Diseases | ELELYSO | 17.75% | *** |
| Lysosomal Storage Diseases | FABRAZYME | 16.75% | *** |
| Lysosomal Storage Diseases | KANUMA | 10.00% | *** |
| Lysosomal Storage Diseases | LUMIZYME | 17.75% | *** |
| Lysosomal Storage Diseases | miglustat | MAC | |
| Lysosomal Storage Diseases | NAGLAZYME | 16.25% | *** |
| Lysosomal Storage Diseases | NEXVIAZYME | 10.00% | *** |
| Lysosomal Storage Diseases | OPFOLDA | 10.00% | |
| Lysosomal Storage Diseases | POMBILITI | 10.00% | |
| Lysosomal Storage Diseases | VIMIZIM | 16.25% | *** |
| Lysosomal Storage Diseases | VPRIV | 16.00% | *** |
| Lysosomal Storage Diseases | XENPOZYME | 10.00% | *** |
| Mental Health Conditions | ZULRESSO | 10.00% | * |
| Movement Disorders | APOKYN | 20.25% | |
| Movement Disorders | apomorphine hydrochloride inj | 16.00% | |
| Movement Disorders | AUSTEDO | 15.00% | |
| Movement Disorders | droxidopa | MAC | |
| Movement Disorders | DUOPA | 10.00% | |
| Movement Disorders | INGREZZA | 10.00% | |
| Movement Disorders | KYNMOBI | 16.00% | |
| Movement Disorders | NORTHERA | 17.25% | |
| Movement Disorders | NUPLAZID | 18.50% | |
| Movement Disorders | RADICAVA ORS | 10.00% | |
| Movement Disorders | RELYVRIO | 10.00% | |
| Movement Disorders | tetrabenazine | MAC | |
| Movement Disorders | XENAZINE | 17.50% | |
| Multiple Sclerosis | AMPYRA | 14.50% | |
| Multiple Sclerosis | AUBAGIO | 19.25% | |
| Multiple Sclerosis | AVONEX | 19.25% | |
| Multiple Sclerosis | BAFIERTAM | 10.00% | |
| Multiple Sclerosis | BETASERON | 19.25% | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| Multiple Sclerosis | BRIUMVI | 10.00% | |
| Multiple Sclerosis | COPAXONE 20 | 21.50% | |
| Multiple Sclerosis | COPAXONE 40 | 21.50% | |
| Multiple Sclerosis | dalfampridine | MAC | |
| Multiple Sclerosis | dimethyl fumarate | MAC | |
| Multiple Sclerosis | EXTAVIA | 18.25% | |
| Multiple Sclerosis | fingolimod | MAC | |
| Multiple Sclerosis | GILENYA | 18.25% | |
| Multiple Sclerosis | glatiramer acetate 20 | 15.00% | |
| Multiple Sclerosis | glatiramer acetate 40 | 15.00% | |
| Multiple Sclerosis | glatopa 20 | 15.00% | |
| Multiple Sclerosis | glatopa 40 | 15.00% | |
| Multiple Sclerosis | KESIMPTA | 10.00% | |
| Multiple Sclerosis | LEMTRADA | 18.25% | |
| Multiple Sclerosis | MAVENCLAD | 10.00% | |
| Multiple Sclerosis | MAYZENT | 10.00% | |
| Multiple Sclerosis | mitoxantrone | 16.00% | |
| Multiple Sclerosis | OCREVUS | 18.50% | |
| Multiple Sclerosis | PLEGRIDY | 19.25% | |
| Multiple Sclerosis | PONVORY | 10.00% | |
| Multiple Sclerosis | REBIF | 17.75% | |
| Multiple Sclerosis | TECFIDERA | 19.75% | |
| Multiple Sclerosis | teriflunomide | MAC | |
| Multiple Sclerosis | TYSABRI | 17.50% | |
| Multiple Sclerosis | VUMERITY | 10.00% | |
| Multiple Sclerosis | ZEPOSIA | 10.00% | |
| Neurological Disorders | ADUHELM | 10.00% | |
| Neuromuscular | RYSTIGGO | 10.00% | |
| Neuromuscular | VYVGART | 10.00% | |
| Neuromuscular | VYVGART HYTRULO | 10.00% | |
| Neutropenia | FULPHILA | 10.00% | |
| Neutropenia | FYLNETRA | 10.00% | |
| Neutropenia | GRANIX | 16.50% | |
| Neutropenia | LEUKINE | 17.25% | |
| Neutropenia | NEULASTA | 17.50% | |
| Neutropenia | NEUPOGEN | 17.00% | |
| Neutropenia | NIVESTYM | 10.00% | |
| Neutropenia | NYVEPRIA | 16.00% | |
| Neutropenia | RELEUKO | 10.00% | |
| Neutropenia | ROLVEDON | 10.00% | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| Neutropenia | STIMUFEND | 16.00% | |
| Neutropenia | UDENYCA | 15.00% | |
| Neutropenia | ZARXIO | 16.00% | |
| Neutropenia | ZIEXTENZO | 10.00% | |
| Ocular Disorders | SUSVIMO | 10.00% | |
| Oncology - Injectable | ABRAXANE | 10.00% | |
| Oncology - Injectable | ADCETRIS | 18.25% | |
| Oncology - Injectable | ALYMSYS | 16.00% | |
| Oncology - Injectable | AVASTIN | 17.00% | |
| Oncology - Injectable | azacitidine | 55.00% | |
| Oncology - Injectable | BELEODAQ | 18.25% | |
| Oncology - Injectable | BELRAPZO | 10.00% | |
| Oncology - Injectable | BENDAMUSTINE HYDROCHLORID | 15.00% | |
| Oncology - Injectable | bendamustine hydrochloride inj | 16.50% | |
| Oncology - Injectable | BENDEKA | 18.00% | |
| Oncology - Injectable | BESPONSA | 10.00% | |
| Oncology - Injectable | BLINCYTO | 10.00% | *** |
| Oncology - Injectable | BORTEZOMIB | 15.00% | |
| Oncology - Injectable | bortezomib for inj | 16.00% | |
| Oncology - Injectable | BORTEZOMIB FOR INJ_BRAND | 16.00% | |
| Oncology - Injectable | COLUMVI | 10.00% | |
| Oncology - Injectable | CYRAMZA | 10.00% | |
| Oncology - Injectable | DACOGEN | 18.00% | |
| Oncology - Injectable | DARZALEX | 18.00% | |
| Oncology - Injectable | decitabine | 21.00% | |
| Oncology - Injectable | EMPLICITI | 18.00% | |
| Oncology - Injectable | ENHERTU | 10.00% | |
| Oncology - Injectable | ERBITUX | 17.75% | |
| Oncology - Injectable | EVOMELA | 18.25% | |
| Oncology - Injectable | FOLOTYN | 18.50% | |
| Oncology - Injectable | GAZYVA | 18.00% | |
| Oncology - Injectable | HALAVEN | 17.50% | |
| Oncology - Injectable | HERCEPTIN | 17.50% | |
| Oncology - Injectable | HERCEPTIN HYLECTA | 10.00% | |
| Oncology - Injectable | HERZUMA | 10.00% | |
| Oncology - Injectable | IMFINZI | 17.75% | |
| Oncology - Injectable | IMJUDO | 10.00% | |
| Oncology - Injectable | INTRON A | 19.00% | |
| Oncology - Injectable | ISTODAX | 18.00% | |
| Oncology - Injectable | IXEMPRA | 17.75% | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| Oncology - Injectable | JEMPERLI | 10.00% | |
| Oncology - Injectable | JEVTANA | 18.00% | |
| Oncology - Injectable | KADCYLA | 17.50% | |
| Oncology - Injectable | KANJINTI | 10.00% | |
| Oncology - Injectable | KEYTRUDA | 17.75% | |
| Oncology - Injectable | KHAPZORY | 10.00% | |
| Oncology - Injectable | KYPROLIS | 18.00% | |
| Oncology - Injectable | levoleucovorin calcium | 14.00% | |
| Oncology - Injectable | LUMOXITI | 10.00% | |
| Oncology - Injectable | LUNSUMIO | 10.00% | |
| Oncology - Injectable | MARGENZA | 10.00% | |
| Oncology - Injectable | MVASI | 10.00% | |
| Oncology - Injectable | MYLOTARG | 10.00% | |
| Oncology - Injectable | OGIVRI | 10.00% | |
| Oncology - Injectable | ONIVYDE | 10.00% | |
| Oncology - Injectable | ONTRUZANT | 10.00% | |
| Oncology - Injectable | OPDIVO | 17.75% | |
| Oncology - Injectable | OPDUALAG | 10.00% | |
| Oncology - Injectable | paclitaxel protein-bound | 16.00% | |
| Oncology - Injectable | PACLITAXEL PROTEIN-BOUND_BRAND | 16.00% | |
| Oncology - Injectable | PADCEV | 10.00% | |
| Oncology - Injectable | PERJETA | 17.50% | |
| Oncology - Injectable | PHESGO | 10.00% | |
| Oncology - Injectable | POLIVY | 10.00% | |
| Oncology - Injectable | PORTRAZZA | 10.00% | |
| Oncology - Injectable | POTELIGEO | 10.00% | |
| Oncology - Injectable | PROLEUKIN | 18.25% | |
| Oncology - Injectable | RIABNI | 10.00% | |
| Oncology - Injectable | RITUXAN | 18.00% | |
| Oncology - Injectable | RITUXAN HYCELA | 10.00% | |
| Oncology - Injectable | romidepsin | 15.00% | |
| Oncology - Injectable | ROMIDEPSIN_BRAND | 16.00% | |
| Oncology - Injectable | RUXIENCE | 15.00% | |
| Oncology - Injectable | RYBREVANT | 10.00% | |
| Oncology - Injectable | RYLAZE | 10.00% | |
| Oncology - Injectable | SARCLISA | 10.00% | |
| Oncology - Injectable | SYLVANT | 10.00% | |
| Oncology - Injectable | TECENTRIQ | 17.50% | |
| Oncology - Injectable | TEMODAR (INJECTABLE) | 18.00% | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| Oncology - Injectable | temsirolimus | 15.00% | |
| Oncology - Injectable | TEPADINA | 15.00% | |
| Oncology - Injectable | THYROGEN | 16.75% | |
| Oncology - Injectable | TIVDAK | 10.00% | |
| Oncology - Injectable | TORISEL | 17.75% | |
| Oncology - Injectable | TRAZIMERA | 15.00% | |
| Oncology - Injectable | TREANDA | 17.50% | |
| Oncology - Injectable | TRUXIMA | 15.00% | |
| Oncology - Injectable | valrubicin | 15.00% | |
| Oncology - Injectable | VALSTAR | 18.00% | |
| Oncology - Injectable | VECTIBIX | 17.50% | |
| Oncology - Injectable | VEGZELMA | 16.50% | |
| Oncology - Injectable | VELCADE | 17.50% | |
| Oncology - Injectable | VIDAZA | 13.50% | |
| Oncology - Injectable | VIVIMUSTA | 10.00% | |
| Oncology - Injectable | VYXEOS | 10.00% | |
| Oncology - Injectable | XGEVA | 16.25% | |
| Oncology - Injectable | YERVOY | 18.00% | |
| Oncology - Injectable | YONDELIS | 17.75% | |
| Oncology - Injectable | ZALTRAP | 17.75% | |
| Oncology - Injectable | ZEPZELCA | 10.00% | |
| Oncology - Injectable | ZIRABEV | 10.00% | |
| Oncology - Injectable | zoledronic acid_onc | 51.00% | |
| Oncology - Injectable | ZOLEDRONIC ACID_ONC_BRAND | 16.00% | |
| Oncology - Injectable | ZYNYZ | 10.00% | |
| Oncology - Oral | abiraterone acetate | MAC | |
| Oncology - Oral | AFINITOR | 17.75% | |
| Oncology - Oral | ALECENSA | 17.75% | |
| Oncology - Oral | BALVERSA | 10.00% | |
| Oncology - Oral | bexarotene cap | MAC | |
| Oncology - Oral | bexarotene gel | MAC | |
| Oncology - Oral | BOSULIF | 17.75% | |
| Oncology - Oral | BRAFTOVI | 10.00% | |
| Oncology - Oral | CABOMETYX | 16.50% | |
| Oncology - Oral | capecitabine | MAC | |
| Oncology - Oral | COMETRIQ | 10.00% | |
| Oncology - Oral | COPIKTRA | 10.00% | |
| Oncology - Oral | COTELLIC | 17.25% | |
| Oncology - Oral | DAURISMO | 10.00% | |
| Oncology - Oral | ERIVEDGE | 17.75% | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| Oncology - Oral | ERLEADA | 10.00% | |
| Oncology - Oral | erlotinib hydrochloride | MAC | |
| Oncology - Oral | everolimus_onc | MAC | |
| Oncology - Oral | FARYDAK | 17.50% | |
| Oncology - Oral | GAVRETO | 10.00% | |
| Oncology - Oral | gefitinib | MAC | |
| Oncology - Oral | GLEEVEC | 18.00% | |
| Oncology - Oral | GLEOSTINE | 16.00% | |
| Oncology - Oral | HYCAMTIN | 17.50% | |
| Oncology - Oral | IBRANCE | 18.25% | |
| Oncology - Oral | IDHIFA | 10.00% | |
| Oncology - Oral | imatinib mesylate | MAC | |
| Oncology - Oral | INLYTA | 18.00% | |
| Oncology - Oral | INQOVI | 10.00% | |
| Oncology - Oral | INREBIC | 10.00% | |
| Oncology - Oral | IRESSA | 18.25% | |
| Oncology - Oral | JAKAFI | 16.50% | |
| Oncology - Oral | JAYPIRCA | 10.00% | |
| Oncology - Oral | KISQALI | 18.00% | |
| Oncology - Oral | lapatinib ditosylate | 15.00% | |
| Oncology - Oral | lenalidomide | 10.00% | |
| Oncology - Oral | LENVIMA | 10.00% | |
| Oncology - Oral | LONSURF | 16.50% | |
| Oncology - Oral | LORBRENA | 10.00% | |
| Oncology - Oral | LUMAKRAS | 10.00% | |
| Oncology - Oral | LYNPARZA | 10.00% | |
| Oncology - Oral | MEKINIST | 17.75% | |
| Oncology - Oral | MEKTOVI | 10.00% | |
| Oncology - Oral | NERLYNX | 10.00% | |
| Oncology - Oral | NEXAVAR | 16.50% | |
| Oncology - Oral | NINLARO | 16.50% | |
| Oncology - Oral | NUBEQA | 10.00% | |
| Oncology - Oral | ODOMZO | 17.75% | |
| Oncology - Oral | ONUREG | 10.00% | |
| Oncology - Oral | pazopanib hydrochloride | 16.50% | |
| Oncology - Oral | PIQRAY | 15.00% | |
| Oncology - Oral | POMALYST | 16.50% | |
| Oncology - Oral | PURIXAN | 14.50% | |
| Oncology - Oral | RETEVMO | 10.00% | |
| Oncology - Oral | REVLIMID | 16.50% | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| Oncology - Oral | ROZLYTREK | 10.00% | |
| Oncology - Oral | RUBRACA | 16.75% | |
| Oncology - Oral | RYDAPT | 14.50% | |
| Oncology - Oral | SCEMBLIX | 10.00% | |
| Oncology - Oral | sorafenib tosylate | MAC | |
| Oncology - Oral | SPRYCEL | 19.25% | |
| Oncology - Oral | STIVARGA | 16.50% | |
| Oncology - Oral | sunitinib malate | MAC | |
| Oncology - Oral | SUTENT | 17.75% | |
| Oncology - Oral | TABRECTA | 15.00% | |
| Oncology - Oral | TAFINLAR | 17.75% | |
| Oncology - Oral | TAGRISSO | 18.25% | |
| Oncology - Oral | TALZENNA | 10.00% | |
| Oncology - Oral | TARCEVA | 17.50% | |
| Oncology - Oral | TARGRETIN | 18.00% | |
| Oncology - Oral | TASIGNA | 17.75% | |
| Oncology - Oral | TEMODAR (ORAL) | 18.25% | |
| Oncology - Oral | temozolomide | MAC | |
| Oncology - Oral | THALOMID | 16.25% | |
| Oncology - Oral | TYKERB | 17.50% | |
| Oncology - Oral | VERZENIO | 10.00% | |
| Oncology - Oral | VITRAKVI | 10.00% | |
| Oncology - Oral | VIZIMPRO | 10.00% | |
| Oncology - Oral | VOTRIENT | 17.75% | |
| Oncology - Oral | XALKORI | 17.75% | |
| Oncology - Oral | XELODA | 17.00% | |
| Oncology - Oral | XOSPATA | 10.00% | |
| Oncology - Oral | XTANDI | 17.75% | |
| Oncology - Oral | YONSA | 10.00% | |
| Oncology - Oral | ZEJULA | 10.00% | |
| Oncology - Oral | ZELBORAF | 17.75% | |
| Oncology - Oral | ZOLINZA | 17.75% | |
| Oncology - Oral | ZYDELIG | 10.00% | |
| Oncology - Oral | ZYKADIA | 17.75% | |
| Oncology - Oral | ZYTIGA | 19.25% | |
| Osteoporosis | EVENITY | 15.00% | |
| Osteoporosis | FORTEO | 16.50% | |
| Osteoporosis | PROLIA | 13.25% | |
| Osteoporosis | RECLAST | 10.50% | |
| Osteoporosis | TERIPARATIDE | 15.00% | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| Osteoporosis | teriparatide injection | MAC | |
| Osteoporosis | TYMLOS | 10.00% | |
| Osteoporosis | zoledronic acid_ost | MAC | |
| Paroxysmal Nocturnal Hemoglobinuria | SOLIRIS | 18.00% | |
| Paroxysmal Nocturnal Hemoglobinuria | ULTOMIRIS | 10.00% | |
| Phenylketonuria | KUVAN | 16.50% | |
| Phenylketonuria | PALYNZIQ | 10.00% | |
| Phenylketonuria | sapropterin dihydrochloride | MAC | |
| Psoriasis | BIMZELX | 16.50% | |
| Psoriasis | COSENTYX | 17.75% | |
| Psoriasis | ILUMYA | 10.00% | |
| Psoriasis | OTEZLA | 15.25% | |
| Psoriasis | SILIQ | 15.00% | |
| Psoriasis | SKYRIZI | 15.00% | |
| Psoriasis | SOTYKTU | 10.00% | |
| Psoriasis | STELARA | 19.50% | |
| Psoriasis | STELARA (SOLN) | 16.00% | |
| Psoriasis | STELARA IV | 10.00% | |
| Psoriasis | TALTZ | 14.75% | |
| Psoriasis | TREMFYA | 15.00% | |
| Pulmonary Arterial Hypertension | ADCIRCA | 15.75% | |
| Pulmonary Arterial Hypertension | ADEMPAS | 16.00% | |
| Pulmonary Arterial Hypertension | alyq | MAC | |
| Pulmonary Arterial Hypertension | ambrisentan | MAC | |
| Pulmonary Arterial Hypertension | bosentan | MAC | |
| Pulmonary Arterial Hypertension | epoprostenol | 40.00% | * |
| Pulmonary Arterial Hypertension | FLOLAN | 10.00% | * |
| Pulmonary Arterial Hypertension | LETAIRIS | 16.75% | |
| Pulmonary Arterial Hypertension | LIQREV | 16.50% | |
| Pulmonary Arterial Hypertension | OPSUMIT | 15.75% | |
| Pulmonary Arterial Hypertension | ORENITRAM | 15.75% | |
| Pulmonary Arterial Hypertension | REMODULIN | 16.00% | * |
| Pulmonary Arterial Hypertension | REVATIO | 17.00% | |
| Pulmonary Arterial Hypertension | sildenafil citrate | MAC | |
| Pulmonary Arterial Hypertension | tadalafil | MAC | |
| Pulmonary Arterial Hypertension | TADLIQ | 16.00% | |
| Pulmonary Arterial Hypertension | TRACLEER | 16.75% | |
| Pulmonary Arterial Hypertension | treprostinil sodium | 10.00% | * |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| Pulmonary Arterial Hypertension | TYVASO | 15.00% | |
| Pulmonary Arterial Hypertension | UPTRAVI | 16.50% | |
| Pulmonary Arterial Hypertension | VELETRI | 14.25% | * |
| Pulmonary Arterial Hypertension | VENTAVIS | 14.00% | ** |
| Pulmonary Disorders | ESBRIET | 17.25% | |
| Pulmonary Disorders | OFEV | 16.50% | |
| Pulmonary Disorders | pirfenidone | MAC | |
| Rare Disorders | CRYSVITA | 10.00% | |
| Rare Disorders | DOJOLVI | 10.00% | |
| Rare Disorders | ENSPRYNG | 10.00% | |
| Rare Disorders | LITFULO | 10.00% | |
| Rare Disorders | VIJOICE | 10.00% | |
| Rare Disorders | ZOKINVY | 10.00% | |
| Renal Disease | cinacalcet hcl | MAC | |
| Renal Disease | FILSPARI | 10.00% | |
| Renal Disease | PARSABIV | 15.00% | |
| Renal Disease | SENSIPAR | 16.25% | |
| Renal Disease | tiopronin | 16.00% | |
| Retinal Disorders | BEOVU | 10.00% | |
| Retinal Disorders | BYOOVIZ | 10.00% | |
| Retinal Disorders | CIMERLI | 10.00% | |
| Retinal Disorders | EYLEA | 17.75% | |
| Retinal Disorders | ILUVIEN | 17.75% | |
| Retinal Disorders | LUCENTIS | 19.00% | |
| Retinal Disorders | OZURDEX | 16.25% | |
| Retinal Disorders | RETISERT | 18.50% | |
| Retinal Disorders | VABYSMO | 10.00% | |
| Retinal Disorders | VISUDYNE | 13.25% | |
| Rheumatoid Arthritis | ABRILADA | 16.50% | |
| Rheumatoid Arthritis | ABRILADA_NS | 16.50% | |
| Rheumatoid Arthritis | ACTEMRA | 16.75% | |
| Rheumatoid Arthritis | ADALIMUMAB-AACF | 16.50% | |
| Rheumatoid Arthritis | ADALIMUMAB-ADAZ | 16.50% | |
| Rheumatoid Arthritis | ADALIMUMAB-ADBM | 16.50% | |
| Rheumatoid Arthritis | ADALIMUMAB-FKJP | 16.50% | |
| Rheumatoid Arthritis | AMJEVITA | 16.50% | |
| Rheumatoid Arthritis | AMJEVITA_NS | 16.50% | |
| Rheumatoid Arthritis | AVSOLA | 10.00% | |
| Rheumatoid Arthritis | CYLTEZO | 16.50% | |
| Rheumatoid Arthritis | ENBREL | 19.00% | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| Rheumatoid Arthritis | HADLIMA | 16.50% | |
| Rheumatoid Arthritis | HULIO | 16.50% | |
| Rheumatoid Arthritis | HUMIRA | 18.50% | |
| Rheumatoid Arthritis | HYRIMOZ | 16.50% | |
| Rheumatoid Arthritis | HYRIMOZ_CORDAVIS | 16.50% | |
| Rheumatoid Arthritis | IDACIO | 16.50% | |
| Rheumatoid Arthritis | INFLECTRA | 16.50% | |
| Rheumatoid Arthritis | INFLIXIMAB | 10.00% | |
| Rheumatoid Arthritis | KEVZARA | 16.50% | |
| Rheumatoid Arthritis | OLUMIANT | 10.00% | |
| Rheumatoid Arthritis | ORENCIA | 18.50% | |
| Rheumatoid Arthritis | OTREXUP | 12.00% | |
| Rheumatoid Arthritis | RASUVO | 10.25% | |
| Rheumatoid Arthritis | REDITREX | 16.50% | |
| Rheumatoid Arthritis | REMICADE | 17.50% | |
| Rheumatoid Arthritis | RINVOQ | 15.00% | |
| Rheumatoid Arthritis | SIMPONI | 18.50% | |
| Rheumatoid Arthritis | XELJANZ | 17.25% | |
| Rheumatoid Arthritis | YUFLYMA | 16.50% | |
| Rheumatoid Arthritis | YUSIMRY | 16.50% | |
| RSV | SYNAGIS | 18.75% | |
| Seizure Disorders | EPIDIOLEX | 10.00% | |
| Seizure Disorders | HP ACTHAR GEL | 16.75% | |
| Seizure Disorders | SABRIL | 17.50% | |
| Sickle Cell Disease | ADAKVEO | 15.00% | *** |
| Sickle Cell Disease | ENDARI | 10.00% | |
| Sickle Cell Disease | OXBRYTA | 10.00% | |
| Sleep Disorder | LUMRYZ | 10.00% | |
| Sleep Disorder | tasimelteon | MAC | |
| Sleep Disorder | WAKIX | 10.00% | |
| Systemic Lupus Erythematosus | BENLYSTA | 17.00% | |
| Systemic Lupus Erythematosus | SAPHNELO | 10.00% | |
| Thrombocytopenia | DOPTELET | 10.00% | |
| Thrombocytopenia | MULPLETA | 15.00% | |
| Thrombocytopenia | NPLATE | 18.00% | |
| Thrombocytopenia | PROMACTA | 18.00% | |
| Transplant | ASTAGRAF XL | 14.00% | |
| Transplant | CELLCEPT | 16.75% | |
| Transplant | cyclosporine | MAC | |
| Transplant | ENVARSUS XR | 12.00% | |

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

| Drug Therapy | Drug Name | AWP Discount | Notes |
|---|---|---|---|
| Transplant | everolimus_transplant | MAC | |
| Transplant | gengraf | MAC | |
| Transplant | mycophenolate mofetil | MAC | |
| Transplant | mycophenolic acid | MAC | |
| Transplant | MYFORTIC | 16.00% | |
| Transplant | NEORAL | 13.75% | |
| Transplant | NULOJIX | 16.75% | |
| Transplant | PROGRAF | 15.00% | |
| Transplant | RAPAMUNE | 17.00% | |
| Transplant | SANDIMMUNE | 15.25% | |
| Transplant | sirolimus | MAC | |
| Transplant | tacrolimus | MAC | |
| Transplant | ZORTRESS | 17.50% | |
| Urea Cycle Disorders | BUPHENYL | 16.25% | |
| Urea Cycle Disorders | carglumic acid | MAC | |
| Urea Cycle Disorders | OLPRUVA | 10.00% | |
| Urea Cycle Disorders | RAVICTI | 16.75% | |
| Urea Cycle Disorders | sodium phenylbutyrate | MAC | |
| Wilson's Disease | clovique | MAC | |
| Wilson's Disease | CUPRIMINE | 16.00% | |
| Wilson's Disease | DEPEN TITRA | 16.00% | |
| Wilson's Disease | penicillamine | MAC | |
| Wilson's Disease | SYPRINE | 16.00% | |
| Wilson's Disease | trientine hcl | MAC | |
| | Default Rate: | | |
| | Tier 1-2: | 19.00% | |
| | Tier 3: | 20.00% | |
| | Tier 4: | 20.50% | |
| | Tier 5: | 21.00% | |

**NOTES:**

CVS Caremark may amend the individual Specialty Drug discounts to manage the financial guarantees. The effective rate guarantees are measured individually and each reconciled annually at the Participating Group level across all Specialty Drugs dispensed by CVS Caremark Specialty pharmacy, including through the Specialty Connect program, with the exception of the following exclusions (in addition to the discount and dispensing fee exclusions):

- New to market Brand Drugs will be priced at AWP -16.50%
- New to market Generic drugs will be priced at AWP -16.50% or MAC, if applicable
- New to market Limited and exclusive distribution drugs will be priced at AWP -12.00%

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

The exclusive specialty offer includes the provision by Caremark of nurse-based rare condition care management services for Engaged Plan Participants (defined below) with the following rare conditions pursuant to the AccordantCare Specialty program established by Caremark, as may be amended by Caremark from time to time:  Crohn's Disease, Cystic Fibrosis, Gauchers Disease, Hemophilia, Lupus, Multiple Sclerosis, Rheumatoid Arthritis, Ulcerative Colitis, and Hereditary Angioedema (the 'AccordantCare Specialty Program').  Pursuant to the AccordantCare Specialty Program, Participating Group acknowledges that Caremark will utilize those Specialty Drug Claims that are filled by Caremark's specialty pharmacy, including Specialty Connect, to identify and outreach to Members that Caremark determines are likely to have one of the above listed rare conditions (each an "Eligible Plan Participant"), and Caremark may communicate with medical and other healthcare providers and any health plans providing benefits to Engaged Plan Participants.  Participating Group acknowledges that the AccordantCare Specialty Program is intended solely to provide education of, and support to, Engaged Plan Participants in the diagnosis and treatment provided by their healthcare providers. "Engaged Plan Participant" means an Eligible Plan Participant who elects to receive and receives AccordantCare Specialty Program services.

MAC: Certain dosage forms and strengths may not be included on the MAC list and shall be priced at the specialty default rate, and included in the Specialty BER and Specialty GER.

**PER DIEMS, NURSING & EQUIPMENT:**
* Remodulin, Veletri, Flolan, Epoprostenol Sodium, Treprostinil Sodium, & Zulresso for Injection: $60 per day
**Ventavis: Participating Group acknowledges and agrees an I-Neb is necessary for the administration of Ventavis.  For each I-Neb provided to Member, upon the initiation of therapy or in the event a replacement I-Neb is necessary, Participating Group shall reimburse Caremark $1,811 for each I-Neb.
*** Unless otherwise stated above:  $75 per dose


Nursing Charges:  $225.00 per visit up to 2 hours, $110.00 for each hour thereafter.  Alternatively, Caremark can refer any medically necessary nursing services to the Participating Group's contracted nursing agency, in which case nursing services will be billed separately by those agencies.


In further consideration of the fees and charges to be paid to Caremark under the Agreement, Caremark will bill any applicable nursing and equipment charges and per diems to the Member's medical benefit.  In the event it is not possible to bill such nursing and equipment charges and per diems to the Member's medical benefit or it is determined there is no coverage, Caremark shall bill Participating Group directly for any nursing and equipment charges and per diem associated with Specialty Drugs.

Routine ancillary supplies (e.g., syringes, alcohol swabs, cotton balls) are included in the Specialty Drug prices set forth in this Specialty Fee Schedule, unless otherwise indicated on in this Specialty Fee Schedule as being charged separately as part of an equipment fee or per diem.

**PRODUCT SHORTAGE:**
In the event of an industry-wide product shortage, Caremark reserves the right to adjust pricing upon notice to the Participating Group.

**CONFIDENTIALITY:**
Participating Group acknowledges and agrees that the information included is confidential, proprietary and trade secret to Caremark and will agree to protect the information from disclosure.


**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

Docusign Envelope ID: E989141Q-628C-4031-A590-21553F9A0318

**SPECIALTY CARVE-OUT:**

In the event a Participating Group (i) outsources or carves out Specialty Drug Services as outlined in this Agreement, or (ii) ceases to provide benefit sponsored coverage for Specialty Drug Services, Caremark shall, in its sole discretion, apply the administrative services; and fee outlined below effective on the date the Services are removed or "carved-out".  Any such Participating Group will be allowed to maintain access to all remaining non-Specialty components, including the contractual terms and financial guarantees for Retail and Mail services with no additional adjustments to the terms and conditions.

| Full Specialty Carve Out | $3.46 PMPM |
|---|---|

The above fee does not include integration expenses with a 3rd party. These fees will be passed to Participating Group. Caremark does not allow foundation funding support or international sourcing.

Caremark agrees to allow up to fifteen percent (15%) of total enrolled Plan Participants measured in the aggregate across all Participating Groups to pursue the Specialty Drug Services Carve-Out without adjusting or altering the underlying contractual terms and financial guarantees contained herein.  Should this fifteen percent (15%) threshold be eclipsed at any point, CVS Caremark reserves the right to adjust the contractual terms and financial guarantees in a manner necessary to return CVS Caremark to its original economic position.

**NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.**

Docusign Envelope ID: E988141D-628C-4031-A590-21E535040318

### Exhibit J
### FORM OF ADDENDUM

**Participating Group Name:**        Pella Corporation

**Participating Group Address:**    102 Main St.
                                     Pella, IA 50219-2198

**Addendum Effective Date:**        January 1, 2025

**Participating Group Pricing:**    Tier 5.1.25

1.      This Addendum ("Addendum") supplements Amended and Restated Prescription Benefit Services Agreement ("Agreement") between CaremarkPCS Health, L.L.C. ("Caremark") and Employers Health Purchasing Corporation ("EHPC") dated as of January 1, 2025. All capitalized terms used in this Addendum shall have the meaning set forth in the Agreement.

2.      The undersigned Participating Group ("Participating Group") is a Plan Participant of EHPC. Participating Group has reviewed the Agreement and desires that Caremark provide to it the products and Services described in the Agreement on the terms and conditions set forth in the Agreement and this Addendum. By signing this Addendum, Participating Group agrees to the terms and conditions of the Agreement, as may be amended or restated from time to time, including the Exhibits attached thereto, and this Addendum. Specific Plan and Service elections shall be implemented by Caremark per the Plan Design Documents completed by and between Caremark and Participating Group and/or as otherwise set forth in the Agreement.

3.      Modifications to the Master Agreement. The parties agree that, as to Participating Group only, the following provisions of the Master Agreement shall be amended and restated as follows:

(i)      Section 7.2 (Payment) is hereby amended by the deletion of the second sentence, and its replacement with the following:

"Participating Group shall pay Caremark all invoiced amounts for Claims and administrative fees within ten (10) days after Participating Group receives an invoice from Caremark."

(ii)     Section 1.10(b) of Exhibit A (Pricing Terms and Conditions) is hereby amended by the addition of the following:

"Any Claim for a Specialty LDD which is not available through the Caremark Specialty Network shall be excluded from the Specialty Network Guarantee and adjudicate at AWP – 16.50%."

(iii)    Section 6.2 (Control of Plan) is hereby amended by deleting the last sentence and replacing it as follows:

"Nothing in this Agreement shall be deemed to confer upon Caremark the status of plan administrator or fiduciary as defined in ERISA, or applicable state law, or any

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.

Docusign Envelope ID: E288141D-628C-4031-A590-31E53F040318

responsibility for the terms or validity of the Plan; provided, however, that Caremark specifically accepts fiduciary status with respect to the Appeals Program as set forth in Exhibit E, Attachment 1 to this Agreement.

(iv)  Section 6.3 (PDD) is hereby amended by deleting the last sentence of subsection (b) and replacing it as follows:

"In addition, Participating Group shall notify Plan Participants of any Plan design changes to the extent and within the timeframes required by applicable law."

(v)  Section 13.15 (Compliance with the Consolidated Appropriations Act, 2021) is amended by adding the following new paragraph related to compliance with the nonquantitative treatment analysis requirements of Section 203 of the CAA:

"In addition, Caremark shall provide relevant data in order to assist Participating Group in connection with the NQTL analysis requirements that apply to the prescription drug benefits provided under the Plan as set forth in Section 203 of the CAA and the implementing regulations and guidance."

4.    This Addendum, together with the Agreement constitutes the entire agreement between the parties with respect to the subject matter herein and supersedes all prior understandings, agreements, contracts or arrangements between the parties, whether oral or written.

Pella Corporation:

By: _____ Lance Traster _____
         13DE5E8FCD0E48B...

Name: ____ Lance Traster ____

Title: ____ Director Total Rewards & HR Technology ____

Date: ____ 4/10/2025 ____

NOT FOR DISTRIBUTION. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL, PROPRIETARY AND CONSTITUTES TRADE SECRETS OF CAREMARK.